James H. Power
Warren E. Gluck
Tiana M. McLean
Sean P. Barry
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: (212) 513-3494
Fax: (212) 385-9010
james.power@hklaw.com
warren.gluck@hklaw.com
tiana.mclean@hklaw.com
sean.barry@hklaw.com



ATTORNEYS FOR APPLICANT
HORNBEAM CORPORATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE THE APPLICATION OF HORNBEAM
CORPORATION

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782

Civil Action No. 14-Misc. _____

## MEMORANDUM OF LAW IN SUPPORT OF AN
## *EX PARTE* APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

Applicant, Hornbeam Corporation, a corporate organized under the laws of Panama, including any assignee or successor-in-interest ("**Hornbeam**"), by and through its undersigned counsel, Holland & Knight LLP, and for its memorandum of law (this "**Memorandum**") in support of an application for discovery pursuant to 28 U.S.C. § 1782 (the "**1782 Application**"), states as follows:

## I.     PRELIMINARY STATEMENT

This Memorandum is offered in support of Hornbeam's 1782 Application seeking discovery with respect to witnesses and documents located in the United States and in this Judicial District for use in the following foreign proceedings:

(i) the reasonably contemplated litigation against Halliwel Assets Inc. ("**Halliwel**"), and its other shareholders Marigold Trust Company Limited ("**Marigold**"), a corporation organized under the laws of Jersey, and Mr. Panikos Symeou ("**Symeou**"), as agent/trustee for Mr. Igor Kolomoisky ("**Kolomoisky**") for violation of the BVI Business Companies Act of 2004, including, without limitation, an accounting, valuation, shareholder oppression, and buyout, that will be filed in the Commercial Division of the High Court of Justice, British Virgin Islands (the "**BVI Shareholder Action**");

(ii) the reasonably contemplated litigation by Mr. Vadim Shulman ("**Shulman**") or one of the entities to which he is the ultimate beneficial owner, like Hornbeam, against Symeou, in both his capacity as the Director of Halliwel and Secretary of Warren Steel Holdings, LLC ("**Warren Steel**"), in a jurisdiction currently unknown,[1] for breach of contract, fiduciary duties, and other duties associated with his positions, as well as for other extra-contractual liabilities (the "**Symeou Action**"); and

(iii) the reasonably contemplated litigation by Shulman, or one of his entities to which he is the ultimate beneficial owner, against Kolomoisky and/or Mr. Genady Bogolubov ("**Bogolubov**"), or one or more of their entities to which either or both are the ultimate beneficial owner(s), in a jurisdiction currently unknown for breach of the Joint Venture

---

[1] While the proper place of jurisdiction for this reasonably contemplated claim is currently unknown, it is likely that this claim will be pursued in either the BVI or Cyprus or both.

Agreement (defined below) arising from Kolomoisky's and Bogolubov's failure to compensate Shulman for his initial investments, including, without limitation, Shulman's purchase of the Steel Factory (defined below) for $13.5 million and his further roughly $15 million investment in the Steel factory, as Kolomoisky and Bogolubov had agreed (the "**Joint Venture Action**").

The term "**Actions**" refers to the Shareholder Action, the Symeou Action, and the Joint Venture Action jointly.

While there are multiple entities and individuals involved in the interrelated actions, this dispute is really between three individuals: Shulman, Kolomoisky, and Bogolubov (the "**Principals**").  In 2001, Shulman knew of an investment opportunity in a steel factory, including its equipment and associated real property, in Warren, Ohio (the "**Steel Factory**"), and he shared this opportunity with Kolomoisky and Bogolubov (the "**Other Ultimate Beneficial Owners**").

The Principals subsequently agreed to enter into a Steel Factory-related joint venture (the "**Joint Venture**").  It was the overall idea that the Principals would act for the benefit of the Joint Venture and contribute and share in the aggregate of all investments, all profits, and all losses to which the three agreed (the "**Joint Venture Agreement**").  Relying on the Joint Venture Agreement, Shulman initially allocated roughly $28.5 million on behalf of the Joint Venture into the Steel Factory.

The Steel Factory was later transferred to Warren Steel, the entity which is the subject of this dispute, which is a wholly owned subsidiary and the sole asset of Halliwel.  Hornbeam, which is ultimately beneficially owned by Shulman, is a one-third owner of Halliwel. Kolomoisky and Bogolubov each ultimately beneficially own the other two-thirds of Halliwel. Accordingly, the Principals ultimately beneficially own Halliwel, one-third each.

Despite their obligation to do so, the Other Ultimate Beneficial Owners never compensated Shulman for his initial $28.5 million investment.  Instead of compensating Shulman, the Other Ultimate Beneficial Owners appear to be using entities and individuals under their control to execute an elaborate self-dealing scheme focused on exploiting Warren Steel.  It appears that the Other Ultimate Beneficial Owners are forcing Warren Steel to transact with related parties on terms unfavorable to Warren Steel and to accept ill-advised on-demand loans secured by Warren Steel's assets and revenues from parties related to Kolomoisky, Bogolubov, or Korf, but not Shulman.  Moreover, the Other Ultimate Beneficial Owners kept Shulman and Hornbeam in the dark as to the extent of these interested transactions and related-party loans totaling roughly $62 million now enjoy security in Warren Steel alleged to be in priority to other unrelated parties, which may have potentially legitimate interests.

