ECNKHORM

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  IN RE:  APPLICATION OF
   HORNBEAM CORPORATION,                    14 MC 424
4
   ------------------------------x
5                                           New York, N.Y.
                                            December 23, 2014
6                                           2:00 p.m.

7  Before:

8                      HON. VERNON S. BRODERICK,

9                                               District Judge

10                             APPEARANCES

11 HOLLAND & KNIGHT LLP
        Attorneys for Hornbeam Corporation
12 BY:  JAMES H. POWER
        SEAN BARRY
13      WARREN GLUCK

14

15

16

17

18

19

20

21

22

23

24

25

1        (Case called)

2            THE COURT:  If the party would just note your

3   appearance for the record, that would be great.

4            MR. POWER:  James Power, of Holland & Knight, for the

5   applicant, Hornbeam Corporation.

6            THE COURT:  Okay.

7            MR. BARRY:  Sean Barry, Holland & Knight, for the

8   applicant, Hornbeam Corporation.

9            MR. GLUCK:  Warren Gluck, Holland & Knight, for the

10  applicant, Hornbeam Corporation.

11           THE COURT:  Okay, great.

12           Now, I have all the papers here.  You may be seated.

13  It's fine if you want to remain seated as I ask questions or

14  when you address at least the questions I have in the order

15  that I issued.  I think, just to give you a sense of at least

16  where I am on this, with regard to the initial showing, in

17  other words, under the law, under 1782, I think from what I

18  have seen, I would find that I have jurisdiction.

19           I also believe, with regard to certain of the factors,

20  the next factors I look at, whether the requested material

21  within the foreign tribunal's jurisdictional reach, not

22  necessarily, I don't think, so I think you meet that criteria.

23           Really where it comes down to is the connection

24  between the lawsuit or the impending lawsuit and the request

25  for the materials.  And, in addition, the breadth of the

subpoena, because what I didn't see in the papers was a nexus

first between the expected litigation and these particular

financial institutions and what the relationship was with them.

It may be that you have that information and it's just not in

the papers, and then on top of that, a more targeted subpoena

based upon that, in other words, if you -- you know it was with

regard to certain transactions and you know it was with regard

to, or certain entities that were related, that have a

relationship to the underlying dispute.  As I understand it, in

essence, they had a joint venture, for lack of a better term,

the other parties to the joint venture -- in other words, not

your client -- the allegation is, siphoning off money by

saddling the company, their jointly owned company, with loans

and debts to basically entities that are related to them and in

an apparent effort is to sort of drive your client out or to

freeze him out in some way.

I guess we can start with the questions that I have in

the order.  The first question, obviously, while I noted that

there are times when you don't necessarily need to, that even

if -- you couldn't get the documents because of the British

Virgin Islands laws, you still may be entitled to it, but in

light of I guess the breadth of the request, it does seem that

there may be more to it, it's not just that you can't

specifically get them, it is -- I guess why don't we start out

with the general proposition:  Do you or your client have more

ECNKHORM

1    information, and then, separate and apart, I'd like to talk

2    about White & Case and PricewaterhouseCoopers, but on the

3    overall, is there more information that you have that you could

4    supplement the record with that establishes a little more of

5    the nexus between the expected litigation and these particular

6    entities?

7              MR. POWER:  Your Honor, would you mind if I sit?

8              THE COURT:  No, that's fine.  Just bend the

9    microphone, pull it towards you so that the court reporter can

10   hear everything you're saying.

11             MR. POWER:  Thank you.  Let me start by advising the

12   Court that this is one of four 1782 applications that we are

13   going to bring.  The reason why we're bringing it here in

14   New York is, we believe with sufficient confidence that there

15   are certain entities and institutions here within this district

16   that possess information that is going to be relevant to the

17   BVI proceedings.  We are bringing an action in Ohio which is

18   where many of these counterparties to these loans are.  It's

19   unfortunate that our subpoena is large in scope because of the

20   number of entities that we're putting loans on here.

21             So, unfortunately, we're just following the amount of

22   entities that we are identifying as relevant.  It doesn't seem

23   that the defendants in these actions have had any limits to the

24   amount of offshore companies, and even U.S. onshore companies,

25   that they use to facilitate the scheme we called in which they

1    have been doing this in terms of encumbering Warren Steel with

2    debt.  So that is why there is unfortunately a larger scope.

