F6mdhorc

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  IN RE:  APPLICATION OF
   HORNBEAM CORPORATION                    14 MC 424
4
   ------------------------------x
5                                          New York, N.Y.
                                           June 22, 2014
6                                          2:07 p.m.

7  Before:

8                      HON. VERNON S. BRODERICK,

9                                              District Judge

10                            APPEARANCES

11  HOLLAND & KNIGHT LLP
         Attorneys for Hornbeam Corporation
12  BY:  JAMES H. POWER
         SEAN BARRY
13

14  REED SMITH LLP
         Attorneys for Symeou
15  BY:  STEVEN COOPER
         SAMUEL KADOSH
16           – and –
    BRUCE S. MARKS
17

18           – also present –

19  FABRIZIIO CAMPANILE

20

21

22

23

24

25

1           (Case called)

2           MR. POWER:  Your Honor, may I also introduce another

3    individual?

4           THE COURT:  Yes.

5           MR. POWER:  This is Fabrizio Campanile.  He is a Swiss

6    lawyer.  He submitted an affidavit in support of this

7    application.  He is here to answer any questions the Court may

8    have on what exactly is going on in the BVI and Switzerland,

9    because I think there were some significant amount of

10   representations made which are not accurate.

11          May he sit at the --

12          THE COURT:  Sure, he may.  Why don't you come up.

13          So I decided to have this hearing to address

14   Mr. Symeou's request for temporary relief.  Pursuant to the

15   Rule 65(b), I could issue a TRO without notice but it would

16   have to be justified by immediate harm.  I didn't see in the

17   application -- an immediate harm here would have been just a

18   matter of days, so I decided to have the hearing today to

19   discuss with the parties the various issues raised by that

20   request.  You know, putting aside the more detailed application

21   that is being made, I just wanted to address the issue of

22   temporary relief.

23          Now, I guess, why don't we initially talk about what

24   the -- because I know when you were here before me, Mr. Power,

25   Mr. Barry, to obtain the relief to get the subpoenas, you did

1    indicate that I did take a look at the transcript that there

2    was going to be -- or you were contemplating filing an action

3    in Ohio.  I believe you may have just indicated that was just

4    against the steel company, or you didn't necessarily limit it

5    but the reference was to the steel company.

6            But let me ask this.  What is the status of the BVI

7    action, because that was the impetus behind your 1782 request?

8            MR. POWER:  Yes, your Honor.  In simple terms, we have

9    four other discovery requests outstanding in which we have not

10   served subpoenas.  Earlier this year, Mr. Symeou indicated to

11   our client that the company was going to be sold basically to

12   insiders.  They were going to be credit bidding their $100

13   million, which is the case which we allege these are fraudulent

14   loans.  They didn't occur.  The full amount didn't happen.

15   This was -- as we explained in the ex parte hearing before your

16   Honor, the information that we were looking to get in part from

17   these correspondent banks was going to be used in the BVI to

18   establish that the money was never transferred into Warren

19   Steel, which is an element of the claims as described by our

20   expert affidavit by Mr. Michael Faye.

21           There has been an issue in the BVI caused solely by

22   actually Mr. Symeou's conduct.  He has refused to change their

23   shareholders' register to reflect Mr. Shulman's company Bracha.

24   Hornbeam was a Panamanian entity.  It was Panamanian entity

25   that wasn't owned or controlled by Mr. Shulman.  It was owned

F6mdhorc

and controlled essentially by Liechtenstein trust lawyers.  It
was a company that was created to simply hold in trust other
people's interest.  And in this case it has held Mr. Shulman's
interest.  Mr. Symeou knew it was Mr. Shulman that was the
beneficial owner.

Despite repeated requests, Mr. Symeou has denied
entering Bracha and/or Tectum or anyone else in the BVI.
Therefore, thus, they are themselves creating an issues which
is inhibiting an action in the BVI, because under certain
elements of the BVI clients, as outlined by Michael Faye, the
registered shareholder is the person arguably with the standing
to bring those claims.  So in over the last six months there
has been a dispute between Mr. Fabrizio and Mr. Symeou to
actually register to reflect a change in the trustee holding of
Bracha and Mr. Shulman's shares.

So any delay in the BVI proceeding has been caused,
for one, by Mr. Symeou's failure to respond to the repeated
requests to change the registered shareholder from Hornbeam,
which simply was always holding Mr. Shulman's interest in
trust.  It was never as its own interest because it is simply a
function of the entity to holdings and trust.

Secondly, in May -- I'm sorry, in March, shortly after
we served the subpoena -- and, remember, we have three other
1782s outstanding which at the time in March we had not yet
gotten a Delaware order and I believe we had just gotten a

F6mdhorc

1   Florida order.  So we had not collected any other information

2   on any other action, which we intend, of course, to do.  We

3   learned, by notification from Mr. Symeou, that the company was

4   going to be sold.  This is Warren Steel, not the BVI company

5   Halliwel.  That has nothing do with this.  Warren Steel is the

6   sole asset of Halliwel.  There was nothing that could be done

7   in the BVI to stop the sale of this Warren steel in the United

8   States.

9           Warren Steel, it was represented by Mr. Symeou that

10  the company was establishing a valuation and that

11  Mr. Kolomoisky, Mr. Bogolubov and the Optima entities would be

12  able to credit bid all their loans which were secured, despite

13  the opposition of Mr. Shulman to securitize those loans without

14  first establishing the validity of such loans.  So as such, one

15  of the reasons why a BVI action has not been started yet is

16  because we went and we sought a TRO only in Ohio, not a

17  separate action, not a merits action, but a TRO to prevent the

18  sale of the Ohio Steel assets to these insiders while we

19  collect information to determine whether or not the very loans

20  in which they intend to credit bid were not procured by fraud

21  and in fact no consideration was ever paid.

22          We have made repeated requests of Mr. Symeou and

23  Mr. Korf, who is here in the United States, to simply disclose

24  the payments that were made underlying this hundred million

25  dollars of insider loans.  These are related parties loans made

1    to Warren Steel, which our client has never seen any evidence

2    of, never seen any transactions.  In other words, if somebody

3    were to say I lent this company a hundred million dollars, a

4    very simple and reasonable request would be, well, let me see

5    the transfer of the consideration paid for this security

6    interest for a hundred million dollars.  It has been refused to

7    this date to provide any evidence of that.  The only evidence

8    that has been provided has been self-serving, self-created

9    summaries of financial transactions of the company.

10           One of the things we were looking to get, and which we

11   did get, frankly, in New York from these intermediary banks, as

12   we have described it before your Honor, this is not sensitive

13   information of Mr. Symeou or sensitive information of Halliwel,

14   this was simply a record of transactions from Halliwel to any

15   other party referencing, as we said, Warren Steel or another

16   entity from Mr. Symeou to somebody else referencing Warren

17   Steel.

18           I can state for the Court, which I clearly stated to

19   Mr. Marks and to Mr. Cooper, that we received absolutely zero,

20   zero transactions of Mr. Symeou.  Mr. Symeou is now before the

21   Court trying to prevent the disclosure of something which

22   simply isn't there.  There are zero transactions provided by

23   any of the banks regarding Mr. Symeou.  I explained that in

24   clear terms.

25           Secondly, there are six transactions of Halliwel.

F6mdhorc

1    Halliwel is an entity of which it is undisputed that our client

2    owns one third of the shares in.  There are six transactions of

3    Halliwel.  Those transactions are, in our opinion, quite

4    suspect.  I won't read it into the record now.  Depending on

5    what the court is going to order, I wouldn't want to have this

6    information further disclosed.

