# EXHIBIT 2

FILED
2015 Sep-28  PM 05:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

|  |  |  |
|---|---|---|
| IN RE APPLICATION OF | ) | |
| BRACHA FOUNDATION | ) | |
| | ) | **CASE NO.: 2:15-mc-00748-KOB** |
| REQUEST FOR DISCOVERY | ) | |
| PURSUANT TO 28 U.S.C. § 1782 | ) | |

## SECOND DECLARATION OF FABRIZIO N. CAMPANILE IN SUPPORT OF HORNBEAM'S MOTION TO INTERVENE AND BRACHA'S OPPOSITION TO MOTION TO VACATE

I, FABRIZIO N. CAMPANILE, being over the age of eighteen, declare as follows:

1.      I am an attorney-at-law admitted to the bar of Zurich, Switzerland in the year 2000.

2.      I make this Declaration in support of Hornbeam Corporation ("**Hornbeam**") and Bracha Foundation's ("**Bracha**") applications for discovery pursuant to 28 U.S.C. § 1782.

3.      I am fully familiar with the facts of this case, as I have been investigating the subject matter of this litigation for approximately three years.

4.      I am fully authorized to make this Declaration by Hornbeam and Bracha. The statements contained herein are true to the best of my knowledge and belief. Aside from where otherwise indicated, facts contained herein are based upon personal knowledge or upon my interviews with Vadim Shulman ("**Shulman**") as well as my review of the relevant documentation, including but not limited to the

multiple sworn affidavits and exhibits thereto that were submitted in the Section 1782 discovery proceeding before the United States District Court for the Southern District of New York entitled *In re Application of Hornbeam Corp.*, 1:14-mc-00424-P1 (VSB) (the **"SDNY Action"**), in the consolidated injunction and receivership proceedings by Bracha, Hornbeam, and Shulman *inter alia* against Warren Steel that is pending before Judge W. Wyatt McKay in the Court of Common Pleas for Trumbull County, Ohio, Case Nos. 2015-CV-1117 and 2015-CV-1577 (the **"Ohio Action"**), as well as in the injunction and liquidation proceedings by Bracha's predecessor-in-interest, Hornbeam, *inter alia* against Halliwel Assets Inc. (**"Halliwel"**) that were brought before the Commercial Division of the High Court of Justice, British Virgin Islands (the **"BVI Court"**), entitled *In the Matter of Halliwel Assets Inc.*, Matter No. BVIHC (COM) 2014/105 and *In the Matter of Halliwel Assets Inc.*, Matter No. BVIHC (COM) 2014/134 (the **"BVI Proceedings"**) as well as the correspondence with the involved parties.

**IN 2012 HALLIWEL ACCEPTED BRACHA AS BENEFICIAL OWNER OF THE SHARES IN HALLIWEL**

5.     On January 5, 2006, the Articles of Association of Halliwel were signed. Between July 12, 2012 and August 2, 2012, the Articles were amended four times. The August 2, 2012 version of the Articles included a limited pre-emption right concerning the transfer of shareholders that had not been included in the original

version when the company was founded.  The August 2, 2012 version of Halliwel's Articles of Association is attached hereto as **Exhibit 1**.

6.      On information and belief, neither Shulman, Bracha, Hornbeam, nor any party acting on their behalf consented to the amendments.

7.      Prior to October 2012, Panikos Symeou ("**Symeou**"), the current sole Director of Halliwel assets and Secretary of Warren Steel, held in trust Shulman's interests in Halliwel by a Deed of Trust dated June 30, 2006 (the "**Deed of Trust**"). The Deed of Trust is attached hereto as **Exhibit 2**.

8.      Dr. Verena Ernst ("**Dr. Ernst**") is a partner of Continor Treuhand Anstalt ("**Continor**"), a Liechtenstein entity that acts as a legal and financial advisor to as well as an administrator of Shulman's corporate entities.

9.      On July 19, 2012, Dr. Ernst wrote to Symeou informing him that Shulman wished Symeou to hold Shulman's interest in Halliwel in trust for Bracha, a Liechtenstein foundation controlled by Shulman and of which Shulman is the first sole beneficiary.

