FBA3HORC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
3    In Re: Application of Hornbeam
     Corporation
4
5                                        14 MISC. 424 (VSB)
6    ------------------------------x
                                         New York, N.Y.
7                                        November 10, 2015
                                         10:30 a.m.
8
     Before:
9
                        HON. VERNON S. BRODERICK,
10
                                         District Judge
11
                            APPEARANCES
12
     HOLLAND & KNIGHT LLP
13        Attorneys for Hornbeam Corporation
     BY:  JAMES H. POWER
14         JOSHUA McLAURIN
15   MARKS & SOKOLOV, LLP
          Attorneys for Intervenor Panikos Symeou
16   BY:  BRUCE S. MARKS
               -and-
17   REED SMITH LLP
          Attorneys for Intervenor Panikos Symeou
18   BY:  SAMUEL KADOSH
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FBA3HORC

1          THE DEPUTY CLERK:  Counsel, please state your name for

2     the record.

3          MR. POWER:  James Power for Hornbeam.

4          MR. McLAURIN:  Josh McLaurin for Hornbeam, pending

5     admission.

6          MR. MARKS:  I'm Bruce Marks for Mr. Symeou.

7          MR. KADOSH:  Sam Kadosh, also for Mr. Symeou.

8          THE COURT:  You may be seated.  Let me review for the

9     parties the documents I have in connection with today's court

10    appearance.  I have the October 8 letter of Mr. Power.  It is a

11    joint letter.

12         MR. POWER:  Yes.

13         THE COURT:  With Exhibits A and B.  I have the

14    November 3 letter of Mr. Power with the attachment of a

15    spreadsheet, and the response dated November 4 from Mr. Marks.

16    I have another letter from Mr. Power dated November 3, and a

17    response to that letter dated November 4 from Mr. Marks.

18         Am I missing any submissions that the parties have

19    made in connection with today's court appearance?

20         MR. MARKS:  Your Honor, we have two charts we want to

21    hand up to the Court.

22         THE COURT:  Okay.  Have you shared them with your

23    adversary?

24         MR. MARKS:  We did, your Honor.

25         MR. POWER:  Which charts?

FBA3HORC

1          MR. MARKS:  The unrelated entities and -- the related

2     entities and the unrelated persons.  Your Honor, may I

3     approach?

4          THE COURT:  You may.

5          MR. MARKS:  To whom should I give this, your Honor?

6          MR. POWER:  Can I have a copy please?

7          MR. MARKS:  Yes, of course.

8          I can explain what they mean in due course, your

9     Honor.  We worked over the weekend and all of yesterday to

10    prepare these.  We thought the information would be helpful to

11    the Court when we discuss where we are today.

12         THE COURT:  So when it is appropriate, when you get to

13    the appropriate point, you should feel free to point me to

14    whatever you want me to know with regard to the charts.

15         MR. MARKS:  Thank you, your Honor.

16         THE COURT:  Just a matter of housekeeping.  My clerk

17    informs me that she knows Mr. McLaurin, that they attended

18    school together.  And that I guess -- I don't know, friends?

19    Friends.  I put them on the spot.  Just so that the parties are

20    aware of that.

21         MR. POWER:  Judge, I did not know that before I

22    brought Mr. McLaurin in.

23         THE COURT:  There is no reason necessarily that you

24    would, yes.

25         MR. MARKS:  In all full disclosure, your court

FBA3HORC

1    reporter appears to know Mr. Kadosh.

2              THE COURT:  So I take it then I have, with the

3    addition of the two charts that were just provided, I have all

4    of the information that I need for today's conference.

5              MR. POWER:  There were two recent Alabama opinions.  I

6    don't know if the judge wants to be informed of those.

7              THE COURT:  I have the opinion that was docketed as

8    document 61.

9              MR. POWER:  There was a recent opinion last Friday in

10   response --

11             THE COURT:  Was that the stay?

12             MR. POWER:  The stay which was denied by the District

13   Court.

14             THE COURT:  I haven't printed that out, but I am aware

15   of that.

16             MR. POWER:  Just so the Court is fully aware, the 11th

17   Circuit just yesterday issued what is called an emergency

18   motion for -- granted Mr. Symeou's request for an emergency

19   stay pending appeal, and they did issue what they call a

20   temporary administrative stay.  Yesterday there was about 300

21   pages filed in the morning with the Circuit Court.  We were

22   given about two hours to respond.  We did get an order from the

23   11th Circuit that issued this temporary administrative stay.

24   The Warren Steel bank records were ready to be produced by

25   Regent Bank to us, so those are now on hold.

FBA3HORC

1          THE COURT:  The 11th Circuit, that was in --

2          MR. POWER:  The Alabama action in which the District

3    Court authorized the Warren Steel records.  A request to stay

4    the production of those records was made, that was denied by

5    the District Court.  We were ready to get the records yesterday

6    pursuant to the subpoena, and there was an emergency stay that

7    was made to the 11th Circuit to prevent the disclosure of the

8    Warren Steel Regent bank records.

9          THE COURT:  The Warren Steel Regent bank records were

10   being obtained pursuant to 1782 subpoena?

11         MR. POWER:  Yes, your Honor.

12         THE COURT:  Okay.  That raises an issue of the 11th

13   Circuit's recent decision in Glock, which I don't think, at

14   least to date, that either party has cited, but as we go

15   through the various arguments, are you familiar with the Glock

16   decision?

17         MR. POWER:  We did address those.  The Glock, the

18   Clerici case, those were all addressed in significant briefing

19   before the district judge in Alabama.  We can give the Court

20   copies of our briefs.  Both parties had the opportunity to do

21   that.  We were not planning on engaging in any sort of

22   extensive legal arguments.

23         THE COURT:  I think I have enough to handle without

24   getting into what's going on in Alabama or the 11th Circuit.

25   It sounds like there is a lot of things going on there.

FBA3HORC

1          Let's talk about now the protective order.  What I

2    plan to do is go through and provide the parties an opportunity

3    with regard to each of the disputed sections to address more

4    fully the arguments they've put in the letter.  And then as we

5    go through, if I have any questions I'll ask them, but I may

6    have rulings at that time.

7          I know that Mr. Symeou had made the request to file a

8    motion in connection with that.  I can tell you right now I'm

9    not inclined to do that in light of the submissions I've

10   received so far and the argument we're going to hear today.

11         But, why don't we start with what I see as the first

12   issue, which relates to use of the materials.  I'll state where

13   the issue stands.

14         Mr. Symeou argues that the material should only be

15   used in connection with the BVI or the specific foreign

16   potential litigations that were indicated in the initial

17   petition.  I take it that Hornbeam views it should be able to

18   use them in connection with motions before me, in other words,

19   in this Court, in connection with the motion for

20   reconsideration.  I believe that I received a letter indicating

21   that.  I'm not sure there is a dispute necessarily about that.

22   I don't think there is.

23         I think where the dispute lies is that Hornbeam would

24   like to use the materials in connection with other 1782

25   applications that it has made, and I think that it may intend

FBA3HORC

1    to make, although I'm not entirely sure about that.

2              So why don't I hear from Hornbeam and then I'll hear

3    from Symeou.

4              MR. POWER:  Yes, your Honor.  Thank you.  May I stay

5    here?

6              THE COURT:  Yes.

7              MR. POWER:  Yeah, I think what the instructions we got

8    from your Honor as we took them to be is that we had every

9    right to come back to your Honor, and for good cause shown,

10   obtain additional 1782 subpoenas.  And again, it would make

11   sense to us as we got the records, for example, like the

12   records we just submitted, where we determined, we found out

13   from one of the wire transfers or series of wire transfers from

14   one of the banks that $82 million was transferred from Halliwel

15   for the purchase of another steel mill that my client knew

16   nothing about, yet he had owned shares in Halliwel for two

17   years up to that point.

18             What would make sense, the types of subpoenas we would

19   want to serve there, is Jefferies was the investment bank that

20   would put together the purchase of those transactions.  They

21   are here in New York.

22             One of the other things we've learned, not necessarily

23   from the documents before that we received from the 1782s, but

24   from records that we obtained along the way in other means was

25   that an investment bank, Sagent, it was putting together the

FBA3HORC

1   very proposal on the valuation of Warren Steel, that they were

2   pitching it to the industry to sell it.  Sagent is also here in

3   New York.  That is also something else we would like to follow

4   up with.

5        Essentially, by the terms of your Honor's order which

6   said we can come back to you for good cause shown, we feel that

7   if we get records that are showing specific things about the

8   transactions and the relationships and between the Optima

9   entries, if we were to get these wire transfer records and they

10   were to demonstrate evidence of certain relationships between

11   Mr. Kolomoisky, Mr. Korf, the Optima entities, Hornbeam,

12   Halliwel, and Warren Steel, that we would be able to use those

13   records themselves that we obtained by permission and authority

14   of this Court, to go to this Court and say, hey, look, here is

15   some additional evidence.  We think we can make a case based on

16   this evidence that we can either serve another subpoena on one

17   of the entities that's involved in one of these relevant

18   transactions, like the $82 million from Halliwel to another

19   entity, for the purchase.  That's MS Metals.

20        So, in the most simplistic form, we had expected or it

21   would make sense to us that records that we obtained here could

22   be used to go back to your Honor for good cause shown to expand

23   the current subpoenas, to issue new subpoenas based on that

24   information.

25        In conjunction with that, as we recently learned in

FBA3HORC

1   Alabama, where we had the judge issued originally a subpoena

2   order that was very much -- I think mirrored exactly what your

3   Honor issued.  It included all of the Optima related entities.

4   All of the entities that had made more than $120 million of

5   loans to Warren Steel.  So we had listed those entities, we had

6   described why we thought those entities were relevant, and we

7   had said that the nature of the relationship between the

8   parties, the commingling of funds, the transactions, whether it

9   be undervalued or overvalued between Warren Steel and these

10  other entities, they were all relevant.

11          The judge originally agreed.  Pointed it out on the

12  bench.  Mr. Symeou made a request and argument it should be

13  narrowed down to Warren Steel.  The judge accepted that in the

14  first instance and said, yet, I am giving you every opportunity

15  to come back to me after you get the Warren Steel records to

16  come back to me for good cause shown to expand and include the

17  original entities in the order for discovery, and that's the

18  Optima entities.  We can give you the list.

19          So we were waiting, again, hopeful as of yesterday we

20  would have gotten all the Warren Steel records as the judge in

21  Alabama had denied the request to stay the production of those

22  records twice.  We may not get those records now for, I don't

23  know, depending on what the 11th Circuit says, two weeks, three

24  weeks, four weeks, six months, or a year.

