**IN THE HIGH COURT OF JUSTICE**                                    CLAIM NO: CL-2020-000001

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (QBD)**

**B E T W E E N:**

**VADIM MARATOVICH SHULMAN**

**Claimant**

-and-

**HOGAN LOVELLS INTERNATIONAL LLP**

**Defendant**

**PARTICULARS OF CLAIM**

THE PARTIES AND OTHER RELEVANT ENTITIES

1. The Claimant, Vadim Maratovich Shulman, was and is an Israeli citizen and businessman, resident in Monaco. His background is in Ukrainian engineering/mining.

2. The Defendant is a limited liability partnership registered in England and Wales under registered number OC323639, part of the international legal practice known as "Hogan Lovells" ("**HL**"). HL held and holds itself out as highly experienced, legally sophisticated and as a firm of choice for multi-jurisdictional and CIS-related work.

3. Mr Gennadiy Bogolyubov ("**GB**") and Mr Igor Kolomoisky ("**IK**") (the "**Intended Defendants**") were and are billionaire Ukrainian businessmen, who also have Cypriot and Israeli nationality, and are close business and personal associates. They were and are controlling members of the Privat (or PrivatBank) Group of Ukraine controlling certain industries in the Ukraine and elsewhere, particularly in the steel, oil and gas, chemical and energy sectors. Privat Group included PJSC Commercial Bank PrivatBank ("**PrivatBank**") until its nationalisation.

1

4. From 1999 or 2000, the Claimant and the Intended Defendants carried on business together as a partnership and/or by way of joint venture investing in and/or managing assets associated with the mining and metallurgical industries, including:

    (1) The "**Ukrainian Assets**": three coke plants - Dneprodzerzhinsk, Bagleykoks and Dneprkoks; the Petrovsky steel plant and the YuGOK iron ore plant in Ukraine.

    (2) A minority interest in a coke processing plant in Zarinsk, Russia ("**Altay-Koks**").

    (3) A steel plant in Ohio, United States known as "**Warren Steel**."

    (4) Management of state-owned the Dnepropetrovsk Metallurgical ("**DMK**") Plant.

5. The relationship between the Claimant and the Intended Defendants broke down and the Intended Defendants acted dishonestly and fraudulently in respect of the said assets.

6. Until the nationalisation of PrivatBank, GB and IK were controlling shareholders in it and members of its supervisory board. Upon its nationalisation, PrivatBank allegedly had a c.US$5.5bn deficit due to a large-scale fraud by GB and IK amongst others. It brought proceedings against the Intended Defendants amongst others in the English Courts in December 2017 for alleged losses of c.US$6.2bn. PrivatBank was represented for these purposes by HL. HL is put to proof of when it first began acting for PrivatBank.

7. Other claims were brought against the Intended Defendants in the English Courts by:

    (1) The Ukrainian billionaire Mr Victor Pinchuk, issued in March 2013 for US$2bn involving ownership rights in the Kryvorizkyi Iron Ore Factory in the Dniepropetrovsk region of Ukraine (the "**Pinchuk Claims**"). It settled shortly before trial in January 2016. HL acted for Mr Pinchuk in these claims and continued to so act after the settlement including in the implementation of the settlement.

    (2) The Russian oil company PJSC Tatneft, issued in March 2016 in the Commercial Court against the Intended Defendants and others claiming damages in the sum of US$344m (the "**Tatneft Claims**"), alleging that the Intended Defendants had taken part in a fraudulent scheme to divert payments for oil.

8. Mr Pinchuk was represented by HL in the Pinchuk Claims, in particular by Mr Chris Hardman, a HL partner specialising in CIS work. Mr Hardman had a reputation as an aggressive litigator/strategist. The Claimant met Mr Hardman in March 2015 to provide a witness statement in support of Mr Pinchuk's case.

9. At the time when the Pinchuk and Tatneft Claims were issued, IK was resident in Switzerland and GB was resident in London. Jurisdiction was not disputed in either case.

THE CLAIMS AGAINST THE INTENDED DEFENDANTS

10. The Claimant's claims against the Intended Defendants were as follows:

    (1) In 2005/6 the parties sold their interest in Altay-Koks and in 2007 in the Ukrainian Assets. Consideration was provided to an entity controlled by the Intended Defendants, partly in cash and partly in Sponsored Global Deposit Receipts ("**GDRs**") convertible into shares in Evraz Group SA (the "**Evraz Deal**").

    (2) The Intended Defendants failed to account to the Claimant for partnership property and/or funds and proceeds, including those owed in respect of the operation and management of the Ukrainian Assets, Altay-Koks and the DMK Plant and his share of the proceeds of the sale of the Ukrainian Assets.

    (3) The Intended Defendants failed to transfer all of the GDRs due to the Claimant under the Evraz Deal.

    (4) The Intended Defendants had failed to act in good faith and honestly in relation to Warren Steel, had failed to reimburse the Claimant's costs and had misappropriated substantial sums belonging to the Claimant from the Evraz Deal which they had purported to invest into Warren Steel. The Claimant had no participation in the management or operation of the plant and had no returns on his investment. The Claimant sought an account and enquiries (the "**Warren Steel Claims**").

    (5) The Claimant's claims against the Intended Defendants were worth c.US$500m.

11. Before embarking on the claims in England, the Claimant, via Bracha (a Liechtenstein foundation of which the Claimant is sole beneficiary) and Hornbeam Corporation (which is owned by the Claimant) sought discovery and evidence, under 28 US Code §1782, for use in non-US proceedings *inter alia* against the Intended Defendants.

12. Further, HL (New York) were retained by the Claimant in about January 2017 and sought to obtain material relevant to identifying assets belonging to the Intended Defendants, for the Claimant to deploy in the English litigation against the Intended Defendants.

THE BACKGROUND

13. The Tatneft Claims:  On 16 March 2016, Tatneft applied for worldwide freezing relief and on 22 March 2016, Teare J made a worldwide freezing order ("**WFO**") for US$380m ("**the Tatneft WFO**").  On 23 March 2016, Tatneft issued its claims.

14. The Retainer by the Claimant of HL: On 23 June 2016, Ms Natalya Luchnikova ("**NL**") and Ms Tanya Ferree ("**TF**"), London-based representatives of the Claimant (the "**Claimant's Representatives**") met Mr Michael Roberts of HL to discuss their potential

retainer for the Claimant's claims against the Intended Defendants, Mr Hardman suggested this as he was away.

