

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Claim No. CL-2020-000001

BETWEEN:

**VADIM MARATOVICH SHULMAN**

<u>Claimant</u>

**- and -**

**HOGAN LOVELLS INTERNATIONAL LLP**

<u>Defendant</u>

——————————————————

**DEFENCE AND COUNTERCLAIM**

——————————————————

1.   In this Defence and Counterclaim, unless otherwise stated, references to paragraph numbers are references to paragraphs of the Particulars of Claim, dated 5 March 2020 (the **"PoC"**). Save as expressly admitted or not admitted herein, each and every allegation contained in the PoC is denied.

**A.   THE PARTIES AND OTHER PROCEEDINGS**

2.   Paragraphs 1 and 2 are admitted.[1]

3.   No admissions are made as to paragraphs 3 to 7, save that:

(1)   Mr Bogolyubov (**"GB"**) and Mr Kolomoisky (**"IK"**, collectively **"B&K"**) are wealthy businessmen who, until December 2016, reportedly held a controlling interest in PrivatBank, and interests in numerous other businesses. In Claim No. HC-2017-001383 (the **"VS Claims"**) GB stated that he was a friend and business associate of IK.

(2)   Paragraphs 4 and 5 reflect the allegations made by the Claimant (**"VS"**) against B&K in the VS Claims, issued on 12 May 2017.

(3)   On 21 December 2017, PrivatBank filed a claim in the High Court (Claim No. BL-2017-000665) against, *inter alios*, B&K (the **"PrivatBank Claims"**) alleging that they and others had fraudulently misappropriated around US$1.9 billion from PrivatBank. The Defendant (**"HLI"**) represents PrivatBank in those proceedings, having been first retained by PrivatBank in August 2017. It is denied (if it is alleged) that HLI was

---

[1]   The PoC use the abbreviation 'HL' to refer to the "*international practice known as 'Hogan Lovells'*". For the avoidance of doubt, this Defence and Counterclaim is drafted on the basis that, unless otherwise stated, the term 'HL' in the PoC is intended to refer only to the Defendant.

instructed by PrivatBank to pursue claims in the English courts for alleged losses of c.US$6.2bn".

    (4)    Paragraph 7 contains a broadly accurate description of: (i) the claims by Mr Pinchuk ("**VP**") against B&K (the "**VP Claims**") filed on 12 March 2013 (Claim No. CL-2013-000814), which settled on confidential terms shortly before trial in January 2016 (the "**VP Settlement**"); and (ii) the Tatneft Claims, filed on 23 March 2016 (Claim No. CL-2016-000172), save that the value of the claim brought by Tatneft is understood to be around US$188.9 million (plus interest). To the extent set out in paragraph 12 below, the final sentence of paragraph 7(1) is admitted.

4.    As to paragraph 8, it is admitted that Mr Hardman was a member of the team at HLI which represented VP (the "**HLI VP Team**"), and that he specialises in cases with a connection to Russia and the 'CIS'. Mr Hardman met VS on 3 September 2014 and 16 December 2015 (not March 2015) for the purposes of VS providing a witness statement in support of the VP Claims. No admissions are made as to the second sentence of paragraph 8, which is too vague and general to allow a specific response.

5.    Paragraph 9 is admitted, save that IK successfully applied to set aside an order permitting the Tatneft Claims to be served on him out of the jurisdiction; that decision was reversed on appeal.

## B.   THE VS CLAIMS

6.    It is admitted that sub-paragraphs 10(1) to (4) reflect the nature of the VS Claims; no admissions are made as to the truth of any of those allegations. It is denied that the VS Claims were or are worth US$500 million, which is speculative and exaggerated. VS is put to strict proof as to the true value of his claims. Further, HLI will rely on the matters set out at paragraph 77 below.

7.    Paragraph 11 is admitted, save that no admissions are made as to the ownership of Hornbeam Corporation ("**Hornbeam**") or the beneficiaries of the Bracha Foundation. It is noted that VS has omitted any reference to: (i) the proceedings commenced by Hornbeam in 2014 in the British Virgin Islands (the "**BVI**"), which related to Warren Steel; and (ii) the proceedings commenced in June 2015 by VS and the Bracha Foundation (and later joined by Hornbeam) in Ohio, which also related to Warren Steel.

8.    As to paragraph 12, it is admitted that: (i) Hogan Lovells US LLP ("**HLUS**") represented VS, Hornbeam and the Bracha Foundation in certain US proceedings pursuant to an engagement letter dated 4 January 2017, which included discovery applications in a number

of US states (the **"US Discovery Applications"**); and (i) at least from around September 2016, VS hoped to use documents obtained via the US Discovery Applications in aid of the VS Claims. Save as aforesaid, paragraph 12 is denied.

## C. BACKGROUND

### i. Initial discussions with VS and his representatives

9.  Paragraphs 13 and 14 are admitted, save that the application for the Tatneft WFO was filed on 15 March 2016.

10. No admissions are made as to paragraph 15, save that Ms Luchnikova (**"NL"**) has at all material times been a qualified English solicitor. Further, HLI understands that Ms Ferree (**"TF"**) provided legal services to VS in connection with the proceedings in the BVI and the US referred to above. HLI is unaware of what, if any, other litigation experience NL and/or TF may have had.

11. No admissions are made as to paragraph 16, save that, during the meeting with Mr Roberts on 23 June 2016, NL and TF stated that VS wished to instruct HLI because, *inter alia*, it had represented VP in his claims against B&K.

12. No admissions are made as to paragraph 17, save that:

    (1) As to the meeting on 23 June 2016, HLI repeats paragraph 11 above. Mr Roberts understood that VS's representatives were already aware of the VP Settlement. It is denied that Mr Roberts (or any other representative of HLI) informed NL and/or TF that HLI was no longer acting for VP in any capacity.

    (2) It is admitted that VP remained a client of HLI after January 2016. The nature and content of the advice provided by HLI to VP is confidential and legally privileged. For the avoidance of doubt, HLI was never instructed by VP to pursue any enforcement proceedings against B&K in respect of the VP Settlement.

13. VS and his representatives were aware that VP remained a client of HLI by at least 24 February 2017, when Mr Sciannaca referred to that fact during a call with NL and TF. Neither VS nor his representatives made any complaint about this at the time, and VS thereby consented to HLI acting on that basis. No admissions are made as to whether VS and/or any of his representatives: (i) had any knowledge of the terms of the VP Settlement (and, if so, when they acquired such knowledge); and/or (ii) were aware that VP remained a client of HLI prior to 24 February 2017. HLI understands that VS had discussions with VP in around mid-2016 and on a number of occasions thereafter.

14. Paragraph 18 and the email and fee proposal referred to in paragraph 19 are admitted. The final sentence of paragraph 19 is admitted, save that the filing deadline of 23 December 2016 (the **"Initial Deadline"**) was only a preliminary target. The fee proposal expressly stated that the Initial Deadline was subject to various assumptions, including that all information and documentation reasonably requested by HLI would be provided by VS without delay. Save as aforesaid, paragraph 19 is denied.

