**IN THE HIGH COURT OF JUSTICE**            **Claim No.**
**CHANCERY DIVISION**

**B E T W E E N :**

**VADIM MARATOVICH SHULMAN**

**-and-**

**(1) IGOR VALERYEVICH KOLOMOISKY**
**(2) GENNADIY BORISOVICH BOGOLYUBOV**

12 May 2017

HC-2017-001383
**Claimant**

**Defendants**

_____

**PARTICULARS OF CLAIM**
_____

**A.**      **INTRODUCTION**

**(i)**      **Parties**

1.      The Claimant ("**Mr Shulman**") is an Israeli businessman, now resident in Monaco.

2.      The First and Second Defendants (respectively "**Mr Kolomoisky**" and "**Mr Bogolyubov**"; collectively, the "**Defendants**") are Ukrainian businessmen. Mr Kolomoisky is domiciled and resident in Geneva, Switzerland, whilst Mr Bogolyubov is domiciled and resident in London, England. Until December 2016, the Defendants, whose business relationship predates their introduction to Mr Shulman, held controlling stakes in and were members of the supervisory board of PrivatBank, one of the largest commercial banks in Ukraine which they had co-founded in 1992 with a small group of other businessmen. PrivatBank was nationalised in December 2016 amidst the discovery of a deficit in the bank's finances reported to be in excess of US$5 billion.

**(ii)**      **Summary of Mr Shulman's Claims**

3.      Since 1999/2000 the parties have carried on business together as a partnership and/or by way of joint venture. The business of the partnership/joint venture has been to invest in and/or manage assets associated with the metallurgical and mining industries. The joint investments have included three coke plants called Dneprodzerzhinsk, Bagleykoks and Dneprkoks ("the **Coke Plants**"), a steel plant ("the **Petrovsky Plant**"), and an iron ore extraction and processing plant ("the **YuGOK Plant**") in Ukraine (collectively "the **Ukrainian Assets**"), a minority interest in a coke processing plant in Zarinsk, Russia ("**Altay-Koks**"), and a steel plant in Ohio, United States ("**Warren Steel**"). The parties'

1

respective interest in each asset was agreed before the investment was made in that asset. The parties also participated in the management of a state-owned plant called the Dnepropetrovsk Metallurgical Plant ("the **DMK Plant**").

4.      Pursuant to the partnership and/or joint venture, the Defendants owed Mr Shulman duties including duties of good faith and duties to account.  Further or alternatively, any joint investments held by or under the control of the Defendants (and rights to control the same), and the proceeds thereof, were held on trust for Mr Shulman and the Defendants in the proportions agreed as regards each investment.

5.      In 2005/6 the parties sold their interest in Altay-Koks. They sold their interest in the Ukrainian Assets in 2007, with the consideration for the sale being provided (to an entity under the control of the Defendants) partly in cash and partly in Sponsored Global Deposit Receipts ("**GDRs**") convertible into shares in Evraz Group SA, a company in the Evraz group ("the **Evraz Deal**").

6.      The Defendants have retained and dealt with partnership property and/or funds and assets belonging to Mr Shulman. Dishonestly and fraudulently, and in breach of statutory, fiduciary and contractual duties owed to Mr Shulman pursuant to the partnership and/or joint venture and/or in breach of trust, the Defendants have failed to account to Mr Shulman for partnership property and/or his funds and their proceeds, including sums owed to him in respect of the operation and management of the Ukrainian Assets, Altay-Koks and the DMK Plant, and his share of the proceeds of the sale of the Ukrainian Assets (and the proceeds therefrom, including dividends paid in respect of Mr Shulman's GDRs at a time when they were held by the Defendants), but have wrongfully retained them, dealt with them for their own benefit and/or misappropriated them.

7.      Further, as regards Mr Shulman's entitlement of GDRs from the Evraz Deal, three million GDRs were not transferred by the Defendants to Mr Shulman until February 2010, and 353,228 GDRs remain outstanding.  By reason of the Defendants' breaches of duty in failing to transfer Mr Shulman's entitlement to him at an earlier date (or at all), Mr Shulman has suffered loss and damage and/or is entitled to equitable compensation.

8.      Further, the Defendants have failed to act in good faith and honestly in relation to Warren Steel, both as to the ownership of Warren Steel Holdings, LLC ("**WSH**", the immediate owner of the Warren Steel plant), and in relation to its operations, and the Defendants have failed to reimburse Mr Shulman for costs he incurred in relation to Warren Steel. Mr Kolomoisky also claimed to Mr Shulman in 2009 that the Defendants had invested $30 million belonging to Mr Shulman (being part of his share of the proceeds of the Evraz Deal) in Warren Steel.  However, he has recently admitted to Mr Shulman that the

Defendants did not do so.  Mr Shulman is entitled to and seeks an account of, together with all necessary enquiries into, the Defendants' dealings in relation to and with Warren Steel and WSH, and the Defendants are further obliged to account to Mr Shulman for the $30 million misappropriated from him and the proceeds thereof.

9.  Mr Kolomoisky, on behalf of the Defendants, has repeatedly accepted that sums are due to Mr Shulman, and between 2008 and 2012 a number of payments were made to Mr Shulman in part payment of the sums due to him.  However, substantial sums remain outstanding.

10.  In this action, Mr Shulman seeks an account, together with all necessary enquiries, of the Defendants' dealings with partnership property and/or his funds and their proceeds and an order for payment by the Defendants to Mr Shulman of the sums found due to him on the taking of such account. Further or alternatively, he seeks delivery up of assets held on trust for him and the proceeds thereof, and/or damages or equitable compensation for the loss which he has suffered as a result of the Defendants' breaches of their duties and/or restitution in respect of the Defendants' unjust enrichment at Mr Shulman's expense.  Mr Shulman also seeks compound interest on all sums due to him at the agreed rate of 7% per annum.

11.  In these Particulars of Claim:

(1)  Where reference is made to Mr Kolomoisky doing an action, taking a step, or making a representation, Mr Shulman's case is that, unless otherwise stated, Mr Kolomoisky was acting on behalf of himself and Mr Bogolyubov.

(2)  All references to dollars ($) are to United States dollars.

## B.  BACKGROUND

### (i)  Mr Shulman's introduction to the Defendants

12.  Mr Shulman's background is in engineering in the mining industry, having graduated from the National Institute of Research and Development in Ore Mining in Krivoy Rog in Eastern Ukraine as an engineer-constructor of underground mines and installations. He then worked at an underground mine in Krivoy Rog for approximately 10 years before he established his own business in supplying coal.

13.  Following the fall of the Soviet Union in the early 1990s, because of Mr Shulman's knowledge and understanding of the mines in the area, the Heads of Administration for

the districts of Donetsk and Dnepropetrovsk asked Mr Shulman to assist in resolving the issue of coal supply to the region. Mr Shulman's involvement in resolving this issue helped his company, Euro Commodities, to become one of the biggest suppliers of coal from the Donetsk region to the Dnepropetrovsk region and, by around 1996, Mr Shulman had several significant customers including the Petrovsky Plant and the Coke Plants.

14. In around 1999, Mr Shulman was introduced to the Defendants by a mutual acquaintance, Dmitry Mishalov ("**Mr Mishalov**"). Mr Mishalov considered that Mr Shulman could assist Mr Kolomoisky in the latter's aim to purchase a stake in the Petrovsky Plant which, like other state-owned assets, was in the process of being privatised by the then Ukrainian government.

15. Mr Shulman and the Defendants soon developed a close business and personal relationship of mutual trust and confidence which continued until around 2013. During the period 2000 to 2013, in addition to making joint investments as pleaded further below, they and their families were close friends and holidayed together every summer and winter.

**(ii)     The basis of the parties' business relationship**

16. The first meeting between Mr Shulman and the Defendants, which was also attended by Mr Mishalov, took place at the offices of Mr Kolomoisky's company, Sentosa Limited, in Dnepropetrovsk in around spring 1999. At the meeting, the Defendants set out their business plan for investing in the Petrovsky Plant and two of the Coke Plants, Dneprodzerzhinsk and Bagleykoks. Mr Shulman and the Defendants discussed investing in the privatisation of, and managing, these assets together, although no firm agreement was reached at the meeting.

17. Mr Shulman and Mr Kolomoisky, who both lived in Israel at the time, discussed their prospective business relationship again at a meeting at Mr Kolomoisky's house in around autumn 1999. At that meeting, because the parties were at the start of what promised to be a significant business relationship, they discussed how any disputes between Mr Shulman and the Defendants that arose out of their business relationship would be resolved. It was agreed that any disputes between or amongst Mr Shulman and the Defendants should be resolved by the English courts, and the parties chose English law to govern their disputes. In this regard:

(1)     Mr Kolomoisky proposed that any such disputes should be dealt with in the London courts, meaning, and by which Mr Shulman understood him to mean, that they would be resolved by the English courts applying English law.  As to this:

(a)  The English courts and legal system had a strong reputation for fairness and incorruptibility, particularly when compared to the Ukrainian courts and Ukrainian law at the time.  Ukraine had only become independent from the Soviet Union in 1991, and its new law and legal system were still in a state of infancy and uncertainty.