In August 2014, after years of investigation and requesting information, Hornbeam received a limited disclosure of financial documentation related to Warren Steel, which was reviewed by FTI Consulting LLP ("**FTI**"), a financial forensic and litigation consultant.

FTI determined that the limited disclosure was incomplete and appeared to contain significant anomalies. FTI notes that there are significant discrepancies in terms of Warren Steel's books and ledgers, ranging from unbalanced debits and credits, to suspicious round-number payments to "related" counterparties including Korf personally, and most importantly, a potential undervalue transfer scheme (selling goods to related parties for less than their true value and/or buying goods from related parties for more than their true value as a means of covertly transferring funds).

Accordingly, it appears that Kolomoisky and Bogolubov have breached the Joint Venture Agreement and are manipulating Warren Steel, Halliwel's sole asset, for their benefit to the

4

detriment of Shulman and Hornbeam.  However, more information is necessary to determine the extent of their scheme and its specific details before a fair value of Hornbeam's shares can be determined.

In 2013, Georgian American Alloys, Inc., CC Metals and Alloys, LLC, Felman Production, LLC, Felman Trading, Inc., Georgian Manganese, LLC, Vartsikhe 2005, LLC, Optima Industrial Management, LLC the ("**U.K. Claimants**") commenced an action against White & Case LLP (England And Wales) and White & Case LLP (USA) and obtained an order enjoining White & Case LLP from representing a party in an action against Kolomoisky and Bogolubov because "they own directly or indirectly the joint majority of the share capital of the [U.K.] Claimants" (the " **U.K. Decision**").  *See* Power Declaration, Ex. 3, ¶¶ 92, 97.

According to the U.K. Order, White & Case LLP was engaged to implement a corporate restructuring under which the **U.K. Claimants** would be brought into the ownership of a new holding company to be known as Georgian American Alloys, Inc. ("GAA") which would be the subject of an IPO."  This is extremely relevant because the U.K. Claimants are all entities related to Kolomoisky, Bogolubov, and/or Korf and many of the U.K. Claimants provided related-party loans to Warren Steel.  The validity of these related-party loans is an important subject of this discovery request.

According to the U.K. Decision, the Professional Service Providers received and/or compiled the related-parties IPO-related documents:

> From 30 June 2011, White & Case was granted access to a data-room maintained by MerrillCorp which contained hundreds of documents relating to the Claimants and around June 2011 White & Case also established a file transfer protocol ("FTP") site which uploaded all of the due diligence files it received relating to Georgian matters.

> As part of the Optima Engagement, White & Case drafted a Form S-1 for GAA which it was intended should be filed to enable GAA to register its securities with the United States Securities & Exchange Commission ("SEC"). The draft Form S-1 contained a significant amount of information and data about GAA and its ferroalloy subsidiaries, including information about the 'risk factors' affecting GAA's operations, related party transactions, tax issues for owners, and the company's future business strategies. In order to draft this document, White & Case reviewed privileged communications, detailed financial and accounting documentation, related-party transactions and agreements for the procurement of raw materials. White & Case also reviewed reports prepared by Price Waterhouse Coopers, liaised with KPMG in relation to the Georgian Manganese acquisition and scrutinised valuation reports.

Power Decl., Ex. 3, ¶¶ 21-22.  This non-privileged information should clearly include the related-party loans that the U.K. Claims made to Warren Steel.  Considering the information is already uploaded and compiled via FTP, it should not be burdensome to produce to Hornbeam.

Under the circumstances, the following categories of evidence will be relevant, important and useful to Hornbeam's claims in the Actions, all of which evidence is located in the United States (in terms of both documents and witnesses):

(i) the valuation of Warren Steel, including its revenues, expenses, production capabilities, liabilities, and assets;

(ii) the circumstances surrounding the loans made by the Related Party Lenders;

(iii) the source of any funds utilized to make these loans;

(iv) the use (or misuse) of any such funds by Warren Steel and its management;

(v) the precise nature and specifics of the transactions in which Warren Steel is engaged, including but not limited to any transactions with entities "related" to Korf and the Other Ultimate Beneficial Owners of Warren Steel;

(vi) the current claims held by Warren Steel against third parties, including but not limited to claims Warren Steel may hold against fraudulent transferees and Warren

Steel's management arising from, *inter alia*, self-dealing and breach of fiduciary duty; and

(vii) the circumstances by which Kolomoisky invested in Warren Steel on behalf of Shulman including the source of funds which include funds due to Shulman from Kolomoisky from previous business transactions.