3    We feel it is quite related to the information and their own

4    activities with respect to Warren Steel.  We are filing an

5    action in Ohio for Warren Steel itself in Florida and in

6    Delaware where many of these entities, the Optima entities, are

7    registered.

8         So the New York subpoena, the 1782 action that we are

9    looking to file, the banks that we are targeting -- we don't

10   have information that any of these defendants or entities have

11   bank accounts at these New York banks; they are simply

12   intermediary banks which possess third-party records in the

13   normal course of business.  Every time funds are channeled from

14   outside of the United States, in U.S. dollars, inside the

15   United States, what we believe, to contribute to the funding of

16   these loans, they are recorded in an instant blink of an eye, a

17   second, within the data system of these banks.

18        The records are maintained -- we get these all the

19   time, we've done these 30 times before.  The banks have never

20   once objected.  It literally is an exercise, even if there are

21   30 entities we are asking the banks to search for, and these

22   are search terms, basically they look at the originators, they

23   look at the recipient, and they put it in the reference section

24   of their computer programs, and it spits out data and it comes

25   in an Excel spreadsheet, and usually within two weeks they send

1    it to us by email.

2          I brought with me today some sample documents in

3    another case that we got where we served a subpoena which was

4    quite broad in the names of the entities that we were seeking.

5    The banks literally, again, within two weeks responded, never

6    an objection.  Sometimes they asked for protective agreement,

7    saying that we'll use the information only in actions related

8    to these causes of action in other jurisdictions, not for any

9    purpose whatsoever but just limited to BVI or Cyprus or

10   whatever.

11         I also have a sample of what the information typically

12   looks like.  They produce it to us by email in an Excel

13   spreadsheet.

14         So, in terms of what the banks have, we know well what

15   they have, they do process these transactions and to the extent

16   that the funding, which is a big concern of ours, where did all

17   these Optima entities get the hundred million dollars to loan,

18   we don't know if truly this money was transferred, if it's in

19   fact just paper loans.  So one of the ways in which we

20   documented, I think, in our papers and from evidence we've seen

21   in other court filings, is that Kolomoisky, Mr. Kolomoisky, and

22   Bogolubov used certain entities to facilitate their transfer of

23   dollars into the United States, and those are entities which we

24   have listed, like Divot, for example, which was one of the

25   original funding entities.

1          So what the information that the banks in New York

2     will give us -- and there are only like seven, maybe eleven

3     banks that we're serving -- what they will give us is the

4     record of the transactions, reference not necessarily going

5     directly to Optima Ventures but if it references Optima

6     Ventures, so it may be sent to some other company we don't even

7     know about with a reference "Optima Ventures loan transfer."

8     That's why this is sort of a very necessary exercise to round

9     out the information that is used and to verify information that

10    may be produced from other sources.

11         It also further supports the ownership structure of

12    these Optima entities.  There has been suggestion in our

13    papers, based on third-party information, that Kolomoisky and

14    Bogolubov do own or firmly own all these Optima entities.  So

15    of course, if we can prove that they do, by showing the

16    transfers of funds from their foreign-controlled offshore

17    entities into one or more of these related parties, which then

18    in turn encumbered Warren Steel, that is the type of

19    information that is going to be introduced and useful to the

20    claims in the BVI.

21         THE COURT:  The question I have, it's really how you

22    know that these banks -- that's the place where, as we're

23    looking through the papers, I just couldn't find that

24    connection.

25         MR. POWER:  Well, two things:  One is, the five years

1   of previous experience we've had subpoenaing these

2   correspondent banks.  There are only a handful of

3   New York-located banks that really are in the business of

4   processing these international transfers.  Some banks come into

5   the market wanting to do it and some banks sort of on a

6   year-to-year basis they decide they do not want to do this

7   anymore because of sanctions and they don't want to be

8   bothered, so these banks are, in our experience, the banks,

9   collective total, that process these transactions.

10       Do we know which particular bank has processed any

11  transaction?  We don't.  And the simple fact, when we serve

12  these subpoenas on the banks, the banks will run a search.

13  Sometimes the banks will come back and say, we never found any

14  hits, there was no Optima entities here.