7             Secondly --

8             THE COURT:  Well, let me ask you this.  Just in

9    connection with the filing of the Ohio lawsuit, was any of the

10   information that you obtained from the subpoenas used in

11   connection with the Ohio lawsuit?

12            MR. POWER:  Absolutely not.  Not one shred of

13   evidence, which I also indicated to Mr. Cooper and to

14   Mr. Marks -- and, in fact, I asked them to please disclose to

15   me -- they made representations to this Court that we used

16   evidence, and, in fact, that is one hundred percent false.  We

17   used no evidence whatsoever.  So I am still perplexed as to how

18   they can make that representation to the Court.  Either it was

19   knowingly false or recklessly made because we did not use any

20   evidence whatsoever of any of the transactions that we received

21   from the New York banks.

22            THE COURT:  OK.  And I take it that in connection with

23   Mr. Symeou's request for temporary relief, do you object to all

24   of the aspects of their request?

25            MR. POWER:  No.  In fact, we actually -- the first

F6mdhorc

1  email that I got -- and I would also like to clarify for the

2  Court for the timing.  It's interesting because in the middle

3  of May, Mr. Fabrizio actually reached out to Mr. Shulman's

4  lawyer, Mr. Marks.  Mr. Marks had represented Mr. Shulman prior

5  in a litigation involving this Warren Steel plant.

6          Mr. Fabrizio -- Mr. Campanile actually asked Mr. Marks

7  certain inquiries regarding the very transactions involving

8  this case.  Mr. Marks did not say, oh, hey, by the way, we were

9  aware of this New York 1782.  Do not use any information.  I

10 want to let you know we know about this action.  Can we talk

11 about a protective order?  It was silent for three weeks, until

12 June 8th, when I got a threatening email that this was an

13 emergency and we had to run to court.

14         So at the time on June 8th, I indicated, in writing,

15 we would be happy to come up with a protective order.  We don't

16 have any information for Symeou.  To the extent we have

17 information for anyone else which you aren't representing, we

18 are happy to enter into a protective order such that it will

19 allow Mr. Symeou, to the extent he has standing, to argue why

20 any information of these other entities not related by any of

21 the counsel sitting behind me could not be used in a BVI

22 proceeding.

23         Secondly, we stated that despite no evidence from

24 Symeou, we have not used any evidence, any information, any

25 Warren transfer in any way, shape or form in any proceeding

F6mdhorc

1    anywhere in the world, including in Ohio.

2            So I am happy for this Court -- I even suggested a

3    briefing schedule -- to have both parties.  I take it there are

4    issues that Mr. Symeou's counsel believes need to be addressed.

5    I think they are actually settled in this district, but,

6    nonetheless, this is the issue:  Is notice required of a

7    nondeposition in a 1782 action?  And, in fact, case law seems

8    pretty clear that unless it is a deposition or unless it is a

9    criminal case, no notice is required until such time as where

10   you at least have to give a party opportunity to be heard.

11           In fact, the Southern District has granted 1782 orders

12   stating expressly that notice did not have to be given.  So,

13   you know, there is precedent here.

14           But we can deal with these issues.  I think these are

15   interesting issues.  I think the parties, I suggested that they

16   would have 30 days to come up with a brief while we would not

17   do anything.  We wouldn't file a foreign action.  We wouldn't

18   use the information -- not that we have used it, but we do

19   agree that Mr. Symeou would have ample time to brief the

20   action, and I suggested, I think, 20 days after that.  As

21   opposed to coming into the court on an emergency basis, which

22   if it was an emergency basis, Mr. Marks would have disclosed to

23   Mr. Campanile back in May, when Mr. Campanile reached out to

24   Mr. Shulman's former attorney Mr. Marks, that this was such an

25   emergency and that we had to prevent the disclosure, use of

F6mdhorc

1    this information, or we would have certainly offered up a

2    protective agreement even earlier on.

3          So I am in favor of limiting the use of this

4    information, not that it has been used and not that we are

5    ready to use it at this exact moment, but certainly we are

6    happy to entertain that and willing to work with counsel to

7    come up with a reasonable protective order.

8          THE COURT:  OK.  So just as I understand with regard

9    to the BVI action, because you haven't been able to somehow get

10   a recognition that the name has changed -- in other words, the

11   entity holding the interest has changed, you haven't been able

12   to file an action in the BVI?

13         MR. POWER:  Yes.  And, also, we are waiting for

14   information.  As I said before, your Honor, we did obtain not

15   just from this court but from Ohio, from Delaware and from

16   Florida, similar 1782 orders.  We have not served those yet.

17   They are going to be served on Mr. Korf, who is the chairman

18   and president of Warren Steel, though he operates his

19   businesses out of Florida.  They are going to be served on

20   Mr. Korf and the Optima entities.  These are the entities which

21   say they lent $100 million to Warren Steel yet provide no

22   evidence of any transaction supporting that, and they are going

23   to be served on Warren Steel itself out of the Ohio action.

24   And, in fact, the Delaware action is somewhat repetitive

25   because Warren Steel is a Delaware entity and some of the

F6mdhorc

 1   Optima entities are Delaware, so we figured they would possess

 2   the records there.

 3            One of the reasons we were waiting -- and this is a

 4   matter of public record -- the Delaware Court asked us to amend

 5   our application.  We refined it.  We had to use local counsel.

 6   So it did take quite some time.  I don't know the exact date

 7   that Delaware issued the order, but it was literally right on

 8   the heels of when Mr. Symeou sent an email to Mr. Fabrizio

 9   stating that they were marketing this Warren Steel plant for

10   sale, including a credit bid to these inside lenders.

11            At that point in time, faced with, one -- secondly, we

12   did not need any of the information in the United States to

13   file a TRO.  We knew a TRO was going to be necessary.  So about

14   March or the middle of March -- Mr. Campanile can advise the

15   Court of the exact dates; he was an actual participant in these

16   changes -- it was made very clear that action in the United

17   States to stop the sale of the company to insiders had to be

18   taken.  That is not the same action that is going to be brought

19   in the BVI, a 184(i) shareholder sort of shutout suit.

20            Again, we do not intend to bring the action until we

21   gather all this evidence.  I mean, one can -- you know, we are

22   not BVI lawyers here, but BVI law isn't so far afield from

23   common sense that if you are going to bring a BVI action

24   arguing that a consideration of $100 million was not paid to

25   Warren Steel for these loans, it would be very easy to gather

F6mdhorc

1    this information in the United States, where it is collected,

2    and to present that in the BVI.  So until such time as we get

3    that information, we won't be bringing a case in the BVI,

4    because that is the fundamental evidence that is going to be

5    submitted.

6         I mean, if Mr. Symeou wants to present this to us

7    without going through these hundreds of thousands of dollars in

8    1782 actions, we will be happy to get the records that we have

9    been asking for for more than a year now.  It actually might

10   even be two years, as Mr. Campanile's exchanges with Mr. Symeou

11   appear to have been going on for quite some time requesting

12   these records.

13        THE COURT:  OK.  Will, let me hear, because as I

14   understand it, Mr. Power, you will be amenable -- this material

15   has not been used in connection with the Ohio action or any

16   other action.  Has it been shared with third parties?  And by

17   "third parties" other than your client who may have seen it or

18   folks at your law firm.  Has it been shared with others?