10.     At this time, Dr. Ernst enclosed the excerpt from the Liechtenstein Register of Commerce that evidenced Bracha's registration.  On the same day, Dr. Ernst informed Symeou that the Deed of Trust would be terminated, and Hornbeam Corporation ("**Hornbeam**"), a Panamanian trust entity administered by Continor, would be registered as the nominee shareholder for its principal, Bracha.

11.     On the same day, Christiana Kouppi, Symeou's colleague at the Cypriot law firm Symeou and Konnaris LLC, only stated that she would need a written confirmation from Shulman in order to transfer his interest in Halliwel, that was then held in trust by Symeou, to Hornbeam.  She requested Shulman to confirm that transferring the 33,332 ordinary shares in Halliwel (the **"Shares"**) would not change his status as the ultimate beneficial owner of the Shares.

12.     Finally, Ms. Kouppi requested Shulman's confirmation of an understanding that to the extent he ever intended to effect a change in ultimate beneficial ownership of the Shares, the transfer would be "subject to pre-emption right in a manner specified in the Articles of association of Halliwel Assets Inc."  The July 2012 email correspondence between Dr. Ernst and Symeou's law firm is attached hereto as **Exhibit 3**.

13.     On September 27, 2012, Dr. Ernst wrote a letter to Ms. Kouppi, Symeou's colleague, confirming that Hornbeam held the Shares in Halliwel and "that Mr. Vadim Shulman, born 27 April 1960, is the beneficial owner of Bracha Foundation.  Should the beneficial ownership change, we will inform you accordingly."  The September 27, 2012 letter is attached hereto as **Exhibit 4**.

14.     The September 27, 2012 letter enclosed the Declaration of Trust (the **"Declaration of Trust"**), dated July 7, 2012, which provided that Hornbeam held the Shares "in Halliwel Assets Inc., BVI in our name as nominee and trustee for

4

Bracha Foundation, Vaduz."  A copy of the Declaration of Trust in attached hereto as **Exhibit 5**.

15.     On October 9, 2012, Shulman wrote a letter to Symeou confirming each of the specifics requested by Symeou's colleague, Ms. Kouppi, including that he remained the ultimate beneficial owner of the Shares and that any change in ultimate beneficial ownership would be subject to pre-emption rights.  A copy of the October 9, 2012 letter is attached hereto as **Exhibit 6**.

16.     Between July and October 2012, Symeou and other members of Symeou & Konnaris LLC conducted due diligence into both Hornbeam's and Bracha's ownership and structure.  With regard to the due diligence on Bracha, the documents provided by Shulman satisfied Symeou that Shulman was the first sole beneficiary of Bracha.

17.     Considering there was no change in ultimate beneficial ownership, under a proper construction of the Articles of Association, article 32A is not applicable.  In the alternative, Halliwel, Symeou, its sole Director, and its shareholders proceeded upon the basis that article 32A did not apply to a transfer of the legal, but not beneficial, title to the Shares.  Thus, no attempt was made to invoke that article during the October 2012 transfer of the Shares from Symeou to Hornbeam.

18.     In October 2012, Symeou recognized and accepted Hornbeam as nominee shareholder and Bracha Foundation as the principal for the Shares.  On October 10,

2012, Hornbeam, as trustee for Bracha, was registered in the Shareholder Register of Halliwel.

19.   Shulman's control and status as first sole beneficiary of Bracha has not changed since the day Symeou accepted and recognized that Bracha was the beneficial holder of the Shares.

## HALLIWEL'S REFUSAL TO REGISTER BRACHA

20.   In July 2014, after being suspicious of Warren Steel's related party loans and operations, I asked Dr. Ernst to request Warren Steel's accounting information from Symeou in his capacity as sole Director of Halliwel and Secretary of Warren Steel.

21.   On July 17, 2014, Dr. Ernst requested from Symeou that Tectum Trust Management Establishment ("**Tectum**"), a trust structure similarly administered by Continor, replace Hornbeam as the *nominee* shareholder of Halliwel.  Dr. Ernst informed Symeou that Bracha would remain the *principal* shareholder and Shulman the ultimate beneficial owner of the Shares.  As such, there would be no change in the (ultimate) beneficial ownership.  The July 17, 2014 email correspondence between Dr. Ernst and Symeou is attached hereto as **Exhibit 7**.