25          Of course the Warren Steel records from the bank would

FBA3HORC

1    be used also to cross reference all of the wire transfers that

2    we got here.  Just as we see from the Halliwel transfers of $82

3    million to buy a steel mill that our client never knew about

4    despite him being a one-third owner of Halliwel, the way the

5    transactions are set up it makes sense to be able to cross

6    reference transactions.  Money going into Warren Steel, money

7    going out of Warren Steel to one of the Optima entities.  We

8    see a pattern of this developing from our review of the wire

9    transfers.

10          So in going back to the Court, for example, if we see

11   other transfers, there is I think $5 million from Mr. Korf's

12   New York attorney's escrow account -- unexplainable, because

13   the references don't state -- going into Warren Steel.  I think

14   from my practice, I do a lot of fraud and asset recovery,

15   people will tell you it is a red flag immediately when a lawyer

16   is using his IOLA attorney's account to fund money coming in

17   from outside the United States through his account to invest

18   for a U.S. local entity into, in this case it was Warren Steel.

19          So, if we were to come to the Court and say we found

20   these particular transactions, we would like to use them before

21   your Honor to say we think we've established good cause shown.

22   Of course that would be entirely up to the court to determine

23   whether that good cause was met.  But it also make sense to use

24   this evidence, which is very much related to the very things

25   we're asking in Alabama, i.e., requests for the actual bank

FBA3HORC

1   records of these other Optima related entities that relate to

2   these transactions.  That's where the New York City records are

3   going to be extremely relevant in tying the pieces together in

4   other 1782s and/or identifying very relevant and material

5   targets to include as the recipient of a subpoena in another

6   district, wherever they may be found, and we can sort of see

7   from the wire transfer records based on addresses and things

8   where sort of a potential target is located.

9            For example, the $80 million from Halliwel to Metals

10  Resources is a Michigan entity.  And we know that Jeffereys did

11  that transaction, and Jefferies is here in New York.  It seems

12  reasonable and good cause, to us, at least, that we would be

13  able to go to the Court and use those records and ask for an

14  additional subpoena on, for example, Jefferies on that

15  particular transaction of 80 million from Halliwel.

16           That's essentially the general summary of why we think

17  the New York records are very useful to the Court and to us in

18  determining what's good cause shown.  If we don't have any

19  access to any records, we're not allowed to gather any evidence

20  or don't have anything, one would expect it is difficult to

21  show good cause shown.  We expect that good cause shown would

22  be from the information we're gathering through various 1782s.

23  Again, it is only in 1782s.  As the Court is well aware now,

24  the Ohio TRO action has been vacated, there is no action

25  pending in the United States.  We will, as we've agreed to the

FBA3HORC

1    Court, and represented to the Court, we do not intend and will

2    not use any records that are obtained from 1782s in an action

3    in the United States.  These are for actions in the BVI which

4    we are moving forward with.

5            I would suggest that the delays we're facing in

6    putting together something we can produce in the BVI is quite

7    reasonably a matter of getting the records like the Warren

8    Steel records that we thought would come without much fanfare

9    from Alabama.  We now may have to wait another six months, a

10   year, before we get those records.  And again, those are the

11   types of records that we're putting together to make sure we

12   have the entire scope of the operations surrounding Warren

13   Steel, the $120 million in funding, where the money went,

14   whether it actually went there, whether it was used to actually

15   fund these other Optima entities in their business endeavors.

16   Those are the kinds of things we're looking at and those go

17   directly to the claims in the BVI.

18           MR. MARKS:  Your Honor, thank you.  Just to put where

19   we are in perspective.  If we can step back a second.  Hornbeam

20   filed claims in the BVI.

21           THE COURT:  Could you adjust the microphone.

22           MR. MARKS:  I'll do this one here.

23           I'd just like to give that a little perspective.

24   Hornbeam filed claims in the BVI that were found to be an

25   abuse.  They were ordered to pay $846,000 by February 1st of

FBA3HORC

1    2015, which they haven't done.  They then filed claims in Ohio.

2    My client's incurred hundreds of thousands of dollars defending

3    those claims, and they were dismissed about a month ago.

4         Now here we are, they're trying to get records for

5    Warren Steel which they should be trying to get in the BVI.  If

6    they want records of Warren Steel, which is the subsidiary of

7    Halliwel, all they have to do is go to the BVI and file a claim

8    before the BVI High Court to inspect the books and records of

9    Halliwel, which would include the books and records of Warren

10   Steel.  And they haven't done that.

11        So if there is any delay on their part, it is because

12   they haven't proceeded in the right court.  So, it is not fair

13   for them to suggest that we have caused any delay, when they

14   were in the BVI in August of 2014, and nothing has stopped them

15   from going back to the BVI, other than paying the $846,000.

16   And your Honor has found that it is not plausible that

17   Mr. Shulman wouldn't be able to pay it.  And therefore, that's

18   really where they should be.  That's my first point.

19        THE COURT:  They made an application to get the Warren

20   Steel documents in Alabama.  And you're anticipating they'll

21   make a similar type of request?

22        MR. MARKS:  Well, your Honor, in effect they've done

23   that here, because they sought the wire records of Warren Steel

24   and Halliwel in this district.

25        Your Honor may not have reviewed our Rule 60(b)(6)

FBA3HORC

1    motion, but our position is that that's a circumvention of the

2    procedures of the BVI for the shareholder of a BVI company to

3    get the books and records of the BVI company.

4            THE COURT:  Warren Steel is not a BVI company.

5            MR. MARKS:  It is a subsidiary of a BVI company, and

6    as a result, the proper procedure, just like, your Honor, if I

7    were invested in a Delaware company that had a Pennsylvania

8    subsidiary, the procedure in the United States if you are a

9    shareholder of the Delaware company is you go to Delaware, and

10   you request the books and records of the Delaware company and

11   its subsidiary.

12           THE COURT:  My question though is are you conceding

13   that were they to go, because, again, you're not dealing with

14   domestic companies, right, you're dealing with a foreign

15   company and a domestic company.

16           MR. MARKS:  Right.

17           THE COURT:  Are you saying that were they to go to the

18   BVI and request the documents of Halliwel, that they would get

19   the documents and be entitled to the documents that are the

20   Warren Steel documents that may be located in this country?

21           MR. MARKS:  The BVI court would determine the scope of

22   what they're entitled to.  We have said repeatedly, it is on

23   the record, that Halliwel will accept that it is in the

24   possession and custody and control of the Warren Steel

25   documents.  So if the BVI court says produce the Warren Steel

FBA3HORC

1    documents, we will produce them.  Like any court, your Honor,

2    like a Delaware court, which would consider the request for

3    books and records of a shareholder.  The court could limit the

4    request.  The court could set conditions on the request.  It is

5    no different whether they invested in a BVI company, which was

6    Mr. Shulman's choice, okay, let's remember.  The three

7    principals were originally shareholders of Warren Steel which

8    is an Ohio company.  They chose voluntarily to transfer their

9    interests from Warren Steel to a BVI company.  And there is

10   reasons that people want to hold shares in an offshore company.

11   There may be tax reasons, there may be other structural

12   reasons.  But that was a choice that Mr. Shulman made.  But to

13   answer your Honor's question, this is within the power of the

14   BVI court to decide the scope of the books and records that

15   they would be entitled to.

16           Your Honor, if I could give you an example.

17           THE COURT:  Sure.

18           MR. MARKS:  One of the problems that occurred here

19   from our perspective, all right, is that they got wire records

20   of Warren Steel.  Those wire records reflect the bank account

21   numbers of the persons who sent the records there, including

22   Mr. Korf that Mr. Power just referenced.  It is entirely fair

23   game, I think, that if they went to the BVI, and they said

24   would you produce the records by which Mr. Korf wired the money

25   into the bank, they could produce the record that says

FBA3HORC

1      Mr. Korf, it says the date, and it says the amount.

2              But the concern that we have, what happened here,

3      which, of course, it was an ex parte proceeding and the

4      subpoenas were served without notice to us and discovery

5      received, we don't think a BVI court would allow them to get

6      the information regarding Mr. Korf's personal account, or

7      Mr. Kolomoisky's personal account, or Mr. Bogolubov's personal

8      account.

9              Your Honor, can you look at the related entities chart

10     now?  This might be a good time to bring this up.  Okay.  What

11     happened, your Honor, your Honor in the ex parte proceeding,

12     you had your hearing and you accepted the representations that

13     Mr. Power made, and you ordered the broad discovery on the 12

14     banks.  And that included all the wires, all wires to and from

15     the related entities.

16             What happened, your Honor, is that banks produced

17     records, and the related entities are on the left side.  These

18     are entities that were listed in the subpoena.  These are the

19     real entities.  Next is the number -- these are the wires that

20     were neither to nor from Halliwel.  These are wires that have

21     nothing to do with the dispute over Warren Steel.  They

22     produced over 5,000 wires.  We worked all weekend to complete

23     this chart.

24             We asked Mr. Powers over the last two weeks, please

25     tell us which wires you think are unrelated, and he didn't

FBA3HORC

1   provide any information to us.  We had to do this ourselves.

2   They got this information, with the exception of the Deutsche

3   Bank subpoena, months and months ago, because we never knew the

4   discovery was produced.  And in a short period of time my

5   office had to put this together using the spreadsheets.  Some

6   were the Excel spreadsheets and some were PDFs.

7           Your Honor, they have received information regarding

8   over $4 billion of transactions, these wires.  And your Honor,

9   remember the spreadsheet that Mr. Power showed you at the

10  December 23 hearing?

11          THE COURT:  Yes.

12          MR. MARKS:  These wires show their addresses, they

13  show their bank account numbers, okay.  They showed the purpose

14  of these transactions.  We don't even know who they've been

15  disseminated to because Mr. Powers hasn't told us.  We've asked

16  them, because we want to know who has actually received these

17  wires, including people outside of the United States, okay, who

18  are not subject to the jurisdiction of this court.  They have

19  information regarding over $4 billion of wires involving

20  Mr. Korf's personal transactions.  The charities that he gives

21  to, the location of his wife's account that he pays money into,

22  the location of the nature of what he does in his personal life

23  for entertainment.  Things that, without getting into it, not

24  everybody would want other people to know.  They know who the

25  customers of these unrelated companies are, because customers

FBA3HORC

1    wire money into their account.  They know who the suppliers are

2    of these unrelated companies.