15. As Mr Roberts and HL were well aware, NL and TF were not themselves litigators.

16. The Claimant was considering instructing HL (and, in particular, Mr Hardman as lead partner) because of and in reliance on their purported experience and sophistication in the type of claims that the Claimant wished to bring against the Intended Defendants. The Claimant's Representatives were aware, and so informed HL (as did the Claimant in October 2016), that there had been and were likely to be various parties chasing the Intended Defendants' assets, including Tatneft, and the Claimant was concerned that the Intended Defendants would dissipate or dispose of assets which could be the subject of enforcement. He wanted to be represented by lawyers well versed and experienced in locating and freezing assets worldwide.

17. One issue discussed at the initial meeting was the fact that, as the Claimant was aware, HL had acted for Mr Pinchuk in his claims against the Intended Defendants. The Claimant's Representatives understood from their discussions with HL that the Pinchuk Claims had been settled and that HL were no longer acting for Mr Pinchuk in respect of these matters:

   (1) Neither the Claimant's Representatives nor the Claimant knew that the Pinchuk Claims settlement was not a clean break between Mr Pinchuk and the Intended Defendants.

   (2) Instead, as they discovered later, the settlement involved staged payments over several years (understood to be c. US$48m per month) plus transfer of prime London real estate, and HL continued to act for Mr Pinchuk in relation to such settlement.

   (3) Mr Pinchuk therefore still had a keen interest in the Intended Defendants' assets.

18. On 28 June 2016, Mr Roberts emailed NL and TF: "*Yes, I believe we are conflict free.*" On 1 July 2016 he emailed that subject to *inter alia* "*the terms of the retainer reflecting our pre-existing role for Victor*" (i.e. Pinchuk), HL would be able to act for the Claimant. On 8 July 2016, HL provided an initial fee proposal and credentials document.

19. On 4 October 2016, HL provided a revised fee proposal stating that they would finalise and issue the claim form by 23 December 2016 (described as the "**Filing Deadline**"). This was the date HL had identified to the Claimant's Representatives as the realistic date by which the claim form could and should be issued.

20. HL were formally retained by the Claimant on 10 October 2016 and Mr Roberts sent him an engagement letter (the **"Retainer Letter"**), naming Mr Alex Sciannaca ("**AS**") as the partner with conduct. The Retainer Letter was headed "DISPUTE RELATING TO WARREN STEEL". It stated that the "*core team*" would: "*(vii) finalise and issue the claim in the English Courts by 23 December 2016 (the "Filing Deadline")*" and as regards scope, "*You have asked us to advise you in relation to possible claims in England and Wales against Igor Kolomoisky and Gennady Bogolyubov in relation to the joint venture in Warren Steel.*"

21. It also stated: "*You are aware that Hogan Lovells <u>previously acted</u> for another party in proceedings against Messrs Kolomoisky and Mr Bogolyubov [sic]*" [emphasis added] and warned of a possible challenge to their acting by the Intended Defendants. The letter used the past tense in describing HL's retainer for the other party (who the Claimant knew to be Mr Pinchuk). HL did not disclose that Mr Pinchuk's settlement remained ongoing and that HL remained acting for him.

22. HL's "*regular Terms of Engagement*" were enclosed (the **"Terms of Engagement"**): Clause 44 addressed "*extent of liability*", stating that "*Our liability to you, however arising, in respect of each matter on which we act for you, extends to the full value of the assets of [HL] (including insurances), save where a lower limit has been agreed with you.*" Clause 47 stated that provisions restricting or excluding the liability of HL "*will not apply in the case of fraud or deliberate misconduct.*"

23. Pursuant to Clauses 40 and 41 of the Terms of Engagement, it was an express term of the resulting retainer that HL would not act in a position of conflict, the definition of which reflected the definition in the SRA Code of Conduct 2011, and would only represent another client whose interests were adverse to the client's own should that not give rise to any conflict of interest under the SRA Code of Conduct 2011.

24. <u>The purported Limitation Clause:</u> the Retainer Letter contained a purported limitation of liability of £5m (the **"Limitation Clause"**): "*To the extent permitted by law, our liability (including any liability of our members, employees or consultants including anyone we call a partner) to you in respect **of this matter**, whether in contract or tort (including negligence) or on any other basis, is limited to £5 million. Any exclusion or limitation of liability does not apply if we commit fraud or deliberate misconduct.*" (Emphasis added).

25. The Limitation Clause applied only to the Warren Steel matter, as the Retainer Letter was itself limited to that specific matter, which it referred to by name. The Retainer Letter did

not refer to or take account of the further claims in respect of Evraz and the Ukrainian Assets (the **"Further Claims"**), which were only identified later.

26. Clause 51 of the Terms of Engagement provided: "*In the event that we agree to undertake additional matters, any such additional representations will be governed by the Engagement Letter and these Terms of Engagement unless we mutually agree otherwise in writing.*" The Limitation Clause did not apply to the Further Claims as, on a proper construction of Clauses 44 and 51, the Terms of Engagement require any lower level of liability to be specifically agreed for any further matter including by separate Engagement Letter.

27. If, contrary to the foregoing, the effect of Clause 51 is to apply the Limitation Clause to any additional claims or matters (including, here, the Further Claims) without the need for any further specific agreement, this was itself unreasonable for the purposes of the Unfair Contract Terms Act 1977 ("**UCTA**") in circumstances where:

   (1) The Limitation Clause purported to apply regardless of the nature, quantum or likely value of the Further Claims, which were very substantial and which even on a conservative assessment multiplied the overall value of the claims significantly.

   (2) The Limitation Clause was unreasonably low especially given the overall potential value of the combined claims (i.e. Warren Steel and the Further Claims) and the scale of the likely fees that would be charged.

   (3) It was unclear and ambiguous, given the terms of the Limitation Clause itself and the fact that neither the Limitation Clause nor the main body of the Retainer Letter itself contained any reference to Clause 51, that it would or could apply to additional matters undertaken by HL rather than only to the matter expressly referred to in the Retainer Letter.

28. Alternatively still, the Limitation Clause was unreasonable in itself for the purposes of UCTA in circumstances where (i) HL were, contrary to the express terms of their retainer, in a position of conflict; (ii) it was unreasonably low, given the value of the likely claims against the Intended Defendants in respect of Warren Steel and/or the Further Claims and the scale of the fees that would likely be charged; and (iii) if it be so alleged by HL, it was intended to apply to any other additional matters.