**ii.   The Retainer Letter and the Terms of Engagement**

15. Paragraph 20 is admitted, save that HLI was retained by VS on 21 September 2016 pursuant to an email on that date from NL. It is noted that VS omits any reference to the fact that he personally signed the Retainer Letter on or before 17 October 2016. The Initial Deadline in the Retainer Letter was again expressly subject to the assumptions referred to above.

16. The first sentence of paragraph 21 is admitted and averred. As to the remainder of paragraph 21, HLI repeats paragraph 12 above.

17. Paragraphs 22 and 23 are admitted; the Terms of Engagement were incorporated by reference into the Retainer Letter. It is admitted and averred that the Retainer Letter contained the Limitation Clause quoted in paragraph 24.

18. Paragraphs 25 and 26 are denied, save that:

   (1)   It is admitted that the Retainer Letter did not expressly refer to work relating to the claims concerning the Ukrainian Assets or the Evraz Deal. Some of the elements of the claims in respect of the Evraz Deal were only identified in February 2017.[2] However, VS's allegations concerning the Ukrainian Assets and payments allegedly owed pursuant to the Evraz Deal had been discussed prior to the Retainer Letter being sent to, or being signed, by VS. The allegation in paragraph 25 that these claims were only 'identified later' is specifically denied.

   (2)   On its true construction, the Retainer Letter applied to all work relating to VS's potential claims against B&K (including any work relating to the Ukrainian Assets and the Evraz Deal) in the English courts.

   (3)   For the avoidance of doubt, the parties also intended the Retainer Letter to apply to work completed in the period between the commencement of the HLI's retainer (21

---

[2]   Namely, the claims in respect of the following: (i) VS's alleged loss arising from a fall in value of the GDRs; (ii) payments allegedly owed to VS by B&K in respect of an interim dividend declared by the Evraz Group SA in 2008; and (iii) the allegedly missing 353,228 GDRs.

September 2016) and the date on which HLI received a signed copy of the Retainer Letter (17 October 2016).

(4)   Further or alternatively, VS is estopped from denying that the scope of the Retainer Letter is as aforesaid:

(a)   Both parties acted on the basis of a common assumption that that Retainer Letter applied to all work relating to VS's potential claims against B&K in the English courts, including any work completed in the period from 21 September to 17 October 2016.

(b)   The aforesaid common assumption is evidenced by, *inter alia*, the fact that VS's representatives referred to issues concerning the Ukrainian Assets and certain aspects of the Evraz Deal: (i) during the meeting with Mr Roberts on 23 June 2016; and (ii) during two telephone calls with Mr Sciannaca and others on 24 October 2016. VS also referred to those issues during his initial meeting with Mr Sciannaca on 25 October 2016, and again during the meeting with Mr Sciannaca on 8 December 2016. Further, HLI sent VS invoices referring to the "*JV Dispute Relating to Warren Steel*", which included fees for work concerning the Ukrainian Assets and the Evraz Deal.

(c)   HLI relied upon the aforesaid common assumption by, *inter alia*, not seeking to amend the Retainer Letter or conclude a new agreement with VS relating to: (i) work done in connection with VS's allegations concerning the Ukrainian Assets and the Evraz Deal; and/or (ii) work completed in the period between 21 September and 17 October 2016.

(d)   In the premises, it would be inequitable for VS now to resile from the aforesaid common assumption.

(5)   Further or alternatively, if (which is denied) work relating to VS's allegations concerning the Ukrainian Assets and the Evraz Deal initially fell outside the scope of the Retainer Letter, the terms of the Retainer Letter (including the Limitation Clause) nevertheless applied to such work pursuant to clause 51 of the Terms of Engagement, which contains the passage quoted in the first sentence of paragraph 26. For the avoidance of doubt, the final sentence of paragraph 26 is denied.

19.   As to paragraphs 27 and 28:

(1)   It is denied that the Limitation Clause (whether considered alone or read together with clause 51 of the Terms of Engagement) was unreasonable for the purposes of sections

3 and 11 of the Unfair Contract Terms Act 1977 (or for any other purpose), as alleged or at all. HLI will rely on, *inter alia*, the following matters:

(a)  The scope and effect of the Limitation Clause is unambiguous and it was included in the Retainer Letter, which VS personally signed on or before 17 October 2016.

(b)  VS had significant bargaining power as result of, *inter alia*, the fact that he was an experienced and very wealthy businessman, and there were numerous law firms in London with the relevant experience and expertise to represent him.

(c)  Neither VS, nor any of his representatives, made any complaint about the Limitation Clause at any stage, whether in October 2016 or subsequently.

(d)  VS received two further retainer letters sent by HLI in November 2016 and October 2017, which related to, respectively: (i) a dispute concerning the ownership of certain paintings; and (ii) a dispute concerning a property in London. Both retainer letters contained an identical limitation clause, save that the specified limit of liability for claims relating to those retainers was £3 million, about which neither VS nor any of his representatives made any complaint.

(2)  The allegation in paragraph 28 that HLI was "*in a position of conflict*" is too vague and general to allow a specific response. Insofar as that allegation can be understood, it is denied for the reasons set out below. In any event, that allegation has no relevance to the question whether the Limitation Clause was reasonable.

(3)  Save as aforesaid, paragraphs 27 and 28 are denied.

20.  Paragraph 29 is denied for the reasons set out at paragraph 18 above.

21.  As to paragraph 30, HLI responds to VS's allegations of 'deliberate misconduct' below. Those allegations lack any basis at all and are denied.

### iii.  Alleged misrepresentations

22.  Paragraph 31 is embarrassing for lack of particulars. Without prejudice to the aforesaid:

(1)  It is denied that any representative of HLI made the representation alleged in paragraph 31(i).

(2)  It is admitted that, by an email to NL on 1 July 2016, Mr Roberts suggested that HLI had no conflict of interest in representing VS, which was true.

(3)  The alleged implied representation referred to in paragraph 31(ii) is a statement of intention and/or opinion, not a statement of fact. Further, and in any event: (i) no admissions are made as to whether that alleged implied representation was made

pending proper particulars; and (ii) any such implied representation if made, would have been true.

23. Paragraph 32 is also embarrassing for lack of particulars. Without prejudice to the aforesaid:

    (1) If (which is denied), any representative of HLI stated or implied that HLI had "*no ongoing role*" on any matter for VP, it is admitted that any such representation would have been false. Paragraph 12 above is repeated.

    (2) As regards the falsity of the alleged representations referred to in paragraph 31(ii), HLI repeats paragraphs 22(2) and (3) above.

    (3) Save as aforesaid, paragraph 32 is denied. In particular, it is denied that HLI breached any duties of loyalty owed to VS, and it is denied that any of the matters stated in paragraph 31 had (or would have had) any effect on VS's decision to retain HLI.

**iv. Discussions with VS and his representatives in October 2016**

24. As to paragraph 33:

    (1) The first sentence is admitted; it is denied that Mr Hardman participated in any part of that meeting. VS had further meetings with Mr Sciannaca and the other representatives of HLI who worked on the VS Claims (the **"HLI VS Team"**) on 26 and 27 October 2016 in order to discuss VS's potential claims.