(b)  At the time, Mr Shulman and Mr Kolomoisky were living in a small community in Israel.  Mr Shulman did not want (and understood Mr Kolomoisky did not want) any disputes to be heard in the place where they were living.

(2)  Mr Shulman agreed.

(3)  In any event, it is to be inferred from the agreement that disputes should be resolved in the English courts that the parties intended their relationship to be governed by English law.

18.  Thereafter, Mr Shulman and the Defendants entered into joint investments in and/or managed metallurgical and mining assets together, as pleaded below. The terms upon which Mr Shulman and the Defendants invested in and/or would manage such assets were agreed to by Mr Shulman and the Defendants over the course of several meetings between the parties in 1999 and 2000 and, in addition to the terms as to governing law and dispute resolution referred to at paragraph 17 above, included the following express terms:

(1)  Mr Shulman, Mr Kolomoisky and Mr Bogolyubov would be equal partners as regards decision-making, in that significant decisions (as distinct from day-to-day decisions) would be taken jointly.

(2)  The Defendants would be responsible for the creation of the corporate structures by which the assets in which the parties co-invested would be held and for the administration of those structures.

(3)  Mr Shulman, Mr Kolomoisky and Mr Bogolyubov would each have an interest in the joint investments they made together, regardless of the precise manner in which the asset in question was held.  They would agree the size of their respective interests in each asset before investment in that asset. Where they made any further investment in an asset in which they had previously invested, they

would agree the size of their respective interests in that further investment at the time it was made.

(4)     The profits (including capital gains) from their joint investments would be distributed amongst Mr Shulman, Mr Kolomoisky and Mr Bogolyubov in the same proportions as the size of their respective interests in each asset as agreed between them at the time of the initial investment or any further investment. Distributions would be by way of dividends, declared and distributed annually.

(5)     The assets in which they co-invested would operate independently of one another, such that they would not sell or buy materials from one another at an undervalue or overvalue to the benefit of one asset over another.

(6)     The parties agreed to report annually to each other on the performance of each asset.

(The "**Agreement**".)

19.     Further, the following terms are to be implied into the Agreement as a matter of law because in the circumstances pleaded above they give effect to the parties' obvious but unexpressed intentions and/or are necessary to give the Agreement business efficacy and/or arose out of the relationship of mutual trust and confidence which existed between Mr Shulman and the Defendants:

(1)     Mr Shulman would provide his industry experience and technical support to the business relationship, and would introduce the Defendants to other people in the coke and steel industries.

(2)     The parties would act in good faith and honestly towards each other, and would account to each other for the profits derived from their joint investments.

20.     Further or alternatively, the Agreement amounted to or gave rise to a partnership between Mr Shulman, Mr Kolomoisky and Mr Bogolyubov (the "**Partnership**"), in that in entering into and carrying out investment and management activities pursuant to the Agreement, Mr Shulman, Mr Kolomoisky and Mr Bogolyubov were carrying on a business in common with a view of profit within the meaning of section 1(1) of the Partnership Act 1890 (the "**Act**"). Further or alternatively, the Agreement amounted to or gave rise to a joint venture between Mr Shulman, Mr Kolomoisky and Mr Bogolyubov.

21.     By reason of the Partnership between them, Mr Kolomoisky and Mr Bogolyubov each owed Mr Shulman, *inter alia*, the following duties pursuant to the Act:

(1)     pursuant to section 20(1) of the Act, a duty to hold and apply all property and rights and interests in property acquired for the purposes and in the course of the partnership business exclusively for the purposes of the Partnership and in accordance with the Agreement;

(2)     pursuant to section 28 of the Act, a duty to render true accounts and full information of all things affecting the Partnership to Mr Shulman and his legal representatives; and

(3)     pursuant to section 29(1) of the Act, a duty to account to the Partnership for any benefit derived by them without Mr Shulman's consent from any transaction concerning the Partnership, or from any use by them of the partnership property name or business connection.

22.     Further or alternatively, by reason of the Partnership and/or joint venture, Mr Kolomoisky and Mr Bogolyubov each owed Mr Shulman the following duties:

(1)     a duty to act honestly and in good faith;

(2)     an obligation to account to Mr Shulman;

(3)     a duty of loyalty and duty of candour, both of which encompassed a duty to disclose their own wrongdoing;

(4)     a duty not to engage in self-dealing;

(5)     a duty of fair dealing, *i.e.* not to deal with connected entities except on market terms with the fully informed consent of Mr Shulman;

(6)     a duty to preserve and be constantly ready with correct accounts of all their dealings with and transactions with the joint investments;

(7)     a duty to produce to Mr Shulman or to a proper person appointed by Mr Shulman all books and documents in their hands relating to the Partnership and/or joint venture; and

(8)     when holding or receiving money for Mr Shulman, a duty to apply that money only for agreed investment purposes and, when not so applied, to pay over or account for that money at the request of Mr Shulman, and to account for any interest earned in respect of that money.

23.     Mr Shulman has an indefinite beneficial interest in and a lien over the property of the Partnership and is entitled to have the property applied in accordance with the Agreement and sections 39 and 44 of the Act on the dissolution of the Partnership.

24.     Alternatively, to the extent that the Agreement did not amount to a Partnership, any asset acquired as a result of an investment made pursuant to the Agreement was acquired for the benefit of Mr Shulman and the Defendants and, together with the proceeds derived from that asset, was held on trust for Mr Shulman and the Defendants in the proportions agreed as regards each investment by whichever of them who held and/or had control of that asset and/or its proceeds, and it would be unconscionable for the Defendants to assert otherwise. Further or alternatively, all rights arising under or out of the structures created to hold each investment were held on trust for Mr Shulman and the Defendants in the proportions agreed as regards each investment by whichever of them had control of those rights and/or the power to exercise them.

## C.     THE JOINT INVESTMENTS AND ACTIVITIES

25.     Pursuant to the Agreement, Mr Shulman and the Defendants entered into the following joint investments and activities:

(1)     the acquisition of a majority interest in and the management of (a) the Coke Plants and (b) the Petrovsky Plant;

(2)     the acquisition of a controlling interest in and the management of the YuGOK Plant;

(3)     the management of the DMK Plant;

(4)     the acquisition of a minority interest in Altay-Koks; and

(5)     the acquisition and management of Warren Steel.

26.     In Sections D to H below, Mr Shulman sets out his claims arising out of the Defendants' breaches of the Agreement and/or their duties owed to him in respect of these investments.

**D.      THE UKRAINIAN ASSETS**

**(i)      The Coke Plants and the Petrovsky Plant**

27.     From around late 1999 / early 2000, Mr Shulman and the Defendants, together with Mr Mishalov, began to acquire stakes in the Coke Plants from both the Ukrainian government and other private investors. They agreed between themselves and with Mr Mishalov that ownership of their accumulated stake in the Coke Plants, which amounted to a majority holding in the plants, would be divided between them as follows:

(1)     25% would be held on behalf of the Defendants collectively;

(2)     25% would be held on behalf of Mr Shulman;

(3)     25% would be held on behalf of Mr Mishalov; and

(4)     25% would be held on behalf of Igor and Grigoriy Surkis, who were intermediaries.

28.     Around the same time or shortly afterwards, Mr Shulman and the Defendants, together with Mr Mishalov, acquired an interest in approximately 98% of the ownership of the Petrovsky Plant, having purchased an interest of between 40% and 50% from a private investor, 26% from a government auction and the remainder from a number of smaller investors. They agreed that the Defendants would together own a half, and Mr Shulman and Mr Mishalov would each own a quarter share, of their collective interest in the Petrovsky Plant.

29.     In addition to Mr Shulman, the Defendants, Mr Mishalov and (in respect of the Coke Plants) Igor and Grigoriy Surkis, there were a number of other shareholders in both the Coke Plants and the Petrovsky Plant, largely comprising workers at the plants who had received shareholder vouchers, whose interests however were sufficiently small that they had no effect on the control and management of the plants.

30.     Subsequently, in around 2002, Mr Mishalov decided to sell his interests in the Coke Plants and the Petrovsky Plant. Mr Shulman agreed with the Defendants to acquire on their joint behalves Mr Mishalov's interest in the Coke Plants, which was then divided between Mr Shulman (as to 50% of that interest) and the Defendants (as to the other 50%). Following the acquisition, Mr Shulman's individual interest and the Defendants' collective interest in the Coke Plants each grew to 37.5%. Mr Shulman does not presently

know who acquired Mr Mishalov's interest in the Petrovsky Plant, and reserves his right to provide further particulars following disclosure.