Hornbeam's Application seeking discovery in aid of the Actions satisfies all of the requirements of § 1782 and the Supreme Court's discretionary factors.  Under 28 U.S.C. § 1782, an applicant may be granted discovery in the United States in aid of a foreign proceeding within reasonable contemplation if the applicant is an interested party to the contemplated proceeding and if the information sought is located within the district.

It is clear that discovery concerning U.S.-based Warren Steel, its U.S.-based related-party lenders, and its U.S.-based related-party business partners is both relevant and crucial to Hornbeam prior to initiating further litigation in the BVI or elsewhere.

## II.       JURISDICTION AND VENUE

Jurisdiction is proper pursuant to Title 28 United States Code Section 1782 as this Application is for discovery involving documents located within the Southern District of New York, discovery necessary to assist Applicant in its foreign court proceeding.  At all times material herein, Applicant is and was a foreign business entity organized under the laws of a foreign state. Venue in the Southern District of New York is appropriate pursuant to Title 28 United States Code Section 1782 because the discovery is being sought from corporations within this judicial district, along with the documents presently located in this jurisdiction.

## III.   FACTUAL BACKGROUND

The facts giving rise to this Application are set forth in detail in the declarations of Vadim N. Shulman, dated December 17, 2014 (the "**Shulman Declaration**"), Fabrizio N. Campanile, dated December 16, 2014 (the "**Campanile Declaration**"), Michael J. Fay, dated December 18, 2014 (the "**Fay Declaration**"), and James H. Power, dated December 19, 2014 (the "**Power Declaration**"), as well as the exhibits attached thereto.

For the sake of clarity a brief background to the to-be-filed foreign litigation is provided here.

### A.   *THE STEEL FACTORY RELATED JOINT VENTURE AND THE JOINT VENTURE AGREEMENT*

While there are multiple entities and individuals involved in the interrelated Actions, this dispute is really between the Principals.[2]  In 2001, Shulman knew of an investment opportunity in the Steel Factory, and he shared this opportunity the Other Ultimate Beneficial Owners.  The Principals subsequently agreed to enter into a Steel Factory-related Joint Venture.  Shulman Decl. ¶ 7-8.  Principals agreed that the Joint Venture's original objective was to disassemble the Steel Factory and relocate it to the Ukraine.  Shulman Decl. ¶ 12.

The Principals agreed in the Joint Venture Agreement that loans and investments would be equally contributed and in the event of an approved loan or investment made by one of the Principals, the other two would contribute equally.  It was the overall idea that the Principals

---

[2] The Principals are each wealthy international businessmen who are the ultimate beneficial owners of multiple entities in multiple countries.  As such, the Principals' business transactions are often carried out through one or more entities, which makes following and understanding the transactions difficult.  For clarity, throughout the Application, mentioning a Principal will refer to both the individual and/or the entities the Principal used to carry out a particular transaction.

would act for the benefit of the Joint Venture and contribute and share in the aggregate of all investments, all profits, and all losses to which the three agreed. Shulman Decl. ¶ 11.

Relying on the Joint Venture Agreement, Shulman initially allocated roughly $28.5 million[3] on behalf of the Joint Venture into the Steel Factory. Shulman Decl. ¶ 13. The Principals formed Warren Steel according to the Joint Venture Agreement, each Principal with a one-third membership, and later transferred the Steel Factory to Warren Steel.

Around 2006, the Principals jointly determined to alter the Joint Venture's objective to restarting the Steel Factory's operations in Warren, Ohio. In support of the Joint Venture's new objective, the Principals jointly agreed to open a $90 million credit line, $30 million each, in Divot Enterprises Limited ("**Divot**"), an entity controlled by Kolomoisky, for the benefit of Warren Steel.   Shulman Decl. ¶ 16-17.

## B.      THE FORMATION OF HALLIWEL, THE INVESTMENT AGREEMENT, AND THE CAPITALIZATION OF SHAREHOLDER LOANS INTO EQUITY IN HALLIWEL

On January 5, 2006, Halliwel, a BVI Company, was formed. Campanile Decl. ¶ 38. Afterwards, the above-described debt in Warren Steel was restructured to equity in Halliwel, with one-third attributable to each Principal. Of the $90 million credit line, $86,679,998.05 has been drawn down, of which $84,391,551,40 went to the benefit of Warren Steel. The Principals assigned their membership interests, totaling one hundred percent ownership, in Warren Steel to Halliwel and converted the drawn down amount into equity of Halliwel, in equal parts, for the ultimate benefit of the Principals, including Shulman. Campanile Decl. ¶ 8. Halliwel has no other assets. As such, Halliwel is the one hundred percent owner of Warren Steel, its sole asset.

---

[3] This amount is the sum of the initial purchase of the Steel Factory for $13.5 million and roughly $15 million for initial Steel Factory-related expenses.

Halliwel's shares are ultimately beneficially owned by the Principals, one-third each. However, Halliwel has three nominee shareholders, each with a one-third interest: (i) Hornbeam; (ii) Marigold, of which Bogolubov is the ultimate beneficial owner; and (iii) Symeou, as trustee for Kolomoisky. Hornbeam holds its one-third shares in Halliwel as nominee for Bracha Foundation ("**Bracha**"). Shulman is the settlor and first beneficiary of Bracha. Accordingly, Shulman is the ultimate beneficial owner of one-third of Halliwel. Campanile Decl. ¶ 42-44.