15       It all depends -- which we don't know this

16  information, by the way -- it all depends on the foreign

17  company's financial institution, to which New York bank that

18  foreign institution has a contract with, in which the funds

19  pass through.  So sometimes, for example, if it's a bank out of

20  Geneva, Switzerland, that bank may have a contract with

21  JP Morgan to process the U.S. dollar transfers.  So of course

22  JP Morgan will have those records.

23       On the other side of the transaction, to the extent

24  that any one of these Optima entities -- and we don't have the

25  bank accounts of these entities so we don't know which U.S.

1  institution they're using, but let's just say it's Bank of

2  America.  Bank of America may also have a contract, ironically

3  enough, with Deutsche Bank, who may process Bank of America's

4  U.S. dollar transactions overseas.

5       So we know for certain, with experience, that the

6  banks we are targeting -- we've even left out some of the banks

7  that are Chinese banks that we don't believe would be

8  processing these transactions because there's no evidence that

9  any of the entities that Kolomoisky or Bogolubov deal with are

10 Asian companies.  If we were targeting an Asian/Far

11 East/Hong Kong/Chinese/Taiwanese companies, most likely they

12 would be using HSBC, Bank of China, China Merchants Bank.  We

13 have not done that here so we've taken them off the list of

14 possible targets because, again, in our experience, these are

15 the banks that are going to be processing it.

16      So there is never a way that we will know exactly

17 which banks are processing the transactions for sure unless we

18 know all of the foreign entities which Mr. Kolomoisky or

19 Bogolubov are using and which banks they use to send money to

20 these U.S. entities.  So we just don't know that.  And in part,

21 that's exactly what we're trying to find out, is to identify

22 those companies.

23      The other way that we can ensure that these banks are

24 the proper banks in which to serve these subpoenas is that

25 they're all a member of the clearinghouse association, which

ECNKHORM

they themselves hold themselves out to be and are publicly

listed as the banks that do this clearing.

I think for purposes of this allocation, although we

can't guarantee that any particular bank has processed any of

the transactions that we're looking for, most likely several

much them have done these transactions. And, frankly, the only

way you ever know is when they run a search. And, again, the

search is, as we have been told in the past, by the folks in

the banks, the administrative personnel, who are in charge of

running these and complying with subpoenas.

It takes them not a very long time -- in terms of the

manhours, it's small -- and to the extent it is a large

request, they issue us a bill, sometimes $300, sometimes the

most we've ever gotten is a thousand dollars. And of course to

the extent that there's miss hits involved, the banks will call

us, they will ask us for an extension, which are always freely

given. The most we've ever had is, I think, a 20-day

extension. The holidays, I would assume that the banks will

get this and start it. If they don't finish, they'll call us

and ask for an extension, which of course will be freely given.

So that's where we are quite certain, for the purposes

of this application, that these banks are in fact here and

possess the information or are likely to possess this

information. Some of them definitely do, some of them might

not but we won't know.

1          THE COURT:  Just so I have it clear, that is because

2     of the nature of the transactions?

3          MR. POWER:  Yes.

4          THE COURT:  We're calling them transactions.  I guess

5     they are, but really these banks are way stations for the cash

6     that may be part of another transaction but it's the cash

7     that's flowing through?

8          MR. POWER:  It's the credits, it's the banking

9     credits.  They keep a ledger of sort of debits and credits

10    electronically, you know, I guess in computer terms, ones and

11    zeros, and there's a whole big database for every transaction

12    and they record the foreign entity which made the transaction,

13    the foreign bank which made the transaction, the New York bank

14    which received the credit, the other New York bank which may

15    have then been credited, and the other the beneficiary that

16    ultimately received the funds.

17         So they are simply, as we call them, intermediaries

18    which just generate and maintain information and records.  So

19    that's what we're seeking, and they do it in the normal course

20    of business and in a way that can easily be produced because

21    people are often requesting these banks to produce this

22    information.

23         THE COURT:  One of their requests is a copy of any

24    orders, instructions, wire transfers, received from payor

25    transfer bank to payee transferee bank for the benefit -- so,

 1  if I understand what you're saying, you don't get tickets --

 2              MR. POWER:  No.

 3              THE COURT:  -- you don't get -- and they may, the

 4  banks may have, some paper backup or some other sort of stuff

 5  but what you accept in response to the subpoena, is that the

 6  chart that you had held up --

 7              MR. POWER:  Yes.

 8              THE COURT:  -- or the spreadsheet?

 9              MR. POWER:  An Excel spreadsheet, most often in the

10  form, they either mail it to us or send us a CD.  One bank,

11  which is not applicable here, is Bank of China, has sometimes

12  done screen prints.