19        MR. POWER:  No, your Honor, other than myself,

20   Mr. Barry here, Mr. Campanile, one of his other legal team,

21   Tatiana has seen it as well as the client, Mr. Shulman, and one

22   of my paralegals.

23        THE COURT:  OK.  So as I understand it, you haven't

24   shared it with others, you haven't used it in the Ohio action.

25   You would agree during pendency of the matter here and the

1  briefing that is going to occur not to utilize it and you would

2  agree that whatever protective order language that the parties

3  would agree upon -- you know, putting aside whether or not

4  there is irreparable harm here or, you know, I don't know is

5  going to speak on behalf of Mr. Symeou, but it seems to me that

6  that would resolve the issue with regard to -- well, let me

7  hear from you with regard -- are you going to speak,

8  Mr. Cooper?

9         MR. COOPER:  Yes, your Honor.  Thank you.

10         Your Honor, I believe that you have not been given the

11  full picture of what's going on here.  I think you have been

12  told a lot of half-truths and some misleading information.

13         THE COURT:  I'd like to -- and I'm not going to

14  prevent you from that, but I want to try and deal with and then

15  we can -- well, the issue of the temporary relief.

16         MR. COOPER:  OK.  The short answer is -- and then I

17  will elaborate on it -- the information has been used there.

18  They have admitted it.  There is no logical reason that they

19  started this case when they did except that they -- the only

20  intervening factor was that they got a bunch of information and

21  we found out about it around June 8th.  And then when we asked

22  them whether they were going to file in the United States, they

23  put us off and they told us we'll let you know if we decide to

24  do that.  We got a whole bunch of misleading nonresponses, and,

25  lo and behold, on the following Sunday we get told they're

F6mdhorc

1    moving in Ohio.

2           They made it very, very clear to you that 1782

3    application was in support of foreign proceedings.  They told

4    you in their brief each and all of the reasonably contemplated

5    actions will similarly be brought before courts in the BVI or

6    elsewhere which are likewise considered foreign tribunals

7    within the meaning of 28 U.S.C. 1782.  They said the same thing

8    in the transcript and --

9           THE COURT:  But in the transcript they did indicate

10   there was going to be something filed in Ohio.

11          And just let me ask, what information do you have

12   that -- I mean, are you suggesting that Mr. Power's

13   representation here is not accurate with regard to the Ohio

14   action, that this information was, in fact, used?

15          MR. COOPER:  Correct.  On that reference that you are

16   making, first of all, in the use in the Ohio action, I saw the

17   same thing and it caused me to pause, too.  But I don't think

18   that that's what they are referring to because -- and I believe

19   Mr. Powers actually confirmed it.  They are not talking about

20   bringing a plenary action or injunctive action.  They are

21   talking about bringing another 1782 action, which is what they

22   did in Ohio, Texas and Delaware.  There is no indication, other

23   than that one line, that they plan to use any of the material

24   and to commence anything domestically.  Everything is foreign.

25   It is up and down in their papers, and they are very emphatic

F6mdhorc

1    about it, your Honor.

2            MR. POWER:  Your Honor, may I clarify something --

3            THE COURT:  Sure.

4            MR. POWER:  -- so we don't go in circles on this?

5            Mr. Cooper is right, we did not -- we couldn't have

6    contemplated filing a TRO action in Ohio back in December of

7    2014 when Mr. Symeou didn't disclose to Mr. Fabrizio Campanile

8    until the end of March that they were about to sell the company

9    in Ohio to the insiders.  So, I mean, to state that I foresaw,

10   I had a crystal ball that in five months after I came and

11   represented to your Honor, under oath, statements that I take

12   very personally and that we have every intention then and I

13   would say every intention now to file in the BVI.

14           However, how convenient for the defendants that they

15   would go and sell the company to their insiders while we are

16   going and undergoing litigation in the BVI.  And once that's

17   done, your Honor, and which is what I represented to the Court

18   in Ohio, who was more than happy to grant the TRO because it

19   saw that we met our burden, in no way, shape or form did we

20   come to your Honor back in December of 2014 with the intention

21   of using any information here or in any other 1782 in this TRO

22   action in Ohio, which we just brought, which we didn't know

23   about or didn't feel the need to even consider until such time

24   as Mr. Fabrizio got indications from Mr. Symeou at the end of

25   March.

1        I mean, Mr. Fabrizio is here.  I mean, I brought a

2   live witness to let the Court know the dates.  Counsel for the

3   defendants I think is simply playing telephone and doesn't have

4   the right dates and the right story.  I brought a witness here

5   to tell the Court the right story, if the Court wants to listen

6   to the dates, and when we contemplated the BVI proceedings and

7   when we contemplated to bring the TRO in Ohio.

8        THE COURT:  OK.  Mr. Cooper.

9        MR. COOPER:  So we've established, your Honor, that

10  when they came to you, they only said they were going to bring

11  foreign proceedings.  OK?  So they never indicated this.

12       Now, if you look at their petition to you, their

13  original application, and look at what they envision are going

14  to be their claims, they indicate three different actions with

15  a host of parties, all in foreign jurisdictions, and then you

16  look at the complaint they filed in Ohio, it is essentially the

17  same.  It is the same language.

18       THE COURT:  But, again, you are seeking temporary

19  relief, extraordinary relief from me, asking me that these

20  materials should be turned over to you, that names of people

21  who I understand that they haven't -- according to what I've

22  heard here today, it hasn't been turned over to third parties.

23       What evidence do you have that the materials were used

24  in connection with the Ohio action?  And, secondly, why isn't

25  this a discovery issue that should be dealt with by the Ohio

F6mdhorc

1    judge?

2           MR. COOPER:  Your Honor, there are very fundamental

3    issues of due process here that I really need to address with

4    your Honor.  I want to answer your narrower question first on

5    what evidence did we have.

6           May we hand something up, your Honor?

7           THE COURT:  First of all, what is it?

8           MR. COOPER:  It is an affidavit that was submitted in

9    Ohio of Mr. Campanile.

10          THE COURT:  OK.  Go ahead.

11          MR. COOPER:  So if you look at page 37, your Honor,

12   paragraph 164, after a long recitation of his perception of the

13   history and the facts, he deals with this issue because I guess

14   he knows it is going to arise that they've gotten all this

15   information through 1782, and I guess he wants to preempt it.

16   So he says:  "Discovery proceedings pursuant to 28 U.S.C. 1782

17   have been filed in the United States discovery application on

18   behalf of Shulman's entities Bracha and Hornbeam solely seeking

19   evidence for use in the BVI and other foreign proceedings, as

20   described in those various applications.  Those limited

21   discovery proceedings have absolutely nothing to do with this

22   proceeding, and other than the existence of Warren Steel bank

23   accounts not previously identified by Symeou, no information

24   whatsoever received will be used in this proceeding in support

25   of the accounting and injunction."

F6mdhorc

1        So, yes, other than the fact that they supposedly

2    discovery Warren Steel bank accounts, plural, there is nothing

3    else.  Now, we don't know exactly what that is.  We haven't

4    seen any of the documents.  But they took this information and

5    they used it in Ohio.

6        And it's also confirmed, your Honor, by Mr. Power,

7    who, when we were going back and forth about this issue and

8    asking for the subpoenas and asking for the information, just

9    spontaneously told us -- it's Exhibit 39, your Honor, in our

10   materials, it's an email from him.  He's talking about the

11   protective order and the schedule, and then he says:  "It is

12   interesting to note, however, that the wire transfer records

13   obtained identify an account" -- he says one account;

14   Mr. Campanile says accounts, plural -- "of Warren Steel at

15   Regents Bank.  This account had been vaguely referenced as part

16   of incomplete and conflicting document disclosures by Symeou

17   prior to the New York 1782 application.  However, it was again

18   indirectly identified by Mr. Symeou during the extraordinary

19   general meeting EGM in Cypress in March.  Despite repeated

20   demands for Warren Steel's Regents' records reflecting the

21   transfers of more than 80 million in purport loans, Mr. Symeou

22   has continued to stonewall the turnover of such records."