22.   The transfer was motivated by Continor's advice that, after 2014, Hornbeam's structure would no longer be compliant with the United States' Foreign Account Tax Compliance Act ("FATCA") and other global regulations.

Tectum complied with the global requirements as it was supervised by the Liechtenstein Financial Markets Supervisory Authority.  Hornbeam did not.

23.    On July 17, 2014, Symeou responded that no action had been taken, and he noted that to complete the transfer of the registered shareholder Dr. Ernst would need to provide all registration documents that explained Tectum's structure and confirmed that the ending beneficial owner (Shulman) remained unchanged.

24.    Symeou confirmed that upon receiving the documents, the transfer would be completed. On July 30, 2014, Dr. Ernst again asked for financial information regarding Warren Steel.  The July 2014 email correspondence between Ronny Pifko and Fabrizio Campanile is attached hereto as **Exhibit 8.**

25.    On July 30, 2014, Dr. Ernst sent a registered letter from Bracha to Symeou regarding Halliwel.  In this letter, Bracha confirmed that Hornbeam held the Shares in trust for Bracha.  It also confirmed that Hornbeam would no longer be the nominee shareholder of Halliwel, that Bracha would remain the principal owner, and that Shulman would remain the ultimate beneficial owner.  The letter enclosed an Instrument of Transfer and a Declaration of Trust, which verified that Tectum was holding the Shares in trust for Bracha and Bracha would remain the principal. Dr. Ernst's July 30, 2014 registered letter and the enclosures thereto are attached hereto as **Exhibit 9**.

26.     As of July 30, 2014, all documents regarding the change of *nominee* shareholder were sent to Symeou.  On the same day, Symeou responded saying he would review the documents.  Furthermore, he did not provide any of the requested financial information, nor did he mention the upcoming August Extraordinary General Meeting ("**August EGM**") or any intention to securitize related-party loans.  The July 30, 2014 correspondence with Symeou is attached hereto as **Exhibit 10**.

27.     On August 1, 2014, Hornbeam was made aware of what was purported to be a *proposed* complex debt-restructuring agreement. The first notice of the August EGM set the date for the vote on the restructuring agreement for August 8, 2014.

28.     On August 7, 2014, the second notice of Shareholders Meeting postponed the August EGM to August 14, 2014.

29.     On August 11, 2014, the third notice of Shareholders Meeting postponed the August EGM to August 21, 2014.

30.     On August 20, 2014, the fourth notice of Shareholders Meeting postponed the August EGM until September 1, 2014. Attached hereto as **Exhibit 11** are the four notices of the Shareholders Meetings.

31.     As such, Symeou agreed to extend the vote on the proposed restructuring, which originally was to be held on August 8, 2014, on three separate occasions.

32.   At that time, no disclosure was made by Symeou that any vote and/or

approval had occurred or would occur before the August EGM was held.

33.   Despite the multiple representations that the vote would be postponed until

September 1, 2014, Symeou, as sole director of Halliwel, without notifying

Shulman, approved the proposed restructuring, and authorized Korf, as president of

Warren Steel, on August 1, 2014 to effect the restructuring.  Attached hereto are

the Korf and Symeou Affidavits submitted in the BVI as **Exhibit 12** and **Exhibit

13** respectively.

34.   During the BVI proceedings, Mr. Levy, counsel for Hornbeam, pointed out

that "Mr. Symeou when told, who is a director of the company and who has

independent duties to the company, when told by Primecap who clearly represent

the interests of, the underlying beneficial interest in the other two-thirds of the

shares, is told to do something, he just does it, he just does it and that's what

happened here. We saw at 16:08 he gets the e-mail saying do it; 16:37, here you

are, chaps, it's all done and dusted."  An excerpt of the transcript from the October

13, 2014 hearing before the BVI court is attached hereto as **Exhibit 14**.