3          So, if you're asking me what might happen in the BVI,

4    and we are going to get into the relief we're hoping your Honor

5    would seek, a BVI court, we think, okay, in an ex parte

6    proceeding, while they might give them the records that are

7    relevant to Warren Steel, would have never given them the

8    information that they now have regarding unrelated

9    transactions, involving individuals, okay, and their personal

10   bank accounts.

11         Not only even that, your Honor, they now, as you can

12   imagine, these operating companies have employees, right.  They

13   have employees.  Felman Trading has employees, the Optima

14   companies have employees.  They wired money into their employee

15   accounts.  I do that on occasion.  Sometimes we pay employees

16   with wires.  Now they have the personal bank accounts of all

17   these people.

18         So, to get back to what your Honor was saying, in the

19   BVI, yeah, they would have a right to go in and to get the

20   records that are related to Halliwel and the Warren Steel.

21   Would they get the same information that they were able to get

22   because they served subpoenas and didn't tell us?  I don't

23   think so.  I think a BVI court -- and we're hoping that this

24   Court will reconsider the scope of what they've received --

25   would only give them what's relevant to the dispute, which is

FBA3HORC

```
1    their allegation that there were false loans or their

2    allegation that there was some type of transactions between the

3    two companies.

4              So, when we get to the issue of how should this stuff

5    be used, I do think it is common ground.  We've said it could

6    be used in this court.  So if they want to use that in this

7    court, okay, for whatever good cause they want to show, not

8    today, because it should be done we think by motion, your

9    Honor.

10             THE COURT:  Let's talk about that a little bit.  I

11   want to resolve this because my sense is with regard to any

12   application, in other words, future things that aren't before

13   me, that it would be another petition or something under 1782.

14             MR. POWER:  Not ex parte either, obviously.

15             THE COURT:  Obviously it would be with service to --

16             MR. MARKS:  Can I make one comment, your Honor?

17             THE COURT:  Sure.

18             MR. MARKS:  Your Honor's already ruled limiting these

19   to outside the United States, being the BVI.  But the problem

20   we have, your Honor, within the United States, okay, right now

21   they have all of this information regarding the related parties

22   that has nothing to do with Warren Steel.  Our position is that

23   they shouldn't have it.  We want to try to put the toothpaste

24   back into the tube.  Right now the toothpaste is out of tube,

25   but at least it is in the bathroom here in New York.  We don't
```

FBA3HORC

1    want to have to chase this toothpaste to a bathroom in Alabama

2    or a bathroom in Florida or a bathroom in Ohio.

3            We believe that the orderly approach would be to keep

4    the protective order that your Honor entered this summer, limit

5    the use of this to this court, or if they go to file in the

6    BVI, to the BVI, but not to put us in a position where, if your

7    Honor changes your decision like the Court in Alabama did, the

8    Court in Alabama, as Mr. Power explained, after we had the

9    interparty oral argument, she eliminated the discovery related

10   to the related parties and limited it to the Warren Steel bank

11   records.

12           But if your Honor were to change, were to give the

13   relief that we're seeking, or if the Circuit Court were, we

14   don't have to go chasing these records around the country.  So

15   that's our view on that.  I hope that was --

16           THE COURT:  So two parts.  One part dealing with the

17   issue relating to the protective order and whether or not they

18   can utilize the documents in other 1782 applications.

19           MR. MARKS:  Correct, your Honor.

20           THE COURT:  But the second point relates to your

21   motion, which relates to the scope of the initial grant here.

22           MR. MARKS:  That's correct, your Honor.  That's

23   correct.  That's correct.  In terms of the scope of -- yes.

24   Absolutely to the scope.  Both to, unfortunately in our view,

25   unfortunately, records that have already been produced that we

FBA3HORC

1    want to claw back, okay.  Because the scope, if there were

2    wires to or from Warren Steel or wires to or from Halliwel,

3    right, we understand that.  Okay, for reasons such as the

4    internal affairs doctrine, we don't agree they should have been

5    discovered here, but we're not objecting to that on scope.  We

6    get that.  We understand why those wires to and from, again,

7    not all the information, because they don't need to know the

8    bank accounts of individuals, but yeah, we understand where

9    that is.

10             But in terms of the scope on these wires, yes, your

11   Honor, we don't want these wires of unrelated parties, or

12   excuse me, of the related parties that have nothing to do with

13   this disseminated to all these other courts.  Then we have to

14   get that toothpaste in that bathroom and this bathroom and this

15   proceeding should conclude before that happens.  Thank you,

16   your Honor.

17             THE COURT:  Okay.  With regard to the issue relating

18   to related unrelated -- I'd like to hear from you.  That is

19   impacted by the protective order, to the extent that I would

20   permit the use of documents in other 1782 applications, the

21   scope, it implicates the motion that has been made by

22   Mr. Symeou.  Let me ask that with regard to the related wire

23   transfers.

24             MR. POWER:  Yes, your Honor.  I would also like to

25   focus on the term "related."  When we approached your Honor at

FBA3HORC

1    the very beginning back in December, we laid out, we believe in

2    great detail the underlying reasons why we wanted various

3    entities included in the subpoena.  We didn't make these up,

4    pulled out of thin air, tried to lasso in more entities than

5    were necessary.

6            More than $120 million has been allegedly loaned to

7    Warren Steel by one or more of these -- I think there is 18

8    entities.  The reason why these entities are part of the

9    subpoena anyway is they said they loaned money.  There is some

10   evidence of transactions being made into Warren Steel.  But

11   there is about $60 million that the defendants, Mr. Symeou was

12   unable to identify from a wire transaction.  We also concur

13   there is about $60 million that's missing.

14           Now, when a party, a related entity, okay, owned by

15   one of the other shareholders in a closed corporation

16   transfers -- says he loaned $120 million, and we see evidence

17   that that's not true, and then we see evidence that we just

18   uncovered last week with a production from Deutsche Bank, that

19   $82 million from Halliwel, this isn't just about Warren Steel.

20   Remember, it was about Warren Steel as up until a week ago our

21   client understood that Warren Steel was the only asset of

22   Halliwel.  Now it looks like there is another steel plant that

23   could be an asset of Halliwel that was purchased with $82

24   million of Halliwel funds that we never knew about, that Symeou

25   never disclosed.  So transactions that involve only Warren

FBA3HORC

1   Steel way is too narrow because of the way defendants have

2   chosen.  No one forced them to conduct their business using

3   Mr. Korf's attorney account to make loans to Warren Steel.  No

4   one forced them to use 15 different related entities for

5   transactions and alleged loans to Warren Steel.  No one forced

6   them to use Mr. Shulman's company Halliwel, of which he owns

7   one-third, to take $80 million of Halliwel funds and buy

8   another steel mill and not let him know about it.

9          So it is the defendant's activities that have created

10  the necessity to expand the scope beyond Warren Steel,

11  Halliwel, and the related entities.  We've limited it to the

12  entities that have themselves -- remember, Mr. Korf is signing

13  with one hand, with his left hand on the loan, one side of the

14  loan agreement, and his right hand on the other, he signed on

15  every one of the loans of the 120 million that is allegedly

16  loaned to Warren Steel, Mr. Korf signed both sides on behalf of

17  the borrower and the lender.  And in fact, he also apparently

18  funded some of this from his personal attorney's account in New

19  York.

20         There has been statements made, I actually believe, I

21  mean, I haven't verified the numbers, but yeah, there is a lot

22  of money that's going around by and between all these

23  companies.

24         What this is more akin to, it is not the toothpaste

25  out of the bottle, it is the bloodhound on the scent of

FBA3HORC

potential fraud.  When a company transacts business in a proper

means but commingles funds that it's been using to syphon out

of Warren Steel, and as we've seen syphon out of Halliwel, the

$80 million, no one can explain that.

           That is when the investigation, rightfully so, is

given a little bit more latitude and leeway to explore the

relationships between the different related parties, how they

are getting the money, again, the premise of this is you have

the one company in all of these 18 related entities that is

losing millions and millions and millions of dollars, has

essentially lost $160 million over the last five years, and

every other company of Mr. Kolomoisky is making tons of money.

And we find out that $80 million of Halliwel funds that was

supposed to be used to fund the operations and so forth was

diverted to buy another company for Mr. Kolomoisky.  And the

other company that was purchased, theoretically on behalf of,

is one of the very entities that we have listed, and the Court

found in the first instance was to be relevant enough and a

related party.  It was an entity that loaned money to Warren

Steel.

           So, at the very nature and the simplest transactions

we are seeing, we see Halliwel, my client's money, one-third of

it, to buy a steel plant on behalf of one of the other Optima

entities, and we see Optima entities lending back to Warren

Steel tens of millions of dollars.  This whole circular system

FBA3HORC

1    calls into question exactly the business practices of what

2    these guys are doing, which supports what is the true value of

3    Halliwel, because my client holds shares in Halliwel.  What is

4    the true value of all of the asset of Halliwel.  Up until last

5    week, we thought it was only Warren Steel.  Now it may be the

6    other steel plant that Halliwel purchased.

7            The transactions are listed in my letter, which,

8    again, at first glance it is very easy to see it raises serious

9    questions why is Halliwel transferring $82 million on June 27

10   of 2008 to purchase another steel mill that has nothing to do

11   with Warren Steel.  Again, there has been no disclosures that

12   there has been any other assets of Halliwel other than Warren

13   Steel.

14           So we think that in terms of related parties, that it

15   is entirely appropriate at this time -- Mr. Marks, I think he

16   knows these companies sort of.  He said in the declaration to

17   the Court that he has all his information from third-party

18   sources.

19           Now, with all due respect, it is not really for us two

20   attorneys at this point in time to determine thousands of

21   transactions, what's relevant and not relevant, when the whole

22   point of this is they're moving money back and forth between

23   the companies, and I think we've demonstrated that for the

24   Court.  They've admitted that they do mostly all their business

25   between Warren Steel's related party business.  So there is no

FBA3HORC

1    secret here they're doing all this business.  Our allegations

2    are they're selling product at a higher prior to Warren Steel,

3    buying product at a lower price.  That they're diverting funds

4    that were put into Halliwel that were supposed to be used for

5    Warren Steel, they've been diverting millions of dollars to

6    other companies.  They are taking profits out of Warren Steel

7    and then into the other Optima entities, and then just loaning

8    money back to Warren Steel, and then claiming a security

9    interest to shut our client out of his shares.

10         Again, it is pretty much textbook.  Again, I've seen

11   this before, we just had a trial in Norfolk.  The judge found

12   very similar things happening by review of all the bank

13   records.  If you look at one bank record.  Up until two weeks

14   ago, Mr. Symeou's position was only Warren Steel's bank records

15   are relevant.  In fact, that's what they argued in Alabama, and

16   the Court said I am going to split the baby here.  I am going

17   to take your arguments, Mr. Symeou's counsel, and we are going

18   to limit this to Warren Steel.