29. If, which is denied, the Limitation Clause is binding for each matter, then it and the £5m limitation applied to each "matter" and "additional matter", i.e. each claim to be pursued on Claimant's behalf was a separate matter for these purposes.

30. Further still, if, which is denied, the Limitation Clause is otherwise binding, the Claimant contends that HL committed deliberate misconduct in the respects particularised below in paragraph 90 with the result that the Limitation Clause does not apply to any matter upon which HL acted for the Claimant.

31. HL's Misrepresentations: At all material times before the Claimant entered into the Retainer with HL, HL represented to him that i) their relationship with Mr Pinchuk was historic, his claims against the Intended Defendants having settled on terms advantageous to Mr Pinchuk, and that HL had no ongoing role for Mr Pinchuk; and ii) there were no conflicts of interest that would operate upon the retainer and, by implication, that the Claimant could expect undivided loyalty from HL in respect of the retainer and his claims against the Intended Defendants.

32. These statements of fact were untrue, and induced the Claimant to enter into the retainer, as HL intended him to do.

33. The 25 October Meeting: On 25 October 2016, the Claimant, NL and TF attended a meeting at HL's London offices. Mr Hardman (who was present at the start of the meeting) asked the Claimant to join him in his office in order to speak in private. Mr Hardman told the Claimant that he personally had a conflict of interest, as he had acted previously for Mr Pinchuk in the case against IK. Nevertheless, Mr Hardman said that he was confident that he could "do the same" for the Claimant as he had for Mr Pinchuk (i.e. secure a successful settlement with the Intended Defendants). Mr Hardman also told the Claimant that he knew that if he had no involvement then, as was the case, the Claimant would not retain HL.

34. Mr Hardman told the Claimant that he could not be seen as officially representing him on paper and had chosen his junior partner, AS, to lead the claims but that the Claimant should not worry as he, Mr Hardman, would be running the case behind the scenes. Mr Hardman told the Claimant: "Do not worry. Alex is me."

35. Thereafter, either Mr Hardman was in truth running the case behind the scenes or Mr Hardman misled the Claimant in order to secure and retain his instructions and was only involved when the Claimant's Representatives sought his input:
    (1) When the Claimant's Representatives did contact Mr Hardman, there was no suggestion from him or from anyone else in HL that the former ought not to contact Mr Hardman or that they ought to contact AS or Mr Roberts instead.

7

(2) Rather Mr Hardman gave the strong impression that he was involved behind the scenes: see by way of example NL's email to AS dated 9 March 2017 and the telephone conversation between NL and Mr Hardman on 27 March 2017.

36. <u>The report to HL in October of the August meeting between the Claimant and IK:</u> On 28 August 2016 the Claimant met with IK. As the Claimant's Representatives reported to HL by note provided on 19 October 2016, IK stated that he was aware that the Claimant was preparing for a claim in London and asked that the Claimant did not sue him there. GB and IK were close friends and business associates and it could be inferred with a high degree of certainty that if IK was aware of "*a direct claim in London*", then so was GB. HL knew or should have known that.

37. <u>The Jurisdiction Issue:</u> The Claimant was advised by HL that he could pursue claims in this jurisdiction against the Intended Defendants on the basis of GB's residence in England. GB's continuing residence in England was of critical importance to the Claimant's ability to bring claims against the Intended Defendants in the English courts.

38. HL's strategy should have been to issue a claim form urgently in order to ground jurisdiction for the claims against both of the Intended Defendants in England pursuant to Article 4(1) of the recast Brussels Regulation (No. 1215/2012) and Article 6(1) of the Lugano Convention. It would then have been extremely difficult if not impossible for either of the Intended Defendants to dispute jurisdiction.

39. Alternatively, if, contrary to the foregoing, the issue of the claim form was not urgent, at the very least GB's Belgrave Square home ought to have been placed under surveillance before Christmas 2016. The results were highly unlikely to have been reassuring.

40. <u>The Tatneft Judgment:</u> By judgment dated 8 November 2016, Picken J granted applications for summary judgment against Tatneft (including the GB application) on the basis that Tatneft's claim had no real prospect of success, and granted applications to set aside the order permitting service out of the jurisdiction on the basis that there was no serious issue to be tried. The Tatneft WFO was discharged but such discharge was stayed pending an application for permission to appeal. The Tatneft WFO was reduced to US$200m with immediate effect.

41. By email dated 10 November 2016 to NL, HL's Ms Hickman reported on the judgment of Picken J and inaccurately stated that the Tatneft WFO had been discharged.

42. <u>PrivatBank:</u> On about 18 December 2016, the National Bank of Ukraine declared PrivatBank to be insolvent. As HL were or should have been aware, the potential nationalisation of PrivatBank would place further significant pressure on the Intended Defendants and their assets. This was likely to lead to further claims and litigation against the Intended Defendants internationally, which was itself likely to mean that they would attempt to place their assets beyond reach of enforcement.

43. <u>The Original Filing Deadline:</u> No claim form was issued by 23 December 2016.

44. Whilst the Claimant agreed to a deferral of the filing deadline until 1 March 2017, this was in circumstances where i) the Claimant was not advised by HL to issue a claim form on an urgent or protective basis for damages, an account and declaratory relief, which claim form need not be served but which would found jurisdiction over a defendant resident in the jurisdiction; ii) rather, he was advised that HL were not yet ready to issue the claim form. Further, the Claimant was never advised that the issuing of a claim form (or, at least, readiness to issue and serve a claim form forthwith) was a prerequisite for a successful application for a WFO.

45. <u>The requests that HL apply for a WFO:</u> From the outset of the retainer, HL were aware that there was a critical issue as to the availability and whereabouts, and risk of dissipation, of the Intended Defendants' assets against which the Claimant would wish to enforce in due course.

46. From October 2016 onwards, the Claimant and his Representatives repeatedly questioned HL as to why they were not applying for a WFO on behalf of the Claimant. This issue arose in circumstances where:

   (1) The Claimant was continuing to pursue discovery, under §1782, in the US for use in proceedings elsewhere.

   (2) The Intended Defendants were and are sophisticated businessmen highly likely to be practised and experienced in the disposal and hiding of assets *inter alia* in secret offshore trusts and nominee structures.

   (3) There were unlikely to be major obstacles to an application for a freezing order given that the risk of dissipation threshold had been passed in respect of the Tatneft WFO and Picken J had so stated in his November 2016 judgment.

   (4) There was a clear advantage to the Claimant in obtaining his own WFO.