    (2) It is admitted that, at VS's request, VS briefly spoke to Mr Hardman on 25 October 2016 in a separate meeting room (not in Mr Hardman's office as alleged). It is denied that Mr Hardman stated that he personally had a conflict of interest. Further, as stated below, HLI did not have any conflict of interest in representing VS.

    (3) HLI created strict information barriers between the HLI VS Team and the HLI VP Team in order to comply with its duties of confidentiality. Mr Hardman was not part of the HLI VS Team. VS was informed of HLI's intention to use such information barriers during the meeting on 25 October 2016; VS made no complaint about this, and thereby consented to HLI acting on that basis.

    (4) Save as aforesaid, paragraph 33 is denied. In particular, it is denied that Mr Hardman made the statements alleged in the final two sentences of paragraph 33.

25. During the meeting on 25 October 2016, Mr Sciannaca stated, *inter alia*, that VS should consider the possibility of making an application for a freezing order against B&K for strategic purposes. However, Mr Sciannaca correctly noted the following points:

(1)  VS would face challenges if he made such an application, including allegations of delay
(given, in particular, the passage of time since the relevant events and the prior BVI/US
proceedings), and that, if making such an application, VS would need to disclose
weaknesses in his case (as part of the duty of full and frank disclosure). The latter
difficulty was also highlighted in a 'Status Update', provided by HLI to VS in a meeting
on 8 December 2016 (the **"December 2016 Status Update"**).

(2)  If VS applied for a freezing order, the court would probably require him to provide
fortification for a cross-undertaking in damages, which Mr Sciannaca suggested might
be approximately US$2-3 million (if the claim was around US$100-150 million), and
that making such an application would also be costly and time consuming.

26.  During the meeting on 26 October 2016, Mr Sciannaca emphasised that VS's claims would
not be straightforward. He also noted again the likely cost involved in any potential
application for a freezing order, and the difficulties that would be created by the need for VS
to disclose the weaknesses in his case at the outset if he made such an application. At the end
of that meeting NL (who was translating the discussion for VS) stated that VS was not
concerned about the claim being filed by the Initial Deadline in light of the work still to be
done in preparing the claim.

27.  As to paragraph 34 it is admitted that Mr Sciannaca led the HLI VS Team. It is denied that
Mr Hardman told VS or any of his representatives that he would be "*running the case behind
the scenes*". Save as aforesaid, no admissions are made as to paragraph 34.

28.  In the premises, paragraph 35 is denied. For the avoidance of doubt, it is denied that Mr
Hardman was "*running the case behind the scenes*" or that he misled VS and/or any of his
representatives. As stated above, Mr Hardman was not a member of the HLI VS Team.

29.  As to paragraph 36, it is admitted that, on 19 October 2016, NL sent a note to Mr Sciannaca
(the **"October 2016 Note"**) containing, *inter alia*, a description of a meeting allegedly held
between VS and IK on 28 August 2016. As a result of the October 2016 Note, the HLI VS
Team knew that there was a possibility that GB was aware of VS's intention to commence a
claim against him in England at some point in the future. Save as aforesaid, no admissions
are made as to paragraph 36.

30.  Paragraph 37 is admitted, save that: (i) the HLI VS Team advised VS (including during the
meeting on 25 October 2016) that the English court's jurisdiction could be based on GB's
domicile in England; and (ii) Mr Sciannaca made it clear to VS (including during the
meeting on 26 October 2016) that B&K were likely to challenge the jurisdiction of the English courts.

31. As to paragraph 38, it is denied that HLI breached any duties owed by it to VS in issuing the claim form prior to 12 May 2017. HLI will rely on, *inter alia*, the following matters:

   (1)   The nature of VS's proposed claims, and the history of his dealings with B&K, meant that extensive investigation was required in order to understand and clarify the details of those proposed claims before a claim form could be issued. Those investigations remained ongoing until shortly prior to 12 May 2017.

   (2)   Further, it was reasonable for the HLI VS Team to proceed on the basis that the claim form should be filed: (i) after a full draft witness statement for VS had been produced;[3] and (ii) after the Particulars of Claim (the "**VS PoC**") had been finalised (in order to ensure that the documents were consistent). HLI did not receive a first draft of the VS PoC from VS's then Junior Counsel, Jack Rivett, until 20 February 2017.

   (3)   If the claim form had been issued and served on its own at an earlier date, VS would have been required to serve the VS PoC within 14 days thereafter. However, the VS PoC could not have been served until mid to late March 2017. Further, in a telephone call with Ms Hickman on 15 March 2017, TF and NL expressly declined to give instructions for the claim form to be issued before the VS PoC had been finalised.

   (4)   Further, if the claim form had been issued but not served at an earlier date, there was a significant danger that B&K would have become aware of the claim and, as a result, may have: (i) applied for the claim form to be served (and the VS PoC would have been required to be served within 14 days thereafter); or (ii) taken immediate steps to avoid personal service of the claim form.

   (5)   The HLI VS Team understood that GB had been domiciled in London with his family since 2009. Further, during a meeting with Mr Sciannaca and others on 7 February 2017, TF stated that she and NL believed GB was still living in London. During that meeting, Mr Sciannaca suggested conducting surveillance of 31 Belgrave Square in order to confirm that GB was still living there, but VS declined to provide instructions for such surveillance at the time.

   (6)   On or about 15 February 2017 Mr Sciannaca was informed by Mr Hardman of a rumour that GB had already moved to Switzerland. Notwithstanding the aforesaid rumour, neither Mr Sciannaca nor any other member of the HLI VS Team believed that GB had

---

[3]   On the basis that: (i) significant parts of the case depended on VS's oral evidence, and it was essential to know what that evidence would be before filing a claim; and (ii) Stephen Smith QC advised, during a telephone call with the HLI VS Team on 14 November 2016, that he required a draft witness statement to have been agreed with VS before the claim could be drafted due to the complex nature of the case.

permanently left London at the time; they believed that he remained domiciled in England with his family. During a meeting on 24 February 2017, TF stated that, as far as she was aware, GB remained in London.

(7)   In any event, issuing a claim form urgently (i.e. prior to finalising the VS PoC) would not have improved the chances of VS establishing jurisdiction for his claims against B&K in England after GB had permanently moved to Switzerland.

(8)   Both the claim form and VS PoC could have been issued and served in mid to late March 2017 or shortly thereafter. The delay in filing those documents thereafter was caused by:

(a)   VS's decision on 16 March 2017 to instruct HLI to refrain from filing the claim, and the request by TF on 20 March 2017 for the original Counsel team to produce a written opinion on the merits of the claims before the claim form or VS PoC were filed. On 24 March 2017, the HLI VS Team received a detailed written opinion from the original Counsel team which correctly highlighted a number of significant weaknesses in the claim (the **"Joint Opinion"**), and immediately sent a copy to VS's representatives; and

(b)   VS's decision on or around 27 March 2017, after reviewing the Joint Opinion, to replace his Counsel team. During a telephone call with Ms Hickman on that date, NL expressly declined to give instructions for the claim to be issued until a new Counsel team had been instructed and had reviewed it. VS did not instruct a new Counsel team (Mr Jonathan Crow QC and Mr Gregory Denton-Cox) until around 19 April 2017. VS instructed Mr Crow QC knowing that he had worked on the VP Claims.