31.     In accordance with the Agreement, the structure by which Mr Shulman and the Defendants held their interests in the Coke Plants and the Petrovsky Plant was arranged by Mr Kolomoisky and Mr Bogolyubov, with the assistance of Mr Kolomoisky's lawyer Timur Novikov ("**Mr Novikov**"). Mr Shulman had no involvement in the creation or operation of those arrangements, but trusted that the parties' agreement as to the ownership of the assets would be honoured by the Defendants.

**(ii)    The YuGOK Plant**

32.     Mr Shulman and the Defendants acquired an interest in the YuGOK Plant following a discussion with Alexander Gravets ("**Mr Gravets**") at Mr Shulman's house in Israel in April 2000, where Mr Shulman was celebrating his 40th birthday. Mr Gravets held a controlling interest of around 24% to 26% in the YuGOK Plant on behalf of himself, Yulia Tymoshenko, who was then Deputy Prime Minister for the fuel and energy sector, and her husband Oleksandr Tymoshenko. The remaining shareholding was majority owned by the Ukrainian government, which did not take an active role in the management of the plant.

33.     Mr Shulman and the Defendants acquired the interest held by Mr Gravets. However, it subsequently emerged that Ms Tymoshenko had purported to sell the same interest which had been held by Mr Gravets to a third party, Vadim Novinsky ("**Mr Novinsky**"), a Russian-born Ukrainian businessman and politician. To avoid a dispute, Mr Novinsky, Mr Shulman and the Defendants met at Mr Kolomoisky's offices in Dnepropetrovsk and agreed that the interest, and any further shares purchased in the YuGOK Plant in the future, would be shared equally between, on the one hand, Mr Shulman and the Defendants and, on the other, Mr Novinsky.

34.     Out of their 50% share, Mr Shulman and the Defendants gave a quarter to Igor and Grigoriy Surkis and another intermediary, Viktor Medvedchuk ("**Mr Medvedchuk**"), and divided the remainder between themselves as to 25% to be held for Mr Shulman and 75% to be held for the Defendants.  As a result, the collective interest of Mr Shulman, the Defendants, Mr Novinsky, Mr Medvedchuk and Igor and Grigoriy Surkis in the YuGOK Plant was held as follows:

(1)     as to 9.375% by Mr Shulman (although Mr Kolomoisky incorrectly represented at the time that Mr Shulman's interest was 8.75%);

(2)     as to 28.125% by the Defendants;

(3)     as to 12.5% by Igor and Grigoriy Surkis and Viktor Medvedchuk; and

(4)     as to 50% by Mr Novinsky.

35.     As with the Coke Plants and the Petrovsky Plant, in accordance with the Agreement, the structure by which Mr Shulman and the Defendants held their interests in the YuGOK Plant was arranged by Mr Kolomoisky and Mr Bogolyubov, with the assistance of Mr Novikov. Mr Shulman had no involvement in the creation or operation of those arrangements, but trusted that the parties' agreement as to the ownership of the assets would be honoured by the Defendants.

**(iii)     Management of the Ukrainian Assets**

36.     Responsibility for the management of the Ukrainian Assets was divided between Mr Shulman and the Defendants as follows:

(1)     Mr Shulman was responsible for running the Coke Plants;

(2)     Mr Kolomoisky was responsible for running the Petrovsky Plant, with the assistance of technical staff provided by Mr Shulman; and

(3)     Mr Bogolyubov (with the agreement of Mr Novinsky) was responsible for running the YuGOK Plant, also with the assistance of technical staff provided by Mr Shulman.

37.     Notwithstanding this division of responsibility, Mr Shulman and the Defendants collectively worked for the benefit of all five of the Ukrainian Assets.

38.     The Coke Plants operated profitably over the period between 2000 and 2007.

39.     According to information subsequently provided by the Defendants (as described in paragraph 87 below), the Petrovsky Plant and the YuGOK Plant were also profitable during the period between 2000 and 2007.

40.     Despite the profitability of the Ukrainian Assets, their profits were not distributed to Mr Shulman. In this regard:

(1)     Although the Coke Plants were profitable, they did not have sufficient cash available to distribute the profits for the entire period between 2000 and 2007, on account of the fact that the Petrovsky Plant, which acquired a substantial amount of coke from the Coke Plants, withheld payment for some of that coke. Instead, the monies with which the Petrovsky Plant might have paid for the coke which it acquired were retained in PrivatBank and held under the control and at the direction, and/or for the benefit, of the Defendants who had controlling stakes in PrivatBank at that time.

(2)     Further, because monies owed to the Coke Plants by the Petrovsky Plant were withheld in PrivatBank, to assist with the plants' cash flow, Mr Shulman and a corporate vehicle of his had to make available an interest-free rolling credit facility of up to $100 million and had to take out loans from PrivatBank which were used for the benefit of the Coke Plants and on which interest was paid of approximately 12%.

(3)     Between 2000 and 2007, Mr Shulman did not receive his shares of the profits made by the Petrovsky Plant and the YuGOK Plant during those years. It is Mr Shulman's understanding that the profits generated by the Petrovsky Plant and the YuGOK Plant were also retained in PrivatBank under the control and at the direction, and/or for the benefit, of the Defendants.

41.     Further, it is Mr Shulman's belief that the accounts and records of the Petrovsky Plant recorded the plant as having paid more for agglomerate which it purchased from the YuGOK Plant than was in fact the case. Mr Shulman reserves the right to seek relief in respect of any such discrepancy following disclosure.

**(iv)    DMK Plant**

42.     For a short period in 2001 and 2002, and pursuant to the Agreement, Mr Shulman and the Defendants managed the DMK Plant, for which they earned a commission.

43.     The commission was paid to the Defendants or an entity under their control, and was received and held by them on behalf of the Partnership / joint venture.   However, sums remain due to Mr Shulman in respect of the management of the DMK Plant.

**(v)     The Defendants' breaches in relation to the profits of the Ukrainian Assets and the management of the DMK Plant**

44.     Following the sale of the Ukrainian Assets at the end of 2007 in the circumstances set out below at paragraphs 53 to 57, Mr Shulman and Mr Kolomoisky met at Mr Kolomoisky's offices in Dnepropetrovsk in Ukraine in 2008 to discuss the sums owed between the parties from their joint investments. At that meeting, *inter alia*:

(1)     Mr Kolomoisky acknowledged that there were sums owed to Mr Shulman which ought to be paid.

(2)     Mr Kolomoisky and Mr Shulman agreed orally that any monies owed to Mr Shulman, whether from the profits of the Ukrainian Assets or otherwise, but retained by or at the direction of the Defendants, would accrue interest at a compound rate of 7% per annum (the "**Interest Rate**"). They further agreed that the Interest Rate would apply retrospectively to all sums which ought to have been distributed and paid to Mr Shulman in accordance with the agreed annual distribution policy.

45.     As set out below at paragraphs 84 to 88, tables were subsequently prepared at Mr Shulman's direction, setting out Mr Shulman's understanding of what was owed to him in respect of certain aspects of his business dealings with the Defendants.

46.     Between February 2008 and September 2012, Mr Kolomoisky made a number of payments to Mr Shulman in part settlement of the sums acknowledged to be owed to him.

47.     However, as at the present date, despite Mr Shulman's repeated requests for payment, in breach of the Agreement and/or their duties and/or trust, the Defendants continue to hold and/or have failed to make payment in full of sums owed to Mr Shulman, including compound interest which has accrued and continues to accrue at the Interest Rate, from the profits generated by the Ukrainian Assets and sums due in respect of the DMK Plant, but have dealt with the same as they see fit and without accounting to Mr Shulman. In so acting, the Defendants have acted dishonestly, knowing that their conduct is contrary to the interests of Mr Shulman or being recklessly indifferent as to whether it is contrary to the interests of Mr Shulman.

48.     In the premises:

(1)     The Defendants are obliged to account to Mr Shulman for all sums owed to him in respect of the operation of the Ukrainian Assets and the management of the DMK

Plant, including reimbursement of loan interest paid on behalf of and for the benefit of the Partnership and/or joint venture, and including monies owed by way of interest calculated at the Interest Rate; and/or

(2)     Mr Kolomoisky and/or Mr Bogolyubov hold the said sums on trust for Mr Shulman and/or they hold any traceable proceeds thereof for the benefit of Mr Shulman and must account to him in respect of the same and/or have been unjustly enriched in the amount of the said sums and are obliged to make restitution of the same; and/or

(3)     Mr Shulman seeks damages and/or equitable compensation for breach of the Agreement and/or for breach of fiduciary duty and/or trust.

## E.     ALTAY-KOKS

49.     In around 2003 or 2004, Mr Shulman and the Defendants were approached by two Russian businessmen, Iskander Makhmudov ("**Mr Makhmudov**") and Andrei Bokarev ("**Mr Bokarev**"), for assistance with the supply of materials to Altay-Koks which they partly owned and managed. In return for their assistance, Mr Makhmudov and Mr Bokarev offered Mr Shulman and the Defendants a 25% stake in Altay-Koks, which they duly accepted and for which they paid $25 million. Mr Shulman's and the Defendants' interest in Altay-Koks was, by agreement, divided equally between them.