Despite their obligation to do so, the Other Ultimate Beneficial Owners never compensated Shulman for his initial $28.5 million investment. Campanile Decl. ¶ 35. As such, the Other Beneficial Owners breached the Joint Venture Agreement and this forms the basis of the Joint Venture Action.

Instead of compensating Shulman, the Other Ultimate Beneficial Owners appear to be using entities and individuals under their control to execute an elaborate self-dealing scheme focused on exploiting Warren Steel. It appears that the Other Ultimate Beneficial Owners are forcing Warren Steel to transact with related parties on terms unfavorable to Warren Steel and to accept ill-advised on-demand loans from related parties that are secured in Warren Steel. Campanile Decl. ¶ 79. Moreover, the Other Ultimate Beneficial Owners are keeping Shulman and Hornbeam in the dark as to the extent of these interested transactions and related-party loans totaling roughly $62 million now enjoy security interest in Warren Steel's assets and revenues. Campanile Decl. ¶ 16.

## C.  THE MALFEASANCE INVESTIGATION AND THE DISCOVERY OF THE RELATED PARTY LOANS

In 2012, Shulman was informed of the existence of only roughly $18 million of related-party loans, which was planned to be converted in the same manner of the original capitalization

of the Divot loans into equity of Halliwel, one-third each for the ultimate benefit of the Principals. However, this debt re-capitalization never occurred.

It was later discovered that the actual amount of the related-party loans was much greater than the amount voluntarily disclosed.  Campanile Decl. ¶ 11.  Parties related to the other Principals, but not Shulman, have made loans to Warren Steel in excess of $106 million.  . Campanile Decl. ¶ 9.  It is unclear how this occurred because pursuant to Warren Steel's Operating Agreement, the express consent of its member Halliwel was required for Korf as president of Warren Steel to enter into transactions over $100,000, and there is no evidence that such consent was ever given.  Campanile Decl. ¶ 14.

The "related" or "connected" parties are Mordechai Korf ("**Korf**"), the President of Warren Steel, and the other entities that are admittedly owned or controlled by Korf, Kolomoisky, or Bogolubov, and their affiliates, including, but not limited to, the following:

> Divot;
> 5251 36th Street LLC;
> CC Metal and Alloys LLC;
> Felman Trading, Inc.;
> Mordechai Korf;
> Optima Acquisitions, LLC;
> Optima Fixed Income LLC;
> Optima Group LLC;
> Optima International of Miami, Inc.;
> Optima Ventures, LLC;
> Querella Holdings Limited; and
> Georgian American Alloys, Inc.

Campanile Decl. ¶ 10.

In respect of all related-party loans, Korf executed the loan documents on behalf of both the lenders and the borrower, Warren Steel.  These lenders were nominally owned by Korf and ultimately beneficially owned by the Other Ultimate Beneficial Owners - however, not by

Shulman.  In some of the agreements Korf even appears personally as a lender to Warren Steel.

Campanile Decl. ¶ 13.

### D.  THE COVERT RESTRUCTURING OF WARREN STEEL'S DEBTS AND THE PROPOSED BUT NEVER HELD EXTRAORDINARY GENERAL MEETING

The magnitude and the intent of this long-running, self-dealing, debt-accumulation scheme was uncovered based on the documents provided on August 4, 2014 in connection with a proposed debt-restructuring of Warren Steel.  Campanile Decl. ¶ 17.  On August 1, 2014 Hornbeam was made aware of what was purported to be a *proposed* complex debt-restructuring agreement by an email included a Shareholder Notice setting an extraordinary general meeting ("**EGM**") to be held on August 8, 2014 in order to approve the *proposed* restructuring agreement.  Campanile Decl. ¶ 19.  Hornbeam was told that the purpose of the extraordinary general meeting was to approve the debt-restructuring agreement, whereby Warren Steel's related-party lenders would obtain security in Warren Steel.

Upon request for additional information concerning the debt-restructuring, Hornbeam ultimately received approximately 250 pages.  Campanile Decl. ¶ 20.

The EGM was postponed multiple times at Hornbeam's request as there was insufficient information to make an informed decision concerning the *proposed* restructuring.  Campanile Decl. ¶ 21.  Hornbeam later received a limited disclosure of financial documentation related to Warren Steel's financials on August 27, 2014, which FTI Consulting LLP ("**FTI**"), a financial forensic and litigation consultant, determined was incomplete and appeared to contain significant anomalies.  Campanile Decl. ¶ 21.

### E.  BVI LIQUIDATION PROCEEDINGS

Finally, Hornbeam's request for an additional EGM postponement was denied.  To prevent the approval of this oppressive, unfairly discriminatory, and unfairly prejudicial debt-

restructuring agreement, Hornbeam sought an interim injunction in the BVI to prevent the an extraordinary general meeting of the shareholders of Halliwel and the approval of the debt-restructuring. Campanile Decl. ¶ 22.