13              But, no, I know it's all-encompassing and I see where

14  the Court would ask the question that it does seem like they're

15  going to be searching storage boxes somewhere.  That's not it

16  at all.  This has sort of evolved into a sort of nomenclature

17  which the banks fully understand.  And, in fact, they tell us,

18  we're not giving you anything other than the records that we

19  always give you and it's the Excel spreadsheet and that's what

20  we're going to do.

21              THE COURT:  And as you know, this is my first time on

22  Part I and maybe that's where -- because in reading the

23  subpoena, it reads like a regular subpoena, where I would

24  expect boat loads of documents, whether they're in electronic

25  or otherwise, but it sounds like the process that you've worked

1  out with the banks is in essence -- and I will say narrowing

2  and maybe I'm using the term incorrectly, but -- well, let me

3  ask you this:  This subpoena, the order that I currently have,

4  from a technical standpoint, if the bank provides you -- I know

5  you're satisfied with that document, but is it really giving

6  you all the documents that you're in fact requesting?

7          MR. POWER:  You know, I think it probably is because,

8  remember, we look at this bank not as the deposit institution,

9  right, where you would have the person's signature, your

10  sign-in card; this is simply a record-generator essentially,

11  it's like a data center.

12          THE COURT:  Where the money comes out, where it goes

13  out to, and then you have further requests for those entities;

14  if you don't have known the input, you request it from the

15  folks who get the money?

16          MR. POWER:  Right.  So these banks have no

17  relationship whatsoever with any of the entities that we are

18  looking at here.  They are simply checking their computer

19  records to see if they have any hits for transactions with

20  going from, to, or referencing any of these entities.

21          THE COURT:  Okay.  Let me just take a quick look at

22  something.

23          (Pause)

24          THE COURT:  Is the same true with regard to the

25  accounting firms, in other words, how are they -- are those

1    sort of the usual suspects, for lack of a better term?

2             MR. POWER:  No, the accounting firms -- we attached to

3    one of the declarations a U.K. court order -- the accounting

4    firms, which KPMG and PwC, and I'll put in White & Case here,

5    we know they were participating in -- well, let me step back.

6             The Optima entities, which are all U.S.-located

7    entities -- Delaware, Florida, managed out of Florida -- the

8    Optima entities were putting together an IPO filing.  Now, I'm

9    not a securities lawyer but I know enough about IPOs, that when

10   you're doing that, there's a huge amount of due diligence

11   involved and lawyers --

12            THE COURT:  At least there should be.

13            MR. POWER:  At least there should be.  We found many

14   instances where there wasn't.

15            From a lawyer's perspective, looking at the

16   information that we have and we submitted to the Court, with

17   these loan transactions and we're saying, you know, it would be

18   very interesting how due diligence, with the allegations that

19   we have asserted here, how due diligence can be done on

20   companies that are sort of loaning this kind of money with

21   these related-party loans, same person signing them.  We know

22   that White & Case New York was the entity that was the lawyers

23   preparing the due diligence, they created a database -- and of

24   course we wouldn't be looking for any attorney-client

25   privileged or work product -- KPMG and PwC were also called in

1    to do some audits of the financial situations of these

2    entities.

3         One could imagine that my argument in the BVI would

4    be, well, you know, what did these Optima entities report?

5    Were they ever going to get their hundred million dollars back

6    for their loans to Warren Steel?  And if not, why would they be

7    loaning that kind of money in the first place, knowing Warren

8    Steel could never pay them back?  How would you possibly report

9    that to potential public investors in a New York Stock Exchange

10   listing?  Did they say this was an unrecoverable debt, never to

11   be paid, or did they say that Warren Steel was worth

12   $300 million?

13        So I could see -- I would hope the Court could see as

14   well -- that that information -- and I am not saying it's the

15   entirety of what's being maintained by White & Case but

16   certainly there was going to be information in that file, when

17   somebody spends two years preparing for an IPO, which is going

18   to show or going to be used and relevant to our arguments of

19   what is the value of Warren Steel, why would anyone make a

20   hundred million dollars of loans if they didn't believe it was

21   Warren that was going to be able to be paid back, and how could

22   you even think about doing an IPO if you've got a hundred

23   million dollars of loans that could never paid back?