23        So not only is Mr. Campanile indicating that that

24   material is used, Mr. Power found it so noteworthy that despite

25   no solicitation of that information, he mentioned to us, oh, by

1   the way, we found an account of Warren Steel at Regents Bank.

2         Now, is this the extent of what they have used?  I

3   don't know; we don't have it.  They clearly have used some

4   material.  And, your Honor, respectfully, they knew about the

5   potential sale of this business on March 31 of this year.  Now

6   it's June 22nd.  They bring this TRO in Ohio a week ago.  Your

7   Honor, the only intervening factors were they got the

8   information and then we learned of it, and they misled us and

9   they rushed to court in Ohio.

10         There is no question, your Honor, if you want a more

11  full-blown plenary hearing on it with witnesses, we can do it.

12  But there is no question that this and their Ohio papers

13  support this idea.  There was nothing urgent and immediate that

14  led to this.

15         And this is not a different kind of action from the

16  one in the BVI.  This is the same thing they brought before.

17  This the same thing they told you they were going to bring

18  again.  This is essentially as Mr. Power says in his papers, a

19  dispute among three shareholders and two of whom control it.

20  They went to the BVI.  It was -- they did not lose or withdraw

21  because of a lack of transparency, like he told you in his

22  papers; they lost on the merits.  The judge characterized what

23  they did as an abuse, and they were sanctioned over $800,000.

24  That explains why before they even came to you they transferred

25  the shares from Hornbeam to Bracha and they sought to dissolve

F6mdhorc

Hornbeam before they came to you.  They told you they were an

interested party before they came to you, and they did that

because they don't want to pay their sanction award and they're

not going to go back to the BVI because they can't go back to

the BVI because they have to pay the sanction award before they

can bring the action.

So what they did is they came to you, they got 1782

relief, and they used that information in Ohio.  OK?

Point one.

THE COURT:  But don't you concede that -- I mean at

the time -- I mean, I guess, are you saying that at the time

they were planning on using the 1782 materials in Ohio?

MR. COOPER:  They were never planning to bring a

foreign action.  And the proof is in the pudding because they

brought the same action -- the same action that they described

to you on page 2 of their application in Ohio.  OK?  So that

was a false pretense that they used to get it.  They didn't --

nothing changed.  They used that information in Ohio.

But that wasn't the only false pretense.  If I can go

on?

THE COURT:  Well, let me ask this.  Look, I guess what

I am trying to get at is I just want to deal with the issue of

temporary relief here.  What is the irreparable harm?  As I

hear Mr. Power, he is willing to enter into a protective order.

He is not going to use it anywhere else.  What the irreparable

F6mdhorc

1    harm to your client?

2            MR. COOPER:  The only thing Mr. Power offered today

3    and offered last week was he would give us documents that

4    concern Mr. Symeou.  OK?  This is a due process -- a number of

5    reasons there is irreparable harm.  First of all, there is a

6    due process violation.  The cases are clear that even though

7    you get ex parte relief under 1782, you have to serve the

8    subpoenas on all the target parties.  The Second Circuit case

9    Gushlak, which we cite to you, and under Rule 45, we were

10   supposed to be provided notice of the subpoenas as the targeted

11   party and we weren't.

12           THE COURT:  Well, again, on the issue of temporary

13   relief, you know, I'm all for you guys briefing this thing to a

14   fare-thee-well on the issues that you are raising with regard

15   to your due process rights and whether or not they have been

16   violated.  But with regard to your request to get immediately

17   immediate relief --

18           MR. COOPER:  Two other points.  First of all, Mr.

19   Power said the only people who have seen it are the people at

20   his firm and his client.  I don't know who his client gave it

21   to you.  I don't know who it has been disseminated to by his

22   client.  You are talking about almost ten years of wire

23   transfers involving many parties, over 20 parties, many of

24   whom, if not all of whom, have business dealings other than

25   Warren Steel.  So essentially they have confidential sensitive

1 information regarding these clients that had nothing to do with

2 this case. We don't know where it has gone. We don't know

3 what it has been used for. And we are entitled to see it.

4 Confidential information, your Honor, is one of the primary

5 reasons that an injunction is appropriate.

6 You also have them moving for a TRO in Ohio. The

7 hearing is scheduled for Friday. We've seen already that they

8 have admitted and were not straight with you about using some

9 of the material they got. Your Honor, we don't know what else

10 they used. We don't know the extent to which this matter -- we

11 are entitled to, first of all, have them have a court order

12 declaring that they can't use it in Ohio and seeing the

13 subpoenas and seeing the material that they got. We are

14 entitled to it. Not just Mr. Symeou's, he is a targeted party.

15 He was identified as a potential target in the application to

16 you. As a result under, Rule 45 we are entitled to all the

17 subpoenas and all the documents, not limited to him. In a

18 case, you do not just produce documents related to that

19 particular client, you make full disclosure. And here you have

20 the precomplaint, ex parte discovery in a domestic action, and

21 it is just completely improper. And I think it was done to you

22 without you hearing the whole story.

23 These parties have litigated obviously for a while.

24 They know each other well. And despite clearly their knowing

25 each over and having the contact information, the option was to

1    come to you ex parte and go to all these other courts and never

2    notify us.  And the only reason it ever came up is because

3    Mr. Marks, who represents one of the parties, happened to see

4    it in connection with something else he was working on.  We

5    didn't even know about this for six months.  And then when it

6    came to a head, bingo, the Ohio action started.

7         Given it is confidential, given we don't know who has

8    it, given the scope of it and given we have an Ohio action, I

9    believe it is very appropriate right now for us to see the

10   subpoenas, to see what they got, to see if in fact they are

11   being truthful that they didn't rely on other things, because

12   we just don't know.  You don't have domestic proceedings where

13   one side has all the cards and the other party doesn't and you

14   have a TRO coming up where -- you know, this is just wholly

15   improper.

16        You retain jurisdiction over this issue.  This was

17   your order.  You are certainly entitled to limit it now that

18   you have -- and you even say in your decision, first of all,

19   that you reserve the right to look further at this and you

20   reserve the right to hear motions to quash.  How can you hear a

21   motion to quash if the party hasn't gotten a copy of the

22   subpoena?

23        THE COURT:  Well, it wouldn't be the motion, it would

24   be the banks themselves who the subpoenas are against.

25        MR. COOPER:  The case law is clear that we are an

F6mdhorc

1    affected party, and as a target we are entitled to see the same

2    material, your Honor.

3         THE COURT:  Again, I'm not -- well, let me hear from

4    Mr. Power and then I will have some additional questions.

5         MR. POWER:  Your Honor, I think it's been three times

6    now you asked Mr. Cooper and Mr. Symeou's counsel to identify

7    what information was used in Ohio.  He has yet to be able to do

8    that.