35.   Based on the representations made by Symeou as well as the exhibits to his

affidavit submitted to the BVI court, he, in his capacity as sole Director of

Halliwel, received and approved the restructuring agreement (over 250 pages,

including 20 documents 19 of which were complex agreements) within only 29 minutes.

36.   As stated in Korf's Affidavit in the BVI, Korf began to execute the restructuring documents on August 1, 2014.

37.   On August 12, 2014, Symeou responded to Olivia Hutter, assistant to Dr. Ernst, stating that the transfer from Hornbeam to Tectum had no legal effect, that no resolution had been passed, that the remaining shareholders had not provided their legal consent, and that the transfer had not been made in accordance with article 32A of the Articles of Association, which to my consternation, was suddenly and inappropriately being invoked. This transaction was no different than the one in October 2012 where Symeou agreed article 32A was not applicable because there was no change in Shulman's ultimate beneficial ownership of the shares. Shulman was merely seeking to replace Hornbeam as trustee of Bracha with Tectum as trustee of Bracha.

38.   Symeou stated that the transfer would be finalized upon receipt of (1) the registration documents of Tectum—which had actually already been received on July 17, 2014—(2) a disclosure of the ownership structure—which also had already been disclosed in the letter from Bracha on July 30, 2014—and (3) a signed declaration that Shulman is the ultimate beneficial owner.  Dr. Ernst was informed by Symeou that waivers from the other two shareholders would be given

10

once there was written confirmation that the ultimate beneficial owner remained the same.  This confirmation was already given in the July 30, 2014 letter.  The email correspondence with Symeou is attached hereto as **Exhibit 15**.

39.    I am of the position that no such waivers are required because the preemption procedure of article 32A did not and does not apply here.

40.    On October 20, 2014, Dr. Ernst informed Symeou that Hornbeam would terminate its services as a nominee shareholder by the end of the year, and she requested that Symeou send all documents for the transfer of shares to Tectum. The October 20, 2014 email correspondence is attached hereto as **Exhibit 16**.

41.    On December 15, 2014, Christoph Huber ("**Huber**"), a partner at Continor, wrote me requesting more information to understand the cost order from the BVI court against Hornbeam.  He said that registering Tectum to be the nominee shareholder of Shulman's interest in Halliwel was out-of-question.  Alternatively, he suggested that the principal, Bracha, become a direct shareholder instead.

42.    On December 19, 2014, I received a Notification and an Instrument of Transfer concerning the transfer of the shares from Hornbeam to Bracha.  The Notification and the Instrument of Transfer are attached hereto as **Exhibit 17**.

43.    On January 7, 2015, I was informed for the first time that the long-planned dissolution proceedings of Hornbeam had begun on December 22, 2014.  The email correspondence from Continor as well as the Minutes of a Special Meeting

of the Stockholders of the Corporation Hornbeam Corp are attached hereto as **Exhibit 18**.

44.   On March 9, 2015, Symeou forwarded to Continor email correspondence regarding additional information from Warren Steel between him and Mordechai Korf. On March 11, 2015, Symeou emailed Laura Maglie, Shulman's advisor at Continor, that the General Meeting of Shareholders was scheduled for March 31, 2015.

45.   On March 17, 2015, Symeou informed Christoph Huber that according to Halliwel's records, the shareholder of Halliwel was Hornbeam and no action had been taken by Symeou to take the administrative action of replacing Hornbeam with Bracha in the Shareholders' Register.

46.   Symeou unnecessarily requested various duplicative documents of the "new" shareholder, Bracha, despite already having this information since 2012.  The February and March 2015 email correspondence between Symeou and Christoph Huber is attached hereto as **Exhibit 19**.

47.   On March 19, 2015, Symeou wrote that even though Hornbeam had begun to be dissolved, Hornbeam still remained the registered shareholder of Halliwel. As Symeou wrote:

"This is because:

(a) Under Panamanian law Hornbeam's dissolution on 22 December 2014 does not have the effect that it no longer exists: Hornbeam continues to exist, and continues to act and be represented by its directors in the usual way for three years after its dissolution. In particular, its dissolution has no effect on its shareholding in Halliwel; and

(b) Unless and until there has been a change of shareholder in the register of members of Halliwel, Hornbeam remains the shareholder of Halliwel. There has been no such change in Halliwel's register of members.