19         Now, we may never get the Warren Steel records because

20   there is now a big push to prevent us from getting the records.

21   But up until two weeks ago it was Mr. Symeou's position that

22   only Warren Steel's records are relevant.  Lo and behold, we

23   have Deutsche Bank produce a late production, and it shows that

24   Halliwel now has transferred all of its funds to buy these

25   other companies on behalf of these related entities.

FBA3HORC

1          So again, at this point, neither myself nor Mr. Marks,

2     as much as we may have investigated this case, not one of us

3     knows enough and can verify to this Court at this point in time

4     when we aren't able to cross reference the Regent bank records

5     that we'd like to get in the near future, if Mr. Symeou is of

6     the position that we can simply go to the BVI and request these

7     records, which I can tell you our lawyers are telling us

8     Mr. Symeou, who is the director of Halliwel, under BVI law can

9     simply hand us a one-page piece of paper and say here's the

10    summary of the status of Halliwel's business activities.

11    They're not required to keep the books and records like we

12    understand here.  The BVI court does not have jurisdiction over

13    Regent Bank in Alabama, which the Alabama court quite aptly

14    noted.  Saying even though you may be able to request them,

15    there is no guarantee they're going to give them or that the

16    documents that are given are going to contain the full amounts.

17    They're not going to be certified by the bank.  They won't be

18    directly from the source.

19         In a case like this, for better or worse where there

20    is all these allegations, it is much better for all the parties

21    to get the documents from the source, so we don't have to go

22    and spend a year in the BVI arguing you didn't give us enough,

23    you doctored the records, things were not produced properly.

24         The best way to challenge a party who has been, we are

25    alleging, is not producing truthful records, either in summary

FBA3HORC

1   form or what have you, is to verify the records from multiple

2   independent sources.

3          I've been doing this for a long time.  The best, the

4   best way that the Court can be sure, we can be sure, that the

5   records match up is by cross referencing the wire transactions

6   that we see from the intermediary banks as well as the actual

7   records from the Regent Bank productions that we were hoping to

8   get as of today.

9          So I would, again, state that to the extent that we do

10  not believe that we should be addressing relevant transactions

11  at this point, because of the reasons I've said.

12         There is another category which we're on board.  We

13  reached out to Mr. Marks.  There is apparently what's been

14  identified as unresponsive records.  Unresponsive records has

15  been identified as records which appear to have been produced

16  by the banks for the words "Optima" and "CSC."  It is almost

17  exactly the same named company, but Mr. Marks I guess he's been

18  consulting with his client, has determined and made a

19  representation to us that those are not any of the Optima

20  entities that are related.

21         Now, I don't know for sure, but I'm certainly willing

22  to take Mr. Marks' word on that.  That if in fact there is an

23  Optima entity within these bank records that is not one of the

24  related party Optimas, maybe the administrator at the bank who

25  is running searches in compliance with the subpoena put in an

FBA3HORC

1    Optima entity that looks exactly the same but it is not the

2    same one.  That's fine.  We're happy to take those off the

3    table.  We're ready to discuss that, discuss it with Mr. Marks.

4    I don't believe, from what I'm hearing, that is not the issue

5    here.

6            What is really the issue is making a determination at

7    this point based upon the counsel for Symeou's belief and

8    representation that nothing is relevant unless they say it is.

9    And I don't believe we're at that point yet.  I believe that is

10   some time down the road when we are able to cross reference the

11   documents received from different sources like the very Regent

12   Bank records that we thought we were going to get from Warren

13   Steel yesterday.

14           THE COURT:  Okay.

15           MR. MARKS:  Can I respond to some of this, please?

16           THE COURT:  Sure.  I understand that the motion I

17   currently have before me is for me to reconsider my initial

18   ruling on the petition that was filed under 1782.  The

19   protective order, obviously, would govern any documents that

20   have been produced under that.  Obviously, what I would like to

21   do is try and get the protective order in place with the

22   understanding that there is a motion for reconsideration

23   pending.  Go ahead.

24           MR. MARKS:  I just want to say, first of all, we

25   dispute the characterization of the $60 million.  We submitted

FBA3HORC

the evidence in the court in Ohio that demonstrated that the

loans had been made.  That's number one.  He can say whatever

he wants.  I understand that.

        Number two, on this $80 million that went to the plant

in Michigan, okay.  Halliwel and Warren Steel were not

operating companies at the time.  Mr. Kolomoisky and

Mr. Bogolubov decided to purchase a plant in Michigan, and the

wires went through Halliwel because the people who were

involved in that didn't realize I guess that Mr. Shulman had an

interest.  If they would go to the BVI, which they appear

unwilling to do, and they were to get the records of Halliwel,

the records of Halliwel would reflect that the 80 some million

dollars was wired into Halliwel by entities that were

associated with Mr. Kolomoisky and Mr. Bogolubov and it was

taken from Halliwel and it was used to pay the facility in

Michigan.

        This concept that the same day he gets these records

from Deutsche Bank and then can write a letter to your Honor

alleging that somehow my clients have taken $80 million of

money that belonged to Halliwel of which Mr. Shulman had an

interest, I would only say to your Honor that's the type of

allegation without a foundation that we've had to deal with in

the BVI, which resulted in an abuse; in Ohio, which resulted in

the case being dismissed; and I'm forced to confront here.

        But to get to the focus, your Honor, we don't have an

FBA3HORC

```
1   objection to the wires being used before your Honor.  Okay.  If
2   they have to be filed under seal, whatever it is, we have
3   issues with that which we can discuss.  But we think that the
4   toothpaste has to be kept in the Southern District of New York
5   unless they file something in the BVI.  And that's a strong
6   position of ours, because otherwise, until this proceeding is
7   concluded, until your Honor makes your final ruling, and until,
8   again, your Honor, I hope you rule in our favor, I don't know
9   what you are agoing to do.  But if you don't and I think it is
10  fair game, your Honor understands the job we have to do, we are
11  going to go to the Second Circuit just like we did in Alabama.
12  It is not the right thing to allow the toothpaste to get out of
13  Southern District of New York until this orderly process is
14  complete.
15          THE COURT:  This is what we're going to do.  The
16  parties agree that the materials can be used before me in
17  connection with any motion practice or any future applications
18  on notice under 1782.  And as I understand it, the parties are
19  in agreement that those documents will be filed pursuant to the
20  protective order that will be entered into here.
21          With regard to the use of the materials in other 1782
22  applications, I'm going to grant that with the following
23  caveat:  I'm not going to permit, while the current motion for
24  reconsideration is pending, I'm not going to permit the use of
25  those documents and the other 1728 applications outside of this
```

FBA3HORC

1    jurisdiction until such time as I have an opportunity to rule

2    on what Mr. Symeou has made an argument that it was too broad,

3    in the first instance that I shouldn't have issued it, but in

4    any event, that it is too broad and encapsulates too much, too

5    many documents that are unrelated to what Mr. Symeou claims is

6    the issue related to Warren Steel.

7         The first item in dispute is the protective order.

8    Let's talk about the attorneys' eyes only.  And let me just

9    make sure I understand the parties' relative positions.  Am I

10   correct that the parties agree that, although in different

11   degrees, that there should be an attorneys' eyes only

12   designation?  Let's start with that and then I want to go from

13   there.  Mr. Power.

14        MR. POWER:  Your Honor, with respect to some entities

15   that -- certainly not with respect to Halliwel and Warren

16   Steel.  We don't see any justification for an attorneys' eyes

17   only designation of records that our client is so close to.

18        We also question the necessity of attorney' eyes only

19   with respect to the related party transactions for the loans.

20   Part of the whole thing is we need a forensics.  In other

21   words, the way evidence is introduced in the BVI, as we did it

22   once before, is through a forensic accountant who analyzed

23   these records.  Everyone knows you don't do a document dump on

24   a court.  In fact, what is likely going to happen if there is

25   1,000 wire transfers, we all know how litigation is.  There is

FBA3HORC

1     a couple kernels in each one.  We haven't determined the kernel

2     yet because we don't have access to the full scope of the cross

3     reference records.

4            That being said, we would think that attorneys' eyes

5     only would limit the ability for us to use it and assess it

6     from a financial expert to put together the concepts of fraud

7     and commingling and undervalued transactions, the very

8     principles that we're looking to use this evidence for.  So, I

9     think it needs to be used sparingly.

10           Look, I do recognize Mr. Kolomoisky's transfers, Mr.

11    Bogolubov's transfers, we are not interested in what he does

12    to -- I forget where he take his wife out to dinner or if it is

13    other people he's taking out, those are the kinds of things

14    that we are not interested in.

15           But again, I would also like to advise the Court it is

16    our position, this 60(b) motion came sort of without much

17    warning.  The way the Court has just couched it, and I believe

18    we agree, is it is really a discovery dispute motion.  We

19    should have met and conferred.  We've gone over these records.

20    We would have said give us your attorneys' eyes only

21    designations, you can leave them for a little bit, the whole

22    scope is it shouldn't be our burden to remove the entire record

23    that's been produced as attorneys' eyes only.  We knew this

24    would take six months go through that.  We're still willing,

25    we've offered to meet and confer.  We've even offered to bring

FBA3HORC

1    Mr. Fabrizio Campanile here who has been investigating this.

2    He's been at this court, he's been in Alabama once.  If they

3    brought Mr. Symeou who may have more information than Mr. Marks

4    about the records, again, we are just two lawyers who are

5    coming into this from the outside.  We don't know, frankly, the

6    true nature of these transactions.  There's other people better

7    determined to determine what these transactions are for.  So to

8    limit them as attorneys' eyes only is to render them useless.

9         We think that no attorneys' eyes only on Warren Steel

10   and Halliwel.  No attorneys' eyes only on the related parties

11   that purportedly made the $120 million of loans.  But people

12   like Mr. Bogolubov and Mr. Kolomoisky's personal accounts,

13   these are powerful men, stuff is sensitive.  We're not

14   interested in making a big deal out of all this.  We're

15   interested in figuring out how did they fund the money.  Did

16   they fund Warren Steel.  Did they take undue dividends by

17   taking money out of Halliwel through Warren Steel through

18   Optima back to Mr. Kolomoisky.  That's the thing we are going

19   to be doing.  We are not going to be looking at where he buys

20   fur coats and other things.