47. The issue of applying for a WFO was raised directly with AS on multiple occasions:

    (1) AS was generally discouraging of the idea, advising that the Claimant would have to put up 20-25% of his entire claims as fortification of the cross-undertaking (and on at least one occasion, over 10%).

    (2) The issue of a WFO was raised at meetings and on telephone calls between HL and the Claimant and/or his Representatives, in particular during meetings on 25 October, 8 December 2016 and 26 January 2017, during a call on 1 June 2017 and during meetings on 8 and 9 August 2017 in Sardinia.

48. <u>News of GB's possible relocation to Switzerland:</u> On Thursday 16 February 2017, AS sent an email to NL advising amongst other things:

    *"... I have heard a rumour that GB may have moved, at least temporarily, to Switzerland (possibly because of the pressure coming on him and IK as a result of the collapse of Privat, but also possibly because he realises it leaves him exposed to proceedings in England)."*

49. On the same day, 16 February 2017, TF telephoned AS. AS said that he could not disclose the source of this information in his email but gave the clear impression that it was Mr Hardman.

50. On 17 February 2017, NL informed AS in a call at 9:30am that given the rumour of relocation, the Claimant was extremely concerned about jurisdiction and wished HL to issue the claim form immediately and that HL were instructed to issue the claim form.

51. HL did not follow the Claimant's instructions and did not issue the claim form. Instead, the Claimant's Representatives were informed by AS that more time was needed to finalise the Particulars of Claim. AS advised that there was no need to be concerned about the rumour as the Claimant could still rely on GB's wife and children remaining in London.

52. No surveillance was carried out on GB's family residence at 31 Belgrave Square or the movements of GB personally. HL did nothing to protect the Claimant's claims or investigate the truth in the rumour.

53. When later applying to challenge jurisdiction, GB relied on the fact that on 20 February 2017 GB and his wife were said to have entered into a separation agreement.

54. <u>Events from March to May 2017:</u> The claim form was not issued by the revised deadline of 1 March 2017. In his jurisdiction challenge application, GB relied on his residency permit in Geneva having been granted on 1 March 2017 and that he had signed a lease on a flat in Geneva on the same day.

55. The Claimant and his Representatives were led to understand that the claim form would be issued by 10 March 2017. By email of 9 March 2017, AS said that before issue of the claim form junior counsel wanted leading counsel to look at the draft Particulars of Claim. NL responded by email the same date that the timescale was unacceptable and asking AS to confirm his availability, and that "*Otherwise, I will be getting in touch with Chris [Hardman]*". A revised filing date of 17 March 2017 was proposed by HL.

56. The claim form was not issued by 17 March 2017.  Instead, counsel turned their attention to the preparation of an opinion on the merits of the claim, which was provided to the Claimant's Representatives on 24 March 2017. Whilst this was sought on the Claimant's instructions, the Claimant remained unaware of the urgent need to issue the claim form.

57. GB later relied on the fact that his wife petitioned for judicial separation on 21 March 2017.

58. On 23 March 2017, AS emailed the Claimant's Representatives stating that personal service on GB was possible and could have "*a greater impact on the individual*" and on 24 March 2017, HL's Ms Hickman advised by email that the claim form could not be finalised until the Particulars of Claim had been fully settled.

59. Following a change in the counsel team to Jonathan Crow QC and Gregory Denton-Cox, prompted by a loss of confidence by the Claimant in the existing counsel team, the claim form was eventually issued in the Chancery Division on 12 May 2017 accompanied by the Particulars of Claim. Service was attempted at Belgrave Square and was signed for by a member of GB's household staff.

60. In the days immediately before service, HL instructed Diligence to provide surveillance of 31 Belgrave Square and of GB (if he appeared, which he did not). As matters transpired, GB had already permanently left the jurisdiction or was later able to persuade Barling J that this was the case.

61. <u>GB's application to challenge jurisdiction:</u> On 3 July 2017, GB brought an application against the Claimant for a declaration that the Court had no jurisdiction to try the underlying

claims on the basis that by the date of issue on 12 May 2017, he was no longer domiciled in England but in Switzerland.

62. <u>Further instruction and advice in relation to a WFO:</u> On 8 and 9 August 2017, the Claimant met with TF and AS in Sardinia. AS gave positive advice in respect of the likely outcome of the jurisdiction application, stating *inter alia* that it did not matter that GB had left the jurisdiction as his wife and children were still residing in London and therefore jurisdiction would be easily established, and describing the purported divorce between GB and his wife as a "*sham*" and "*window dressing*."

63. The Claimant informed TF and AS at this meeting that he understood Tatneft were in discussions with GB in respect of the amount of security payable in lieu of the WFO and that he had been told that GB had already prepared a new structure and was ready to move his assets into this structure as soon as the Tatneft WFO was withdrawn, so that his assets could not be seized as a result of any further legal action against him. The Claimant reiterated his request that HL take steps to protect his position by applying for a WFO immediately. AS again gave discouraging advice in respect of a WFO and did not suggest any further steps which might be taken to protect the Claimant.

64. <u>The Paradise Papers:</u> On about 10 or 11 November 2017, the UK and Ukrainian press printed reports of the leak of the Paradise Papers, which provided details of the ongoing dealings between Mr Pinchuk and the Intended Defendants regarding the settlement of their dispute. The reports concerned the transfer of two prime London properties to Mr Pinchuk as part of the settlement. HL acted for Mr Pinchuk in relation to such matters. The leak included emails of 20 January and 2 February 2016 from HL to Appleby referring *inter alia* to a conditional settlement whereby the Intended Defendants "*will make a series of staged future payments to Mr Pinchuk over the course of several years*".

65. <u>Further consideration of a WFO:</u> On 30 November 2017, HL sent an email to NL and TF revisiting whether to apply for a WFO with junior counsel. The email stated: "*If the Tatneft freezing order remains in place then we do not consider that it is necessary to apply for our own. We would also require evidence that there is a risk of GB dissipating assets in order for any application that we make to be successful.*" HL thereby implied that this would be difficult.

66. HL, whilst advising the Claimant against making an application for a WFO, were at the same time preparing an application for a WFO on behalf of PrivatBank against the Intended Defendants, which was heard on 19 December 2017.

ROLLS BUILDING

67. <u>The December 2017 Jurisdiction Hearing:</u> The hearing of GB's jurisdiction application took place on 18/19 December 2017. The application was supported by evidence that GB had ceased to be domiciled in England before 12 May 2017.