32.   As to paragraph 39, it is denied that HLI breached any duties to VS by failing to arrange surveillance of 31 Belgrave Square prior to Christmas 2016, as alleged or at all. HLI repeats sub-paragraph 31(5) above. Further, Mr Sciannaca referred to the possibility of such surveillance: (i) during the meeting on 7 February 2017; (ii) in an email to NL and TF on 16 February 2017; and (iii) during a meeting on 3 March 2017. However, VS did not provide instructions for such surveillance to commence until around 8 May 2017. The final sentence of paragraph 39 is too vague and general to allow a specific response and, accordingly, no admissions are made as to that sentence.

v.   **Events between November 2016 and January 2017**

33. During a telephone call on or around 30 November 2016, Mr Clanchy informed NL and TF that it was unlikely that a draft of the VS PoC could be produced before the end of the year due to: (i) the delay in receiving relevant documents from VS; and (ii) the need to resolve 'gaps and inconsistencies' in information which had been provided by VS.

34. During a meeting with members of the HLI VS Team on 5 December 2016, VS's then Leading Counsel, Stephen Smith QC, indicated that a lot more work was required before the claim could be brought, and identified a number of issues which required further investigation and consideration.

35. Paragraph 40 is admitted. Mr Justice Picken's decision was reversed on appeal.

36. Paragraph 41 is admitted, save that: (i) the email was also sent to TF; and (ii) it is denied that Ms Hickman's email was inaccurate, as alleged or at all. The Tatneft WFO had been discharged, albeit that the discharge order had been stayed. Ms Hickman only had access to the published judgment of Mr Justice Picken; she was not aware of the terms of the order made as a consequence of that judgment (which was not sealed until 11 November 2016).

37. No admissions are made as to paragraph 42, save that it is admitted that: (i) on 19 December 2016, it was widely reported that PrivatBank would be nationalised; and (ii) HLI was aware that the nationalisation of PrivatBank was likely to place additional financial pressure on B&K, and might lead to further claims against them. HLI notes that the Tatneft WFO remained in place at all material times.

38. As to paragraphs 43 and 44:

    (1) It is admitted that the claim form was not issued by the Initial Deadline. The Initial Deadline was not achievable in light of, *inter alia*, the complexity of the case and the delay in relevant information and documents being provided to HLI.

    (2) On 8 December 2016, VS agreed a new target date for issuing the claim form and VS PoC, namely 10 March 2017.

    (3) As to the allegation that HLI should have advised VS to issue a claim form on an "*urgent or protective basis*", paragraph 31 above is repeated.

    (4) The final sentence of paragraph 44 is irrelevant given that VS chose not to pursue an application for a freezing order against B&K (in light of the difficulties noted in paragraph 25 above). Without prejudice to the aforesaid, it is admitted that the HLI VS Team did not expressly inform VS that, if he obtained a freezing order, he would be required to give an undertaking to the court to issue and serve a claim form as soon as practicable thereafter. Save as aforesaid, paragraph 44 is denied.

39. Paragraph 45 is denied, save that it is admitted that the HLI Defendant was aware that it was sensible for VS to consider the possibility of applying for a freezing order against B&K. That issue was discussed on 25 and 26 October 2016 (see paragraphs 25 and 26 above), and was subsequently discussed on a number of other occasions (see paragraph 41 below).

40. Paragraph 46 is denied, save that:

    (1) The first sentence is too vague and general to allow a specific response. Without prejudice to the aforesaid, it is admitted that Mr Sciannaca raised the need for VS to consider a possible application for a freezing order during the meetings on 25 and 26 October 2016, and also highlighted the significant challenges that would be faced by VS if he chose to make such an application.

    (2) Sub-paragraph 46(1) is admitted, save that the US Discovery Applications were made by Hornbeam and the Bracha Foundation. The relevance of those applications is not understood; VS was not permitted to use any documents obtained via those proceedings for the purposes of an *ex parte* application for a freezing order in England without the permission of the relevant US court.

    (3) No admissions are made as to sub-paragraph 46(2).

    (4) As to sub-paragraph 46(3), it is admitted that Mr Sciannaca advised VS during the meeting on 25 October 2016 that if he made an application for a freezing order he may be able to show that there was a real risk of dissipation of assets by B&K, subject to the difficulty of explaining VS's delay in seeking freezing relief. Given that VS decided not to pursue such an application at that time, the difficulties for such an application created by VS's delay increased thereafter.

    (5) Further, HLI will rely on the matters stated in paragraph 76(2) below.

41. As to paragraph 47:

    (1) Paragraph 40(1) above is repeated. Further, it is admitted that Mr Sciannaca advised VS against applying for a freezing order during a meeting on 8 December 2016, on the basis of the challenges which he had previously identified, especially the fact that such an application would require VS to highlight the weaknesses in his own case as part of the duty of full and frank disclosure.

    (2) The advice provided to VS by Mr Sciannaca on 8 December 2016 reflected the advice received from Mr Smith QC. In particular: (i) during a telephone call on 14 November 2016, Mr Smith QC advised against applying for a freezing order and explained that such an application would be a 'dangerous step' for VS in light of the uncertainty

regarding the factual basis for his claims; and (ii) during a meeting on 5 December 2016, Mr Smith QC and Mr Sciannaca agreed that it would not be prudent for VS to apply for a freezing order. Mr Smith QC provided similar advice on this issue at a meeting with VS, his representatives and the HLI VS Team on 9 February 2017.

(3)   It is denied that the issue of freezing relief was discussed during the meetings attended by Mr Sciannaca, VS and others on 25, 26 and 27 January 2017.

(4)   NL and TF discussed the issue of potential freezing order application again during a telephone call on 1 June 2017. During that telephone call, Mr Crow QC warned VS against making such an application in light of: (i) VS's delay in seeking freezing relief; and (ii) the need for VS to disclose weaknesses in his case as part of the duty of full and frank disclosure, including an agreement relating to the Evraz Deal dated 28 January 2009 (the **"2009 Evraz Agreement"**), which contained an arbitration agreement, was apparently signed by VS and was inconsistent with a number of his claims.

(5)   It is admitted that Mr Sciannaca discussed the issue of freezing relief with VS again during a meeting in Sardinia on 8 or 9 August 2017. Mr Sciannaca advised against such an application on the basis of the difficulties which he, Mr Smith QC and Mr Crow QC had highlighted previously, and also the further passage of time since then.

(6)   Save as aforesaid, paragraph 47 is denied. In particular, it is denied that Mr Sciannaca (or any other member of the HLI VS Team) ever advised VS or his representatives that VS would need to provide 10% or 20-25% of the value of his claims as fortification for a cross-undertaking in damages.