50.     Approximately two years later, Mr Makhmudov and Mr Bokarev purchased Mr Shulman's and the Defendants' interest in Altay-Koks for $40 million.

51.     As at the present date, in breach of the Agreement and/or their duties and/or trust, the Defendants continue to hold and/or have failed to make payment of the outstanding sums owed to Mr Shulman, from the share of operating profits which the Defendants received from the parties' collective interest in Altay-Koks, including interest which has accrued and continues to accrue at the Interest Rate.  Rather, they have dealt with the same as they see fit and without accounting to Mr Shulman. In so acting, the Defendants have acted dishonestly, knowing that their conduct is contrary to the interests of Mr Shulman or being recklessly indifferent as to whether it is contrary to the interests of Mr Shulman.

52.     In the premises:

(1)     The Defendants are obliged to account to Mr Shulman for all sums owed to him in respect of their collective investment in Altay-Koks, including monies owed by way of interest calculated at the Interest Rate; and/or

(2)     Mr Kolomoisky and/or Mr Bogolyubov hold the said sums on trust for Mr Shulman and/or they hold any traceable proceeds thereof for the benefit of Mr Shulman and must account to him in respect of the same and/or have been unjustly enriched in the amount of the said sums and are obliged to make restitution of the same; and/or

(3)     Mr Shulman seeks damages and/or equitable compensation for breach of the Agreement and/or for breach of fiduciary duty and/or trust.

## F.    THE SALE OF THE UKRAINIAN ASSETS

### (i)    Background to the sale of the Ukrainian Assets

53.    In around early 2007, Mr Kolomoisky entered into discussions with Roman Abramovich ("**Mr Abramovich**"), a Russian businessman, and/or his associates concerning a sale to Mr Abramovich of a portfolio of assets which included the Ukrainian Assets as well as other assets in which Mr Shulman did not have an interest.

54.    Mr Shulman only became aware of the discussions shortly before an agreement for the sale of the Ukrainian Assets was entered into. According to Mr Kolomoisky, the terms of the Evraz Deal were that, in return for the portfolio of assets including the Ukrainian Assets, Mr Abramovich's corporate group, Evraz, would provide consideration in the form of (i) $1.06 billion in cash and (ii) GDRs representing approximately 10% of the shares in Evraz Group SA, a company in the Evraz group. Mr Shulman reserves the right to provide further particulars and/or seek further relief in the event that the terms of the Evraz Deal were different from those represented by Mr Kolomoisky.

55.    Under the sale terms which Mr Kolomoisky alleged he had achieved by the Evraz Deal, Mr Shulman's purported share of the consideration paid by Evraz for the Ukrainian Assets was said to be a cash payment totalling $175 million and 6,353,228 GDRs for Evraz Group SA, which GDRs equated to 2,117,742 shares in that company. However:

(1)     As set out in paragraph 34(1) above, Mr Kolomoisky had incorrectly stated Mr Shulman's share of the collective interest in the YuGOK Plant of Mr Shulman, the Defendants, Mr Novinsky, Mr Medvedchuk and Igor and Grigoriy Surkis to be 8.75% rather than 9.375%.

(2)     In any event, in determining the consideration payable to Mr Shulman from the Evraz Deal, Mr Kolomoisky had given Mr Shulman a lower share of the proceeds

of the sale of the collective interest in the YuGOK Plant than the 8.75% he had stated Mr Shulman was entitled to.  Even if Mr Shulman's share of the interest in the YuGOK Plant had only been 8.75%, Mr Shulman was entitled to receive an additional $3.9 million from the Defendants.

(3)     Mr Shulman therefore was and remains entitled to receive an additional sum to reflect his true interest in the YuGOK Plant and the proceeds of sale thereof in the amount of (i) $3.9 million and (ii) 0.625% of the value placed on the collective interest in the YuGOK Plant in the Evraz Deal.

**(ii)     The Defendants' breaches in respect of the Evraz Deal**

56.     In breach of the Agreement and/or their fiduciary duties and/or trust, the Defendants failed to pay and transfer in full the monies and GDRs owed to Mr Shulman in respect of his share of the consideration paid by Evraz for the Ukrainian Assets.

57.     In this regard, pending disclosure and further investigation, it is Mr Shulman's understanding that, following the completion of the Evraz Deal:

(1)     In around December 2007, Evraz paid the cash consideration owed under the Evraz Deal to a Cypriot branch of PrivatBank.  Mr Shulman believes that by May 2008, Evraz transferred the GDRs to an entity in the Privat group of companies under the Defendants' control. The Defendants failed to transfer the GDRs to Mr Shulman at that time.

(2)     In 2008, an interim dividend was declared by Evraz Group SA in respect of the GDRs. The dividend was paid to Mr Kolomoisky and/or Mr Bogolyubov at a later date in cash and/or by way of an issue of GDRs. Mr Shulman's entitlement in respect of the dividend was retained by the Defendants.

(3)     During the course of 2008, in part settlement of the sums owed to Mr Shulman under the Evraz Deal, Mr Kolomoisky paid to Mr Shulman by instalments the total sum of $75 million. Mr Shulman and Mr Kolomoisky agreed that a further sum of approximately $100 million owed to Mr Shulman would be set off against monies owed by Mr Shulman to the Defendants in respect of another business investment.

(4)     In around May 2008, three million of Mr Shulman's GDRs were sold by Mr Kolomoisky and/or Mr Bogolyubov for the total sum of $333 million to Lanebrook Limited ("**Lanebrook**"), which is a Cypriot company owned and

controlled by, *inter alia*, Mr Abramovich. Mr Shulman believes that 50% of the sum of $333 million was paid by Lanebrook to Mr Kolomoisky and/or Mr Bogolyubov on or around 30 June 2008, with the remainder paid on or around 30 December 2008.

(5)     On or around 3 July 2008, Mr Kolomoisky paid the sum of $165 million to Mr Shulman, in part settlement of the sums owed to Mr Shulman from the sale of the GDRs to Lanebrook.

(6)     During the course of 2009, Mr Kolomoisky paid approximately $90 million to Mr Shulman in further part settlement of the sums owed to Mr Shulman from the sale of the GDRs to Lanebrook. Mr Shulman and Mr Kolomoisky agreed that a further sum of approximately $27 million would be set off against monies owed by Mr Shulman to the Defendants in respect of another business investment.

(7)     On or around 3 February 2010, following demands by Mr Shulman, Mr Kolomoisky transferred to Mr Shulman three million of the outstanding GDRs owed to him.

58.     As at the present date, in breach of the Agreement and/or their duties and/or trust, the Defendants continue to hold and/or have failed to make payment of the outstanding sums owed to Mr Shulman, including interest which has accrued and continues to accrue at the Interest Rate, from the consideration paid under the Evraz Deal and/or from the sale of three million of Mr Shulman's GDRs to Lanebrook and/or from the interim dividend declared in respect of the GDRs in 2008. Further, the Defendants continue to hold and/or have failed to transfer to Mr Shulman the outstanding GDRs owed to him from the Evraz Deal and/or from the interim dividend declared in respect of the GDRs in 2008 (if any part of such dividend was paid to Mr Kolomoisky and/or Mr Bogolyubov by way of an issue of GDRs). In so acting, the Defendants have acted dishonestly, knowing that their conduct is contrary to the interests of Mr Shulman or being recklessly indifferent as to whether it is contrary to the interests of Mr Shulman.

59.     In the premises:

(1)     The Defendants are obliged to account to Mr Shulman for all sums and GDRs owed to him in respect of his share of the consideration paid by Evraz for the Ukrainian Assets and/or from the sale of three million of his GDRs to Lanebrook and/or from the interim dividend declared in respect of the GDRs in 2008, including monies owed by way of interest calculated at the Interest Rate;

(2)     Mr Kolomoisky and/or Mr Bogolyubov hold the said sums and assets on trust for Mr Shulman and/or they hold any traceable proceeds thereof for the benefit of Mr Shulman and must account to him in respect of the same and/or have been unjustly enriched and are obliged to make restitution in respect of the same; and/or

(3)     Mr Shulman seeks damages and/or equitable compensation for breach of the Agreement and/or for breach of fiduciary duty and/or trust.

**(iii)     Loss of value of the GDRs**

60.     Mr Shulman believes that the GDR element of the consideration paid by Evraz was received by an entity under the control of the Defendants by May 2008.

61.     However, in respect of the 3,353,228 GDRs owed to Mr Shulman which were not sold to Lanebrook in May 2008:

(1)     Three million GDRs were transferred to Mr Shulman in February 2010.

(2)     The outstanding 353,228 GDRs have not been transferred to Mr Shulman.