Proceedings were commenced in the BVI Commercial Court (the "**BVI Court**") in Matter No. BVIHC(COM) 2014/105 (the "**Injunction Proceedings**") to enjoin the extraordinary general meeting so that there would be time for Hornbeam to evaluate an assess the proposed debt restructuring. On 29 August 2014, an application was issued for an urgent ex parte injunction by Hornbeam against Halliwel, its director, Symeou, and Marigold. The Injunction Proceedings were issued on the same day. The injunction sought was granted on 29 August 2014 (the "**Injunction**").

## F.   *HALLIWEL, MARIGOLD, AND SYMEOU CONCEALED MAJOR CORPORATE ACTION FROM HORNBEAM PRIOR TO AND DURING HORNBEAM'S EMERGENCY BVI LITIGATION*

However, during the course of the respondents' opposition to the injunction, Hornbeam learned that the proposed debt restructuring had already been passed and approved by Symeou and Warren Steel's management, without being placed for consideration at the EGM, which meeting never occurred. Campanile Decl. ¶ 23. As such, the Injunction Claim was dismissed as moot on 13 October 2014.

Hornbeam then commenced proceedings in the BVI Court entitled *In the Matter of Halliwel Assets Inc.*, Matter No. BVIHC (COM) 2014/134 (the "**BVI Liquidation Proceedings**"). The BVI Liquidation Proceedings were commenced by Originating Application filed on 10 October 2014 seeking the appointment of a liquidator of Halliwel (the "**Originating Application**"). On the same day, an Ordinary Application was filed by which Hornbeam sought the appointment of a provisional liquidator over the assets of Halliwel. The Ordinary Application

was dismissed at a hearing on 13 October 2014. The Originating Application was never listed or heard.  Fay Decl. 8.

Due to the lack of adequate disclosure regarding the underlying claims, the BVI Liquidation Proceedings have been withdrawn by consent between the parties.  Hornbeam is free to issue a further Originating Application.  Fay Decl. ¶ 11.

## G.    THE UNILATERAL AND CLANDESTINE APPROVAL OF THE DEBT-RESTRUCTURING AGREEMENT

Despite Halliwel's agreement to postpone the EGM on multiple occasions in August, and multiple communications made by Symeou and/or Halliwel related to the EGM, it was not until September 2014, while the injunction application was being litigated, that Hornbeam, to its own consternation, was informed of the injunction that the resolutions related to the debt-restructuring agreement, which were to be submitted for approval at the EGM of Halliwel originally noticed for August 8, 2014, had _already_ been "passed" by the Unanimous Written Consent of the Sole Member of Warren Steel on August 1, 2014.  Campanile Decl. ¶ 23.

Clearly, this action was taken without the knowledge and consent of Hornbeam and/or Shulman and without any EGM of Halliwel taking place, despite the notice.  Campanile Decl. ¶ 24.  Most disturbingly, under the terms of the proposed debt-restructuring agreement, the new and ratified loans to Warren Steel were styled "on demand" and could be called in at any time at the sole discretion of the related-party lenders. Campanile Decl. ¶ 25.

## H.    THE FTI CONSULTING REPORT: WARREN STEEL'S RECORDS ARE "INCOMPLETE" AND RIFE WITH "SIGNIFICANT ANOMALIES," "INCONSISTENCIES," AND "RELATED PARTY" TRANSACTIONS

In addition to the related-party loans, it appears that the Other Ultimate Beneficial Owners are manipulating Warren Steel by causing it to participate in a price fixing scheme through related-party transactions.  FTI reviewed the information that was provided to Hornbeam

and  made clear in its report that Warren Steel's records are incomplete.  Even worse, the records

that were provided are rife with significant anomalies, inconsistencies, and "related party"

transactions.  Campanile Decl. ¶ 21.  Many of the business transactions in which Warren Steel

appears to engage are with related parties.  In particular, and as set forth in the preliminary

forensic analysis report produced by FTI, there are significant discrepancies in terms of Warren

Steel's books and ledgers, ranging from unbalanced debits and credits, to suspicious round-

number payments to "related" counterparties including Mr. Korf personally, and most

importantly, a potential undervalue transfer scheme (selling goods to related parties for less than

their true value and/or buying goods from related parties for more than their true value as a

means of covertly transferring funds).  Campanile Decl. ¶ 138.  On their face, these activities

suggest profits which would have been earned by Warren Steel were wrongfully diverted to

related parties to the detriment of Warren Steel, Halliwel, as sole owner of Warren Steel, and

Shulman. Campanile Decl. ¶ 139.

## I.     THE OTHER ULTIMATE BENEFICIAL OWNERS USE WARREN STEEL AND THE RELATED PARTIES FOR THEIR BENEFIT AND TO SHULMAN'S DETRIMENT

The actions of Kolomoisky, Bogolubov and/or Korf, and the entities controlled by them

have minimized, if not eliminated, the ability of Shulman to get a return on his initial investment.