24             THE COURT:  So it's the IPO of Warren Steel?

25             MR. POWER:  The IPO of the Optima entities.

ECNKHORM

1          THE COURT:  Of the Optima entities?

2          MR. POWER:  Which were the creditors of Warren Steel,

3  issuing all the loans.  And the individual that straddles both

4  all of the Optima entities and the Felman Trading and CC

5  Metals, is Mordechai Korf, who is also the president of Warren

6  Steel, who was signing both on behalf of Warren Steel as

7  borrower and all these Optima entities as the lender.

8          THE COURT:  Okay.  Maybe that is spelled out somewhere

9  in the papers but it's not as clear as I think you've just

10  stated it.

11          MR. POWER:  There is a lot of information.  I

12  apologize if --

13          THE COURT:  No, no, I have no problem; it's actually

14  piecing it together.

15          In particular, I know you just mentioned you're not

16  looking to get attorney-client privileged information.  I take

17  it, though, that this is not, although the banks routinely get

18  these, this is not going to be something that the accounting

19  firm or White & Case is something that they would necessarily

20  be expecting?

21          MR. POWER:  Expecting?  No.  Do we get them?  Our firm

22  has gotten a 1782 application before.  They are done, I can

23  tell you, as a professional working with another law firm, we

24  would certainly do all we could to accommodate them, grant the

25  requests.  I know it's the holidays; we wouldn't be expecting

1    hard deadlines.  We would ask them to first just check their

2    records.  I think we would, again, work with them on sort of a

3    rolling basis.

4            We don't want this to be unnecessary litigation by us,

5    forcing unreasonable deadlines or unreasonable requests on PwC,

6    KPMG or White & Case.  This is an effort to get information in

7    the most reasonably calculated and economic way possible.  So

8    that's what I can say about what I anticipate our dealings with

9    White & Case to be.

10           THE COURT:  Okay.

11           So to the extent the subpoena asks for bank account

12   information, these entities you're not expecting to have?  To

13   the extent -- they don't have traditional bank accounts, they

14   may have access and password rights, but it's not a bank

15   account necessarily they would use, like a checking account or

16   savings account or something like that or even a resolving

17   credit type of thing, it's not that sort of a relationship, as

18   I understand it?

19           MR. POWER:  No, not with the intermediary banks, no.

20   They have no contractual relationship with these intermediary

21   banks.  And that's also, one of the things that the

22   intermediary banks always tell us -- even if, for example, one

23   of these entities had a contract or had a bank account with,

24   let's just say, Credit Suisse in Switzerland, the Credit Suisse

25   entity in New York says, just so you know, we assume your

1    request isn't asking for that and even if it does, we're not

2    going to give it to you because we don't maintain that here,

3    that's somewhere else, so you're not getting that but in the

4    end, here you go, here's the disk, the wire transfer records

5    from our search.

6           So we don't expect it, and we don't anticipate

7    receiving that from any of the banks in New York.

8           THE COURT:  How are the purchase parties, how are

9    they -- because as I understand, these are the parties that

10   were initially involved in the purchase of Warren Steel?

11          MR. POWER:  Yes.

12          THE COURT:  How were they involved or relevant to the

13   dispute?  Is it in some evaluation?  In other words, that was

14   years ago and so I had some questions about that.

15          MR. POWER:  Well, again, to basically make sure we

16   have all the information, we wanted to get the records from the

17   intermediary banks, to the extent there are any.  They may do

18   their search and say, we just don't have any.  So for Instrad

19   and the others, for the purchase parties, we wanted to make

20   sure we had all of the records because, again, it is some time

21   ago and maybe we won't be able to collate all of the records.

22   So this is just one of the ways, to make sure, use all means

23   possible to get the records that are going to be at issue in

24   these cases.

25          THE COURT:  I guess typically, have you -- in

1   connection with the issue about whether or not this sort of

2   request is circumventing what you could do in the BVI?