9         Again, I take serious issues that without any evidence

10   or without -- he has had our Ohio pleadings for quite sometime

11   now, you know.  And everyone who is in that firm is equipped

12   with a highlighter and a pen to go through the Ohio pleadings

13   and identify what we have used.  We have used nothing, your

14   Honor, not one thing.

15        Now, if Mr. Cooper is telling this Court, OK, that it

16   is so secretive that the fact we've seen evidence of an Ohio --

17   a Regents Bank account of Warren Steel, the very entity in

18   which our client owns one third and they're saying even that,

19   that is so sensitive, the fact that there is an actual bank

20   account, Warren Steel, that you now know of, that that can't be

21   used, you have to wipe your memory clean of knowing that there

22   is a bank account, which, again, as I said, that bank account

23   was identified very, I say, in not a very open and frank manner

24   by Mr. Symeou before.  In other words, they did a summary of

25   accounting and they said that Warren Steel has a bank account

F6mdhorc

1    at Ohio.

2         We now know the bank account number, your Honor.  Big

3    deal.  We didn't use the bank account number in Ohio.  So to

4    suggest that the knowledge of a bank account of the very entity

5    in which we sought a TRO -- and, again, the TRO had nothing to

6    do with the bank account, it had to do with transferring the

7    assets to themselves.

8         So, your Honor, there is nothing that we've used.  And

9    the fact that we knew that there was a Regents Bank account, it

10   was confirmed in the wire transfer of, again, from Warren

11   Steel's Regents Bank account which disclosed the bank account

12   number, which, again, we didn't use in any way, shape or form

13   in Ohio.  And I'm also told by Mr. Campanile that Mr. Symeou

14   informed Mr. Campanile in August of 2014 about the existence of

15   a bank account at Regents Bank.

16        So this is not at all, as Mr. Cooper suggests, such

17   sensitive secret information that the Court has to use

18   extraordinary relief to prevent a one-third shareholder who

19   invested $60 million and is simply actually trying to get the

20   very records of this Regents Bank account of Warren Steel, to

21   say that that is precisely the information that, you know, is

22   of such a secretive nature that Mr. Symeou has to protect all

23   these other parties who he is representing now in form, not

24   officially, but from -- you know, from further dissemination

25   or, you know, God forbid the public or somebody knows that

1    there is a Regents Bank account of Warren Steel.  You know,

2    that is not at all information which one needs to protect,

3    first of all, or that was sought from this 1782 action.

4          So, again, I state that the Court asked Mr. Cooper to

5    identify with specificity what he believes we used, what

6    information we used, and there isn't any.  In fact, again,

7    there are no records whatsoever, not one wire transfer

8    referencing from, to, or referencing Mr. Symeou.  You know, if

9    any of these other individuals thought this was so important,

10   they would have hired counsel to come and appear on their

11   behalf.

12         So, you know, I don't see that the request being made

13   by Mr. Cooper rise to the level that would require any kind of

14   Court intervention other than agreeing to a protective order,

15   which we have agreed to.  So I don't think there has been this

16   vast rogue disclosure of anything.

17         And, in fact, Ohio, as we contemplate, we started

18   preparing that TRO for quite some time, interestingly enough,

19   despite Mr. Cooper's representation, before it was filed.  It

20   was quite a significant undertaking.  So it was well before

21   even Mr. Marks said he stumbled upon some blog that referenced

22   this case.  So that Ohio action was in the works as soon as

23   Mr. Symeou disclosed to Mr. Campanile that they were intending

24   to credit bid and sell Warren Steel's assets.

25         THE COURT:  OK.

F6mdhorc

1    MR. COOPER:  Your Honor, can I just --

2    THE COURT:  Sure.

3    MR. COOPER:  I think it is important.

4    THE COURT:  And, also, to this point, I understand the

5    reference to the bank account.  Was that in fact -- Mr. Cooper,

6    is that reference in the complaint?  In other words, is this

7    Regents Bank account reference in the complaint?

8    MR. MARKS:  Your Honor, if I may?

9    THE COURT:  Yes.

10   MR. MARKS:  I am the one who is involved in the Ohio

11   proceeding, which is not simply an injunction, as Mr. Power

12   represented, it is for damages.  It is a full plenary suit to

13   get damages for what they incurred.  They have an expedited

14   request to produce documents which references Regents Bank.

15   THE COURT:  I'm sorry.  You've made a request that

16   they produce --

17   MR. MARKS:  No.  They have.  Your Honor is asking what

18   has the Shulman side done, OK, to use this information in

19   addition to what Mr. Campanile admitted in his affidavit that

20   was filed in Ohio, and you asked about Regents Bank, right,

21   your Honor?

22   THE COURT:  So you're saying their knowledge of the

23   Regents Bank, although not in the complaint, is something that

24   they utilized to create a discovery request?

25   MR. MARKS:  They filed a motion for expedited

1     discovery filed in Ohio, and it seeks discovery related to

2     Regents Bank.

3                 THE COURT:  OK.

4                 MR. MARKS:  So not only is there -- again, I will let

5     Mr. Cooper speak, but there is not only the admission in

6     Mr. Campanile's affidavit that they used the information from

7     the discovery that your Honor authorized in which they

8     uncovered information about Regents Bank, and they took that

9     information and put it as a basis for their discovery request.

10                THE COURT:  OK.

11                MR. MARKS:  So there is a clear -- I'm going to sit

12    down, but there is a clear use of that information in Ohio.

13                THE COURT:  Has your client previously disclosed the

14    existence of the Regents Bank even if he had not disclosed the

15    specific account number?

16                MR. MARKS:  Your Honor, I don't know that, but it's

17    clear what happened is that that's the bank that received

18    the -- which they would know, that's the bank that would

19    receive the wires for the loans.  And so, therefore, they

20    learned that information -- or they took the discovery that

21    your Honor authorized, they learned the information that this

22    is the recipient bank, as opposed to other banks, and then they

23    used that information to target their expedited discovery

24    request in Ohio -- a clear use of what they learned.  They

25    didn't ask for information regarding ten banks, right, your

F6mdhorc

1    Honor?  They narrowed their request to the bank -- the Regents

2    Bank because they learned of the role that it played as a

3    result of what we believe that they discovered, which is why

4    Mr. Cooper said, your Honor, you know, all we're asking for --

5    which is no burden to them, all we're asking for is the

6    subpoenas that have been served on the banks, and we're asking

7    your Honor to order them to turn over the discovery that they

8    got.  We don't know what they have.  So we know, because

9    Mr. Campanile admitted in his declaration, that they used the

10   Regents' Bank stuff.  But we can't police what they're telling

11   us, your Honor, unless we know what they received.

12          As your Honor well knows, in any proceeding in the

13   United States, if you serve a subpoena, the discovery that's

14   responsive to the subpoena is produced at a time and a place,

15   under Rule 45.  It is a mandatory requirement, and then both

16   sides go to the production.  They can inspect it and they can

17   copy it.  We were denied that fundamental opportunity to see

18   what they got.

19          I know, your Honor, in practice people say to each

20   other, hey, we're not going to make the bank bring this to

21   Holland & Knight so that you can come and inspect and copy it.

22   Attorneys on both sides communicate with each other, and they

23   say to the bank email it to both of us, email it to one of us

24   and we'll copy it, but you don't get to do it secretly and

25   that's the information that we need to get.

F6mdhorc

1    THE COURT:  Have you made discovery requests in the

2  Ohio action?

3    MR. MARKS:  No, your Honor.  The first that we learned

4  of the Ohio action was your Honor may remember that on I

5  believe it was Wednesday or Thursday of last week, your Honor's

6  clerk said that -- I'm sorry, Wednesday -- that you would be

7  available either -- I'm sorry either Monday of this week or

8  what's -- I'm sorry.