(c) Under Halliwel's Article 32A there is a right of first refusal procedure to follow when one shareholder (Hornbeam) wishes to transfer its Halliwel shares to another shareholder (Bracha). Unless and until that procedure is followed and has been completed, Hornbeam remains the shareholder of Halliwel. That procedure has been started by Hornbeam, but has not yet been completed: the other shareholders have not yet provided their written consent to the proposed transfer by Hornbeam."

*See* Exhibit 19, pp. 2-3.

48.     Of course, as Dr. Ernst responded, it was "not true that you [Symeou] did not hear from me [Dr. Ernst] since last July in this unfortunate matter but we are

still waiting for your reply as promised last November. To be honest, I have no understanding for the delay in this procedure since Hornbeam was always a nominee shareholder only and I informed you in time that it will be terminated by year-end 2014 and no longer serves as nominee shareholder. The ultimate beneficiary has not changed since your firm acted as nominee shareholder and I now need to insist that the change of shareholder is made without delay. Hornbeam was always administered here in Liechtenstein and it makes no sense at all to send notifications to Panama." *See* Exhibit 19, p. 2.

49.    On March 24, 2015, Symeou again refused to register Bracha as the shareholder and requested information that had already been provided or was completely irrelevant. The March 24, 2015 email correspondence is attached hereto as **Exhibit 20**.

50.    On May 18, 2015, I wrote an email to Symeou stating that by replacing Hornbeam with Bracha in the shareholder register would not create any change in the ultimate beneficial ownership of the shares in Halliwel.  I further requested that he provide me with information on how to register Bracha. The May 18, 2015 email correspondence is attached hereto as **Exhibit 21**.

51.    On May 22, 2015, Symeou responded to my May 18th email by refusing to register Bracha in place of Hornbeam unless there was written consent from the other shareholders or a pre-emption procedure as outlined in article 32A of the

Articles of Association were followed. The May 22, 2015 email correspondence is attached hereto as **Exhibit 22**.

52.   On June 1, 2015, I expressly requested underlying financial information regarding the related party loans to Warren Steel. For ease of reference, I provided a table of the purported dates, amounts, and related party lenders to ensure this information could be easily compiled.  However, Symeou did not provide any of the information I requested. Rather, he stated evasively that I should make a "more reasonable request." The June 1, 2015 email correspondence and referenced table are attached hereto as **Exhibit 23**.

53.   On June 5, 2015, I wrote an email to Shulman's previous counsel Bruce Marks ("Marks"), in a related-litigation in the United States District Court for the Western District of Pennsylvania (*Vadim Shulman et al. vs. Lemster et al.*, Civil Action No. 11-cv-00852) requesting information.

54.   He replied saying that "our firm was involved in the 'Lemster case.'"  This was a less than genuine representation based on the fact that this firm and he himself represented plaintiffs, which included Shulman and other entities under Shulman's ownership and control, in a dispute regarding the purchase of Warren Steel's assets and real property.  Marks refused to provide me with any information or records.  The June 5, 2015 email correspondence with Bruce Marks is attached hereto as **Exhibit 24**.

55.   Marks currently represents Symeou and Halliwel in this matter and the "interests of Kolomoisky" in others.

56.   Shulman has expressly conveyed that he believes that Marks' current representation of Halliwel and Symeou, which is adverse to Shulman, is a direct conflict with his previous representation of Shulman in a dispute related to the purchase of Warren Steel's assets and real property.

## DEFENDANTS' CONFLICTING REPRESENTATIONS

57.   During the Ohio Action, the Defendants submitted self-serving and redacted documents and records purporting to be accurate business records of Warren Steel. The Affidavit of James Kovach, dated June 30, 2015, submitted in the Ohio Action and the exhibits thereto is attached hereto as **Exhibit 25**.  The Affidavit of Korf, dated June 23, 2015, submitted in the Ohio Action and the exhibits thereto, is attached hereto as **Exhibit 26**.