21        If there is an attorney designation on those

22   particular individuals that are very sensitive and I recognize

23   the sensitivity, we're happy to work with that.  We don't want

24   a broadbrush attorneys' eyes only.  In fact, it has been

25   suggested we can't even show Halliwel records to Mr. Shulman.

FBA3HORC

```
1    We have been fighting to just have our client see the very
2    records of the companies in which he owns one-third in.  I
3    thinks that's the kind of sort of position that we're fighting
4    with when there is this interest of locking everything down to
5    the extent it serves no purpose.
6            THE COURT:  What I'm grappling with is where the line
7    is between the attorneys' eyes only information that the
8    parties would seek to have as only the attorneys review, and
9    what would be deemed confidential.  In other words, material
10   that can be viewed by others that the parties at least for the
11   time being have indicated should be kept confidential, and
12   perhaps filed under seal.
13           MR. POWER:  So, if we want that distinction, from my
14   perspective, no attorneys' eyes only, no confidentiality with
15   respect to Halliwel and Warren Steel because our client is so
16   close to that.  Our client has the right to assert that
17   privilege as well.  All of the related party entities we're
18   happy to do confidential.  But that means, at least from what I
19   recall from when we were trying to come to an agreement with
20   the protective order, that means we got to share it within our
21   inner circle.  An attorney in the BVI has to be able to look at
22   these records.  What good is it you can't show anything to the
23   attorney in the BVI?  That's taking your order and vacating it
24   itself by the limitation.  We would like have forensic
25   analysis.  The protective order has a certification, so people
```

FBA3HORC

```
 1    who are going to look at this are going to sign it.  And again,
 2    I'm certainly going to stand by it, I know the people I deal
 3    with will stand by it.
 4          I'm happy to keep Mr. Bogolubov and Mr. Kolomoisky's
 5    information attorneys' eyes only.  Not even confidential.
 6    We'll keep it at the maximum.  I don't have to show that.
 7    Mr. Shulman won't have to see that.  We can save that until the
 8    very end, after we fill in all the other blanks.
 9          THE COURT:  Let me hear from Mr. Symeou, Mr. Kadosh.
10          MR. KADOSH:  Your Honor, I just want to take a step
11    back and provide a little bit of context as to why we're
12    seeking the attorneys' eyes only designation here and why it is
13    so important in this case.
14          So attorneys' eyes only, as your Honor knows, like the
15    quintessential use of it is when you have competitors and there
16    is sensitive information that you don't want your competitor to
17    see.  And that's exactly the situation here, in the sense that
18    they used to be business partners, Mr. Shulman and
19    Mr. Kolomoisky and Mr. Bogolubov, and now they're having
20    conflict, and frankly we don't want Mr. Shulman to see the wire
21    transfers.  Let's leave aside Warren Steel and Halliwel for a
22    minute.  Okay.  I want to cabin those off.
23          THE COURT:  Rather than cabining them off, why don't
24    you state your position with regard to those two, so we can see
25    if there is any sort of agreement.
```

FBA3HORC

1          MR. KADOSH:  With respect to those two, I think our

2     only concern, and the only thing we want to designate as

3     attorneys' eyes only with respect to the wire transfers

4     relating to Halliwel and Warren Steel are if there is bank

5     account numbers, Warren Steel is paying an employee.  Right.

6     We think we should be able to designate that bank account

7     number, that's sensitive information, that we should be able to

8     designate the bank account number as attorneys' eyes only.  Or

9     the bank account numbers, if there is a wire between Warren

10    Steel and Kolomoisky, we don't want Mr. Shulman to know the

11    bank account numbers, right.  He can see the transfer, he can

12    see the transfer, but we don't want him to see the bank account

13    numbers for his competitors' bank accounts.

14          And I want to explain to you what we're concerned

15    about here.  Right, our principal concern is that these wire

16    records, Hornbeam is seeking to have the ability to send these

17    wire records overseas.  And not only overseas, but to send them

18    to jurisdictions that don't have the strongest rule of law.

19    When we talk about, as the Court noted in its decision, what

20    we're dealing is three Ukrainian oligarchs.  So when Hornbeam

21    seeks to have Mr. Shulman's associates and confederates and

22    assistants and experts analyze these records, what this means

23    in practice is that the bank account numbers and the wire

24    records relating to Kolomoisky and Bogolubov, they're now in

25    contention, are going to be going to the Ukraine where there is

FBA3HORC

1    not a strong rule of law.  It could be going to other countries

2    where there is not a strong rule of law.  And there is a not

3    insubstantial concern, your Honor, that that information could

4    be used by state actors by others to harm Mr. Kolomoisky's

5    interests.

6          This is not an abstract concern.  It was reported in

7    the news last week that the Ukrainian government had arrested

8    the second in command or Mr. Kolomoisky's chief confederate.

9    We don't want Mr. Shulman to know where Mr. Kolomoisky's assets

10   are, where his bank accounts are.  It is not information that

11   he or his associates or his confederates need to know.  That's

12   why we feel really strongly about this.  This information is

13   going to jurisdictions where it can really be used to harm our

14   client.  And so our entire position really flows from that

15   fact.

16         Now, once we're in that position, we think that we

17   should have the ability to designate anything not relating to

18   Warren Steel or Halliwel, all the personal wire transfers, all

19   the wire transfers of the entities that are owned by Kolomoisky

20   or Bogolubov, that should all be able to be designated

21   attorneys' eyes only.

22         Then with respect to Warren Steel and Halliwel, we

23   think that the bank account numbers should be able to be

24   designated attorneys' eyes only, because there is that same

25   concern about the information getting into the wrong hands, out

FBA3HORC

1    of the Court's jurisdiction, and places with weak rule of law.

2    And that's why we feel like we need to be able to tag these

3    records as attorneys' eyes only.

4              THE COURT:  Just to be clear, to the extent the

5    protective order is entered into here, I would expect anyone

6    who gets the documents, whether they're here or anywhere in the

7    world, would have to sign off on that.  I know that may be,

8    since they're outside of the jurisdiction, that may be of

9    limited value.

10             But the bottom line is there are parties here that

11   could be held responsible for the actions, I think as

12   contemplated in the current protective order, my recollection

13   is that there is provision for damages, should the protective

14   order be violated.

15             Yes, Mr. Marks.

16             MR. MARKS:  Hornbeam is dissolved.  The only party

17   here is Hornbeam.  It is a dissolved Panamanian company without

18   any assets.  So, the fact that there may be people in Ukraine

19   who sign this, that's not really very much protection.  Whether

20   they're Ukraine, Bracha, which is the parent of Hornbeam, your

21   Honor, is in Liechtenstein.  Liechtenstein doesn't enforce the

22   judgments of any other country.  That was one of the reasons

23   that we put in a motion in Alabama that the protective order

24   didn't provide us much protection.  We understand the Court in

25   Alabama did as much as it could.  We understand your Honor will

FBA3HORC

1    do as much as your Honor can.

2          What we say is if there is not a very strong remedy,

3    give us a little self-protection, which, your Honor, they can

4    always object.

5          THE COURT:  That will be obviously any provision for

6    either the attorneys' eyes only or confidential designation,

7    that would be subject to the other party objecting to.

8          But let me ask this just with regard to a narrow

9    question, then I'll allow Mr. Power to speak.  Attorneys' eyes

10   only, but what about retained experts by the attorneys?  In

11   other words, by you, Mr. Marks, on behalf of Mr. Symeou, or by

12   Mr. Power on behalf of his client.

13         Some of this material, quite frankly, while I'm sure

14   both of you have more facility with analyzing financial records

15   and the like, there is something to be said for an attorney who

16   hires an expert and that expert to review those documents.  So

17   let me hear on that specific issue.

18         MR. MARKS:  Your Honor, if you're asking me, I am

19   going to be very brief.  Mr. Power already indicated he

20   wouldn't object, he understood why we wanted it for the

21   unrelated transactions of Mr. Bogolubov, of Mr. Kolomoisky, and

22   also Mr. Korf.

23         Just for the record, your Honor, they're not our

24   clients in this proceeding.  Our client is Mr. Symeou, but

25   obviously he's protecting the interests of the shareholders,

FBA3HORC

1    and I think that goes without saying.

2          But your Honor, I don't see why any expert in or

3    outside the United States would need to know the bank account

4    number of an employee of Mr. Korf of Mr. Kolomoisky,

5    Mr. Bogolubov.

6          As far as the Halliwel and the Warren records, we've

7    all agreed they would be confidential, so you can't disseminate

8    them.  But we don't have an objection to the Halliwel and the

9    Warren records being subject to confidentiality, and the

10   experts signing the certification.  God bless them.  That's why

11   they're experts.  We understand that.

12          THE COURT:  All right.  Mr. Power?

13          MR. POWER:  Yeah, I think what I'd like to just point

14   out, we actually were the proactive party in saying it should

15   not just be Hornbeam signing this, it should be Bracha, it

16   should be Mr. Shulman and Mr. Kolomoisky and Mr. Korf.  The

17   parties that have an interest in these various transactions.

18          Mr. Marks is representing only Symeou.  We are talking

19   a lot about protecting the rights of all these other parties.

20   I get it, because we're lawyers, we see their sensitivity.  But

21   now, I think there is also a line that Mr. Symeou can cross

22   where he is arguing on behalf of all these other entities

23   without any basis whatsoever.

24          My client is in Monaco.  He has relationships in

25   Switzerland.  Most of the accounts, we can take this out, but

FBA3HORC

1   my client is not in the Ukraine.  Mr. Kolomoisky is in London

2   or Switzerland as well.  These are people that are in the

3   world's financial centers.  You can reach out to them.  They've

4   reached out to my client in Monaco, they have his addresses.

5   Mr. Shulman, Bracha, and Hornbeam -- which is not dissolved, by

6   the way.  It is in the process of voluntarily being dissolved

7   by a group of Liechtenstein lawyers who no longer want to use

8   the company for holding shares of people in trust.  We have

9   three years before that's done.  That's a lot of time.

10        But again, we are the ones who offered and suggested

11   that Bracha and Shulman be signatories to this as well as sign

12   certifications.  Mr. Symeou didn't want Bracha and Shulman

13   having access to these records, and simply wanted Hornbeam, who

14   they say is an entity that has no ability to get any recourse

15   from.

16        We had our names on here, I'm happy to put our names

17   on here.  Obviously, we've made known to our clients the types

18   of seriousness of the confidentiality agreements in the United

19   States and they recognize it.  Our instructing counsels are

20   lawyers.  We deal with this.

21        So, we think a protective agreement is going to more

22   than adequately address the issues of having this information

23   disseminated to the four corners of the world.