68. <u>The PrivatBank WFO:</u> PrivatBank applied for a WFO over the Intended Defendants assets. The application was heard by Nugee J on 19 December 2017 (i.e. the second day of GB's application against the Claimant) and an interim WFO was made.

69. The inter partes hearing of Privatbank's WFO application was held on 19 January 2018:

   (1) Privatbank was represented by HL and Stephen Smith QC (the Claimant's former Leading Counsel).

   (2) TF attended the hearing with a view to obtaining relevant information about the Intended Defendants' assets.

   (3) Stephen Smith QC on instructions from HL applied for the part of the hearing relating to those assets to be held in private to the exclusion of TF.

   (4) PrivatBank obtained a freezing order for US$2.6bn against the Intended Defendants.

   (5) TF's exclusion was contrary to the Claimant's interests because of the likely relevance to him of information relating to the assets of the Intended Defendants.

70. On the evening of 19 January 2018, Ms Hickman emailed the Claimant's Representatives setting out "*a summary of the points dealt with at today's Privatbank hearing and the judgment given at the end of the day.*" The email recorded exchanges in respect of the membership of a confidentiality club in respect of the Privatbank WFO; that Privatbank had argued that "*Members of the confidentiality club could represent Shulman and Pinchuk as well as Privatbank*" and that Nugee J ordered that "*HL lawyers who work on PrivatBank are not prevented from working on Shulman and Pinchuk.*"

71. Neither the Claimant nor his Representatives had been informed previously that HL were representing PrivatBank. It is apparent from the terms of Ms Hickman's 19 January 2018 email that, unbeknown to the Claimant, some of the same HL individuals had been and were working on the Pinchuk Claim (or the implementation of the settlement), the Claimant's claims and the PrivatBank Claim.

72. <u>The Judgment of Barling J:</u> By judgment of 2 February 2018, Barling J granted GB's application and ordered costs (including a payment on account) against the Claimant. His judgment reflected the fact that GB stated that he had become resident in Switzerland by 1 March 2017. Barling J found *inter alia* that:

   (1) There was overwhelming evidence that before 5 April 2017, GB had ceased to live at the Belgrave Square House and was living in Geneva.

   (2) There was no issue of GB having left England but not taking up residence in Geneva, such that he might have become resident elsewhere.

73. The Court of Appeal refused the Claimant permission to appeal on 2 July 2018. Accordingly, the Claimant's claims against the Intended Defendants were lost.

74. By the end of 2018, the Intended Defendants were understood by the Claimant to have fled Switzerland for Israel and thereafter to have gone to Ukraine.

THE NEW US PROCEEDINGS

75. On 23 August 2019, the Claimant and Bracha filed claims in Delaware against multiple defendants including the Intended Defendants, Mr Korf, Privatbank, Warren Steel and others, in respect of fraud, unjust enrichment, conversion, breach of fiduciary duty, civil conspiracy, corruption and other claims including a claim for an account relating to Warren Steel. The New US Proceedings are at a very early stage and jurisdiction is not established.

THE CONFLICTS OF INTEREST

76. HL acted for the Claimant when there were multiple conflicts of interest:

   (1) There was an obvious conflict between the interests of the Claimant and the interests of Mr Pinchuk: Mr Pinchuk's interest was in the Intended Defendants continuing to make the staged payments and/or transfers to him under the terms of their settlement agreement, and the Claimant's interest was in the Intended Defendants' assets (including the most accessible assets) being frozen and/or available for enforcement on his behalf in the event that judgment was obtained against them.

   (2) There was an obvious conflict of interest between the interests of the Claimant and the interests of PrivatBank: PrivatBank was also aiming to secure and/or enforce against the Intended Defendants' assets and to enforce any judgment or settlement obtained against the Intended Defendants' most accessible assets.

   (3) There was also an obvious own interest conflict or the significant risk of an own interest conflict between the interests of the Claimant and HL's own interests in:

     i. Taking on multiple clients all with high value claims against the same Intended Defendants to maximise HL's fee generation and profile; and

    ii. Then favouring and preferring the interests of the client with the larger and more fee generative claims (PrivatBank rather than the Claimant) as apparent from the facts that:

       1. The Claimant was not informed when HL were retained by PrivatBank;

       2. A WFO was sought and obtained against the Intended Defendants on behalf of Privatbank by HL; and

       3. TF was excluded from part of the hearing on 19 January 2018.

77. The Claimant was not asked for and had not given his informed consent to any of the conflicts set out above. In any event, consent could not have cured the conflicts. The conflicts of interest are relevant to and explain HL's conduct to late 2017 and thereafter, including but not limited to HL's otherwise inexplicable failures, which (as set out below) themselves constituted deliberate misconduct by HL:

  (1) To issue, or advise the Claimant to issue, the Claimant's claim form;

  (2) To seek, or advise the Claimant to seek, a WFO in circumstances where the Claimant wished to pursue one; and

  (3) To follow the Claimant's instructions in respect of both of these matters.

78. The Claimant will invite the Court to infer, given these matters and the matters set out below, that from the outset of the retainer HL lacked any genuine commitment to his best interests and actively preferred the interests of Mr Pinchuk and PrivatBank.

## THE SRA CODE OF CONDUCT 2011

79. At all material times, HL were subject to SRA Code of Conduct 2011. Chapter 3 of the SRA Code of Conduct provided: "*If there is a conflict, or a significant risk of a conflict, between two or more current clients, you must not act for all or both of them unless the matter falls within the scope of the limited exceptions set out at Outcomes 3.6 and 3.7.*"

80. The Code defined "client" and also "client conflict" and "own interest conflict" for the purposes of Chapter 3. The Code then provided:

    "*Prohibition on acting in conflict situations*

    *O(3.4) you do not act if there is an own interest conflict or a significant risk of an own interest conflict;*

    *O(3.5) you do not act if there is a client conflict, or a significant risk of a client conflict, unless the circumstances set out in Outcomes 3.6 or 3.7 apply ...*"

81. Neither Outcome 3.6 nor 3.7 were applicable (and in any event, even if they had been, no attempt was made by HL to comply with their terms).

<u>DUTIES OWED TO THE CLAIMANT BY HL</u>

82. Before the inception of the retainer, between the date of the first meeting on 23 June 2016 and 10 October 2016:

    (1) HL owed a duty to the Claimant as a quasi or prospective client to inform him that they would be unable to accept the retainer to act for him given their retainer by and ongoing role for Mr Pinchuk, and to refuse to act.