**vi.   Events in February and March 2017**

42.   Paragraph 48 is admitted. The email was also sent to TF. It proposed commencing surveillance on 31 Belgrave Square in order to gather evidence suggesting that GB was still domiciled in England, but VS's representatives did not provide instructions for surveillance of the property to begin until around 8 May 2017.

43.   The first sentence of paragraph 49 is admitted. No admissions are made as to the remainder of paragraph 49. As stated at paragraph 31(6) above, Mr Sciannaca had been informed of the rumour by Mr Hardman.

44.   As to paragraphs 50 to 52:

(1)   It is admitted that NL told Mr Sciannaca during a telephone call on 17 February 2017 that VS wanted the claim to be issued during the week commencing 20 February 2017,

once the documents had been finalised and approved by VS. During that call, TF stated that she believed it was not going to be difficult to establish that GB continued to reside in London.

(2)   Following that telephone call, Ms Hickman emailed Mr Rivett stating that it was 'very important' for the HLI VS Team to receive a draft of the VS PoC by the following Monday. The HLI VS Team received the first draft of the VS PoC from Counsel on 20 February 2017. After further input from VS's representatives, both the claim form and VS PoC could have been ready to be issued and served in mid to late March 2017 or shortly thereafter; the delay thereafter was due to VS's decision to request the Joint Opinion and then to replace the original Counsel team (see paragraph 31(8) above).

(3)   No admissions are made as to whether Mr Sciannaca told NL and/or TF that there was "*no need to be concerned about the rumour*". As stated above, in his email to NL and TF on 16 February 2017, Ms Sciannaca proposed commencing surveillance of 31 Belgrave Square. No admissions are made as to the second sentence of paragraph 52.

(4)   Save as aforesaid, paragraphs 50 to 52 are denied. In particular, it is denied that HLI failed to follow VS's instructions, as alleged or at all.

### vii.   Events between March 2017 and the filing of the claim

45.   Paragraphs 53, 54 and 57 are admitted, save that: (i) it is denied that the 'revised deadline' for filing the claim was 1 March 2017 (as stated at paragraph 38(2) above, VS had agreed a revised filing deadline of 10 March 2017); and (ii) GB and his wife filed a petition for judicial separation on 22 March 2017.  GB's evidence in support of his jurisdiction challenge stated that: (i) he ceased to reside in London at some point between 14 October 2016 and 20 February 2017; and (ii) he began living in Geneva on 1 March 2017.

46.   As to paragraphs 55 and 56:

(1)   The HLI VS Team and VS's original Counsel team worked hard to finalise the claim form and VS PoC by the revised deadline of 10 March 2017. Important details concerning VS's claims in respect of the Evraz Deal (such as the allegedly missing 353,228 GDRs) were first provided to the HLI VS Team in late February 2017. An updated version of the VS PoC was sent by Mr Rivett on 1 March 2017, which was discussed with VS's representatives during a telephone call on the following day.

(2)   The emails referred to in the second and third sentences of paragraph 55 are admitted. During a telephone call with NL on 9 March 2017, Mr Sciannaca noted that Mr Smith

QC had agreed to review the VS PoC that weekend. As a result, NL agreed to delay the target date for filing the claim to 17 March 2017.

(3)   A further draft of the VS PoC was received by the HLI VS Team from Mr Rivett on 10 March 2017, and the draft was immediately sent to NL and TF.

(4)   During a further telephone call with NL on 13 March 2017, Mr Sciannaca suggested issuing and serving only the claim form, with the VS PoC to follow within 14 days thereafter. NL suggested that it would be better to serve the documents together, but stated that VS would consider the proposal.

(5)   A further draft of the VS PoC was sent to NL on 15 March 2017. During telephone calls later that day: (i) NL initially informed Ms Hickman that it was VS's preference for both the claim form and the VS PoC to be filed together by 17 March 2017; but (ii) NL later stated that VS was happy for those documents to be filed on 20 or 21 March 2017 instead.

(6)   On 16 March 2017, HLI were instructed to refrain from filing the claim. On 20 March 2017, TF confirmed that the claim was not to be filed until the original Counsel team had provided the Joint Opinion (see paragraph 31(8) above).

(7)   Save as aforesaid, paragraphs 55 and 56 are denied. In particular, it is denied that there was an 'urgent need' to issue the claim form as alleged; paragraph 31 above is repeated.

47.   The emails referred to in paragraph 58 are admitted. The email sent by Mr Sciannaca on 23 March 2017 noted that VS's preference was to serve GB personally, but highlighted a number of difficulties with doing so.

48.   Paragraph 59 is admitted, save that:

(1)   NL requested an urgent telephone call with Mr Hardman on 27 March 2017, during which she stated that VS wanted to replace his Counsel team in light of the terms of the Joint Opinion. During that call, Mr Hardman warned NL that changing a Counsel team often creates delay and noted that VS could issue his claim before doing so.

(2)   As stated at paragraph 31(8)(a) above, NL also informed Ms Hickman that VS wished to change his Counsel team during a separate telephone call on the same day. During that call, NL expressly declined to give instructions for the claim form and VS PoC to be filed or served until a new Counsel team had reviewed those documents.

(3)   The claim form and VS PoC were delivered by courier to 31 Belgrave Square on 15 May 2017.

### viii. GB's jurisdiction challenge and subsequent events

49. Save that no admissions are made as to when GB permanently left the jurisdiction, paragraphs 60 and 61 are admitted. HLI repeats paragraphs 42 and 45 above.

50. Paragraph 62 is admitted, save that: (i) it is denied that Mr Sciannaca stated that VS could 'easily' defeat GB's jurisdiction challenge; and (ii) no admissions are made as to the precise language used by Mr Sciannaca when discussing that jurisdiction challenge.

51. As to paragraph 63, it is admitted that VS informed Mr Sciannaca on 8 or 9 August 2017 of a rumour that GB was in discussions with Tatneft. Mr Sciannaca suggested that, if the Tatneft WFO were to be lifted, the HLI VS Team could seek to monitor GB's assets using the information which the latter had provided as part of his jurisdiction challenge. It is denied that VS gave Mr Sciannaca instructions to apply for a freezing order; sub-paragraph 41(5) above is repeated. Save as aforesaid, no admissions are made as to paragraph 63.

52. Paragraph 64 is admitted, save that: (i) the press report disclosed by VS is dated 15 December 2017; and (ii) HLI repeats paragraph 12 above.

53. The email from Ms Hickman referred to in paragraph 65 is admitted. It is denied (if it is alleged) that anything in that email was incorrect and/or misleading. The final sentence of paragraph 65 is denied.

54. As to paragraph 66:

    (1) As to the advice provided to VS in respect of a potential application for a freezing order, HLI repeats paragraph 41 above.

    (2) It is admitted that HLI represented PrivatBank in its application for a freezing order. No admissions are made as to when the HLI PrivatBank Team began to prepare that application (save that it was after August 2017); the timing and content of the advice provided to PrivatBank concerning its application for a freezing order is confidential and legally privileged.