62.     Mr Shulman had requested (through Mr Novikov) that the GDRs be transferred to him. In failing to transfer the said GDRs to Mr Shulman at an earlier date, the Defendants acted in breach of the Agreement and/or their duties and/or trust.  Mr Shulman's position as to the precise date on which the Defendants were able to, and ought in compliance with their duties to, have transferred to Mr Shulman the 3,353,228 GDRs owed to him is reserved pending the receipt of disclosure by the Defendants, including disclosure as to the date on which the GDR element of the consideration paid by Evraz was received by the Defendants or an entity under their control.

63.     Had the Defendants transferred these GDRs to Mr Shulman at a date prior to February 2010, then Mr Shulman would have been able to, and would have, begun selling or hedging them at that point.

64.     As a result of the Defendants' breaches of the Agreement and/or their duties, Mr Shulman has suffered loss and damage and/or seeks equitable compensation in the amount of:

(1)     in respect of the three million GDRs received by Mr Shulman on 3 February 2010, the difference between (i) the highest value of the GDRs between the date on which the Defendants received them and 3 February 2010, alternatively the value

at which Mr Shulman would have sold or hedged the GDRs had they been transferred to him at an earlier date and (ii) their value on 3 February 2010;

(2)  in respect of the 353,228 GDRs which have been retained by the Defendants, the highest value of the GDRs between the date on which the Defendants received them and judgment, alternatively the value of the GDRs at which Mr Shulman would have sold or hedged the GDRs had they been transferred to him at an earlier date (alternatively the difference between those values and the value of the GDRs as at the date they are transferred by the Defendants to Mr Shulman).

65.  Without prejudice to Mr Shulman's reservation of his right to plead further in relation to the date on which the GDRs ought to have been transferred to him, the value of the GDRs, and (if necessary) the date(s) on which he would have sold the GDRs following such transfer, the GDRs had a value of $114 per GDR on 16 May 2008.  On that basis, the loss and damage and/or equitable compensation to which Mr Shulman is entitled is approximately $284 million, together with interest thereon at the agreed Interest Rate.

## G.   WARREN STEEL

### (i)   Failure to reimburse Mr Shulman for costs related to Warren Steel

66.  In around 2001 or 2002, and pursuant to the Agreement, Mr Shulman and the Defendants acquired Warren Steel (which comprised an old steel plant and a new steel plant located in Warren, Ohio) from a company in bankruptcy called CSC, Limited, as follows:

(1)  In around October 2001, a company registered in Malta and wholly owned by Mr Shulman, called Instrad Limited, acquired the equipment at the new plant at Warren Steel (the "**Equipment**") through an intermediary, and held it on trust for Mr Shulman and the Defendants.

(2)  In late November 2001, the two plants and the land on which they were situated were acquired and transferred to WSH, a new company incorporated on 19 November 2001.

67.  Mr Shulman and the Defendants agreed between themselves that:

(1)  The Equipment would be dismantled and transported to Ukraine to be used to furnish the Petrovsky Plant, which was then under reconstruction and being upgraded.

(2)   Ownership of the old plant and the land on which Warren Steel was situated would be split equally between Mr Shulman, Mr Kolomoisky and Mr Bogolyubov.

(3)   Mr Shulman, Mr Kolomoisky and Mr Bogolyubov would invest equally in Warren Steel and in any business opportunity relating to the land, and share equally the profits and losses derived therefrom.

68.   The purchase price of $13.5 million paid for Warren Steel was financed by Mr Shulman. Mr Kolomoisky and Mr Bogolyubov subsequently reimbursed Mr Shulman for two thirds of this price, representing their respective one third shares of the assets.

69.   In addition, between 2001 and 2005, Mr Shulman paid at least $5 million in costs relating to Warren Steel, comprising, *inter alia*, the following:

(1)   approximately $62,000 per month for security and utilities such as electricity;

(2)   approximately $340,000 in costs of dismantling the equipment;

(3)   approximately $500,000 in transporting equipment to and back from Ukraine; and

(4)   approximately $400,000 for safe storage of equipment in the port of Odessa between 2003 and 2005.

70.   In breach of the Agreement and/or their duties, the Defendants have failed to reimburse Mr Shulman for their respective one third shares of these costs, which they still owe to Mr Shulman together with interest at the Interest Rate and in respect of which Mr Shulman seeks payment in these proceedings. Further, Mr Shulman reserves the right to claim in respect of further costs which he incurred in relation to Warren Steel.

**(ii)   The Defendants' failure to act in good faith and honestly in relation to Warren Steel**

71.   In early May 2005, Mr Shulman, the Defendants, Instrad Limited and another company registered in Malta and wholly owned by Mr Shulman, called Plama Limited, agreed that Plama Limited would replace Instrad Limited as trustee of the Equipment for Mr Shulman and the Defendants. Legal title to the Equipment was duly transferred from Instrad Limited to Plama Limited in June 2005. Subsequently, it is Mr Shulman's understanding that, in or around November 2007, his and the Defendants' interest in the Equipment was transferred to WSH.

72.    During the course of 2005, Mr Kolomoisky proposed that Mr Shulman and the Defendants halt the dismantling of Warren Steel, return some of the Equipment which had been transported to Ukraine back to Ohio, and instead operate the steel plant in Ohio as a going concern. In accordance with the Agreement, any future profits generated by Warren Steel would be divided equally between Mr Shulman, Mr Kolomoisky and Mr Bogolyubov. Mr Shulman and Mr Bogolyubov agreed to this new plan.

73.    Thereafter, the Defendants have failed to act in good faith and honestly in relation to Warren Steel, both as to the ownership of WSH and in relation to its operations.

74.    In relation to the ownership of WSH, up until an investigation into Warren Steel was commenced by Mr Shulman's adviser, Ronny Pifko ("**Mr Pifko**"), at Mr Shulman's direction in around April or May 2012, it was Mr Shulman's belief that, consistent with the Agreement, and their agreement of the size of their respective interests in Warren Steel at the time of their investment in it, Mr Shulman, Mr Kolomoisky and Mr Bogolyubov each held an equal direct shareholding in WSH. However, that investigation revealed that Mr Shulman's shareholding had been transferred to an intermediary company incorporated in the British Virgin Islands, called Halliwel Assets Inc. ("**Halliwel**"). Pending disclosure and further investigation, Mr Shulman's current understanding as to the ownership structure of WSH derived from his ongoing investigations is as follows:

(1)    Halliwel was incorporated in the British Virgin Islands on 5 January 2006.

(2)    In around 2006, Mr Shulman provided examples of his signature to Mr Novikov to be used solely for the day-to-day running of the parties' joint investments, including WSH, but not for executing any substantive documents unless expressly approved by Mr Shulman.

(3)    By a unanimous written consent purportedly signed on 3 April 2008, each of Mr Shulman, Mr Kolomoisky and Mr Bogolyubov resigned as a shareholder of WSH and approved Halliwel as the sole shareholder of WSH. Mr Shulman has no recollection of having signed or approved the resolution, and the Defendants are put to proof as to its validity and legal effectiveness.

(4)    Up until 3 April 2009, the entire issued share capital in Halliwel was held by Panikos Symeou ("**Mr Symeou**"). Pursuant to a Deed of Trust dated 30 June 2006 and purportedly signed by Mr Shulman, Mr Symeou held a third of the issued shares in Halliwel as trustee for Mr Shulman. Mr Shulman has no recollection of

having signed or approved the Deed of Trust, and his rights in that regard are reserved.

(5)     On 3 April 2009, one third of the issued shares in Halliwel were transferred by Mr Symeou to Marigold Trust Company Limited ("**Marigold**"). It is Mr Shulman's understanding that Marigold is a nominee shareholder for Mr Bogolyubov.

(6)     Around the same time as Mr Shulman was asking Mr Kolomoisky for evidence of and clarification concerning an investment of $30 million allegedly made on Mr Shulman's behalf in WSH (as pleaded below at paragraphs 77 to 79), on or around 12 June 2012, the issued share capital of Halliwel was increased from 50,000 shares to 99,996 shares, held as to two-thirds by Mr Symeou and one third by Marigold, in the circumstances described at 79(6) below. On the same date, Mr Symeou purportedly executed a Declaration of Trust, stating that he held 33,332 shares in Halliwel on trust for Mr Shulman.

(7)     Mr Novikov informed Mr Pifko that the share capital was in the process of being increased in an email sent on 12 June 2012, and copied to Mr Shulman. By the same email, Mr Novikov said that there was no written shareholders' agreement concerning Halliwel or WSH. However, in his capacity as director of Halliwel, Mr Symeou appears to have approved an "Operating Agreement" in relation to WSH on 5 April 2008. That agreement purports to record capital contributions of $56,807,967 having been made by Halliwel as at the date on which it was purportedly entered into.

(8)     Having learned of the above arrangements as a result of the investigation into WSH, Mr Shulman instructed Mr Pifko to arrange for the shares held by Mr Symeou on trust for Mr Shulman to be transferred to a nominee company registered under the laws of Panama, called Hornbeam Corporation ("**Hornbeam**"). That transfer was approved by the board of Halliwel on 10 October 2012.