The value of the shares have significantly decreased by the heavy burden of the restructured debt

of Warren Steel and especially by granting a priority secured interest in Warren Steel to the new

loans in the amount of $25 million in favor of related parties.  Campanile Decl. ¶ 26.

While this depreciates all share value, the interests of the Other Ultimate Beneficial

Owners are still protected by their security interests and their ownership of the lenders.

Additionally, through the related party "on-demand" loans secured in the majority of Warren

Steel's assets, the Other Ultimate Beneficial Owners have enormous control over Warren Steel.
But Hornbeam has no such protection and is purely the victim. Campanile Decl. ¶ 27.

The BVI Shareholder Action and the Symeou Action ultimately arise from the Other
Beneficial Owner's self-dealing scheme, including the debt-restructuring, the related-party loans,
and the related-party transactions.

## IV.    ARGUMENT

### A.    *28 U.S.C. § 1782 PROVIDES FOR DISCOVERY IN AID OF THE REASONABLY CONTEMPLATED FOREIGN ACTIONS*

The basis for this *ex parte* Application is 28 U.S.C. § 1782 ("Section 1782"). "First, it is
neither uncommon nor improper for district courts to grant applications made pursuant to § 1782
ex parte." *Gushlak v. Gushlak*, 486 Fed. Appx. 215, 217 (2d Cir. 2012).

Section 1782 authorizes a United States District Court, upon the application of an interested
person, to order a person residing in the district to give testimony or produce documents for use in
a foreign proceeding:

> The District Court of the district in which a person resides or is
> found may order him to give his testimony or statement or to
> produce a document or other thing for use in a proceeding in a
> foreign or international tribunal, including criminal investigations
> conducted before formal accusations.  The order may be made
> pursuant to a letter rogatory issued, or request made, by a foreign or
> international tribunal or upon the application of any interested
> person and may direct that the testimony or statement be given, or
> the document or other thing be produced, before a person appointed
> by the court.

28 U.S.C. § 1782(a).

Whether to grant this Application for discovery pursuant to 28 U.S.C. § 1782 is within this
Court's discretion. *In re Application of Aldunate*, 3 F.3d 54, 62 (2d Cir. 1993), *cert. denied*,
510 U.S. 965 (1993).

## B.      *HORNBEAM SATISFIES THE STATUTORY REQUIREMENTS OF 28 U.S.C. §* *1782.*

The United States Supreme Court has interpreted Section 1782 as having a broad application. *Intel Corp. v Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004). In determining that Section 1782 authorizes a federal district court to provide discovery assistance, the Supreme Court specifically rejected the multiple limitations that Intel attempted to inject into the interpretation of the statute. *Intel*, 542 U.S. at 256. Instead, the Supreme Court adopted a broad and liberal interpretation of the Statute and provided guidelines for the future application of the statute by federal district courts. *Id.*

Hornbeam satisfies each of the requirements of 28 U.S.C. §1782 and those set forth by the Second Circuit in *Aldunate*. *Id.* In *Aldunate* the Second Circuit stated of Section 1782 that:

> [T]he statutory language is unambiguous in its requirements: (1) the person from whom discovery is sought must reside in or be found in the district of the district court to which the application is made, (2) the discovery must be "for use in a proceeding in a foreign or international tribunal," and (3) the application must be made "by a foreign or international tribunal" or by "any interested person.

3 F.3d at 58 (quoting 28 U.S.C. §1782).

Thus, the Court may enter an Order allowing discovery for use in the contemplated foreign Actions. Specifically, Hornbeam is an interested person to the Actions; the persons or entities with possession, custody and/or control of the discovery sought reside in or are found within this District; and the evidence is sought for use in the contemplated foreign Actions, which will be held before a foreign tribunal.

### *Hornbeam, the Applicant, is an interested person to the Actions*.

Hornbeam, as a holder of one-third of Halliwel's shares and potential Claimant in the contemplated Actions, is clearly an "interested person" as that term is used in 28 U.S.C. § 1782.

See *In re Application of Malev Hungarian Airlines*, 964 F.2d 97, 101 (2d Cir. 1992), *cert. denied*, 506 U.S. 861 (1992).  Corporations and business entities qualify as a "person" under Section 1782, as the United States Code defines a "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  1 U.S.C. § 1.

The Court's decision in *Intel* highlights the broad applicability of this standard.  The Supreme Court recognized the definition of an interested party to be any person who "possess[es] a reasonable interest in obtaining [judicial] assistance."  *Intel*, 542 U.S. at 256.  Here, Hornbeam has already commenced an action regarding this dispute that was withdrawn by consent and it further contemplates bringing the Actions.  The BVI Liquidation Proceeding was withdrawn due to the lack of adequate disclosure and transparency, which only supports this Application.  As such, Hornbeam clearly possesses a reasonable interest in obtaining the assistance requested.