3           MR. POWER:  Yes.  We did include the declaration of

4   BVI lawyer Michael Faye.  He's quite respected since he was a

5   sitting justice in the Eastern Caribbean court system.  What we

6   tried to make clear there -- and maybe it didn't come clear and

7   that's a misgiving on our part -- is, the BVI courts don't have

8   jurisdiction over some of these entities.  There's only Holwell

9   is a BVI company, there was only Hornbeam did file an action

10  there, so there's jurisdiction over Hornbeam but it doesn't

11  have jurisdiction over all the Optima entities or even Warren

12  Steel or the third-party entities.  So what we tried to make

13  clear is that the BVI court doesn't have the ability to issue

14  subpoenas and so forth.

15          THE COURT:  Okay.  In other words, it's a

16  jurisdictional issue --

17          MR. POWER:  Yes.

18          THE COURT:  -- it's not a capacity issue?  In other

19  words, if in fact -- you can't get it because the entities are

20  outside of the jurisdiction but not because the BVI courts

21  prohibit getting that sort of information?

22          MR. POWER:  No.  Now, we did indicate, as is

23  commonplace amongst jurisdictions outside of the United States,

24  I think it's commonly known that jurisdictions other than the

25  U.S. are more constricted in their discovery processes, which

1  people love to come to the U.S., where discovery is, and they

2  complain about it when they're the subjects of discovery.  So

3  the BVI court would not prohibit the introduction of this

4  information.  It also just isn't as robust, the ability to go

5  out and get emails, for example, maybe of some third party or

6  those kinds of things.

7          So the scope of the discovery often ordered and

8  permissible in the BVI is more limited than the scope of

9  discovery in the U.S., but that is sort of irrelevant based on

10  the case law on 1782 applications here.  The standard is that

11  if the U.S. is more liberal in its discovery rules, compared to

12  the jurisdiction in which the discovery is being sought to be

13  used in, that is not in any way, shape or form a bar to

14  granting that discovery.

15          THE COURT:  Okay.

16          Now, you've mentioned you have copies of what is

17  typically produced, so I'd like to see that.

18          MR. POWER:  Yes.

19          THE COURT:  I can't remember if you said you have

20  copies of other orders that you've obtained.

21          MR. POWER:  Yes.

22          THE COURT:  Now, is it in connection with this matter?

23          MR. POWER:  No, it's in connection with a matter that

24  we filed two months ago.  It's a BVI case.  I represent a

25  foreign liquidator which was appointed over a BVI company.

We've gotten Chapter 15 recognition here. We've done this in

many cases. This is one of the forms that we issue these

subpoenas in, not necessarily solely on 1782 but when we

represent foreign liquidators who are looking to recreate the

company's records when they don't have the books, so it's a

very good exercise in how to do this by getting these

intermediary bank records. So we did serve the intermediary

banks. The subpoena that we served is quite robust, and I can

show you a copy of the subpoena, which the banks have responded

to. Within two weeks, two banks requested an extension.

THE COURT: Okay. Is that here in the Southern

District?

MR. POWER: Yes. It's the Bankruptcy Court, Southern

District.

THE COURT: I'll take a look at whatever you have.

I'd like to take a few moments. I know -- Counsel, does

someone have a flight?

MR. POWER: I have a flight to Kansas. But I can hand

this up.

THE COURT: Yes, if you could.

MR. POWER: I would ask: One of them is some

emails --

THE COURT: Is it something --

MR. POWER: If the Court intends to put it into the

record, this stuff is usually --

1          THE COURT:  I was not intending to make this part of

2     the record.  I recognize this is totally separate proceedings,

3     unrelated to this.  You're providing it for my edification --

4          MR. POWER:  Yes, your Honor.

5          THE COURT:  -- so I see the way that typically

6     institutions respond and where you've gotten applications in

7     the past.

8          I'm just going to go in the back for a short period of

9     time and I will be right back.

10         (Recess)

11         THE COURT:  I know I've looked at this, and I looked

12    at what you provided, in particular, the spreadsheet.  And to

13    me, there's a disconnect between the spreadsheet and the actual

14    order that I am being asked to sign.  And I understand what you

15    have explained to me here today.  It wasn't as crystally done

16    in the application itself.  If all you're looking for is what's

17    in the spreadsheet -- and, again, I just don't see how that,

18    when I read through this and it does ask for account

19    information and things like that, and actually -- they don't

20    actually have traditional accounts, as I understand it.  So I'm

21    not prepared to sign this today.  I'm not saying I won't sign

22    it if the application is made again, and it may be that --

23    because I have never seen one of these, that I am being overly

24    strict with you, but I'll tell you the way I would describe it.