9    THE COURT:  Friday.  Thursday or Friday.

10    MR. MARKS:  But the answer is no, your Honor.  We only

11  learned about it when I got an email on Sunday of last week

12  where your Honor was available Monday of last week, right?

13    THE COURT:  Yes.

14    MR. MARKS:  So Mr. Power said he wasn't available but

15  never told anybody that the reason he wasn't available was

16  because he was going to email me pleadings, draft pleadings on

17  a Sunday and then go into the court in Ohio the next morning.

18    THE COURT:  I guess my question is, as I heard, there

19  is a hearing on Friday.

20    MR. MARKS:  There is a TRO hearing, yes, regarding our

21  papers.

22    THE COURT:  Am I correct that the discovery -- is the

23  discovery requested in advance of that hearing or --

24    MR. MARKS:  They requested it but the Court, the Ohio

25  court -- your Honor, I was answering the question is there a

F6mdhorc

1    linkage of their usage with Regents Bank, and I believe I

2    established a clear usage, because that was the bank that they

3    targeted in their expedited discovery request.  The Ohio court,

4    your Honor, did not grant that request.

5              THE COURT:  OK.

6              MR. MARKS:  That's been put off to a time, I suppose,

7    they --

8              THE COURT:  OK.

9              MR. MARKS:  But I did want your Honor to see how it

10   was used there.

11             THE COURT:  Yes.

12             MR. POWER:  Your Honor, I think what's interesting in

13   this case is despite repeated requests to Mr. Symeou, he has

14   not identified any bank of Warren Steel other than the Regents.

15   Bank, which he identified well in advance of when we applied

16   for the TRO.

17             So it's interesting that Mr. Marks said we only

18   referred to the Regents Bank of Warren Steel when in fact the

19   only evidence we have both before, now, and I'm sure in the

20   future is going to be this one bank account.  So you wouldn't

21   target multiple bank accounts when to your knowledge it only

22   consists of it being one.  So I think that, again, is a

23   misdirection.

24             The information hasn't been used in Ohio.  It is not

25   going to be used in Ohio.  There is no need for it in Ohio.

F6mdhorc

1        Just so the Court is clear what we've asked for in

2   Ohio and it has been a very simple request.  It is a TRO.  A

3   TRO has to be premised on something.  What we did under Ohio

4   law, a TRO can be put in place and an accountant and a

5   receiver -- we have applied for a receiver.  We are getting

6   nowhere with these defendants.  We are going to spend hundreds

7   of thousands of dollars in every 1782 action that we have

8   sought here in the United States.  They are going to fight

9   tooth and nail, and the rest of the subpoenas are going to be

10  on themselves.

11       Good luck getting the information from Korf.  He is

12  going to fight it in Florida.  In Delaware they are going to

13  fight it.  So in reality, your Honor, this is a merry-go-round.

14  Every time we ask for something they refuse to provide it.

15  When we seek legal redress to get it, they say we are not

16  entitled to it.

17       Yet they say -- you know, again, our client invested

18  $60 million.  He has asked to identify the bank accounts of

19  Warren Steel so he can do an independent analysis.  In Ohio, I

20  think it's very likely, and all we've asked in Ohio is that a

21  receiver be appointed, a receiver that is going to provide

22  information to Mr. Kolomoisky, Mr. Bogolubov and Mr. Shulman,

23  all three of the principals of this facility are going to get

24  honest, accurate, fair and legitimate reports of what is the

25  status of this company.  That is the reason why we filed the

F6mdhorc

1    Ohio action.

2           And I don't think anyone here, again, unless they're

3    trying to hide the bank accounts, what's been going on, why not

4    let an independent person figure out what's going on with this

5    company so we can end this litigation, we can avoid hundreds of

6    thousands of dollars in further litigation in each one of these

7    other 1782 actions, which we haven't served yet, and we are

8    contemplating serving them soon because at some point, for

9    example, if in the Ohio action a receiver is not appointed, the

10   TRO isn't maintained -- and I think it will because I think the

11   Ohio Court sees what's going on here, but then, again, we

12   needed to stop the sale of the Ohio company to the insiders

13   otherwise the relief that we would bring in the BVI is going to

14   be without bearing any fruit.

15          THE COURT:  OK.  Just a quick question, Mr. Power.

16          Do you know -- this is an issue that Mr. Cooper had

17   raised a little bit earlier -- whether your client has provided

18   the information or documents obtained from the subpoenas issued

19   based upon my order to anyone else?

20          MR. POWER:  The answer is, your Honor, I do not

21   believe that any disclosure has been made outside.  My client,

22   as far as I understand, does not speak English.  The

23   disclosures and if the cases were discussed with -- if the

24   information was discussed, it was, I understand, done through

25   who has already been disclosed, Ms. Tatyana in Russia.  So I

1    can say to the Court right now there has been no representation

2    from the client that this information has been used anywhere

3    else outside of a very small group of people who gathered the

4    information.

5             THE COURT:  So you don't believe it to be so but you

6    don't know for certain?

7             MR. POWER:  Well, no one can ever know for certain.

8    The client has -- the client, we have said this information is

9    not for public disclosure, this is only for this case, this is

10   going to be used in a foreign proceeding, nowhere else.  So as

11   with anything, you know, I have no reason to believe that my

12   client had breached the agreement that we had when we provided

13   this information for the client to assess.

14            THE COURT:  OK.

15            MR. POWER:  Much of this information, your Honor, by

16   the way, many of the entities that we named were also our

17   clients' own entities.

18            Now, I also find it disturbing that Mr. Symeou --

19   again, it is only Mr. Symeou who is here -- who is saying this

20   information is so important and sensitive that he has to be

21   able to see it.  Mr. Symeou doesn't have any permission from

22   Mr. Korf, from Mr. Kolomoisky, Mr. Bogolubov.  Why would Symeou

23   be entitled to see everyone else's information right now if in

24   fact --

25            THE COURT:  After you are done, Mr. Power, I am going

F6mdhorc

 1    to hear from Mr. Cooper and then I am prepared to make a ruling

 2    on this particular issue.

 3            MR. POWER:  I think, your Honor, until we find out

 4    ultimately whether Mr. Symeou -- the issue of standing, the

 5    issue of notice, that in fact Mr. Symeou represents more than

 6    just himself, which we've identified to the Court there is no

 7    information on his behalf, anything more than a protective

 8    order which will prevent this dissemination of this information

 9    in any proceeding anywhere in the world by any of the parties

10    that has access to it I think is more than sufficient at this

11    point.

12            THE COURT:  All right.  Mr. Cooper.

13            MR. COOPER:  Your Honor, you know, when I hear

14    Mr. Power talk, I feel like he is talking around the issue.

15    He's trying to make Mr. Symeou to be such a bad guy, he's

16    almost saying, oh, because he didn't give us this stuff, we're

17    entitled to do whatever we want.

18            What we are here to talk about today are the federal

19    Rules of Civil Procedure, not whether he believes on the merits

20    somebody is right or somebody is wrong.  And for him to say he

21    doesn't understand why we are claiming or proving that

22    information was used in the Ohio proceeding when the client

23    sitting next to him put in an affidavit that said exactly that

24    is a little bit beyond belief.

25            Under the federal rules, you do not have trial by

F6mdhorc

1    ambush.  You have full disclosure.  You do not hide the ball

2    and make us guess how they used substantial discovery material

3    in their case.  We do not have access to their work product.

4    All we know is there was absolutely no other justification for

5    filing that other than they got material and they said so.