58.   The Ohio Defendants produced heavily redacted Regions Bank records in order to thwart Shulman, Bracha, and Hornbeam's efforts to determine whether the proceeds were used by Warren Steel for legitimate benefits or ultimately transferred back to Related Parties without consideration.

59.   However, the Ohio Defendants' own records further demonstrate the need for discovery and evidence their misdeeds and wrongful self-dealing.

60.     The Ohio Defendants purport that Warren Steel owes more than $132

million dollars to Related Parties as a result of self-dealing loans and transactions.

However, the redacted bank records verify that Warren Steel received only $61

million.  *See* Table 2 below.

| TABLE 2 |||
| :---: | :---: | :---: |
| **MISSING AMOUNTS OF PURPORTED RELATED-PARTY DEBT** |||
| **DESCRIPTION/ SOURCE** | **RELATED-PARTY DEBT** | **VERIFIED BY BANK RECORDS** |
| "Related Party Loans" (2011 – 2014) – Exhibit 25, ¶ 9, Exs. 1-2. | $62,160,895.90 | $59,817,000.00[1] |
| Credit and Cash Advances from Felman Trading and Felman Production (2009 – 2015) – Exhibit 25, ¶¶ 10-17, Exs. 2-6. | $26,066,115.66 | $894,358.38[2] |
| Debt Restructuring (August 2014) - | $25,000,000.00 | $0 |
| Multiple loans to Warren Steel from Optima Acquisitions (2009 – 2011) - Exhibit 25, Ex. 2 | $19,335,000.00 | $0 |
| **TOTAL** | **$132,562,011.56**[3] | **$60,711,358.38** |

[1] No bank statement reflects the purported loan of $2,213,530.48 from Optima Acquisitions, LLC or the loan of $130,365.42 from Warren Steel's president Korf.  Exhibit 25, Ex. 2.

[2] This amount is the sum of Felman Production's credits from the redacted bank statements. Exhibit 25, Ex. 3.

[3] The Ohio Defendants produced unaudited spreadsheets purportedly disclosing additional Related Party debt, now referred to as credits and cash advances instead of loans, in the amount of $26,066,115.66 from Felman Trading, Inc. and Felman Production, LLC to Warren Steel.

61.     The Ohio Defendants attempt to account for $45 million of the missing $70 million with more unaudited spreadsheets, but Defendants provide no accounting for $25 million.

62.     The Ohio Defendants admit that Warren Steel's largest trading partners are Related Parties.

63.     The Ohio Defendants represent that Warren Steel currently owes over $2 million to Felman Production for a debt incurred before 2014, despite Warren Steel's balance sheet for the end of 2014 stating that the amount due to Felman Production is zero dollars.

64.     Kovach states "[f]rom June 9, 2009 to April 30, 2013, WSH purchased materials, and received cash advances from Felman Production. . . . WSH owes $2,080,170.20 to Felman Production."  Exhibit 25, ¶ 18.  However, Warren Steel's balance sheet for December 31, 2014, which was provided by Symeou and Korf in March 2015, states: "20300 Due to Felman Production 0.00." Warren Steel's purported balance sheet for December 31, 2014 is attached hereto as **Exhibit 27**.

65.     Symeou and Korf made false representations to Plaintiffs regarding Warren Steel's indebtedness to Related Parties and concealed from Shulman, Bracha, and

---

These documents reveal that Warren Steel's Related Party debt is $132,562,011.56, considerably more than Plaintiffs' previous calculation of $106 million.

Hornbeam $20,035,000 of Related Party loans from Mordechai Korf ($2.5 million), Felman Trading, Inc. ($16,785,000), and Optima Ventures, LLC ($750,000).  Mordechai Korf previously provided an unaudited spreadsheet of "Warren Steel Holdings, LLC. Intercompany Loans For the Period: 01/01/10 – 09/28/2012" which listed Related Party debt as $18,985,530.48.  Previous correspondence and the unaudited spreadsheet is attached hereto as **Exhibit 28**.

66.  This amount is considerably lower than the amount provided by Kovach, who provided sworn testimony listing regarding the purported loans and providing redacted bank statements for Related Party loans totaling $39,275,530.48 for the same time period (01/01/10 – 09/28/2012)).  *See* Exhibit 25, Ex. 1.