24        And again, to the extent that there is a wire transfer

25   from Mr. Kolomoisky directly to Warren Steel through a New York

FBA3HORC

1   bank, that cat's out of the bag to some degree.  If these wire

2   transfers emanate from or to Halliwel or Warren Steel, there

3   should be no attorneys' eyes only and no confidentiality.  The

4   United States court system already, as well as the protective

5   order, we would redact bank account -- you're required if you

6   are going to submit them anywhere to redact bank account

7   numbers.  These are things we would do in the normal course.

8   For many of these records, attorneys' eyes only is not

9   necessary to implement the protections that are already in

10  place and can be crafted by the protective agreement.

11          THE COURT:  I guess this is where I'm coming out on

12  this issue.  I'm hesitant, in fact I'm not going to sort of

13  make prior -- attorneys' eyes only in the scheme of documents

14  that get produced, I would imagine that the information that's

15  attorneys' eyes only should be somewhat limited.

16          Having said that, I'm not in a position to make an in

17  advance decision.  Although I hear what the parties are saying

18  with regard to Halliwel and Warren Steel and the issue with

19  regard to the bank account numbers.  I do think that certain of

20  that information may be stuff that if it is redacted could be

21  attorneys' eyes only in the unredacted version.

22          Having said that, with regard to the sort of related

23  party transactions, I don't know what form that would take, and

24  it may be that what will wind up happening is, again, as I

25  mentioned, I would expect attorneys' eyes only to be a more

FBA3HORC

1    limited subset of the documents that get produced.  And

2    obviously there maybe a substantial portion of the documents

3    that are confidential.

4          But, I'm going to include the designation with regard

5    to attorneys' eyes only, indicating to the parties as a general

6    matter where sort of my thinking on attorneys' eyes only

7    documents, and it may be that once and, again, the parties

8    designate the material, either I or -- most likely I, because I

9    typically retain discovery related matters, I have a sense this

10   may become -- I hope it doesn't become a semi full-time job to

11   regulate the discovery.  But there may be disputes about what

12   is covered by attorneys' eyes only versus confidentiality.

13         So I'm going to include the provision.  I think what I

14   intend to do overall is after the conference, go back, take a

15   look at the redlined version that was submitted by the parties

16   and create a version that I'll send to the parties which is the

17   version that I think should be entered.

18         Obviously, there may be things that I've missed or

19   nuances, so I'll allow the parties before we enter it to have

20   their last word, so to speak.

21         Obviously, as I've already mentioned, with regard to

22   using the information in other venues, that is going to be on

23   hold until I rule on the motion for reconsideration.

24         Mr. Power, you alluded to this, as I understand it, am

25   correct, Mr. Marks, that Mr. Symeou objects to having Bracha be

FBA3HORC

1   part of the agreement?

2          MR. MARKS:  Yes, your Honor.  Bracha is a foundation.

3   So it doesn't mean anything to me.  First of all, it shouldn't

4   be a party to the agreement because it didn't bring the

5   application, and the Ohio court has already ruled it doesn't

6   have standing to bring a case in the BVI.

7          Our position is simple.  Mr. Symeou is the litigant.

8   He will sign it on our side.  Hornbeam is the litigant, whoever

9   their liquidator is, that's the appropriate person to sign it

10  for them.

11         If Mr. Kolomoisky or Mr. Bogolubov want the documents,

12  they'll sign the certification.  It is that simple.  They will

13  be treated like anybody else.  They're not parties to this

14  litigation.  Same for Mr. Shulman.  If Mr. Shulman wants the

15  documents, again, it's not attorneys' eyes only for him, same

16  for Mr. Kolomoisky and Mr. Bogolubov, they sign the

17  certifications.  It is really not a complicated thing in our

18  perspective.

19         We have got two litigants:  Hornbeam and Symeou.  They

20  sign it, counsel can sign it, of course.  But anybody else,

21  they're anybody else.  They're no different than the experts,

22  they are no different than counsel in the BVI or instructing

23  counsel, who I guess is Mr. Campanile.  If they want the

24  documents, they sign, and they subject themselves to the

25  jurisdiction of this court.

FBA3HORC

1          MR. POWER:  We think it is absolutely -- we are

2    talking about relevance to the transactions.  Mr. Symeou is a

3    lawyer in Cyprus.  We've seen he has very little exposure to

4    any of the Optima entities.  I would be surprised if he knows

5    what any of these transactions are about.  How are we going to

6    engage in a meaningful discussion about relevance and not

7    relevance unless Mr. Korf is a signatory to this and gets the

8    records, Mr. Kolomoisky gets the records, Mr. Bogolubov gets

9    the records, and the people that are instructing the parties to

10   make these transactions and loans look at the records.

11   Mr. Symeou, and Mr. Marks --

12          THE COURT:  Why isn't it sufficient that they sign the

13   certification?  In other words, I understand the one point, why

14   isn't it sufficient if they sign the certification?

15          MR. POWER:  Okay.  Well, they would certainly have to

16   sign the certification if they got the documents.  But I'm

17   struggling to see how this will work with the discovery dispute

18   that the parties who -- Mr. Symeou is not a party to any of

19   these transactions.  He is an outsider by all means as to

20   regards to Optima Steel, and all these other entities, 18

21   entities Mr.  Symeou has no relationship whatsoever.  How are

22   we going to engage in a discussion as to relevance of the

23   transactions when you have a lawyer sitting in Cyprus who won't

24   come to the United States and won't participate in the meet and

25   confer to determine how these things are relevant.

FBA3HORC

1          THE COURT:  First speak to who on your side of the V

2     do you believe should end up signing this?

3          MR. POWER:  There is the four people that we've

4     already disclosed to the Court prior to the previous order, and

5     again, I would like to state for the record we have already

6     disclosed to the Court who received the records.  We are not

7     holding any information back.  There has been some allegations

8     we refused to disclose.

9          Mr. Shulman has the records, Tatiana Ferrer, who is a

10    Russian speaking lawyer in London got the records, who was

11    working on the team, as well as Fabrizio Campanile.  Those are

12    the only people outside of the United States who have the

13    records.  Those are the only people that will get these

14    records.  Fabrizio Campanile, who is part of the legal team as

15    defined by the original order already has the Deutsche Bank

16    records, but we didn't give the Deutsche Bank records to

17    Mr. Shulman.  We wanted to hold off on that to get

18    clarification from the Court.  Those are the three people

19    outside the United States.

20          In terms of BVI counsel, we would of course like to

21    have them see the records and the forensic analyst FTI --

22          THE COURT:  And the distinction I'm drawing, and I'll

23    have to go back because I hadn't focused on this, is between

24    signing here the protective order, and utilizing the

25    certification process.

FBA3HORC

1          MR. POWER:  Frankly, I think your Honor was, if we are

2     going to have somebody sign the certification, to the extent

3     they are the people getting the records.  I've disclosed who

4     will sign the certification.

5          To the extent signing the protective order, if we

6     don't include all the parties that will be looking at these

7     things, the law firms just as the original protective order is

8     probably just fine.  I think the certification covers it.

9     Because again, we are going to be in endless dispute as to

10    whether Korf should be signing it, whether Hornbeam.  I don't

11    think that's necessary.  I think the lawyers signing this is

12    fine.  Anybody who gets the records signs the certification,

13    and we can put the issue to bed, as opposed to quibbling

14    whether it is Bracha or Shulman or Hornbeam or over who has to

15    sign this.

16         THE COURT:  Mr. Marks.

17         MR. MARKS:  Just quite simply, there is no quibbling.

18    My experience is the parties sign protective orders.  There's

19    two parties:  Mr. Symeou and Hornbeam.  They should sign it.

20    If you want the attorneys to sign it as well, we will do it.

21         THE COURT:  Mr. Power, I don't know who would sign on

22    behalf of Hornbeam, but is that an issue?

23         MR. POWER:  No.  It's fine.  Hornbeam has given power

24    of attorney.  That's also not an issue.  I will let the Court

25    know, however, just like we did in Alabama, we would like -- if

FBA3HORC

1    Bracha is not a party to this and there is going to be an issue

2    with giving Bracha the records, I don't know if I'm hearing

3    that's an issue or not.  It is an issue, right?  Is there an

4    issue with Bracha having these records?

5              MR. MARKS:  I have no idea.  What is Bracha?  People

6    get records.

7              THE COURT:  Rather than talking to one another.

8              MR. MARKS:  Sorry.

9              THE COURT:  I think that just to put a fine line on

10   it.  With regard to certifications and the like, obviously

11   there are going to be individuals that sign the certifications.

12   They may be signing in a representative capacity.  In other

13   words, I don't know who would be the individual at Bracha or

14   who would be the individual at some of the other entities with

15   regard to the certification.  But with regard to who is going

16   to sign here, it will be counsel, it will be the parties.  And

17   then with regard to certifications, typically when a

18   certification is signed, the party just goes to the individual

19   and they sign it within the confines of the protective order.

20   In other words, they would be allowed to see documents that are

21   confidential, and then agree to keep things confidential.

22              Yes, Mr. Marks.

23              MR. MARKS:  It was agreed, and I don't mean to

24   interrupt, it was agreed, it is in both drafts that all the

25   documents will be deemed confidential.  Sorry.

FBA3HORC

1          THE COURT:  That's all right.  So, what I'm asking

2    you, is it your position, Mr. Marks, that I would have to

3    police who signs a certification?

4          MR. MARKS:  Your Honor, if I want Mr. Novikoff to get

5    the documents, he is an assistant.  He was disclosed by them in

6    the Ohio proceedings.  If I want Mr. Novikoff to get the

7    documents, so for example, he can assist me, then Mr. Novikoff

8    has to sign.  If I wanted Mr. Bogolubov to get the documents --

9    I'd like to meet him, I've never represented him, that would be

10   a good reason to go to London.  But everybody's equal.

11         THE COURT:  Okay.  I think I have where the parties

12   stand.  So I think I won't say resolved.  I think we can move

13   on to the next issue regarding the dates, and I'll figure out

14   what the timing is with regard to control dates for various

15   things to occur.

16         MR. MARKS:  Your Honor, just to mention, in terms of

17   attorneys' eyes only, we want that to be 10 days from the date

18   of the order.  We've been relying on that and we haven't marked

19   anything attorneys' eyes only.  We didn't have those documents

20   for months.  It is not something honestly where we hope to use

21   very much, but we haven't done it yet.

22         THE COURT:  I thought it was 10 days from date of the

23   order or the production if they're produced in the future.  And

24   that's the version I was thinking about.  There didn't appear

25   to be that much of a dispute with regard to that.  But I think

FBA3HORC

1    that's fine.  Ten days with regard to the documents that have

2    already been produced, to get that in order, and then 10 days

3    with regard to new documents that might get produced.  I'm okay

4    with that.