    (2) This duty is not subject to the terms of the retainer subsequently agreed (including the Limitation Clause, if, contrary to the above, it is binding on the Claimant).

83. Pursuant to the Retainer Letter and Clause 41 of the Terms of Engagement, it was an express term that HL would comply with the SRA Code of Conduct 2011.

84. At all material times after the parties entered into the retainer, HL owed an implied contractual duty to the Claimant to exercise the care, skill and diligence to be expected of reasonably competent solicitors holding themselves out as a leading global firm with skill, and expertise in commercial disputes involving the CIS and jurisdictional matters.

85. Such duty extended to exercising reasonable skill and care in:

    (1) Advising the Claimant in respect of the prompt issue and service of the claim form and protecting his claims against the Intended Defendants in the English courts.

    (2) Advising the Claimant in respect of jurisdictional matters including the risks and benefits of various strategies and tactics in litigation of this scale.

    (3) Advising the Claimant in respect of the protection of his interests including a freezing order in the High Court in respect of the assets of the Intended Defendants.

    (4) Providing the Claimant with an overall strategy and tactics in respect of high value and complex litigation against the Intended Defendants, which was appropriately aggressive, commercial and sophisticated, and which took into account the likely actions of the Intended Defendants.

    (5) Advising the Claimant as to urgent or immediate steps to protect his interests and secure the jurisdiction of the English courts such as issuing a claim form by the agreed date of 23 December 2016, and/or as a matter of urgency thereafter.

    (6) Following the Claimant's instructions.

86. Further, HL owed the Claimant commensurate duties of care in tort.

87. Further still, HL owed the Claimant the following fiduciary duties:

    (1) To act at all material times in the best interests of the Claimant and not to prefer the interest of any other persons.

    (2) Of undivided loyalty.

    (3) Not to act and/or to continue to act when in a position of client and/or own interest conflict of interest.

    (4) To act with integrity and not allow its independence to be compromised.

    (5) To act upon the Claimant's instructions.

    (6) To disclose information held by HL (in particular, as a result of HL acting for Mr Pinchuk and PrivatBank) relevant to the Claimant's claims (including his aim to seek a WFO and/or ability to enforce any judgment or settlement) against the Intended Defendants.

    (7) To make full and candid disclosure to the Claimant, or to cease to act if events arise that compromised HL's ability to follow the Claimant's instructions.

88. As a result of the matters pleaded above, HL breached their contractual and/or tortious duties to the Claimant in that:

<u>PARTICULARS OF BREACH OF CONTRACT AND/OR NEGLIGENCE</u>

<u>In the pre-contractual period</u>

    (1) HL negligently and in breach of Outcome 3.4 of the SRA Code of Conduct (the Claimant being a prospective client) failed to inform the Claimant that they could not act for him in respect of his intended claims against the Intended Defendants given their ongoing role for Mr Pinchuk (and PrivatBank if that professional relationship or retainer had already begun) and the obvious conflicts of interest to which this gave rise. HL ought to have declined to act for the Claimant.

<u>In respect of the claim form</u>

    (2) HL failed to provide the Claimant with competent advice on the issue of the claim form and the inter-relationship between the date of issue and jurisdiction. In particular, HL failed to advise the Claimant that, even if the Particulars of Claim were not ready, the claim form could and should be issued protectively as an urgent procedural step, and if necessary could be amended following issue but before service without the court's permission and with the court's permission thereafter.

    (3) HL failed to provide any or any adequate advice in respect of the CPR and the rules for issue and service of the claim form, including the ability to issue without service.

(4) HL seemingly delayed issue of the claim form on the purported basis that issue and then immediate personal service of the claim form on GB would in some way improve the Claimant's position on jurisdiction, when such an approach served only to delay the date by reference to which jurisdiction would be considered.

(5) HL failed to advise the Claimant that the claim form could and should be issued before Western Christmas and by the Original Filing Deadline of 23 December 2016.

(6) Alternatively (to the Claimant's primary case), HL failed to advise the Claimant that if and insofar as the claim form was not to be issued urgently, they should place 31 Belgrave Square and GB under surveillance to ensure that there was no suspicious behaviour indicative of a permanent relocation abroad.

(7) HL failed to advise the Claimant that, given the rumour that GB had permanently relocated to Switzerland, the claim form should be issued forthwith without any further delay and on 16 February 2017, alternatively on 17 February 2017 at the latest.

(8) HL failed to follow the Claimant's express instruction on 17 February 2017 to issue the claim form urgently given the rumour that GB had permanently moved to Switzerland.

(9) HL unnecessarily delayed the issue of the claim form from 23 December 2016 onwards on an ongoing basis and failed to advise that it should be issued urgently.

In respect of a WFO

(10)     HL wrongly failed to act on the requests to seek a WFO and instead advised the Claimant not to pursue a WFO.

(11)     HL wrongly suggested that there would be no advantage in it and/or that the threshold for risk of dissipation could not be met, despite the matters set out above in paragraph 46; HL should have advised the Claimant to pursue a WFO.

(12)     HL wrongly advised that the Claimant would have to pay up to 20-25% of his entire claims by way of security for a cross-undertaking (or, on a later occasion, on 8 or 9 August 2017, over 10%). There was no proper basis for that advice.

In respect of conflicts of interest

(13)     HL breached an express term of the Retainer Letter by acting for the Claimant in circumstances where there were both client conflicts and an own interest conflict as defined in the SRA Code of Conduct 2011.

(14)     HL wrongly acted in a position of both client and own interest conflicts of interest, arising from Pinchuk and PrivatBank, and in circumstances where:

i. The Claimant was not told that Mr Pinchuk had an ongoing interest in the Intended Defendants' assets under the terms of settlement, whereby payments were to be made over "several years" (according to an email from HL to Appleby of 20 January 2016 disclosed in the Paradise Papers), and that HL continued to act for Mr Pinchuk in respect thereof.

18

ii. The Claimant was not told of the PrivatBank retainer, in which HL acted for a further party competing for the same assets of the Intended Defendant.

iii. HL should not have told the Claimant they were free to act for him and/or they should not have accepted the PrivatBank retainer. This reflected the own interest conflict between the Claimant's own interests and HL's interest in obtaining as many wealthy and high-profile Ukrainian clients as possible to generate fees.

89. Further, HL breached their fiduciary duties to the Claimant in that they:

### PARTICULARS OF BREACH OF FIDUCIARY DUTY

(1) Acted for the Claimant in circumstances where they had acted for and/or continued to act for Mr Pinchuk and/or PrivatBank notwithstanding the client conflicts and the own interest conflict. HL should not have accepted instructions to act for the Claimant.