    (3) For the avoidance of doubt, no members of the HLI VS Team were involved in the PrivatBank Claims. HLI created information barriers between the HLI VS Team and any individuals working on the PrivatBank Claims (the **"HLI PrivatBank Team"**). Mr Sciannaca informed NL and TF of those information barriers during a telephone call on or around 21 December 2017.

55. Paragraph 67 is admitted; HLI repeats paragraph 45 above. Paragraphs 68 to 70 are also admitted, save that: (i) it is denied that Mr Smith QC requested any part of the hearing on 19 January 2018 to be held in private (a short part of that hearing was held in private at the

request of Mr Mark Howard QC, who represented IK); (ii) no admissions are made as to whether anything said during the closed part of that hearing had any relevance to the VS Claims and/or VS's interests; and (iii) no admissions are made as to paragraph 69(5).

56.  Paragraph 71 is denied, save that:

(1)  It is admitted that VS was not informed of the fact that HLI represented PrivatBank prior to the hearing on 19 December 2017, because that information was confidential.

(2)  VS was aware of HLI's retainer for PrivatBank from at least 21 December 2017. Neither VS nor any of his representatives made any suggestion at the time that this allegedly gave rise to any conflict of interest.

(3)  Information barriers were created between members of the HLI VS Team and: (i) the HLI PrivatBank Team; and (ii) the HLI VP Team. Whilst there was an overlap in the latter two teams, it is specifically denied that "*some of the same HL individuals*" who were or had been working on the VP Claims and/or the PrivatBank Claims were (or had been) working on the VS Claims.

57.  Paragraph 72 is admitted, save that it was unnecessary for Mr Justice Barling to decide whether GB had become resident or domiciled in Switzerland or any other country prior to 5 April 2017. HLI repeats paragraph 45 above.

58.  The first sentence of paragraph 73 is admitted. The second sentence is denied:

(1)  As stated at paragraph 75, VS, the Bracha Foundation and Hornbeam have brought claims against B&K and others in Delaware (the **"Delaware Proceedings"**), which overlap substantially with the VS Claims.

(2)  Further, at any time after Mr Justice Barling's judgment dated 2 February 2018, VS, Hornbeam and/or the Bracha Foundation could have brought the VS Claims (or, alternatively, similar claims relating to the same subject matter) in other jurisdictions, including: (i) Switzerland; (ii) the BVI; and/or (iii) Israel.

59.  No admissions are made as to paragraph 74, which relates to VS's alleged understanding.

## D.   THE DELAWARE PROCEEDINGS

60.  The first sentence of paragraph 75 is admitted and averred, save that: (i) Hornbeam is also named as a plaintiff in the Delaware Proceedings; and (ii) no admissions are made as to when those proceedings were commenced. No admissions are made as to the final sentence of paragraph 75. VS, the Bracha Foundation and Hornbeam have positively asserted in the Delaware Proceedings that the Delaware state courts have jurisdiction to determine their claims. It is noted that VS does not (and could not) suggest the contrary.

## E.   ALLEGED CONFLICTS OF INTEREST

61.   Paragraph 76 is denied. In particular:

(1)   It is denied that HLI had any conflict of interest in acting for both VS and VP. HLI was never instructed by VP to pursue any enforcement proceedings against B&K in respect of the VP Settlement. Further, paragraph 13 above is repeated. In any event:

(a)   The VS Claims and the VP Claims were unrelated and, as stated above, HLI established information barriers between the HLI VS Team and the HLI VP Team in order to comply with its duties of confidentiality.

(b)   HLI had no reason to believe that the total value of B&K's assets would be insufficient to satisfy: (i) any sums due under the VP Settlement; and (ii) the VS Claims.

(c)   Even if VS had obtained a freezing order against B&K, that would not have prevented them making payments and/or transferring assets pursuant to the VP Settlement.

(2)   It is denied that HLI had any conflict of interest in acting for VS and in also acting, after August 2017, for PrivatBank:

(a)   The VS Claims and the PrivatBank Claims were unrelated and, as stated above, HLI established information barriers between the HLI VS Team and the HLI PrivatBank Team in order to comply with its duties of confidentiality.

(b)   Further, HLI had no reason to believe that the total value of B&K's assets would be insufficient to satisfy the VS Claims and the PrivatBank Claims.

(c)   Even if VS had obtained a freezing order against B&K, that would not have prevented PrivatBank enforcing any judgment or settlement agreement relating to the PrivatBank Claims. Similarly, the PrivatBank WFO would not have prevented VS enforcing any judgment or settlement that he may have obtained against B&K.

(3)   It is denied that there was any conflict (or any significant risk of a conflict) between HLI's own interests and those of VS. For the avoidance of doubt, the assertion that HLI 'favoured and preferred' the interests of PrivatBank (or any other client) over those of VS is without foundation and is denied. It is denied that any of the matters referred to in paragraph 76(3) (as to which paragraphs 55 and 56 above are repeated) support that allegation.

62.   Paragraph 77 is denied. HLI repeats paragraphs 13 and 56 above. Further:

(1)   If, which is denied, HLI had any conflict of interest as alleged, it is denied that any such conflict had any effect on the way in which the HLI VS Team conducted the VS Claims.

(2)   It is denied that HLI failed to follow VS's instructions and/or breached any duties owed to VS, whether deliberately or otherwise (see paragraphs 69 to 72 below). The allegation of 'deliberate misconduct' in paragraph 77 is denied.

63.   In the premises, paragraph 78 is denied. It is specifically denied that any of the matters stated in the PoC support the alleged inference referred to in paragraph 78.

## F.   DUTIES OWED BY HLI

64.   Paragraphs 79 to 81 are admitted.

65.   As to paragraph 82, it is admitted that, in the period between 23 June 2016 and the commencement of HLI's retainer for VS on 21 September 2016, HLI had a duty to inform VS if it was unable to represent him for any reason. It is denied that HLI was unable to represent VS due to any conflict of interest, as alleged or at all. As to the scope of the Retainer Letter (and the Limitation Clause), HLI repeats paragraph 18 above. Save as aforesaid, paragraph 82 is denied.

66.   As to paragraph 83, clause 41 of the Terms of Engagement stated that HLI would not represent VS and/or other clients if doing so gave rise to a conflict of interest as defined in the SRA Code of Conduct 2011. It is denied (if it is alleged) that HLI owed a contractual duty, as distinct from a professional duty, to comply with each and every provision of that code.

67.   Paragraphs 84 to 86 are denied, save that it is admitted that:

(1)   From 21 September 2016, HLI owed VS: (i) a contractual duty (pursuant to clause 5 of the Terms of Engagement) to exercise the care, skill and diligence to be expected of a reasonably competent firm of solicitors with expertise in commercial litigation; and (ii) a commensurate tortious duty of care.

(2)   The aforesaid duties required HLI to take reasonable steps to provide appropriate advice to VS in relation to all aspects of his claims or potential claims. It is denied that HLI owed a specific duty to advise VS to issue a protective claim form. HLI repeats paragraph 31 above.