(9)     Instruments of transfer were subsequently executed by Hornbeam on 18 July 2014 and on 19 December 2014 at Mr Shulman's direction, transferring legal ownership of the shares held on trust for Mr Shulman to (respectively) Tectum Trust Management, a Liechtenstein company, and the Bracha Foundation, a Liechtenstein foundation ultimately beneficially owned by Mr Shulman. Mr Symeou, who is the sole director of Halliwel, refused to register either transfer on the grounds that they did not comply with pre-emption provisions in Halliwel's articles of association, the validity and applicability of which is not accepted and

in respect of which Mr Shulman reserves his rights. As a result, Hornbeam remains the registered shareholder in Halliwel.

(10)     Accordingly, as at the present date, 33,332 shares in Halliwel, representing one third of its issued share capital, are held on Mr Shulman's behalf by Hornbeam.

75.     In relation to the operations of Warren Steel, without Mr Shulman's prior knowledge or approval, and Mr Shulman believes at the Defendants' direction, WSH has purportedly borrowed substantial sums from companies related to the Defendants and/or their associates pursuant to purported loan agreements. In this regard:

(1)     By a resolution of WSH purportedly passed on 15 March 2007 by the members of WSH including Mr Shulman, Mordechai Korf ("**Mr Korf**"), who is a close business associate of the Defendants, was appointed as President of WSH. Mr Shulman has no recollection of having signed the resolution, and his rights in that regard are reserved.

(2)     By an email sent to Mr Shulman (who forwarded the email to Mr Pifko) on or around November 2012, Mr Novikov stated that WSH had entered into transactions described as "Intergroup Loans" for the total sum of $18,875,530.48 with five companies incorporated in the USA called Optima Acquisitions LLC ("**Optima Acquisitions**"), Optima Group LLC, Optima International, CC Metals & Alloys LLC and Felman Trading, Inc, and that Optima Acquisitions had made payments in the amount of $1,694,243.36 on behalf of WSH. To the best of Mr Shulman's knowledge and belief, each of these companies is ultimately owned and/or controlled by and/or associated with one or both of the Defendants and/or Mr Korf (collectively, "**Related Companies**").

(3)     Subsequently, by an email sent to Mr Pifko on 17 December 2012, Mr Novikov stated that the amount of the loans purportedly provided by Related Companies to WSH was $19,186,471. Mr Novikov added that these loans would be assigned to Halliwel for $1, following which Halliwel would subscribe for further shares in WSH, with its obligation to make payment for those shares being set off against WSH's outstanding liabilities under the said loans.

(4)     However, WSH's balance sheet as at 31 August 2013, which was sent by Mr Symeou to Mr Shulman's lawyer in Liechtenstein, Dr Verena Ernst ("**Dr Ernst**"), under cover of email on 15 November 2013, recorded outstanding loans in the amount of $56,290,895.90. The lenders of the alleged loans were reported to be Mr Korf personally, the Related Companies identified in paragraph 75(2) and

three further companies believed by Mr Shulman to be Related Companies (Optima Fixed Income LLC, Optima Ventures LLC and Querella Holdings Limited).

(5)     Mr Symeou also sent Dr Ernst on 15 November 2013 copies of loan agreements allegedly entered into by WSH between June 2008 and February 2013 with Mr Korf and the Related Companies identified in paragraphs 75(2) and (4) above, together with two further companies believed by Mr Shulman to be Related Companies (Optima International of Miami, Inc and 5251 36th Street LLC). The total amount allegedly loaned under those agreements was approximately $34 million. Each of the loan agreements and their accompanying promissory notes were signed by Mr Korf on behalf of both WSH and the lender.

(6)     By around 1 August 2014, WSH's alleged liabilities to Related Companies and Mr Korf had increased to $88 million. In this regard:

(a)     Under cover of email sent to Dr Ernst on 1 August 2014, Mr Symeou in his capacity as director of Halliwel, gave notice to Hornbeam of an extraordinary general meeting of Halliwel to be held on 8 August 2014 for the purpose of, *inter alia*, considering and, if thought fit, resolving to approve a resolution of WSH in respect of the restructuring of WSH's debt.

(b)     In addition to the notice of the extraordinary general meeting, Dr Ernst also attached an unsigned document headed "written consent of the sole member of Warren Steel Holdings, LLC, August 1st, 2014" (the "**WSH Resolution**"). The said document referred to 18 exhibits (labelled Exhibits A to R inclusive), and set out the resolutions proposed to be entered into by WSH in order to effect the restructuring of its debt.

(c)     Those exhibits were provided by Mr Symeou to Dr Ernst under cover of email sent on 4 August 2014. Exhibit A recorded 53 loan agreements allegedly entered into by WSH between 24 June 2008 and 19 December 2013, under which WSH's outstanding liabilities were reported to be $62,160,895.90. Exhibit B recorded accounts payable to Felman Production, LLC in the amount of $2,080,170.20 and to Felman Trading, Inc. in the amount of $23,985,945.46.

(d)     By a letter addressed to Halliwel on 7 August 2014 in relation to the proposed restructuring of WSH's debt, Mr Korf stated that WSH was

currently indebted to "*various related party lenders/creditors*" for approximately $88 million.

(7)     The proposed restructuring of WSH's debts included the entry into a further loan in the aggregate approximate amount of $25 million and the subordination of WSH's debts to the repayment of the new loan facility. On 20 August 2014 and in response to a request for further information regarding the restructuring from Dr Ernst, Mr Symeou revealed that the lender under the new loan agreement was Optima Acquisitions.

(8)     Unknown to Mr Shulman or his advisers until 19 September 2014, Mr Symeou, acting in his capacity as director of Halliwel, the sole registered member of WSH, had approved the proposed restructuring of WSH's debts on 1 August 2014. In this regard:

(a)     On 1 August 2014, the same date as Mr Symeou gave notice to Hornbeam of the extraordinary general meeting of Halliwel, Mr Symeou sent a signed version of the WSH Resolution to Artem Dolmatov of Primecap, a corporate services provider to companies related to the Defendants.

(b)     By an agreement purportedly entered into on the same date and signed by Mr Korf on behalf of Optima Acquisitions and WSH, Optima Acquisitions granted a loan in the sum of $15 million to WSH which was repayable on demand.

(c)     Despite having already approved the WSH Resolution, Mr Symeou agreed to three requests by Hornbeam for an adjournment of the proposed extraordinary general meeting of Halliwel to enable Mr Shulman and his advisers to review the restructuring proposals and associated financial documents. Mr Symeou refused Hornbeam's request for a fourth adjournment, with the result that on 29 August 2014 Hornbeam obtained a without notice interim injunction restraining the holding of the meeting on 29 August 2014 in anticipated proceedings before the High Court of Justice in the British Virgin Islands (the "**BVI Proceedings**"). The BVI Proceedings were issued on or around 15 September 2014.

(d)     It was only on 19 September 2014, shortly before the return date on the injunction, that Forbes Hare, lawyers acting for Mr Symeou and Marigold in the BVI Proceedings, informed Hornbeam, *inter alia*, that (i) the debt restructuring had already been approved by the WSH Resolution signed by

Mr Symeou on 1 August 2014, (ii) WSH had already received $15 million from Optima Acquisitions pursuant to that restructuring, and (iii) WSH would shortly need to draw down the remaining sum of approximately $10 million which had been made available under the restructuring. Because the debt restructuring had already been purportedly approved by Halliwel, the injunction lapsed on 13 October 2014 and the BVI Proceedings were dismissed.

(9)     Notwithstanding the significant loans that had purportedly been provided to WSH, on 11 March 2015, Mr Symeou gave notice of an extraordinary general meeting of Halliwel to consider and, if appropriate, decide on pursuing one of the following strategic options on the future of Halliwel's investment in Warren Steel:

(a)     an increase in the share capital of Halliwel by $24.5 million with a view to Halliwel making a contribution of $24.5 million to WSH so as to enable it to continue operating as a going concern; or

(b)     the engagement of a suitable investment banking firm to assess the business and prospects of WSH with a view to preparing an offer for the sale by Halliwel of its investment in WSH.

(10)    At the extraordinary general meeting on 31 March 2015, which was attended by a Swiss lawyer, Fabrizio Campanile, on behalf of Hornbeam, it was resolved (notwithstanding Mr Campanile's opposition) to engage a suitable investment banking firm to assess WSH with a view to preparing an offer for the sale by Halliwel of its investment in WSH. However, it appears that, prior to the meeting, representatives of WSH had already met with Houlihan Lokey, Jefferies and Sagent Advisors, each of which is an investment bank, concerning a potential sale of WSH. Of these firms, Sagent Advisors had proposed to reduce its transaction fee by 25% in the event that Optima Speciality Steel, which is believed to be a Related Company, or another related company acquired WSH.