### *The persons or entities with possession, custody and/or control of the discovery sought reside in or are found within this District.*

In addition, the New York banks and the professional service providers "reside" or are "found" in this Judicial District.  A company is found where it is incorporated, headquartered or where it is engaged in "systematic and continuous activities."  *In re Godfrey*, 526 F. Supp. 2d 417, 422 (S.D.N.Y. 2007) (citation omitted).  Hornbeam seeks the production of documents by Bank of America N.A.; Bank of NY Mellon; BNP Paribas SA; Citibank N.A.; Commerzbank AG; Deutsche Bank AG; HSBC Bank (USA) NA; JPMorgan Chase Bank N.A.; Royal Bank of Scotland PLC; Standard Chartered Bank; UBS AG; Wells Fargo Bank, N.A. (hereinafter collectively referred to as "**New York Banks**") and White & Case LLP, KPMG LLC, PricewaterhouseCoopers LLP (collectively, the "**Professional Service Providers**").

Each of the New York Banks and Professional Service Providers have an office in the District and maintains the records requested.  *See* Power Decl.  Moreover, responses to past

18

subpoenas to New York Banks, these types of records have been produced, without objection, as early as two weeks after receipt of the subpoena.  Hornbeam anticipates serving the New York Banks and the Professional Service Providers with subpoenas in this District upon the issuance of an order by the Court authorizing the discovery assistance requested.

### *Discovery is sought for use in the contemplated foreign Actions, which will be held before one or more foreign tribunal.*

Hornbeam seeks discovery "for use in a proceeding in a foreign or international tribunal". *Aldunate*, 3 F.3d at 58 (quoting 28 U.S.C. §1782).  As the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) explained, "the 'proceeding for which discovery is sought under §1782(a) must be within reasonable contemplation, but need not be 'pending' or 'imminent'." *Id* at 243.  As Fabrizio N. Campanile, Swiss counsel to Hornbeam and Shulman, and Michael John Fay, BVI counsel to Hornbeam, explain in their accompanying declarations, Hornbeam plans to initiate the Actions after obtaining sufficient discovery to support its claims.

In *Intel*, the Supreme Court confirmed a low threshold for satisfying the "foreign or international tribunal" requirement by concluding that the Directorate General (i.e., a governmental investigative body and not a court) is a "tribunal" for the purposes of satisfying the requirements of § 1782.  The Court also stated that "[t]he term 'tribunal'… includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts." *Intel*, 542 U.S. at 248.  In light of the expansive definition of the term "tribunal," a BVI Court proceeding clearly constitutes a "proceeding in a foreign or international tribunal."

In *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), the Supreme Court relied on the legislative history of the statute to hold that a foreign proceeding need not be pending

in order for Section 1782(a) to provide judicial assistance. *Id.* at 258.  In fact, the Court expressly rejected the previous view held by the Second Circuit that a proceeding must be "imminent- very likely to occur and very soon to occur." *Id.* at 259 (rejecting *In re Ishihara Chemical Co.*, 251 F.3d 120, 125 (2d Cir. 2001)).  Rather, the Court held that the proceeding must only be within "reasonable contemplation." *Id.*

Since *Intel*, several District Courts have followed the Supreme Court's ruling that 28 U.S.C. §1782(a) allows for discovery assistance to proceedings which have not yet been filed. *See e.g.,* *In re Wilhelm*, 470 F.Supp.2d 409, 410-11 (S.D.N.Y. 2007); *In re Marano*, No. 09-80020, 2009 WL 482649, *2 (N.D.Cal. Feb. 25, 2009) (in the civil proceeding context).  Hornbeam demonstrates that the to-be-filed Actions are well within reasonable contemplation.  Indeed, Hornbeam has already commenced a proceeding, which was withdrawn by consent due to lack of disclosure and transparency, related to this dispute.

Also, each and all of the reasonably contemplated Actions will similarly be brought before courts, in the BVI or elsewhere, which are likewise considered foreign tribunals within the meaning of 28 U.S.C. §1782.

### No Other Factors Weigh Against Allowing Discovery

In addition to satisfying the requirements of *Aldunate*, 3 F.3d at 58, there are no factors which would argue against allowing the discovery.  In *Malev*, the Second Circuit emphasized that the goals of Section 1782 should be considered in deciding motions brought under the statute. *Malev*, 964 F.2d at 100.  These goals of Section 1782 are:

> [T]win aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign courts by example to provide similar means of assistance to our courts.

*Id.*  Both these aims will be fulfilled by granting the requested discovery.  The discovery sought will assist Hornbeam in the Actions.  According to Hornbeam's BVI counsel, Mr. Fay, "there is no rule of BVI evidence that would prevent discovery obtained under 28 U.S.C. § 1782 being used in BVI proceedings "  Fay Decl. at 28.

Thus, the goals of the statute will be accomplished through granting this application.  Given the holdings in *Aldunate* and *Malev*, it must be concluded that a Section 1782 application should be granted where, as here, an applicant has met the express requirements of the statute and where the discovery will achieve the goals set by the statute's enactment.  *Aldunate*, 3 F.3d at 58; *Malev*, 964 F.2d at 100.