25    You can be seated.

1          MR. POWER:  Okay.

2          THE COURT:  It's almost as if this is the initial

3   document request in a litigation that then gets winnowed down

4   to the essence, as the parties have a back-and-forth, and there

5   may be that understanding with the banks, that when they get an

6   order like this, that they provide the spreadsheet.  But that's

7   not what the order is, and it seems to me that if all you

8   really want is what's contained in the spreadsheet, then I need

9   to have a little bit more understanding of that, and

10  specifically how what's being requested ties into whether it's

11  the spreadsheet or what you're actually looking to get.

12         MR. POWER:  I guess for the Court, the best way to

13  describe it, which would I guess advise the Court, would be for

14  the bank to run a search of its records for these entities,

15  either as a beneficiary, a recipient or in the reference

16  section.  The columns -- again, the spreadsheet is hard to read

17  because it's long, it has multiple columns, so in essence

18  that's exactly what we're asking for.

19         And if the order that was written simply to the bank

20  says run a search for these entities as originator, beneficiary

21  or in the reference section, I would be happy to get that.

22         THE COURT:  That would be fine.

23         MR. POWER:  Yes.

24         THE COURT:  I'll look at the exact language but I

25  think that that would be something that I think would be, to

1    me, more narrowly tailored and get you exactly what you want

2    without having the order in the format it's currently in.

3          MR. POWER:  I don't know if there's a technical term

4    for that.  Again, over the course of dealings that we have

5    arrived at what the banks understand, they have tailored it

6    now, again, to the extent we just say they're to provide us

7    their records when they do their search for beneficiary,

8    recipient and reference, and we can do that.

9          THE COURT:  Okay.  I know it's the holidays, but I

10   understand you do want to get this.  If you want to put

11   something together and send it to my chambers' in-box, you can

12   do that.  But just let us know when it's going to be arriving.

13         MR. POWER:  Well, will have to go back, leave for a

14   flight, but my colleagues here will go to the office, they will

15   revise the proposed order and where -- do you have a copy of

16   the order here where it says for the banks instead of, as the

17   Court noted, instead of any and all receipts and those kinds of

18   things, copies, instructions, wire -- simply just saying copies

19   of wire transfer records where these listed entities are

20   beneficiary, originator, or in the reference.

21         THE COURT:  Okay.  It sounds as if the banks will

22   understand that and provide you with that --

23         MR. POWER:  Yes.

24         THE COURT:  -- I think more narrowly tailored

25   information.  I don't know how to do the same thing with the

1   White & Case section and the accounting section.  I don't know

2   what their reaction to this is going to be, but the one thing I

3   would say is -- and thanks to my law clerk, he caught this

4   because I was misreading it -- when you say for the documents

5   from White & Case and Pricewaterhouse, when you say for the

6   production of the following nonlegally privileged documents, it

7   shouldn't be definitional, in other words, then you have a

8   list; I think it should be something along the lines of, for

9   the production of the following, to the extent they are

10   nonlegally privileged documents, because, in other words,

11   it's -- I don't know whether these are.  And that may be what

12   you intended, I don't know, but if you could tweak that.

13         MR. POWER:  We don't want to fight over

14   attorney-client legal documents.  That's not --

15         THE COURT:  Exactly.  I was going to add that language

16   in there anyway --

17         MR. POWER:  Yes.

18         THE COURT:  -- and I recognize that.  You've freely

19   said that to me.

20         Okay, so why don't you take care of that and then we

21   will take a look at the order when it comes back.

22         MR. POWER:  Will do.

23         THE COURT:  Thank you very much.

24         MR. POWER:  Thank you, your Honor.

25         THE COURT:  We will stand adjourned.

1          MR. POWER:  Your Honor, could we email it?  I did

2     receive an email from someone on Saturday.

3          THE LAW CLERK:  Yes, to the Brodericknysdchambers

4     account.

5          MR. POWER:  Could we email you a revised Word

6     document?

7          THE LAW CLERK:  Yes.  That's great.

8          MR. POWER:  Thank you.

9                         * * * ?

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25