6    And --

7            THE COURT:  Is the company -- does your client

8    contemplate selling the company or not?

9            MR. COOPER:  There is nothing imminent right now

10   and --

11           THE COURT:  That's --

12           MR. COOPER:  He could answer himself.

13           THE COURT:  Mr. Marks.

14           MR. MARKS:  I don't mean to double-team you, your

15   Honor.

16           THE COURT:  No, that is OK.  If one lawyer knows more

17   information, go ahead.

18           MR. MARKS:  The answer is there was a general -- there

19   was a shareholders meeting.  I represented -- Mr. Campanile

20   was one and there was representatives of Marigold Trust, which

21   is Mr. Bogolubov's entity, and Mr. Symeou, which is

22   Mr. Kolomoisky's entity.  There was a shareholders meeting in

23   Cypress on March 31st of 2015, and they engaged an investment

24   bank called Sagent to market the plant.  That is in what I

25   would call the nascent -- n-a-s-c-e-n-t, I know what the word

F6mdhorc

1   means but I have trouble pronouncing it --

2           THE COURT:  Nascent.

3           MR. MARKS:  That is in the nascent stages.  They are

4   reaching out to identify and to talk and to communicate to try

5   to get bids from third parties to see if third parties are

6   interested in buying the plant, and that process, quite

7   naturally, then would set a market price for the plant.  And

8   there is no plan at all to imminently sell the facility, and

9   that will be, needless to say, raised on Friday -- at all.  And

10  they knew that.

11          Again, I don't want to get into the back and forth of

12  the merits of it, but that happened on March 31st.  There is an

13  independent investment bank that's trying to organize this, get

14  proper, you know, closure forms.  There is nothing -- that is

15  not imminent.

16          But let me let Mr. Cooper speak because I think the

17  issue he is focusing on is how Rule 45 works, and Rule 45

18  doesn't permit secret discovery.

19          MR. COOPER:  Your Honor, to argue we're not entitled

20  to see this, we shouldn't see it, I mean, it just doesn't

21  comfort with anything about the federal rules.  And besides the

22  general principles here, there are very serious credibility

23  issues.  Even if they weren't credibility issues, we are

24  entitled to an open mode of discovery.  That is the way it is

25  done in American courts.

F6mdhorc

1        But the credibility issues I've outlined today are

2   only part of them.  When they came to you, the linchpin reason

3   they said they needed this discovery and what your Honor

4   rightfully relied on based on the record you have -- and I'm

5   reading from your decision -- is "The material Hornbeam seeks

6   to discover is potentially critical to those foreign

7   proceedings, because it is relevant to whether Kolomoisky and

8   Bogolubov controlled the related party or provided the funds

9   that the related parties loaned to Warren Steel."  Then you go

10  on:  "Evidence like that is material."

11       That was in December of this year.  In October --

12  December of 2014.  In October of 2014, in the very BVI

13  proceeding that they reference -- it is Exhibit 6 in our

14  appendix -- there is an affidavit from Mr. Korf, who is the

15  president of Warren Steel.  He says, in paragraph 5.4:  "These

16  operating losses have been met partly at least by further

17  borrowings.  Given the financial position of Warren, it was not

18  possible to arrange commercial financing.  The only parties

19  that were going to be prepared to lend further sums to Warren

20  were those already financially committed to Warren, who stood

21  to lose the sums committed if Warren were to fall and/or who

22  were sufficiently familiar with the Warren business to

23  understand that it could be a highly profitable business given

24  significant investment.  At various times over the years,

25  inquiries were made to several commercial banks concerning

F6mdhorc

 1    financing for Warren Steel, and no commercial banks were

 2    willing to provide such financing.

 3            "Accordingly, and as those acting for the ultimate

 4    beneficial owner of Hornbeam have again been aware for some

 5    time, a series of connected party loans have been provided to

 6    Warren Steel to keep it running.  To demonstrate that ultimate

 7    beneficial owner of Hornbeam has been aware of these connected

 8    party loans for some time, I refer, for example, to the email,"

 9    and then he cites a couple of exhibits.

10            There was no issue before you regarding whether these

11    were related.  This had been disclosed months earlier.  If they

12    in fact wanted to bring an action because they had a lack of

13    transparency and didn't know whether they were related actions,

14    they knew on October 14th.  It was admitted by Mr. Korf.  They

15    could have amended in the BVI and brought the action then but

16    they didn't.  They lost.  They were assessed costs.  And then

17    they came to you under the guise of they don't have enough

18    discovery in the BVI.  We need to know this.  And your Honor

19    unequivocally relied on that as the gravamen of your decision.

20    It was never a mystery.

21            THE COURT:  All right.  I am prepared to make a

22    ruling.

23            I think, at least with regard to -- and, again, I am

24    not making a ruling with regard to your ultimate potential

25    entitlement to receive these materials, but with regard to the

1   actual request for temporary relief, I think that the entry of

2   a protective order to maintain the status quo will be

3   sufficient with regard to that.  Obviously, I am going to

4   address the merits once the parties complete their briefing of

5   the issue.

6           As I understand it, I will outline what I believe the

7   protective order will say and I will leave it up to the parties

8   to actually come up with the language and any additional

9   language they feel is appropriate to protect their respective

10  clients' interest.

11          The materials will not be utilized in any domestic or

12  foreign proceeding, litigation, arbitration.  It will not be

13  disseminated to anyone other than counsel and the parties.

14          The parties are going to be directed -- and by "party"

15  I am referring to, Mr. Power, your client -- that it is not to

16  be disseminated.  To the extent that your client does not have

17  a copy, if you intend to provide -- well, you shouldn't provide

18  your client with any further copies, and the use of the

19  material should be limited to the people -- the attorneys that

20  you mentioned earlier, and they should all be informed that

21  they are not to utilize it in any proceedings going forward.

22          Now, as I understand it, you do not -- well, even if

23  you did have an intent to issue some further subpoenas in

24  connection with my order, that you will refrain from doing that

25  at this stage until we can address the merits of the issue

F6mdhorc

1   raised by defendant, by Mr. Symeou.

2          Now, I will leave it up to the parties.  I don't know

3   how long it will take you to put that pen to paper so I can

4   enter that, but you have my general understanding of what would

5   be necessary.  In essence, the material just shouldn't be

6   disclosed or used.  OK?

7          Now, in connection with a briefing schedule, I

8   understand that you have this hearing on Friday.  I was going

9   to suggest opposition papers due -- and I don't know whether

10  the parties have discussed a briefing schedule for the

11  underlying matter.  Mr. Marks.

12         MR. MARKS:  He had offered in his opposition papers 20

13  days.  If your Honor wants to say 20 days from today, that

14  would be fine with us.

15         THE COURT:  OK.  I mean, I was going to say -- I am

16  going to say what I was going to say and then the parties

17  can -- I am amenable if more time is necessary.  Opposition by

18  July 6th.  Reply -- any reply will be due July 13th.  And then

19  we would have a hearing on July 17th at 10 a.m.  Obviously, I

20  didn't take into consideration that the parties are going to be

21  in Ohio on Friday and preparing for that, and I don't know

22  whether -- is that matter scheduled just for one day, the

23  hearing?

24         MR. MARKS:  Yes, your Honor.

25         MR. POWER:  Your Honor, the TRO was supposed to be in

1    place for 14 days.  At the request of Mr. Marks, the Court set

2    the hearing on for this Friday instead of the following Monday.