67.  During a six month period, Warren Steel appears to have sold steel to Kentucky Electric Steel ("**KES**"), a Related Party, for at least $7.3 million less than it would have sold the steel to a non-Related Party.

68.  Prior to the March EGM, Symeou and Korf disclosed to Plaintiffs unaudited spreadsheets entitled "Sales Price" revealing that Warren Steel sells steel to non-Related Parties at rates between $692 and $772 or more per ton and to KES at a discounted rate of only $623 per ton ($69 to $149 less per ton than the rates for non-Related Parties).  The unaudited spreadsheets provided by Symeou and Korf are attached hereto as **Exhibit 29**.

69. Kovach states that: "From January 2015 through June 2015, WSH sold approximately 52,311 tons of steel to Kentucky Electric Steel ("KES") . . . for an aggregate purchase order price of $28,832,482.20."  Exhibit 25, ¶ 18.

70. Even the transactions the Ohio Defendants highlighted as an example of their innocence, the sale of steel to KES through a "broker" Raytrans Management, LLC, smacks of fraud and financial scandal.  No legitimate business purpose exists to use a middle man to broker a deal between companies that have the same management.  That is particularly true here where Raytrans is not in the business of brokering steel and Russell Stein, the sole member of Raytrans, was convicted of bank fraud.  *See USA v. Stein*, 5:96-cr-00033-FPS-1, D.E. 159 (N.D.W. Va 1996) ("Restitution Paid in the amount of $781.68 by Raytrans Management LLC for Russell M. Stein RECEIPT #: WVNE007864 (nmm) (Entered: 06/15/2015)").

71. At the same time, Warren Steel, a company that has purportedly lost over $175 million between 2008 and 2013, nonetheless appears to have provided substantial funding to Steel Rolling Holdings, LLC, a Related Party start-up company and paid over $6 million for payroll, capital expenditures, legal, professional, and other expenses of Related Parties.

72. Pages 3, 13, and 27 of the exhibits produced by Korf in the BVI Proceedings disclose that Warren Steel paid more than $650,000 of the expenses of Related Party, Steel Rolling Holdings, LLC, related to payroll and capital expenditures, and

20

"incurred $5,505,202 legal, professional, and other administrative expenses on the behalf of Optima International of Miami, Inc. an affiliate of the Company." The Exhibits produced by Korf in the BVI Proceedings are attached hereto as **Exhibit 30**. Defendants more than likely used proceeds of Related Party loans to Warren Steel to bankroll and provide funding to Optima International of Miami, Inc., Steel Rolling Holdings, LLC, through the date of its sale in early 2015 to Ferragon Corp., and other Related Parties.

73. Finally, many of the documents the Ohio Defendants submitted as "proof" that Warren Steel's bookkeeping was appropriate are simply unreadable.

## THE FAVORABLE DISCOVERY ORDER IN THE SDNY ACTION

74. On September 17, 2015, Judge Broderick issued a Memorandum and Order in the SDNY Action finding that Hornbeam satisfied the requirements of 28 U.S.C. § 1782.

75. After a substantively identical 1782 Application to obtain records from third-party banks not subject to jurisdiction in the BVI, a full briefing schedule, multiple hearings, post-briefing letter updates to the Court, and three months for deliberation of the issues, Judge Broderick of the United States District Court for the Southern District of New York held that Hornbeam was an "interested person" and also dismissed many of Symeou's other allegations and denied the relevant portion of his motion to vacate.

76.     The Memorandum and Order from the SDNY Action is attached hereto as **Exhibit 31**.

77.     Judge Broderick determined that the Ohio Action did not allege the same claims as the reasonably contemplated proceedings in the BVI and other jurisdictions.

78.     The Ohio Action was commenced in direct response to the attempt to sell Warren Steel to a Related Party and credit bid the Related Party loans before we have had a chance to prove their illegitimacy.

## THE CONTEMPLATED AND PENDING FOREIGN PROCEEDINGS

79.     Shulman, Bracha, and Hornbeam are preparing to commencing proceedings in the BVI and potentially other jurisdiction(s) where claims against Kolomoisky, Bogolubov, Symeou, and Korf can be brought.