5          Paragraph 15.  Just to be clear, Mr. Marks,

6    Mr. Kadosh, I think you referenced Section 14 in the section of

7    the joint letter.  I think that should be Section 15 when

8    you're talking about destruction of responsive materials.

9          MR. KADOSH:  Yes.

10          THE COURT:  I don't know what the dispute is here.

11    Because on the one hand, there is some language which was

12    stricken, the amended protective order does not affect any

13    parties right to, and I assume it would be seek relief

14    concerning the destruction.  Then any party may seek the

15    destruction of responsive materials --

16          MR. POWER:  I don't think there is any dispute.  I

17    don't see anything.  That might have been a difference in

18    wording as far as I can see.

19          THE COURT:  I'll take a look at that.  All it's doing

20    is allowing the parties the ability to apply to have documents

21    it believes are not relevant to the litigation destroyed, and

22    it would be a back and forth with regard to much of the other

23    parts of the protective order.

24          MR. POWER:  Section B, this is a point of contention.

25    I don't know why it is not highlighted and asterisked and

FBA3HORC

1    starred.  It is the one year issue.  The judge in Alabama just

2    granted five years.  I think the Court can see that the

3    discovery disputes is going to be a long haul.  We were

4    expecting the Regent bank records.  One year in this

5    environment is like two weeks.  It is like dog years here.  So

6    I think one year is way too -- I am happy to come back to the

7    Court and report after one year.  I think one year, we may be

8    appealing, as the defendant said, to the Second Circuit, we may

9    not be using anything at any time soon.

10            THE COURT:  As I read this, it basically says all of

11   the documents, and I assume one year from the date of the order

12   if you don't start the action in the BVI.  Let me think about

13   that.  But I understand what you're saying.  And I don't know,

14   the appeal in the 11th Circuit, is that something that can be

15   or is expedited in some way?  I'll take a look at that.  I

16   understand the argument there, and at a minimum, it may have

17   one year but either party can apply to the Court for an

18   extension of that time or something like that.  I haven't

19   thought about that in particular.  I've had experience where

20   these automatic destruction of materials, when people are sort

21   of left to their own devices, when there isn't something to

22   trigger them to do something, sometimes it happens, sometimes

23   it doesn't.  Sometimes there is a dispute and the parties don't

24   even realize it until it is too late.  But I'll try and

25   structure some language there and the parties can take a look

FBA3HORC

1      at it and let me know what they think.

2                  Are there any other things that I have not covered

3      that I need to cover with regard to the protective order?

4                  MR. POWER:  The attorneys' eyes only designation, I

5      think our language on page four, it is taken out.  I want the

6      Court to know as a practical perspective, one of our concerns

7      with a wholesale marking of pages, these are Excel spreadsheets

8      and wires, we thought if you have a wire transfer that you are

9      concerned about, you can't just mark the entire page.  Let's

10     work that out.

11                 THE COURT:  I think consistent with what we've

12     discussed here, I think my general conception of attorneys'

13     eyes only, it should be narrowly tailored.  I think Mr. Marks

14     has indicated certainly with regard to some bank accounts and

15     things like that, it is not because there is a bank account

16     number that means the whole page is.  It may be that in some

17     circumstances it is.  But I am not going to give a ruling on

18     documents that I haven't seen.

19                 But I think everybody has gone through an exercise

20     like this in other cases, attorneys' eyes only designations and

21     confidential designations.  So I'm relying on the parties in

22     part to recognize where the line should be drawn.  Mr. Marks,

23     you were about to say something.

24                 MR. MARKS:  I was going to say there is one thing I

25     think, your Honor, I think Mr. Power is not pushing it and I

FBA3HORC

1    think your Honor has accepted, the limitation isn't going to be

2    on both sides that you don't designate attorneys' eyes only for

3    yourself.  Mr. Symeou is protecting the interest of the

4    shareholders of the company.  So we would designate on behalf

5    of Kolomoisky and Bogolubov if the wires are unrelated or if it

6    has to do with the bank account information of an employee or

7    something like that.  So I wanted to make sure.  It seems to me

8    we're all on the same page.

9            THE COURT:  I think so.  With everything, the devil is

10   in the details, and it may be that some of the documents there

11   may be some kind of dispute over.  We're not there yet, in part

12   because I think the first order of business is to get a

13   protective order that is going to be in place, and then the

14   second order of business is for me to consider the motion for

15   reconsideration.

16           Obviously, the one thing, Mr. Power, that you will

17   have the ability to do, again, on notice, is if, based upon

18   what we've discussed here today, if there are additional 1782

19   applications you want to make in this district, what I would

20   suggest is this:  Before filing the petition, speak to

21   Mr. Marks and Mr. Kadosh and see if you can work out at least

22   some of the scope issues.  I understand that you may not be

23   able to work them all out, but it will limit the amount of

24   paper that we end up having to get here, and hopefully you will

25   be able to at least present to me what is really in dispute.

FBA3HORC

1    Because there is some materials I think you would agree you

2    don't necessarily need or want.

3              MR. POWER:  Right.

4              THE COURT:  And that there may be a way to limit that.

5              With regard to the protective order.  Once I get all

6    of the papers, I think there are some papers that are due for

7    me today with regard to the motion for reconsideration.

8              MR. MARKS:  We're going to agree to some -- it ties

9    into something else, your Honor, that's on my agenda if I

10   might.  We're happy to provide extension, brief or not brief,

11   depending on two things.

12             One is, your Honor, there is the issue of the

13   subpoenas on the service providers, which again, I can explain

14   to your Honor why that's going to involve -- it's going to

15   something that is subject to the motion for reconsideration.

16   Currently there is a protective order that precludes the

17   service of new subpoenas.  That's the order that you entered I

18   think in July or August.  It was after the June hearing.  We'd

19   like to keep that in place so that the service provider

20   subpoenas don't go out.  Because that's going to again involve

21   a protracted level of litigation that we would like to avoid.

22   Perhaps your Honor will moot that or perhaps there is a way we

23   can agree to do exactly what happened in Alabama.  To at least

24   limit it to the materials that are related to Halliwel and to

25   Warren.  So that's one issue.

FBA3HORC

1              THE COURT:  By service providers you mean

2       professionals?

3              MR. MARKS:  PricewaterhouseCoopers, White & Case, and

4       KPMG.  Your Honor, what happened there is there is a ferroalloy

5       business.  Mr. Shulman has no interest in the ferroalloy

6       business at all.  One of the companies in that, Felman, does

7       provide product to Warren Steel.  White & Case was engaged to

8       do a potential IPO of that business.  The consultants were KPMG

9       and PricewaterhouseCoopers.  Mr. Powers attaches Exhibit 3 a

10      decision in London where White & Case was disqualified from

11      representing Mr. Pinchulk against Mr. Kolomoisky and

12      Mr. Bogolubov in London because they did the due diligence here

13      in the United States, and they were adverse to them on the

14      ferroalloy business.  That had nothing to do with Warren Steel.

15      They saw that published decision in England.  They asked your

16      Honor for permission to put the subpoena on the service

17      providers.  It is very broad because it goes to all the

18      documents that they have regarding the different related

19      parties.  Optima Management, Felman Production, Georgian

20      American Steel.  We ask that service of that be delayed and

21      perhaps you can instruct Mr. Power and I to see if we can

22      negotiate limitation on that, so at least it would be done in

23      the way that it was done in Alabama, limited to Warren Steel

24      and to Halliwel.

25             THE COURT:  These are professional lawyers or

FBA3HORC

1    accountants or the like.  I understand they haven't been

2    served, but my concern is that through their normal processes,

3    these entities are --

4              MR. MARKS:  We do not object if the subpoena is served

5    for preservation.  That's not a problem.

6              THE COURT:  Let's get that.

7              MR. MARKS:  Just one second.  They may have a problem

8    because it may be burdensome for them, but we don't have a

9    problem.

10             THE COURT:  They can come in and object.  Having been

11   at a law firm, I haven't been at an accountant firm, but they

12   tend to keep records for a fairly long time anyway.  But I

13   think for purposes of preservation, it makes sense to have that

14   happen, and you should probably submit maybe even a joint

15   letter to those parties explicitly telling them that it is for

16   preservation, there is no need feed for them to begin

17   gathering, assembling, but they need to do whatever document

18   preservation steps that they typically take when they receive a

19   subpoena.

20             With regard to the scope and the like, the parties

21   should meet and confer on that.  Again, it's been a while since

22   I looked at those specific subpoenas.  And Mr. Power, determine

23   whether all of the material that would be covered by the

24   subpoena is still stuff you would be interested in.

25             MR. POWER:  Okay.

FBA3HORC

1      THE COURT:  Mr. Marks mentions the ferroalloy

2   business.  If that's something that could be carved out,

3   perhaps that can be carved out.  Because part of the scope

4   issue I think I am going to be visiting or revisiting in

5   connection with the motion for reconsideration.  So, serve the

6   subpoenas, we'll hold any response in abeyance until I rule on

7   the motion for reconsideration.

8      MR. MARKS:  The other item on my agenda, your Honor,

9   is we provided to you the related persons chart.

10      THE COURT:  Yes.

11      MR. MARKS:  If your Honor has that.  There's two

12   things.  I wanted to briefly explain it to your Honor and then

13   I wanted to make a request if I could.

14      THE COURT:  Okay.

15      MR. MARKS:  As I say, we only got these documents

16   within the month and we went through them.  And the wire

17   records, as your Honor knows, they indicate who the originator

18   is, who the beneficiary is, and it has the address, and

19   obviously it has the amount of the wires.  The other side has

20   had these documents, we don't know when they got them because

21   they haven't provided their correspondence with the banks which

22   we want to have.  Because discovery should be transparent, and

23   we've requested they provide the correspondence with the banks

24   so we can put together the chronology of what happened and find

25   out why the banks were producing over 9,000 records that have

FBA3HORC

1  nothing to do with this case.

2          It took us a week, just a week, your Honor, to figure

3  out, based on the names and the addresses and doing Google

4  searches, that we have thousands of records of regulated

5  companies of investment funds, Optima Group Holdings LLC,

6  Optima Fund Management LLC, these are hedge funds that are

7  regulated in New York.  We've got wire records of information

8  technology companies.  We have wire records of investment

9  banks.  We have no business having at all.  And these are wire

10  records that have been disseminated to a lot of people who are

11  outside of the United States.