(2) Continued to act for the Claimant whilst accepting instructions to act on behalf of PrivatBank, where there was a conflict of interest between the Claimant's interests and those of PrivatBank. HL should not have accepted the instructions to act for PrivatBank, assuming those were received after their retainer with the Claimant began, or alternatively (and contrary to the Claimant's primary position) should at the very least have terminated their retainer with the Claimant (whilst this would itself have been a breach of duty, it would have been less egregious than acting for both clients).

(3) Failed to advise the Claimant of the existence of either of the client conflicts of interest or of the own interest conflict. The Claimant's awareness that HL had previously acted for Mr Pinchuk did not and could not amount to disclosure of the existence of the ongoing conflicts of interest (which could not be cured in any event).

(4) Failed to disclose information held by HL (in particular that held as a result of HL acting for Mr Pinchuk and PrivatBank) relevant to the Claimant's claims (including his aim of seeking a WFO and/or being able to enforce any judgment or settlement) against the Intended Defendants.

(5) Given HL's knowledge of the rules in relation to client and own interest conflicts (as apparent from the terms of their own retainer), the decisions to act where there were clear client conflicts and a clear own interest conflict were deliberate.

(6) Failed to advise and/or warn the Claimant that it was in his best interests to issue the claim form as a matter of urgency (throughout, by 23 December 2016, but also on 16 and 17 February 2017) and/or to make an application for a WFO.

(7) Given HL's purported expertise, and that Mr Hardman was involved at the very least in discussing the Claimant's claims with AS, and in the absence of a proper and credible explanation for these failures, the Claimant infers that this was no mere oversight or

negligent failing, but that HL deliberately preferred the interests of their other clients (Mr Pinchuk and/or PrivatBank) and/or their own interests to the Claimant's.

## DELIBERATE MISCONDUCT

90. In the circumstances, given the facts and matters set out above:

(1) The above breaches of fiduciary duty each constitute deliberate misconduct.

(2) There was a deliberate decision by HL, itself constituting deliberate misconduct, not to act on the Claimant's instructions to issue, or to protect his interests by issuing, a claim form protectively. There is no other credible explanation for how a law firm of HL's ostensible calibre could have failed to advise the Claimant that the key date for jurisdiction purposes was the date of issue and, accordingly, the claim form should be issued as a matter of the utmost urgency where there was a rumour, which could not be adequately tested, that GB had left the jurisdiction permanently in order to avoid further claims in the English Courts.

(3) There was a deliberate decision by HL, itself constituting deliberate misconduct, not to act on the Claimant's instructions to seek, but rather to dissuade him from seeking, a WFO. There is no other credible explanation why AS and his team would have resisted this and it is inferred that this was done in order to protect and prefer the interests of other clients.

(4) This failure was part of an overall pattern, which itself constituted deliberate misconduct, of failure to promote and protect the Claimant's interests as part of a concerted litigation strategy. Rather, it is to be inferred that HL preferred and prioritised the interests of their other clients, Mr Pinchuk and PrivatBank.

(5) Even if, which is denied, there were no deliberate decisions made to actively prefer the interests of other clients, deliberate decisions were also made by HL to:

    i. Act for multiple fee-generative clients despite the clear conflicts of interest between them; to enter into those retainers themselves constituted deliberate misconduct in light of such conflicts and HL's own interest in fee generation; and/or

    ii. Neglect or to ignore the interests of the Claimant and an attitude of reckless indifference was adopted, hence the lack of any urgency or strategic effort in respect of the issue of the claim form and the question of applying for a WFO; such indifference itself constituted deliberate misconduct especially in the context of high-value and highly contested claims..

BREACH OF CONFIDENCE

91. HL have acted in breach of their obligation to protect the Claimant's confidential information as apparent from the following facts and matters:

(1) The Claimant was not consulted about and did not provide any, still less any informed, consent to whatever information barriers may, or may not have been put in place between his case and those of Mr Pinchuk and PrivatBank; the starting point must be that, unless special and established measures are taken, information moves within a large firm.

(2) Further support for this presumption is apparent from the following:

    i.  The close relationship between the Claimant's own advisors, HL (and in particular Mr Hardman) and Jonathan Crow QC, and Mr Pinchuk, who the Claimant saw together at the Joshua/Klitschko boxing match on 29 April 2017, the day after he had first met with Mr Crow in conference as his new leading counsel.

        a.  This was of particular concern where, as the Claimant knew, there was a relatively cordial and mutually beneficial relationship between Mr Pinchuk and IK (and insofar as it suited him to do so, Mr Pinchuk could be expected to feed any confidential information which he could obtain about the Claimant to IK).

        b.  The Claimant raised this concern with AS through NL in a telephone call on 1 May 2017. AS told her that he did not think there was anything strange about these individuals attending the boxing match together as he knew that they were friends. Upon being pressed to investigate the position further, AS told NL that he would speak to Mr Hardman and revert to her with further information, but he did not do so.

    ii.  The fact of information passing to IK via HL. In early June 2017 solicitors acting for GB raised concerns about HL having acted for Mr Pinchuk and asking about information barriers:

        a.  On 6 June 2017, during the course of a call, AS advised the Claimant's Representatives that IK's solicitors were aware that the Claimant had instructed Jonathan Crow QC and were raising this as an issue (as Mr Crow had previously acted for Mr Pinchuk).

        b.  The Claimant's Representatives immediately asked how IK's solicitors could have known that Mr Crow was acting for Mr Shulman (as this was not public knowledge and was confidential).

        c.  AS said he would look into the point but never reported back. It is to be inferred that this information could only have reached IK through HL or through a combination of HL and Mr Pinchuk.

iii. The fact that information in the Claimant's proceedings, such as GB's address in Geneva (Rue Abraham-Gevray) appears to have been shared between or used by HL lawyers acting for PrivatBank for the purposes of formulating PrivatBank's application for a WFO; even if such information was only shared within HL if and when it was referred to in open court at the hearing on 18 or 19 December 2017 (as to which HL are put to proof), HL only knew of the availability of such information as a result of acting for the Claimant.

iv. The fact that, as is apparent from Ms Hickman's email dated 19 January 2018, lawyers from HL who worked on the Privatbank matter were also working on the Claimant's case as well as Mr Pinchuk's.