68.   It is admitted that, from 21 September 2016, HLI owed VS the fiduciary duties referred to in paragraph 87, save that: (i) sub-paragraph 87(4) was a professional duty owed under the SRA Code of Conduct 2011, not a fiduciary duty; (ii) it is denied (if it is alleged) that HLI owed an absolute duty to follow VS's instructions under any circumstances; and (iii) it is denied

that HLI owed a duty to disclose to VS any confidential information held in connection with any other client's case.

## G.  ALLEGED BREACH OF CONTRACT AND/OR NEGLIGENCE

69.   As to paragraph 88, it is denied that HLI breached any of its contractual and/or tortious duties to VS, as alleged or at all:

(1)   As to the duty owed by HLI prior to the commencement of its retainer on 21 September 2016, HLI repeats paragraph 64 above. It is denied that HLI owed any duty to inform VS that it was unable to represent him, as alleged in paragraph 88(1); HLI repeats the matters stated in paragraphs 61 and 62 above.

(2)   As to paragraphs 88(2) and (3), it is denied that HLI failed to provide VS with appropriate advice as to the relevant rules concerning jurisdiction and service; the HLI VS Team provided such advice, *inter alia*: (i) during the meeting on 25 October 2016; and (ii) by an email from Mr Sciannaca dated 23 March 2017. It is denied that HLI had a duty to advise VS to issue a protective claim form; paragraph 31 above is repeated.

(3)   As to paragraphs 88(4) to (9), it is denied that HLI breached any duties to VS by failing to issue the claim form prior to 12 May 2017 and/or by failing to advise VS to do so and/or by failing to follow VS's instructions in that respect and/or by failing to arrange for surveillance of 31 Belgrave Square prior to around 8 May 2017. Further, it is denied that HLI advised VS that personal service would improve his 'position on jurisdiction'. HLI repeats paragraphs 31, 42, 44 and 46 above.

(4)   As to paragraphs 88(10) to (12), it is denied that HLI failed to provide VS with appropriate advice concerning a potential application for a freezing order and/or that HLI failed to follow VS's instructions in that respect. Further, it is denied that HLI advised VS that: (i) there would be no advantage in him obtaining a freezing order; (ii) he would be unable to establish a real risk of dissipation of assets by B&K; and/or (iii) he would need to provide 10% or 20-25% of the value of his claims as fortification for a cross-undertaking in damages. Paragraphs 25, 40 and 41 above are repeated.

(5)   As to paragraphs 88(13) and (14), it is denied that HLI was unable properly to act for VS as a result of any conflict of interest and/or that HLI breached clause 41 of the Terms of Engagement. HLI repeats paragraphs 61 and 62 above.

## H.  ALLEGED BREACH OF FIDUCIARY DUTY

70.   As to paragraph 89, it is denied that HLI breached any of the fiduciary duties it owed to VS, as alleged or at all:

(1) There was no conflict between VS's interests and those of VP and/or PrivatBank, as alleged or at all. HLI repeats paragraphs 61 and 62 above. Further, VS was not entitled to receive, and HLI had no duty to disclose, any confidential information held by HLI in connection with any other client's case.

(2) As to the allegation in paragraph 89(6) that HLI failed properly to advise VS about issuing the claim form and/or a potential application for a freezing order, HLI repeats paragraph 69 above.

(3) It is denied that Mr Hardman was a member of the HLI VS Team. Paragraphs 24 and 28 above are repeated. Further, the allegations of deliberate misconduct in paragraphs 89(5) and (7) lack any basis at all and are denied.

## I.   ALLEGED 'DELIBERATE MISCONDUCT'

71. There is no basis for the serious allegations of deliberate misconduct in paragraph 90, which are not properly pleaded and are, in any event, denied. Those allegations are wholly inappropriate and should not have been made.

## J.   ALLEGED BREACH OF CONFIDENCE

72. As to paragraph 91, it is denied that HLI breached any duties of confidentiality owed to VS, as alleged or at all:

(1) As stated above, HLI created and maintained strict information barriers between the HLI VS Team and: (i) the HLI VP Team; and (ii) the HLI PrivatBank Team. VS was informed about HLI's intention to use these information barriers: (i) during the meeting on 25 October 2016 (in respect of the VP Claims); and (ii) during a telephone call between Mr Sciannaca and VS's representatives on or around 21 December 2017 (in respect of the PrivatBank Claims). VS made no complaint about these matters and thereby consented to HLI acting on that basis.

(2) The matters referred to in paragraph 91(2)(i) are irrelevant. VS was well aware that Mr Hardman and Mr Crow QC had acted for VP and therefore knew him. It is admitted that VS saw Mr Hardman, Mr Crow QC and VP at the Joshua/Klitschko boxing match on 29 April 2017, and that VS had met Mr Crow QC on 28 April 2017. The first two sentences of paragraph 91(2)(i)(b) are admitted. The final sentence is admitted, save that no admissions are made as to whether Mr Sciannaca stated that he would revert to NL (or anyone else) 'with further information'. Save as aforesaid, no admissions are made as to the matters stated in paragraph 91(2)(i).

(3)    Paragraphs 91(2)(ii)(a) and (b) are admitted, save that the telephone call took place on 1 June 2017. It is denied (if it is alleged) that any member of the HLI VS Team informed IK or any of his representatives (or VP) that Mr Crow QC had been instructed to represent VS prior to that information becoming public in December 2017. VS's representatives suggested, during the call on 1 June 2017, that VS himself had told VP that he had instructed Mr Crow QC to represent him. It is denied that Mr Sciannaca said he would 'look into' this issue, as alleged in paragraph 91(2)(ii)(c). The inference sought to be drawn in that paragraph is denied for the reasons stated above.

(4)    As to paragraph 91(2)(iii), GB's address in Geneva was referred to in open court during the jurisdiction hearing on 19 December 2017. That information therefore ceased to be confidential and was provided by Mr Sciannaca to the HLI PrivatBank Team after that hearing. The HLI PrivatBank Team first used that information in the claim form for the PrivatBank Claims, which was issued on 21 December 2017.

(5)    As to paragraph 91(2)(iv), it is denied that any member of the HLI VS Team had any involvement in the PrivatBank Claims, or that any confidential information relating to VS's case was disclosed to anyone in the HLI PrivatBank Team (or the HLI VP Team). It is denied that Ms Hickman's email dated 19 January 2018 suggests otherwise.

**K.  ALLEGED MISREPRESENTATION**

73.  As to paragraphs 92 and 93, it is denied that HLI has any liability to VS for misrepresentation, as alleged or at all. Paragraphs 22 and 23 above are repeated.

74.  Even if (which is denied) HLI made any alleged false representations to VS, it is denied that VS has suffered any loss as a result: (i) it is denied that, but for the alleged misrepresentations, VS would have chosen not to retain HLI; (ii) further or alternatively, many alternative London law firms would have insisted on a similar limitation clause; and (iii) further, and in any event, HLI will rely on the matters referred to in paragraphs 76 and 77 below.