(11)    In those circumstances, Mr Shulman and Bracha commenced proceedings in Ohio in June 2015 (and Hornbeam subsequently brought similar proceedings) seeking, amongst other things, to restrain the sale of WSH. A temporary restraining order was granted but the proceedings were subsequently dismissed, which decision is the subject of an outstanding appeal.

(12)    According to press reports, the Warren Steel plant has since closed.

76.   Pursuant to the Agreement and/or their fiduciary duties, the Defendants are obliged to account for their dealings in relation to and with Warren Steel and WSH, including as to any assets derived from the investment in Warren Steel and/or derived from WSH or its assets which are in the hands of the Defendants and/or under their control and extending to any dealings with WSH carried out through companies which they controlled. In the premises:

    (1)   Mr Shulman seeks such an account, together with all necessary enquiries in relation to the Defendants' dealings in relation to and with Warren Steel and WSH; and/or

    (2)   Mr Kolomoisky and/or Mr Bogolyubov hold any such assets on trust for Mr Shulman and/or they hold any traceable proceeds thereof for the benefit of Mr Shulman and must account to him in respect of the same and/or have been unjustly enriched and are obliged to make restitution in respect of the same.

## H.   MISAPPROPRIATION OF $30 MILLION

77.   At a meeting at Mr Kolomoisky's offices in Dnepropetrovsk in Ukraine in 2009, Mr Kolomoisky informed Mr Shulman that, of the consideration received pursuant to the Evraz Deal, he had invested $90 million into WSH, comprising a $30 million investment by each of Mr Shulman, Mr Kolomoisky and Mr Bogolyubov, which sum was alleged to be required to fund operations at Warren Steel.

78.   If that investment was made, it was made without Mr Shulman's knowledge or consent and in breach of duty and/or breach of trust.  As a result of the Defendants' breach of duty and/or trust, Mr Shulman has suffered loss and damage in the sum of $30 million.

79.   Further or alternatively, Mr Kolomoisky and Mr Bogolyubov have misappropriated the sum of $30 million and/or dealt with it for their own use, for which they are liable to account. In this regard:

    (1)   As pleaded above, Mr Kolomoisky first alleged in 2009 that the sum of $30 million had been invested in WSH on Mr Shulman's behalf in response to Mr Shulman's demands for the sums owed to him under the Evraz Deal and from the profits generated by the Ukrainian Assets. The sum of $90 million seemed to Mr Shulman to be significantly more than was required in order to re-open Warren Steel as an operating plant. Despite Mr Shulman's request, however, Mr Kolomoisky did not provide him with a business plan for WSH.

(2)     Subsequently, Mr Kolomoisky (or one of his associates) informed Mr Shulman that the purported investment into WSH had not been made in one sum in 2009 as Mr Shulman had previously been told, but had purportedly been invested in three equal instalments on 1 July 2008, 1 July 2009 and 1 July 2010.

(3)     Despite repeated demands, including on Mr Kolomoisky's yacht in or around the summer of 2010 and at various family parties in Monaco, Geneva and London between 2010 and 2012, Mr Kolomoisky failed to provide any documentation in support of or clarification in relation to the alleged investment in WSH until 7 May 2012.

(4)     Under cover of email sent on or around 7 May 2012 and purportedly by way of clarification of the manner in which Mr Kolomoisky had invested Mr Shulman's money in WSH, Mr Novikov described a complex structure to be entered into involving (i) the assignment to Mr Shulman and the Defendants of a series of loans which had purportedly been provided to Halliwel in 2006 by a company called Divot Enterprises Limited ("**Divot**", which Mr Shulman believes is also a Related Company), and (ii) the capitalisation of such loans. Prior to receipt of this email, Mr Shulman had not heard of Divot.

(5)     That structure was in direct contradiction with the representations made by Mr Kolomoisky in 2009 and 2010 that he had invested $30 million directly into WSH on Mr Shulman's behalf. Further, the purported loans were dated at least two years before the dates on which Mr Kolomoisky claimed that he had made the $90 million investment into WSH.

(6)     Pending disclosure and further investigation, Mr Shulman's understanding of that alleged structure is as follows:

(a)     By two separate financing agreements purportedly entered into on 30 June 2006 between Divot (as lender) and Halliwel (as borrower), Divot made interest free loans of, respectively, $30 million and $60 million, purportedly payable to the account of the "Primary Creditor" (respectively, the "**First Divot Facility**" and the "**Second Divot Facility**"). "Primary Creditor" was not defined under the agreements.

(b)     By a Deed of Assignment and Release purportedly executed by Divot, Halliwel and Mr Symeou on 30 April 2012, Divot (for no apparent consideration) assigned to Mr Symeou the right to repayment of the sum of $57,785,509.54 which Halliwel had allegedly drawn down under Second

Divot Facility. It is to be inferred that a similar deed was created in respect of the sums allegedly drawn down under First Divot Facility, assigning the right to repayment to Marigold.

(c)   By a resolution purportedly passed on 12 June 2012 by Marigold and Mr Symeou as the registered shareholders in Halliwel, Halliwel resolved to issue 16,666 shares to Marigold in return for $28,894,488.51 and 33,330 shares to Mr Symeou for $57,785,509.54. The recitals to the resolution recorded that the board of Halliwel had advised its shareholders that it considered it convenient to capitalise shareholder loans in the total amount of $86,679,998.05.

(d)   By a Set-off Agreement purportedly entered into between Marigold and Halliwel on 12 June 2012, the sum of $28,894,488.51 allegedly owed to Marigold by Halliwel was set off against an identical sum allegedly owed by Marigold to Halliwel in return for the issue of 16,666 shares.

(e)   By a further Set-off Agreement purportedly entered into between Mr Symeou and Halliwel on 13 June 2012, the sum of $57,785,509.54 allegedly owed to Mr Symeou by Halliwel was set off against an identical sum allegedly owed by Mr Symeou to Halliwel in return for the issue of 33,330 shares.

(7)   The Defendants have not provided any documentation demonstrating that WSH received or benefitted from any of the sums allegedly drawn down by Halliwel under the First Divot Facility or the Second Divot Facility. Further, the Defendants have not explained the reason for the difference between the sum of $90 million allegedly invested in Warren Steel and the sum of $86,679,998.05 allegedly owed under the First and Second Divot Facilities.

(8)   Further, the notion that WSH received an injection of funds in the amount of $90 million in 2009 (or between 2008 and 2010) is inconsistent with (i) the fact that according to a draft report produced for Mr Shulman by Western Reserve Valuation Services LLC dated 10 July 2013 (which was instructed on Mr Shulman's behalf), Mr Shulman's interest in Warren Steel was valued at only $1,230,000, (ii) the suggestion, referred to in paragraph 75(9) above that Warren Steel required a further injection of funds in 2015 to enable it to continue as a going concern, and (iii) the fact that Warren Steel has now closed.

(9)     Further, at a meeting held at Mr Shulman's apartment in Monaco on 28 August 2016, Mr Kolomoisky admitted to Mr Shulman that he had not invested $30 million into WSH on Mr Shulman's behalf but had dealt with the monies for his own use. Mr Kolomoisky purported to defend his conduct on the grounds that he was under pressure in Ukraine regarding his conduct in relation to PrivatBank, whilst Mr Shulman's business interests in the USA were prospering. Mr Kolomoisky asked Mr Shulman in Russian not to "*beat a man who is down*".

80.    In so acting, the Defendants have acted dishonestly, either knowing that their conduct is contrary to the interests of Mr Shulman and/or being recklessly indifferent as to whether it is contrary to the interests of Mr Shulman.

81.    In the premises:

(1)     The Defendants are obliged to account to Mr Shulman for the sum of $30 million, together with interest calculated at the Interest Rate; and/or

(2)     Mr Kolomoisky and/or Mr Bogolyubov hold the said sum on trust for Mr Shulman and/or they hold any traceable proceeds thereof for the benefit of Mr Shulman and must account to him in respect of the same and/or have been unjustly enriched in respect of the said sum and are obliged to make restitution in respect of the same;  and/or

(3)     Mr Shulman claims damages for breach of the Agreement and/or fiduciary duty and/or trust.

## I.    BREAKDOWN OF TRUST AND CONFIDENCE

82.    As a result of the Defendants' misconduct, the relationship of mutual trust and confidence between Mr Shulman and the Defendants has irretrievably broken down such that it is not reasonably practicable for them to carry on in business together and/or it is just and equitable that the Partnership be wound up.

83.    In addition to the breaches of the Agreement and/or duty pleaded above, Mr Shulman relies upon the Defendants' conduct in relation to his repeated requests that they settle the sums owed to him.

84.    In this regard, in 2008 and as referred to above at paragraph 44, after the Evraz Deal had been completed, Mr Shulman met with Mr Kolomoisky in Dnepropetrovsk in Ukraine. At that meeting, Mr Kolomoisky acknowledged that there were sums owed to Mr Shulman

which ought to be paid, and the Interest Rate was agreed. Following this, Mr Shulman asked his agent, Boris Veksler ("**Mr Veksler**"), to review the financial records of the Coke Plants to determine the sums owed between the parties.