This is specifically true given Hornbeam's contemplation of the Actions, and Hornbeam's need to satisfy a heightened pleading standard in the BVI, which does not allow for non-party discovery.

## C.    *HORNBEAM ALSO SATISFIES INTEL'S DISCRETIONARY FACTORS*

In *Intel*, the Court identified four factors that bear consideration in ruling on a Section 1782 request.  While the factors are not exhaustive, the Court stated that a court ruling on a Section 1782 request should consider: 1) whether the person from whom discovery is sought is a participant in the foreign proceeding; 2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government, court, or agency to federal-court judicial assistance; 3) whether the Section 1782(a) request conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States; 4) whether the discovery requests are unduly intrusive or burdensome.  *Intel*, 542 U.S. at 264-65.

Granting Hornbeam's request for relief is consistent with the guidance provided by the *Intel* court since neither New York Banks nor the Professional Service Providers will be parties

to or participants in the Non-U.S. Actions.  As such, Hornbeam would be unable to obtain discovery from the New York Banks or the Professional Service Providers in the BVI.

The nature of the Actions does not implicate any factor or policy that would weigh against granting Hornbeam's request.  Instead, the nature of the Actions – international business transactions and large scale self-dealing schemes between related parties – weighs in favor of Hornbeam's request.  This is compounded by the existence of related cases regarding Kolomoisky's and Bogolubov's similar use of related parties to take advantage of business partners by wrongful means.

Nor would granting the assistance requested by Hornbeam offend any foreign jurisdiction or constitute a circumvention of foreign proof-gathering rules. *See* Fay Decl. 28.  The BVI does not ban discovery pursuant to 28 U.S.C. § 1782.

Finally, the requests are neither unduly intrusive nor burdensome.  As discussed above, the key information relevant to the Actions is located in this District.  This includes documentation from the New York Banks and the Professional Service Providers.  As noted above, this information has not been made available to Shulman or Hornbeam and is not available to Hornbeam within the BVI.  Moreover, substantial underlying documentation is needed to verify (or disprove) the unsupported internal accounting records produced by Warren Steel under Korf's management, as set forth in the FTI Report.  This is particularly important where the limited evidence demonstrates that Korf is involved in the self-dealing scheme.

Additionally, the Professional Service Providers have already collected and compiled the information via FTP in connection with what would have been a publically available S-1 filing.  Producing non-privileged information should not be burdensome.

**D.      THE COURT SHOULD EXERCISES ITS DISCRETION TO GRANT FOREIGN
DISCOVERY ASSISTANCE**

Under the circumstances, evidence that will be relevant to Hornbeam's claims in Actions
is not available in the BVI, Ukraine or Cyprus but is located in the United States and/or in this
District (in terms of both documents and witnesses).  As such, Hornbeam respectfully requests
the Court grant its request for discovery pursuant to 28 U.S.C. § 1782 to obtain discovery (as is
specified in the Application) concerning:

- the valuation of Warren Steel, including its revenues, expenses, production
  capabilities, liabilities, and assets:

- the circumstances surrounding the loans made by the Related Party Lenders;

- the source of any funds utilized to make these Related Party loans;

- the use (or misuse) of any such funds by Warren Steel and its management;

- the precise nature and specifics of the transactions in which Warren Steel is engaged,
  including but not limited to any transactions with entities "related" to Korf and the
  Other Ultimate Beneficial Shareholders;

- the current claims held by Warren Steel against third parties, including, but not
  limited to, claims Warren Steel may hold against fraudulent transferees and Warren
  Steel's management arising from, *inter alia*, self-dealing and breach of fiduciary duty.

Obtaining this information will require: (i) depositions of Warren Steel management, and
(ii) subpoenas requiring production of Warren Steel's contracts, accounts and agreements from
suppliers, vendors, financial institutions, accountants, employees and counterparties, all of which
persons and documents are located in the United States as well as the New York Banks and the
Professional Service Providers in this District; (iii) depositions of the Related Party Lenders'

management, and (iv) subpoenas requiring production of the Related Party Lenders' financial statements and resolutions concerning the related party loans, all of which persons and documents are believed to be located in the United States.

## V.    CONCLUSION

In summary, consistent with precedent cited above, the facts in the present matter clearly meet the requirements of 28 U.S.C. § 1782, and this Application for the Order should be granted.


Dated:        New York, New York
              December 19, 2014


                              HOLLAND & KNIGHT LLP


                              By: _____
                                  James H. Power
                                  Warren E. Gluck
                                  Tiana M. McLean
                                  Sean P. Barry
                                  HOLLAND & KNIGHT LLP
                                  31 West 52nd Street
                                  New York, New York 10019
                                  Telephone: (212) 513-3494
                                  Fax: (212) 385-9010
                                  james.power@hklaw.com
                                  warren.gluck@hklaw.com
                                  tiana.mclean@hklaw.com
                                  sean.barry@hklaw.com

                                  *Attorneys for Hornbeam Corporation*