3              THE COURT:  OK.

4              MR. POWER:  The parties can extend it.  I know

5    Mr. Marks did say that he is going to need a lot of time to

6    brief the preliminary injunction issue, the receiver issue.  So

7    it was Mr. Marks who requested to the Ohio Court that he was

8    going to need an ample amount of time.

9              I think under the briefing schedule that we know and

10   the statutory guidelines and the requirements for extending a

11   TRO are quite limited, but there is a lot of briefing that is

12   going to be going on during this time.

13             THE COURT:  Sure.  I guess my question is only do the

14   parties think they need a little bit more time with regard to

15   my schedule, you know, because I wasn't anticipating the other

16   proceeding going forward?  Mr. Marks.

17             MR. MARKS:  Your Honor, my understanding in Ohio is

18   that our motion to vacate the TRO will be heard by the

19   Magistrate Judge on Friday.

20             THE COURT:  OK.

21             MR. MARKS:  Given the briefing we will be on, we would

22   expect it will take the Magistrate Judge some time to issue her

23   report and recommendation.  We would anticipate consenting to

24   extending TRO until the Magistrate Judge has had the

25   opportunity to rule.

F6mdhorc

1           THE COURT:  OK.

2           MR. MARKS:  So there will be from our perspective no

3     need for further briefing unless the Magistrate Judge wants it

4     after Friday.  The preliminary injunction hearing, if it ever

5     gets to that stage, will be quite some time in the future.

6           THE COURT:  OK.

7           MR. MARKS:  We want to give the Magistrate Judge time

8     to be able to properly review the record and to make a

9     recommendation.

10          THE COURT:  Sure.

11          MR. MARKS:  So this schedule, your Honor -- the 6th,

12    the 13th and the 17th is certainly -- and we appreciate your

13    Honor making your Honor available on the 17th -- that's fine

14    with us.

15          THE COURT:  OK.  Mr. Power.

16          MR. POWER:  You know, that's fine with us.  I mean,

17    when are you away?

18          MR. BARRY:  That is fine.

19          MR. POWER:  That is fine, your Honor.

20          MR. COOPER:  On your earlier ruling about the TRO, I

21    assume you meant all the material that they've gotten, not just

22    those limited to Mr. Symeou, correct?

23          THE COURT:  That is all the material they have gotten

24    in connection with any subpoenas that they issued pursuant to

25    the order that I entered, yes.

F6mdhorc

1          MR. COOPER:  OK.  The other question I have is with

2     regard to the hearing, are you anticipating having live

3     testimony?

4          THE COURT:  You know, I don't know at this stage.  I

5     mean, I don't think so but I don't know.  Because, you know,

6     although I am prepared for the limited purpose of today, I have

7     not looked through all the affidavits and materials that you

8     submitted.  But I was not anticipating having live testimony.

9          I can let you know specifically by the end of the week

10    whether I -- I mean, I haven't seen the opposition papers, but

11    my initial reaction is no, that I wouldn't have.

12          MR. POWER:  Your Honor, I think, recalling the

13    gravamen on the allegations in the TRO application, frankly, we

14    did bring a witness here because there were a lot of factual,

15    you know, this was done for nefarious purposes.  I think, from

16    knowing the law, that the issue purely is, under Rule 45 and/or

17    27 and/or 1782, is notice required -- when is, if at all,

18    notice required to a potential defendant in a foreign action.

19    I think that probably doesn't require any witnesses from my

20    side.

21          THE COURT:  All right.  Let me ask this, Mr. Cooper,

22    was it your -- again, I indicated my view, but did you

23    anticipate -- did you want to have witnesses?

24          MR. COOPER:  My belief is no.  However, Mr. Power did

25    bring a witness and he proffered what that witness was going to

F6mdhorc

1    say when they started contemplating the Ohio arcs, etc., etc.

2    If you are going to get into fact issues like that, then we

3    would be entitled to some discovery about that, and we can't

4    have him come in unilaterally and say that.  So I think it

5    could be done on the basis of legal issues in the papers.  If

6    there are residual fact issues, perhaps at that point you can

7    stay the residual fact issues and have a hearing on the fact

8    issues with due notice.

9             THE COURT:  Yes.  I anticipate that the opposition

10   papers will deal with the legal issues, and to the extent there

11   is going to be an affidavit, it will be similar to the

12   affidavit submitted on behalf of your client.  If the need

13   arises, I will let the parties know.  You know, I probably have

14   to wait at least until I see the opposition papers.

15             And, obviously, Mr. Cooper, if once you see the

16   opposition papers you feel that an evidentiary hearing is

17   necessary, I will get the parties on the phone and I'll hear

18   you on that.  But I think my initial view is that I would take

19   it on the papers.  I would have specific questions for counsel

20   on the 17th, and make a ruling soon thereafter, if not on that

21   date.  OK?

22             MR. COOPER:  That is fine, your Honor.

23             THE COURT:  All right.

24             MR. COOPER:  Yes.  Thank you.

25             MR. POWER:  Yes.

1        THE COURT:  Anything else, Mr. Power?

2        MR. POWER:  No, your Honor.  Thank you.

3        THE COURT:  OK.  Let me ask this.  When do the parties

4   think they can be able to get me the protective order?  I just

5   want to have something.  I will put it in the docket so I have

6   a date.

7        MR. POWER:  At the end of tomorrow.

8        MR. COOPER:  You know, one thought I have on that,

9   your Honor, is I think it would be -- given the nature of this,

10  it would be important to have Mr. Shulman sign it and make the

11  representation, because there is no way of knowing -- you know,

12  I don't want to charge Mr. Power with knowing everything his

13  client did.  I think it is important, given that he has

14  received this material, that he be a signatory to this.

15       MR. POWER:  Your Honor, I would ask the same of

16  Mr. Kolomoisky and Mr. Bogolubov and Mr. Symeou and Mr. Korf.

17       MR. COOPER:  I will be happy to do that if you provide

18  materials to us.  If you provide materials to us, we will sign

19  it in short order, your Honor.

20       MR. POWER:  Your Honor, I meant -- what I was going to

21  clarify is that those individuals have given Mr. Symeou any

22  sort of apparent authority to speak on their behalf.

23  Mr. Symeou is also not present in this district.  Mr. Symeou is

24  a Cyprian resident.  Suggesting that Mr. Korf needs to sign

25  something -- Mr. Shulman needs to sign something, I think it

F6mdhorc

1     goes beyond the level.  But before that is determined, I can

2     perhaps have a statement from Mr. Shulman.

3              THE COURT:  OK.  Look, I don't think it is necessary

4     for the clients to sign a protective order.  I think, counsel,

5     you need to communicate with it.  I think the protective order

6     should indicate that it has been provided to the attorneys who

7     have an interest in the matter as well as to the client.  OK?

8              MR. POWER:  All right.  We will even ask -- we will

9     confirm every person who has a look in our law firm, and, as I

10    said, we will state the names of the individuals who have even

11    had access or have been summarized this information.

12             THE COURT:  Why don't you do this.  Why don't you get

13    it to me by the end of the week.  You obviously have other

14    things you are working on, but, if you can get it to me by

15    tomorrow, that's fine, but I will give you until the end of the

16    week.

17             Anything else, Mr. Power?

18             MR. POWER:  No, your Honor.

19             THE COURT:  Mr. Cooper?

20             MR. COOPER:  No.  Thank you, your Honor.

21             THE COURT:  Mr. Marks?

22             MR. MARKS:  No.  Thank you, your Honor.

23             THE COURT:  All right.  Thank you.

24                                   -   -   -

25