80.     As Judge Broderick recognized, based on the resources of the parties and the total amount of the claim, it is unreasonable to think that the BVI cost order would prevent commencing an action in the BVI.

81.     Neither Shulman nor Bracha own the shares of Hornbeam and neither has control over Hornbeam's finances.  However, it is clear to me that, as a trust company, Hornbeam likely does not have sufficient assets to pay such a cost award.  This is particularly true because it held shares in trust for others and did not own these shares—at least in the case of the Shares in Halliwel.

82.    There is not a cost order against Shulman or Bracha.

83.    Hornbeam withdrew the BVI Proceedings by consent of the parties because the action which was sought to be restrained had already taken place, Hornbeam's application for an interim liquidator was denied by the BVI Court as the Court found there was not sufficient financial evidence introduced by Hornbeam to substantiate the allegation that Halliwel was insolvent.  A further Originating Application may be issued.

84.    After Hornbeam's previous experience in the BVI, the shareholder oppression claims brought by Bracha or Hornbeam or both will only be brought after sufficient evidence of fraud, self-dealing, and other misdeeds is collected and analyzed.  Despite multiple demands, Symeou and Korf refuse to provide meaningful information.

85.    After a full briefing of the issues, Hornbeam has been granted the authority to continue gathering evidence for use in the foreign proceedings by issuing subpoenas in the Southern District of New York.

86.    The Section 1782 subpoenas have been delayed because we have concentrated on preserving Halliwel's only asset, Warren Steel, in the Ohio Action for an injunction and a receiver.

87.    Hornbeam and Bracha plan to resume evidence gathering in other jurisdictions where they have been granted the authority to do so.

88.     Recently, I have become aware that Symeou and Halliwel resurrected the BVI Proceedings by making *ex parte* applications on March 3, 2015, months before Symeou's motion to intervene in this action.

89.     The Provisional Order granting Syemou's Application for a Charging Order and the Provisional Order granting Halliwel's Application for a Charging Order are attached hereto as **Exhibit 32** (collectively, the "**Provisional Orders**").

90.     As the Provisional Orders make clear, Symeou and Halliwel are attempting to enforce previous cost orders "against the assets of Judgment Debtor [Hornbeam]."  More specifically, they are attempting to charge Hornbeam's 33,332 shares in Halliwel so that those shares may be executed against to satisfy the cost orders.

91.     I understand that a pivotal issue that will be adjudicated in the BVI Proceedings will be exactly the same as the main issue in the reasonably contemplated foreign proceedings discussed in Bracha's 28 U.S.C. § 1782 application: the valuation of Warren Steel.

92.     The value of Halliwel is directly related to the value of Warren Steel, its sole asset.  Thus, Warren Steel's value must be determined before one can determine the value of Halliwel (or the value of each Halliwel share).  Accordingly, Warren Steel's value must be adjudicated before determining how many of Hornbeam's shares in Halliwel (if any) must be executed against to satisfy the cost orders.

93.     After recently recognizing that Symeou, Halliwel, and others continued the

BVI Proceedings *ex parte*, Bracha served the subpoenas on Regions Bank to obtain

evidence of Kolomoisky, Bogolubov, Symeou, and Korf's fraud and misdeeds to

support its claims and defenses in those proceedings.

94.     Bracha and Hornbeam plan to participate in the BVI Proceedings in the near

future.

95.     On September 21, 2015, Halliwel and Symeou filed a motion to dismiss in

the Ohio Action, which included an argument that the action should be dismissed

pursuant to the doctrine of forum non-conveniens.  A copy of their motion to

dismiss is attached hereto as **Exhibit 33**.

96.     On September 25, 2015, Bracha filed its notice of opposition to the BVI

Provisional Orders.  The notice of opposition to the BVI Provisional Orders are

attached hereto as **Exhibit 34**.


        Pursuant to Section 1746 of Title 28 of the United States Code, I declare

under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated:        Zurich, Switzerland
              September 28 , 2015


                                        FABRIZIO N. CAMPANILE

                             25