12          We're very uncomfortable about that.  There is an

13  ethical rule which deals with attorneys having possession of

14  records which are inadvertently produced.  We don't understand

15  how it happened that the records of these unrelated parties

16  were produced months ago.  And neither this Court was told

17  about that at the June 22 hearing or we were told about it.

18  Because if I had known that there were 9,000 records of

19  unrelated companies, I wouldn't have wanted them.  I don't want

20  them on my servers, I don't want them in my office.  We

21  shouldn't have them.

22          And what we are asking your Honor do is to order the

23  other side to produce their correspondence with the banks,

24  their e-mails, whatever it is, so we can get a handle on why

25  this occurred.

FBA3HORC

1          And then we are going to ask your Honor, it shouldn't

2    be our obligation, but there has to be a process where these

3    banks are notified, and certainly at least the entities that

4    are most significantly impacted are notified about what

5    happened.

6          It is a problem in my mind that people have in my

7    office, innocently, in Mr. Power's office and people associated

8    with him have wire records of $400 million of a hedge fund, of

9    $100 million of these other companies.  So I don't know what

10   happened.  If there hadn't been ex parte communications with

11   the banks, if we had been included in that process, we would

12   have understood what happened.  We don't know if they were

13   instructed to do searches.  Whether they made the mistake

14   themselves.  We want to get to the bottom of it.  Ethically,

15   I'm concerned about it, and I don't want to have happen in a

16   year from now that somebody releases these records, and these

17   people find out that this happened, and they would blame me or

18   somebody else.

19          THE COURT:  Well, I think in the first place they

20   would blame the bank for releasing the documents.

21          MR. MARKS:  Can we get the correspondence?

22          THE COURT:  Let me hear from Mr. Power about that.

23          MR. POWER:  Your Honor, in one of your orders you

24   instruct the parties to chill.  I hate to say it, with all due

25   respect.

FBA3HORC

1              MR. MARKS:  I'm chill.

2              MR. POWER:  We've been waiting for this moment of

3      basically I gotcha.

4              The records.  And this is one of the sheets that

5      Mr. Marks handed up to the Court, it is unrelated persons.  If

6      you look, Optima Group Holdings, Optima Fund Management, CSC

7      Arabia, CSC Australia, CSC Japan, CSC Vietnam.  We see the

8      pattern.  Obviously someone at the bank -- we don't have

9      intimate knowledge of these entities, and I am not sure

10     Mr. Marks does either.

11             To the extent these entities have nothing to do with

12     the related parties and are not responsive to the subpoena, it

13     has been disclosed, we've been asking for a list.  We did not

14     look at our records to look for ways to hold ourselves

15     responsible for the bank producing records that weren't

16     responsive.  Mr. Marks is looking for e-mail exchanges, all

17     these things.  It is obviously a buildup to say we did

18     something wrong.

19             I can say to the Court we did nothing but serve the

20     subpoena on the bank.  We answered any questions they might

21     have had.  It is very obvious, 100 percent obvious that any of

22     the unrelated persons that's unresponsive production is only

23     because the names are so exactly the same.  We're happy to get

24     rid of them.  We hope to do that.  Mr. Marks has asked me many

25     times to ask the banks to expand the scope.  Absolutely not.

FBA3HORC

1    So, if we are going to engage in this witch hunt, I'm happy to

2    do it, and we'll do it aggressively against any suggestion that

3    we've done anything wrong.  If that's where Mr. Marks is taking

4    this, then that's fine.  We'll address it head on.

5         If, on the other hand, his concern truly is to deal

6    with a mistake by the bank in producing records that are not

7    responsive to the subpoena, that's a very easy fix.

8         Now, again, I have a belief as to what the true

9    intentions are of that.  I frankly don't care, I don't want,

10   we're not going to use records of somebody that's not

11   responsive.  But again, I think we have been asking for a list

12   of the unresponsive parties that have been identified over the

13   last three weeks.  We just got this last night.

14        THE COURT:  Okay.  What about the request for

15   correspondence or e-mails with the bank?

16        MR. POWER:  We have produced correspondence, letters

17   with the bank.  To the extent there's e-mails, that would

18   require, one, going back and forth with our system.  I can just

19   tell you historically the representations dealings with the

20   bank are they call us up, ask for an extension.  They leave a

21   message.  They pass it over to one of our colleagues.  We just

22   looked at our records when Mr. Marks asked to get the

23   production, we did go to our records.  That's where we found a

24   Deutsche Bank letter that said, hey, we're waiting for you to

25   send us over a protective agreement.  So, there is another

FBA3HORC

1    letter from Wells Fargo who we don't have any production from.

2    We sent them a letter saying -- this was probably six months

3    ago, there is an outstanding production.  What are you going to

4    do about it.  We've heard nothing.

5         So we have produced pretty much all the records that

6    were we were able to find from the files that have been

7    maintained by the paralegal and by the associate.  When I get

8    these things, I forward them over to somebody.

9         I think really what Mr. Marks was asking, and again,

10   maybe he should tell the Court, is he looking to try to get

11   information that we expanded the scope of discovery?  The

12   answer is no.  And if we are going to have to go through all

13   our system just to show we didn't expand the scope of discovery

14   to include the very entities that he finds are unresponsive,

15   we'll do that.

16        Now, as to the other correspondence, we gave them the

17   cover letters, we've given all the cover letters that were on

18   the subpoena.  I'm a little unclear as to whether or not a

19   e-mail from the bank saying can I have an extension to produce

20   the discovery is responsive materials that were produced in

21   response to the subpoena.  But regardless, we will do what the

22   Court finds.  This is something we internally discussed.

23   Mr. Marks' demand for every e-mail and voice mail and

24   everything.

25        So, which again, is a huge undertaking to the extent

FBA3HORC

1    the sole purpose of that is to see if we directed the bank to

2    expand the scope to include these unrelated entities.

3          THE COURT:  It sounds as if there have been some

4    production of this material.  But Mr. Marks, let me hear from

5    you and then I'll make a ruling.

6          MR. MARKS:  Your Honor, I've really been pretty chill

7    and I don't really think the concept of a witch hunt is an

8    appropriate accusation to be made about me.

9          Our position is that subpoenas shouldn't be served ex

10   parte.  There shouldn't be communications ex parte between the

11   persons serving the subpoena and the recipient.  That it should

12   be a transparent process.  We've been cut out of that process

13   not only from the beginning, but most recently because they

14   never provided this letter from Deutsche Bank or reminding

15   Deutsche Bank.  We had no idea there was discovery outstanding

16   from Deutsche Bank until November 3 when they sent it to us.

17   They never provided us a followup letter to Wells Fargo.  We've

18   not received any of this.

19         On the one hand Mr. Power says there is not very much

20   communications because I guess they leave voice mails for each

21   other, and then he's saying this is something -- all we want is

22   the communications.  If there are e-mails to and from the bank,

23   there are only so many people, Mr. Barry, Mr. Power, who was

24   ever involved.  Let's produce them so the Court can understand

25   what happened.

FBA3HORC

```
 1              THE COURT:  I won't require some computer search.  But
 2     the individuals who were responsible, whether it is a paralegal
 3     or attorneys at your firm, Mr. Power, who dealt with the
 4     different entities that were subpoenaed, have them review their
 5     files.  And see both in terms of paper files that they may have
 6     but also electronic files for communications with the banks
 7     relating to subpoenas, to the extent you haven't already
 8     produced that material, I'd ask that you turn that over.
 9              With regard to going forward, both sides, from now on,
10     any communications with subpoenaed parties, you should copy
11     your adversary.
12              Mr. Power, if someone from your office is making a
13     request or following up, they should copy the adversary.
14     Similarly, Mr. Marks, if someone from your office is following
15     up with a subpoena with an entity that's already been
16     subpoenaed, you copy your adversary.
17              MR. MARKS:  May I clarify that?  And I appreciate your
18     Honor allowing us to see the communications.  As far as the
19     banks are concerned, if there is any further communications
20     with the banks, we consider them to be third parties, we will
21     copy Mr. Power on all communications and vice versa.  As
22     concerns White & Case, that's a complicated issue, your Honor.
23     Because they are the attorneys for some of the related
24     entities, and there is an attorney-client privilege.  If and
25     when anything had to be produced, there is going to be
```

FBA3HORC

1    communications between White & Case and lawyers who represent

2    those entities.  And also Pricewaterhouse Coopers and KPMG are

3    not third parties either.

4         So what I would ask your Honor to do is distinguish

5    between the third parties which are the banks and require both

6    of us to have no ex parte communications, but not apply that

7    same rule to the entities where there are relationships.  We'll

8    abide by what your Honor says, but I don't see how White & Case

9    can deal with a subpoena.

10        THE COURT:  They also haven't responded yet.

11        MR. MARKS:  They haven't been served.

12        THE COURT:  They are going to be served, as I

13   mentioned, in some form of joint submission to them what their

14   responsibilities are, what is expected of them with regard to

15   preservation.

16        With regard to any future communications, I think

17   nothing is going to be produced unless and until I rule on the

18   other issues.  So I'm not saying that with regard to those

19   entities, Mr. Marks, because there isn't any ongoing subpoena

20   response because it's going to be held in abeyance, those

21   communications you don't have to share with your adversary.

22        MR. MARKS:  Thank you, Judge.

23        THE COURT:  Is there anything else we need to deal

24   with today?  I am going to try, and obviously there is a lot of

25   material that I have to look at.  I am going to try and get the

FBA3HORC

1   transcript, or at least a rough, so I can make sure that I'm

2   marking up the protective order.  But my intention is to get it

3   to the parties in the next couple of days, and certainly before

4   the end of the week.

5           With regard to the extension, just submit a letter to

6   me or e-mail saying what you've agreed upon with regard to

7   that, or if there is a dispute I'll resolve that.  This is the

8   extension with regard to the briefing on the motion for

9   reconsideration.

10          As I mentioned, Mr. Power, if you do intend to make

11  some additional 1782, typically they would go to the Part 1

12  judge, but I agreed to keep this.  And so, they should come to

13  me.

14          MR. POWER:  Yes.

15          THE COURT:  But I expect the parties to meet and

16  confer before I get the submissions.  In part because it may

17  alleviate some work that the parties have to do and may focus

18  the issues that are in dispute that I have to decide.

19          MR. MARKS:  Thank you for your generous amount of

20  time.  We appreciate it very much.

21          THE COURT:  It is a fair amount of time.

22          MR. MARKS:  If you go five more minutes, we can each

23  bill two hours.

24          THE COURT:  Unfortunately, I have no one to bill.  We

25  are going to stand adjourned.  Thank you very much.