## THE CLAIM FOR MISREPRESENTATION

92. As per paragraphs 31 to 32, HL made untrue statements of fact to the Claimant which induced him to enter into the retainer. As a result of the misrepresentations set out above:

(1) The Claimant committed himself to a retainer which prejudiced his interests going forwards, and had the result that his interests were not promoted and his claims were not protected. In particular, no claim form was issued before GB permanently left the jurisdiction for Switzerland.

(2) The Claimant was committed to a retainer in circumstances where HL were acting despite obvious conflicts of interest, a situation which only worsened over time.

(3) Further if, which is denied, the Limitation Clause is binding and effective, then the terms of the retainer purported to limit HL's liability to a small fraction of the value of the Claimant's claims, namely the sum of £5m.

93. As a result of the said misrepresentations, the Claimant has suffered loss and damage. Had the Claimant never entered into the contract:

(1) He would have instructed an appropriately experienced alternative law firm in London who would have pursued his claims properly.

(2) He would have had the opportunity to pursue the highly valuable claims against the Intended Defendants, would have sought and obtained a WFO and would have secured a highly valuable judgment and/or settlement, which would have been enforceable against available assets and/or would have been recovered from the Intended Defendants without the need for enforcement. The value of such claims is to be calculated by reference to the sum of US$500m.

(3) He would not have been subject to the purported Limitation Clause.

94. Accordingly, the Claimant is entitled to damages *inter alia* pursuant to section 2(1) of the Misrepresentation Act 1967.

CAUSATION AND LOSS IN RESPECT OF ALL OTHER CLAIMS

95. In respect of the claims for i) breach of duty in the pre-contract period and/or ii) breach of contract and/or negligence and/or breach of fiduciary duty and/or breach of confidence and deliberate misconduct, HL have caused the Claimant loss and damage and/or he is entitled to equitable compensation.

96. Had HL acted competently and properly and/or the Claimant been properly advised in the pre-contractual period, HL would have informed the Claimant that they were unable to act for him and would not have acted for him. The Claimant would have instructed an appropriately experienced alternative law firm in London to act for him who would have pursued his claims properly, would have issued the claim form as a matter of urgency and would have sought and obtained a WFO. Alternatively, HL would have given proper disclosure of the conflicts and the Claimant would not have instructed HL to act for him and would have instructed an appropriately experienced alternative law firm in London to act for him who, again, would have pursued his claims properly, would have issued the claim form as a matter of urgency and would have sought and obtained a WFO.

97. Even if the Limitation Clause is otherwise binding on the Claimant pursuant to the terms of the Retainer Letter (which is denied), it is not incorporated into and is not binding in respect of the parties' pre-contractual relationship and/or the claim for misrepresentation.

98. Further, had HL acted competently and properly and/or the Claimant been properly advised thereafter and during the course of the retainer:
    (1) HL would not have acted in a position of conflict or in circumstances where the interests of their clients conflicted and would not have actively preferred the interests of Mr Pinchuk and/or PrivatBank over those of the Claimant.
    (2) The claim form would have been issued before 23 December 2016, or early in 2017 or, at the very latest, by 17 February 2017 when GB was still domiciled in the UK.
    (3) An application for a WFO would have been (successfully) pursued.
    (4) The Intended Defendants would not have challenged jurisdiction, alternatively would have had a very weak position in respect of jurisdiction and even if GB nevertheless sought to challenge jurisdiction, he would not have prevailed.

99. Accordingly, HL's deliberate misconduct, breach of contract, negligence and/or breach of fiduciary duty caused the Claimant loss and damage, and/or the Claimant is entitled to equitable compensation, to reflect the value of the lost chance to pursue and enforce his claims against the Intended Defendants in the English High Court. Further, the Claimant is also entitled to damages for breach of confidence.

100.    Had the Claimant been properly advised: i) he would have had claims in the English Courts of very substantial value against the Intended Defendants and a WFO in respect of the Intended Defendants' assets of similar magnitude, and ii) he would have obtained that WFO before PrivatBank obtained theirs.

101.    The value of the Claimant's claims against the Intended Defendants was approximately US$500m plus costs.

102.    Given the conduct of the Intended Defendants in respect of the partnership assets, joint investments and business dealings, in the original proceedings the Claimant claimed declaratory relief together with all necessary accounts and enquiries in particular but not exclusively as to profits generated, the Intended Defendants' dealings with those profits and other partnership assets, together with orders for payment.

103.    These claims were not all capable of exact quantification by their nature pending trial, but they included:
    (1) Loss of value of the GDRs in a sum of c. US$284m plus interest at the agreed rate;
    (2) Sums owed in respect of the Ukrainian Assets (including profits generated by those assets and sums due from the sale of those assets) in the region of US$180m;
    (3) A liability to account in the sums alleged to have been invested in Warren Steel; and
    (4) Further claims for accounts and enquiries.

104.    The Claimant would have had a formidable prospect of success in his claims against the Intended Defendants, would have made a substantial recovery of both judgment sums and his own costs from them, alternatively substantial recovery by way of settlement. He has accordingly lost a high percentage chance of recovering sums of up to US$500m and sums in respect of his costs (alternatively, such percentage chance as the Court may find). He is entitled to interest at 8%pa from the notional date of judgment or settlement to date.

105.   Further, the Claimant would have avoided the costs of the jurisdiction applications (i.e. his own costs and the adverse costs ordered to be paid by him) and would not have been ordered to pay the costs of the Intended Defendants.

106.   Furthermore, there was also a total failure of consideration in respect of HL's fees and disbursements.

107.   In light of HL's deliberate misconduct, HL are unable to rely on their purported Limitation Clause (even if, which is denied, it was otherwise applicable and enforceable).

108.   Further the Claimant claims and is entitled to recover interest pursuant to section 35A of the Supreme Court Act 1981 on the damages and/or equitable compensation found due at such rate and for such period as the Court shall think fit.

AND THE CLAIMANT CLAIMS:

1.   Damages as aforesaid or in such other sum as the Court may find; and/or
2.   Equitable compensation; and/or
3.   Such further and other relief as the Court thinks fit;
4.   Interest as aforesaid;
5.   Costs.

BEN HUBBLE QC

LUCY COLTER

STATEMENT OF TRUTH

I believe that the facts stated in these Particulars of Claim are true.

.......................... Vadim Shulman

Dated this  5  day of March 2020 and served by Pillsbury Winthrop Shaw Pittman LLP, Tower 42 Level 21, 25 Old Broad Street, London EC2N 1HQ, solicitors for the Claimant.