75.  In the premises, paragraph 94 is denied.

**L.  ALLEGED LOSS**

76.  As to paragraphs 95 to 100, if (which is denied) HLI breached any of its duties to VS, it is denied that VS has sustained any loss or damage as a result:

(1)    As to the alleged breaches of duty relating to the date of issue of the claim form:

(a)    VS has not lost the opportunity to pursue his claims against B&K; paragraph 58 above is repeated.

(b) No admissions are made as to whether and, if so, when VS would have given instructions to issue a protective claim form if that had been suggested.

(c) Further, even if the claim form had been issued at an earlier date, GB would still have challenged the jurisdiction of the English courts; paragraph 45 above is repeated.

(d) Further and in any event HLI relies on the matters set out in paragraph 77 below.

(2) As to the alleged breaches of duty relating to a potential application for a freezing order:

(a) VS has not identified any loss said to result from any alleged breaches of duty relating to the advice provided by HLI concerning such an application. For the avoidance of doubt, it is denied that VS has sustained any such loss.

(b) Further, and in any event, no admissions are made as to whether, and in what circumstances, VS would have pursued such an application. VS chose not to do so because of: (i) the significant challenges he would have faced in making such an application (including those referred to at paragraphs 25 and 41 above); and (ii) the significant costs involved.

(c) It is denied that, if VS had filed such an application, he would have had any real prospect of obtaining a freezing order against B&K, or of any such order surviving an *inter partes* hearing. Further, even if VS had obtained a freezing order, it would have been discharged on 2 February 2018 (alternatively on 2 July 2018) when the court ruled that it had no jurisdiction to determine the VS Claims.

(d) Further, and in any event, any freezing order would not have prevented B&K making payments and/or transfers of assets pursuant to the VP Settlement or any court judgment or arbitral award.

(3) It is denied that VS has sustained any loss as a result of any alleged conflict of interest and/or breach of fiduciary duty. Without prejudice to the aforesaid:

(a) It is denied that any failure to inform VS about any alleged conflict between his interests and those of VP had any effect on VS's decision to retain HLI on 21 September 2016 and/or to continue providing instructions to HLI thereafter.

(b) Any alleged conflict of interest relating to HLI's retainer for PrivatBank is irrelevant to the alleged loss pleaded by VS. HLI began to represent PrivatBank in August 2017, well after the claim form for the VS Claims had been issued.

(c)  Further, and in any event, no admissions are made as to whether any alternative law firm would have provided advice to VS which differed in any material respect from the advice which was provided by HLI (including as to issuing a claim form and applying for a freezing order).

(4)  VS has not identified any loss allegedly sustained by him as a result of the alleged breaches of confidentiality. For the avoidance of doubt, HLI denies that VS has sustained any such loss.

(5)  If (which is denied) VS has sustained any loss as a result of any alleged breaches of duty by HLI, VS is not entitled (by reason of the Limitation Clause) to recover more than £5 million by way of damages and/or equitable compensation. For the avoidance of doubt, it is denied that the Limitation Clause is inapplicable to the claims referred to in paragraph 97.

77.  Save that it is admitted that the relief sought in the VS Claims included the relief referred to in paragraph 102, and that the VS PoC included the claims identified in paragraph 103 (save that the amounts claimed to be due in respect of the Ukrainian Assets were not quantified), paragraphs 101 to 104 are denied. It is specifically denied that:

(1)  The value of VS's claims is or was US$500 million. Paragraph 6 above is repeated.

(2)  VS would have had a "*formidable prospect of success*" in his claims against B&K, or that he has lost "*a high percentage chance*" of recovering sums of up to US$500 million in respect of those claims. HLI will rely upon, *inter alia,* the following matters:

(a)  A number of fundamental difficulties with the VS Claims were highlighted in the Joint Opinion. Neither Mr Crow QC nor Mr Denton-Cox indicated that they disagreed with anything stated in the Joint Opinion.

(b)  Similar difficulties were highlighted in: (i) a written opinion provided by Joseph Hage Aaronson LLP; and (ii) the December 2016 Status Update.

(c)  IK filed a jurisdiction challenge on 16 January 2018, which contended that the VS Claims had no real prospect of success.

(3)  It is denied (if it is alleged) that VS would have recovered all of his legal costs from B&K even if his claims had been successful.

78.  As to paragraph 105, B&K would still have challenged the jurisdiction of the English courts even if the claim form had been issued on an earlier date. Paragraph 45 above is repeated. Without prejudice to the aforesaid, it is admitted that VS would not have been required to pay the costs of an unsuccessful jurisdiction challenge.

79. Paragraph 106 is embarrassing for lack of particulars and, in any event, plainly incorrect. Further, VS has not sought to recover any sums by way of restitution. For the avoidance of doubt, it is denied that VS would be entitled to any such relief.

80. Paragraph 107 is denied. The allegations of 'deliberate misconduct' have no basis at all.

81. In the premises, it is denied that VS is entitled to any interest, as alleged in paragraph 108.

**M. RELIEF**

82. For the reasons stated above, it is denied that VS is entitled to the relief sought in the PoC, or any relief.

83. Further, and in any event, HLI will seek to set-off any damages and/or equitable compensation that may be found to be payable to VS against the sums claimed in the Counterclaim below.

**COUNTERCLAIM**

84. Paragraphs 1 to 83 above are repeated. HLI sent invoices (the **"Invoices"**) to VS for work done and disbursements paid in connection with the VS Claims between 27 September 2016 and 7 February 2018, pursuant to the Retainer Letter. The total amount payable was £1,527,294.67.

85. Payments totalling £1,056,074.58 were made by or on behalf of VS to HLI in respect of the Invoices. The sum of £471,220.09 remains outstanding in respect of those Invoices; HLI will provide particulars of the outstanding sums in due course.

86. In breach of clause 10 of the Terms of Engagement, VS has failed to pay the outstanding sums within 14 days of the relevant Invoices, or at all. In the premises, HLI is entitled to recover the sum of £471,220.09 from VS as a debt. HLI is further entitled to contractual interest on the aforesaid sum at the rate of 8% per annum pursuant to clause 12 of the Terms of Engagement. HLI will provide particulars of the interest claimed in due course.

AND THE DEFENDANT COUNTERCLAIMS:

(i)      the sum of £471,220.09;

(ii)     interest as aforesaid;

(iii)    such other relief as the Court thinks appropriate; and

(iv)     costs.

*1 May 2020*

**HELEN DAVIES QC**
**MICHAEL BOLDING**
Brick Court Chambers
7-8 Essex Street
London, WC2R 3LD



### Statement of Truth

The Defendant believes that the facts stated in this Defence and Counterclaim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised by the Defendant to sign this statement.

Signed:   N. M. Atkins

Full name:   NICHOLAS MARK ATKINS

Position held:   PARTNER AND GENERAL COUNSEL

Date:   1 MAY 2020

Solicitors for the Defendant:

Herbert Smith Freehills LLP
Exchange House
Primrose Street,
London, EC2A 2EG