85.   Mr Shulman and Mr Kolomoisky met again in Dnepropetrovsk in 2009, where they discussed Mr Veksler's figures. Mr Kolomoisky requested that the sums owed to Mr Shulman be divided into separate sections showing the sums owed from (i) the period 2000 to 2002 and (ii) the period 2003 to 2007. It was at that same meeting that Mr Kolomoisky claimed that he had invested the sum $30 million on behalf of each of himself, Mr Shulman and Mr Bogolyubov in WSH out of the sums received under the Evraz Deal, referred to above at paragraphs 77 to 79.

86.   Following the meeting in 2009, at Mr Shulman's instruction, Mr Veksler prepared tables which set out what Mr Shulman understood was owed to him from the profits generated by his joint investments and business dealings with the Defendants and the consideration paid under the Evraz Deal (giving credit for sums believed to be owed by Mr Shulman to the Defendants), including interest which had accrued at the Interest Rate, with the sums owed divided into two periods as requested by Mr Kolomoisky (the "**Tables**").

87.   Mr Veksler prepared the Tables with the assistance of Tatiana Guryeva ("**Ms Guryeva**") and Lyubov Chmona ("**Ms Chmona**"), respectively the Vice Chairman and Head of The Client Servicing Business at PrivatBank and the Deputy Chairman of the Management Board and Head of The Business On Industrial and Commercial Companies Budgeting at PrivatBank. Ms Guryeva and Ms Chmona, who reviewed the Tables on the Defendants' behalves, provided figures which allegedly represented Mr Shulman's share of the profits generated by the Petrovsky Plant and the YuGOK Plant (which were run by the Defendants until the Evraz Deal) and by Altay-Koks. Mr Shulman does not know whether the figures provided by Ms Guryeva and Ms Chmona were calculated on the basis that Mr Shulman's interest in the YuGOK Plant was 8.75% (as incorrectly represented by Mr Kolomoisky at the time of their investment) or 9.375% (being Mr Shulman's actual interest in the YuGOK Plant).

88.   In 2012, Mr Kolomoisky again accepted that Mr Shulman was owed money at a meeting at Mr Shulman's house in Monaco. Subsequently, on 2 June 2012, Mr Shulman sent Mr Kolomoisky the Tables electronically. As at that date, the Tables recorded a sum owed to Mr Shulman in excess of $72.5 million.

89.   Between 2008 and 2012, Mr Kolomoisky made a number of payments to Mr Shulman in part settlement of the sums owed to him by the Defendants. Mr Shulman applied those sums in settlement of interest owed on the outstanding monies to him and then (as

appropriate) in settlement of the principal sums owed to him. However, those payments ceased in around the middle of 2012 without any explanation, leaving a significant amount outstanding.

90.     In August 2013, Mr Shulman and his family again holidayed with the Defendants and their families in Greece and Croatia. During the course of that holiday, Mr Shulman showed the Tables (as by then updated to take account of payments received and the further interest which had accrued) to Mr Kolomoisky. In response, Mr Kolomoisky said that he would settle the outstanding debts upon his return home.

91.     Thereafter, despite Mr Shulman's attempts to contact the Defendants in September and October 2013, the Defendants refused to respond to him until around spring 2015 when Mr Bogolyubov telephoned Mr Shulman concerning the BVI Proceedings and separate proceedings which Mr Shulman had commenced against the Defendants in the United States. In response to a request by Mr Shulman for payment of the outstanding sums owed to him, Mr Bogolyubov claimed that he had not "personally" taken any money from Mr Shulman. Mr Bogolyubov repeated the claim that this was "just business" and "not personal" at a meeting in the lobby of the Hotel de Paris in Monaco in around spring 2016.   If and to the extent that Mr Bogolyubov was seeking to suggest that he was not personally liable to account to Mr Shulman for the profits and assets of the Partnership business, that is wrong for the reasons set out in these Particulars of Claim.

92.     Mr Shulman subsequently met with Mr Kolomoisky on 28 August 2016 at Mr Shulman's apartment in Monaco. At that meeting, Mr Kolomoisky and Mr Shulman looked together at the Tables. Whilst he queried the previously agreed Interest Rate, Mr Kolomoisky did not dispute that he and Mr Bogolyubov owed Mr Shulman monies from the profits generated from their joint investments and business dealings and the consideration paid under the Evraz Deal.

93.     Because the Defendants had failed to make or procure payment to Mr Shulman of the outstanding sums owed under the Tables, Mr Shulman sent Mr Kolomoisky the Tables again on 8 September 2016. Mr Kolomoisky replied on 10 September 2016 stating that he had reviewed the Tables and was collecting information in relation thereto.

94.     Since 10 September 2016, neither of the Defendants has made any further payments to Mr Shulman or provided any information.

**J.**      **RELIEF TO WHICH MR SHULMAN IS ENTITLED**

95.      As a result of the Defendants' breaches of statutory and/or fiduciary duty and/or the Agreement and/or trust, the relationship of mutual trust and confidence between Mr Shulman and the Defendants has irretrievably broken down. In the premises, Mr Shulman seeks an order that the Partnership be dissolved pursuant to section 35 of the Act on the grounds that:

    (1)      the Defendants have been guilty of such conduct as is calculated to prejudicially affect the carrying on of the business; and/or

    (2)      the Defendants have wilfully or persistently committed breaches of the Agreement, and/or have otherwise conducted themselves in matters relating to the partnership business that it is not reasonably practicable for Mr Shulman to carry on business in partnership with the Defendants; and/or

    (3)      the circumstances described above render it just and equitable that the partnership be dissolved.

96.      Further, Mr Shulman claims an account on the dissolution of the Partnership and/or on the footing of wilful default, together with the payment of all sums found due on the taking of such account.

97.      Further or alternatively, Mr Shulman seeks a declaration that Mr Kolomoisky and Mr Bogolyubov hold all assets (and/or rights to control the same) acquired as a result of investments made pursuant to the Agreement, together with the proceeds derived from those investments, on trust for Mr Shulman. Mr Shulman is entitled to assert his proprietary interest in any such assets or the traceable proceeds of such assets and seeks injunctive relief in support of that proprietary interest and/or delivery up of the same.

98.      Further or alternatively, Mr Shulman claims restitution of all the sums and assets by which the Defendants have been unjustly enriched at his expense.

99.      Further or alternatively, Mr Shulman claims damages and/or equitable compensation for the losses incurred as a result of the Defendants' breaches of fiduciary duty and breaches of the Agreement.

100.      Mr Shulman claims interest on all sums found due to him at the Interest Rate, and/or compound interest in equity and/or interest pursuant to section 35A of the Senior Courts

Act 1981 and/or pursuant to section 42 of the Act on all sums found due to him compounded at such rate and for such period as the Court thinks fit.

**AND THE CLAIMANT CLAIMS:**

(1)     A declaration that the Agreement constituted or gave rise to a partnership between the Claimant and the Defendants;

(2)     A declaration that the Partnership was dissolved as from October 2013, further or alternatively an order that the Partnership be dissolved;

(3)     An order that the affairs of the Partnership be wound up;

(4)     Further or alternatively, a declaration that the Agreement constituted a joint venture between the Claimant and the Defendants pursuant to which and/or as implied terms of which the Defendants owed the Claimant fiduciary duties including a duty of loyalty and a duty to account;

(5)     All necessary accounts and enquiries be taken and made, in particular but not exclusively as to:

   a.   the profits generated by the parties' joint investments and business dealings, the Defendants' dealings with those profits and other partnership assets, and the sums due to Mr Shulman;

   b.   the monies and/or GDRs owed to the Claimant under the Evraz Deal, including the sum of $30 million alleged to have been invested in WSH by the Defendants on the Claimant's behalf, and the Defendants' dealings with that sum;

   c.   the investment in and the Defendants' dealings with Warren Steel and WSH;

(6)     An order for payment by the Defendants to the Claimant of any sums found due on taking such an account or accounts and interest on those sums;

(7)     Further or alternatively, a declaration that the Defendants hold all assets (or rights to hold such assets) acquired pursuant to the Agreement or otherwise and/or the proceeds of the same on trust for the Claimant;

(8)     An enquiry be made as to what assets are held on trust by the Defendants for the Claimant;

(9)   A proprietary injunction restraining dealings with the Claimant's property and/or any assets derived therefrom and/or delivery up of the same;

(10)   Restitution as aforesaid;

(11)   Damages and/or equitable compensation as aforesaid;

(12)   Interest as aforesaid;

(13)   Costs;

(14)   Further or other relief.

### HOGAN LOVELLS INTERNATIONAL LLP

**Statement of Truth**

I believe that the facts stated in these Particulars of Claim are true.

Signed................................................................

Date... 12. 05. 2017 .................................................